

Dirty
Money

# The Class Action Industrial Complex

## Congress tried to crack down on the class action racket in 1995. Today shareholder suits are bigger than ever, fed by a cozy cabal of lawyers, unions and public pension funds. **The only real loser is you.**

By Neil Weinberg and Daniel Fisher

HREE YEARS AGO A COUPLE OF LITTLE-KNOWN LAW FIRMS STOOD POISED TO REAP THE BIGGEST shares of a huge legal fee: $262 million—$10,861 per billable hour—for their role in landing a $3.2 billion settlement against scandal-scarred Cendant Corp. Then Leslie Conason got in their way. Conason, a staff lawyer for New York City, whose pension fund was one of three lead plaintiffs represented by the two firms in the Cendant suit, was outraged by the sum. She tried coaxing the pair of firms—Bernstein Litowitz Berger & Grossmann of New York and Barrack, Rodos & Bacine of Philadelphia—into taking less. They refused. When she asked the presiding judge in the Cendant case to scale back the legal windfall, she was rebuffed. Then she appealed to the U.S. Third Circuit Court of Appeals.

ELWOOD SMITH FOR FORBES

Conason was baffled when her partners wouldn't oppose a $262 million dollar legal bill.

Leslie Conason: a lonely fight against $10,800-per-hour fees.

Dirty Money

The appeals court called the fees "staggering" and ordered the parties to agree on a smaller sum. In the brawl that ensued, the law firms accused their client Conason of reneging on a deal. They filed complaints with her boss. "It was a very ugly experience," she says. But she prevailed. When the dust settled, the lawyers had cut their fee to $55 million, letting the $207 million difference go to the city fund and thousands of other shareholders.

But here's the weird part: Conason had to wage this fight alone. The other two lead plaintiffs—the New York State Common Retirement Fund and the California Public Employees' Retirement System—did not join her push for lower fees. Never mind that if she won, the two funds would get more money. "As fiduciaries, we [city officials] were all scratching our heads that New York State and Calpers weren't interested in opposing the $262 million fee," Conason says.

H. Carl McCall, who at the time was state comptroller and the sole trustee of the New York State fund (assets: $116 billion), says there was no need for him to challenge the legal fees because the city was taking care of it. Was that the only reason he wasn't complaining about the $10,861-per-hour fee?

McCall's ties to the two law firms are close. He played a role in naming Bernstein Litowitz and Barrack, Rodos to handle the Cendant case and a few others, including a suit against WorldCom and Citigroup in the wake of the telco's belly flop. Citigroup has agreed to pay $2.65 billion to settle. Barrack, Rodos and Bernstein Litowitz will reap the biggest pieces of a $144 million payday if the court agrees.

McCall, meanwhile, received $140,000 in campaign contributions from the two class action firms between 1998 and 2002. That had no impact, either, McCall asserts. "They not only contributed to me but happen to be major Democratic donors," he says. His successor, Alan Hevesi, received $55,000 in 2002 from the two law firms and affiliated political action committees.

And so it goes in the cozy confines of the class action racket. Plaintiff lawyers give handily to the politicians who hire them. They hire ex-insiders to woo pension funds, fete clients at cushy conferences and pay referral fees to powerbrokers who hook them up with new pension plaintiffs. None of this is illegal per se; nor does it violate existing rules of legal ethics. But even some lawyers have problems with it.

"This is corruption on a grand scale," says class action lawyer Howard Sirota of New York, who says payola by his rivals may force him out of the game. Contributing cash to the officials who oversee your business "is illegal in municipal finance. The American Bar Association [discourages] it. A grand jury is investigating

ERICA BERGER FOR FORBES

it (*see* FORBES, *Feb. 16*). And absolutely nothing happens," Sirota says.

Last year plaintiff shareholders won $3 billion in class actions against the companies they had invested in, says Institutional Shareholder Services. (Let's ignore, for now, that often they drain money from companies in which they still hold a stake; *see box on this page.*) The take was distributed in small chunks to thousands upon thousands of recipients. But $800 million of it will go to a small circle of very lucky people: securities plaintiff lawyers.

The plaintiff lawyers had help in amassing their $800 million take—from pension fund trustees who are oblivious, defense attorneys who won't challenge the fees because it might prompt the other side to push for an even bigger settlement and insurers who are happy to charge higher premiums to cover the rising costs of litigation.

The Republican-controlled Congress hoped to smash this lawsuit cabal when it passed the Private Securities Litigation Reform Act in 1995. It was touted as the end of frivolous class actions and obscene fees. In the past, firms such as Milberg Weiss Bershad Hynes & Lerach raced to the courthouse when a company fell into trouble, filing a fast case in the name of an Average Joe. "I have the greatest practice of law in the world. I have no clients," FORBES once quoted former Milberg Weiss partner William Lerach as saying.

The reform law hands control to big institutional investors. Nicknamed the "Anti-Milberg Weiss Act," it requires that lead plaintiff status must go to the investor who suffered the greatest loss. Big investors, Congress hoped, would shun frivolous suits and push to cut legal fees.

But the act has morphed into an industrial-strength shakedown. Trial lawyers reached out to new partners: the boards of public and union pension funds. They often include union veterans unabashed about suing corporations. These boards, rather than cutting back on lawsuits and pressing lawyers for lower fees, have jumped into bed with them.

The law firms Bernstein Litowitz and Barrack, Rodos have proved especially deft in this new world. Bernstein Litowitz, with 36 lawyers, landed nine settlements last year, worth $950 million in damages, second only

## Negative-Sum Game

Class action lawyers like to crow about how much money they recover for shareholders, but much of the windfall comes from their clients' own pockets, a kind of robbing Peter to pay ... Peter. Face it: Whether the proceeds come from the company or its insurers, investors ultimately foot the bill. "You're just taking money out of one pocket and putting it in the other," says Keith Johnson, chief counsel for the State of Wisconsin Investment Board.

Even when investors in, say, WorldCom, exact recompense from an outside party such as the company's banker, Citigroup, big institutions and anyone who owns a large-cap index fund likely are just taxing themselves. Lawyers, of course, disagree. "Most of our clients sold stock [at a loss] due to a wrong, and they're entitled to recourse," says Max Berger, senior partner at Bernstein Litowitz Berger & Grossmann. "That current shareholders [ultimately] pay for it is unfortunate but doesn't mean the company shouldn't pay."

Last year securities-fraud settlements ran an average of $21 million per case, and half of all settlements came in at less than $6 million, says Cornerstone Research. Big companies typically buy $40 million or more in insurance coverage for directors and officers, so they are mostly covered. To public companies, that makes such suits just another cost of business. But it's a rising one: The median price for D&O insurance rose 61% in three years to $50,000 in 2003. Class actions are a growth business for insurers and for law firms on both sides of the table.

Oxford Health last year settled a case for $300 million, with $75 million coming from its accountants. The company also took a $182 million pretax charge for the amount not covered by its insurance. The result was a cash dividend paid to former Oxford shareholders by current ones. Anyone who held on throughout paid himself—minus $84 million in fees for the plaintiff lawyers.

A rare exception is a Wisconsin suit against Anicom. The $40 million settlement included $12.4 million from Anicom's former chairman, Alan Anixter, and his son, Scott. That is because Wisconsin hired outside the usual lawyer pool and dangled a 5% "kicker" for any money won from other parties.

—D.F. and N.W.

EDWARD SMITH FOR FORBES



to Milberg Weiss, says Institutional Shareholder Services. Barrack, Rodos, with half as many lawyers as Bernstein, did five settlements last year, for $390 million, ranking fifth, ISS says.

Bernstein Litowitz sues on behalf of public pension funds in New York, Florida and Louisiana and has focused on big institutions since its inception in 1983. It is run by Max Berger, a fatherly senior partner with an unabashed affection for class actions. "I wanted to get into this business because I believed I could make a good living and do good," he says. He is proud to have recouped 40 cents and 50 cents of each dollar lost in the Cendant and 3Com cases, respectively, compared with an average of just 5 cents in such cases.

Leonard Barrack, a tough-talking Temple Law School grad, founded Barrack, Rodos in Philadelphia in 1976 and made it into a class action powerhouse. The firm goes to war for public pension funds in New York and Florida and several big union funds in Chicago. How it landed some clients is the subject of a federal grand jury investigation and a lawsuit settled last month. Barrack was the chief fundraiser of the Democratic National Committee in 1998 and has given upwards of $100,000 a year to Democratic pols. He declined to be interviewed for this story.

All told, public and union pension funds were lead plaintiffs in 28% of investor class actions last year; in 1996 they led just 3% of cases, says PricewaterhouseCoopers. Yet they have done nothing to improve shareholder recoveries or reduce significantly the lawyers' cut. "We have a system where the courts consistently allow law firms to file cases on behalf of figureheads," complains University of Arizona law professor Elliott Weiss. Translation: The lawyers still run the show. It is a pointed criticism, for Weiss did the research on class action settlements that helped shape the reform act.

## Pounds of Flesh

Class action lawyers won $3 billion from investors last year and distributed it mostly to the same shareholders—less their own $800 million cut.

| Law firm | Securities class action settlements in 2003 ($mil) | Fees and expenses as percent of settlements |
|---|---|---|
| Milberg Weiss Bershad Hynes & Lerach | [illegible] | 30% |
| Bernstein Litowitz Berger & Grossmann | [illegible] | 23.5 |
| Grant & Eisenhofer | 610 | 36 |
| Goodkind Labaton Rudoff & Sucharow | 551 | 40 |
| Barrack, Rodos & Bacine | 390 | 35.5 |

*Source: Securities Class Action Services; Verteris Corp.*

Even some pension fund officials admit the lawyers, not the funds, guide this class action assault. "We don't go to them, they come to us. They're simply looking for lead plaintiffs," says William Reeves, general counsel to Teachers' Retirement System of Louisiana, a Bernstein Litowitz client in eight recent suits.

Some of the pension plans are motivated by greed, some by ideology. "The thinking was, 'If we can get something for nothing, why not?'" says Coleman Stipanovich, executive director at Florida's state employee pension plan, one of the most litigious funds of the past decade. He took over in 2002 and says this is no longer the case. Something for nothing? Yes, if you believe that the insurance premiums that keep this racket going are paid by the tooth fairy. It would be more accurate to say that the premiums are paid by corporations, and thus, ultimately, by the shareholders who are the supposed beneficiaries of this litigation.

At the Jacksonville [Fla.] Police & Fire Pension Fund, a Bernstein Litowitz client, suing big business for fraud seemed a fitting step. "Every day our members put people in jail for auto theft and armed robbery. It was logical to leap from enforcing local laws to going after boardroom bandits," says John Keane, a former cop who is the administrator of the $900 million fund.

The Jacksonville fund is the lead plaintiff in a class action accusing Nextcard of underreporting loan losses; it also leads a case pending against El Paso Corp. Keane has parlayed this into regular speaking gigs, traveling to Bernstein Litowitz investor forums that also have featured Carl McCall, the ex-comptroller for New York, and New York Attorney General Eliot Spitzer, Wall Street slayer.

In other instances pension officials are barely aware they are suing at all or pay no attention to how much their lawyers are earning. "I'm not aware of any particular litigation," says Earl Richard, a trustee of the Louisiana School Employees' Retirement System. Among the five cases in which the $11.6 billion fund has been a Bernstein Litowitz client recently are those against Lucent Technologies, 3Com and Finova. A trustee for the separate state teachers' fund says it never occurred to him to ask what share of the court awards goes to the lawyers, though this was a role Congress clearly wanted fund officials to take on.

Despite its New York roots, Bernstein Litowitz is especially influential in Louisiana. The state's public pension funds have retained the firm for at least 15 class actions. Bernstein Litowitz has contributed more than $90,000 to Louisiana politicians since 1996. It gave $38,000 last year, 83% of its contributions nationally.

The connection goes back seven years to when Douglas McKeige, head of Bernstein Litowitz's new-business group, got together with Tulane law school chum G. Anthony Gelderman III to ask for his help in signing up Louisiana's public pension funds. A New Orleans native and stalwart of the city's elite, he is married to a former Mardi Gras queen of carnival and resides in the swanky Garden District. Gelderman said he knew little about the new reform act but could offer good connections. He had been chief of staff and general counsel to the former Louisiana treasurer, Mary Landrieu, who now is a U.S. senator.

Gelderman, now counsel to Bernstein Litowitz in New Orleans, has brought eight Louisiana funds on board and takes a cut of all business generated by his sign-ons. One connection is through Louisiana Treasurer John Neely Kennedy, a trustee for three of the

public pension funds that are represented by Bernstein Litowitz in a total of 13 suits. Kennedy is running for the U.S. Senate, and last year Gelderman arranged for Bernstein Litowitz partners to attend a fundraiser—in New York—for the Louisiana politician.

Bernstein Litowitz partners and affiliates have contributed at least $24,000 in two years to Kennedy, plus thousands more to Senator Landrieu; Charles C. Foti Jr., the Louisiana attorney general and trustee of one client fund; and Lambert Boissiere, a state senator and director of four client funds. Bernstein Litowitz's Berger says he contributed to Kennedy as a favor to Gelderman and wasn't even aware the state treasurer is a director of client funds. "I support people I think are courageous and support issues important to my business, like litigation that creates accountability," Berger says.

Gelderman says he has "no concerns whatsoever" about the ethics of Bernstein Litowitz funding Louisiana pols who can help it win business. "I had credibility and access, and, more importantly, the firm is the best in the business," he says.

To be sure, the trustees at Kennedy's three funds aren't directly responsible for selecting counsel; they appoint administrators who handle that. The lawyers make contributions anyway. "If a politician approaches them [law firms] and says he's on a fund's board, they don't want to piss 'em off," says Reeves, general counsel to Louisiana teachers' fund.

Bernstein Litowitz, like other firms in the class action field, offers free "portfolio monitoring" to pension-fund clients, tapping into their portfolios electronically and alerting them to potential lawsuits.

One lawyer who works for pension funds in Florida receives e-mails every week from big class action firms prowling for clients, with queries sometimes arriving within minutes of each other after new cases are filed. Florida lawyers get their cut: up to 18%, he says. Such fees are typically described as compensation for work as local liaison rather than purely for referring a client, which violates legal ethics in most states.

The outside counsel to the Jacksonville Police & Fire Fund, Robert Klausner of Plantation, Fla., receives a varying cut of lawyer fees for work on cases he refers to class action firms, on top of a retainer for routine work. Fund trustees seem largely unaware of Klausner's arrangement. "There are a lot of suits we're probably involved in because our attorney [Klausner] is involved in a lot of things," says Barbara Jaffe, a Jacksonville fund trustee and an adviser with Wachovia Securities. Trustee Bobby L. Deal, a lieutenant with the Jacksonville police, says of Klausner: "He's on retainer. If there's any other compensation, I'm not aware of it." Klausner says his pay is adequately disclosed and that it's the job of the fund's administrators to keep the trustees well informed.

Bernstein Litowitz also pays Klausner a sum he won't disclose (and which Berger puts

## Money on the Table

You knew this already: In a lawsuit only the lawyers win. Their average cut of shareholder settlements still hums along at 28% of the total award, barely down from 30% when Congress tried to throttle them by passing the Private Securities Litigation Reform Act of 1995. Before the reforms investors got only 7 cents back for every dollar allegedly lost; since then their take has fallen to just a nickel, says Cornerstone Research.

Yet the fees would fall if only big investors would fight them. When New York City officials challenged huge fees in the Cendant settlement, an appeals court agreed and the take was whacked down to 1.7% of the $3.2 billion award. Many times, though, the results are absurd. In a suit against Halliburton, Philadelphia class action firm Schiffrin & Barroway negotiated a $6 million settlement for investors who had owned the stock until May 2002. Subtract the $2 million, or 33%, in fees the law firm is seeking and its lead plaintiff, Private Asset Management, will recover less than $40 of its $800,000 loss.

Expenses can gobble up millions more. In a suit against Enron, Milberg Weiss recently submitted a "partial" reimbursement request listing $1.5 million for photocopying and $866,000 for restaurants, hotels and transportation. All told, expenses among the ten leading class action shops gobbled up 3.8% of shareholder recoveries last year, says Verteris, which tracks such data. Most investors awarded money in class actions never collect it. Only one-third of the big institutions eligible to share in awards actually file to receive them, according to research by James Cox and Randall Thomas, law professors at Duke and Vanderbilt, respectively. They cite poor understanding of the process. What of the money that goes unclaimed? In some cases the investors who do apply divvy it up. In others, insurers never have to pay it out. Some judges even require that it go to charity. The lawyers, of course, get paid regardless. —*N.W. and D.F.*





Dirty
Money

at up to $30,000) to be the only class action lawyers with access to Klausner's annual pow-wows of pension officials. The firm will spend a similar sum hosting a cocktail party for fund officials at a Council of Institutional Investors get-together in September. It also cosponsors Guns & Hoses, an annual police and firemen's fund conference slated for San Diego in October.

"You just don't know what pecuniary rewards [fund officials] derive from aligning with a certain law firm," says Duke law professor James Cox. "It can run the gamut from outright corruption down to just feeling important when they call you up and take you to hearings." After the reform act passed, Barrack, Rodos got hired by the Pennsylvania state treasurer at the time, Catherine Baker Knoll, a Democrat. In 1996 she tapped the firm to represent state pension funds. Knoll later received $36,500 in contributions from the law firm. But in 2000 then-governor Tom Ridge, a Republican, concluded that Knoll had overstepped her authority. The Pennsylvania funds have since scaled back their legal efforts. Knoll says through a spokesman that Barrack was selected via competitive bidding.

Barrack, Rodos also has a tight relationship with the Philadelphia Pension Board, a client it wanted to represent in a shareholder case against Network Associates a few years ago. The federal judge in the case demanded to know why the pension board had hired Barrack, Rodos without seeking other offers. It later emerged that the city solicitor wrongly stated he had never received campaign money from the firm—when, in fact, he had.

So the judge ordered the plaintiffs to put the case up for competitive bidding. Rather than go along with that, the city pension board withdrew from the case entirely. When the legal work ultimately was handed out, the winners agreed to charge only a 7% cut of any award rather than the usual 30% or so. A federal investigation into the Barrack-city relationship is pending.

Barrack, Rodos also hired Sara Biden, sister-in-law of U.S. Senator Joseph Biden (D–Del.), in a deal that landed it in court. Sara Biden came on board in 1997 to woo municipal and union pension funds. She flew around on Barrack's own plane and helicopter, landing the lawsuit-happy Florida State Board of Administration and the Communications Workers of America and several other pension funds as clients. All told, Biden argues she generated $96 million in fees for Barrack, Rodos, entitling her to $4.8 million, a 5% cut.

But after Biden found out last year that her boss was paying other go-betweens double the cut she was getting, things got ugly. Barrack claimed she failed to earn the $2 million the firm had already paid her and that she ran up extravagant travel expenses for herself and her family. Neither side would comment; the cases were settled last month for undisclosed terms.

Undeterred, Barrack earlier this year hired for a similar role Regina Calcaterra, formerly a lawyer for New York City's pension system and chief lobbyist for then-city comptroller Alan Hevesi. Congress wanted savvy experts like her to get involved when it set out to reform the class action racket nine years ago. This probably wasn't what it had in mind. **F**

## Golden Triangle

Powerful lawyers and the politicians they fund have turned public pensions into Wall Street's latest legal scourge.

### H. Carl McCall

**As the New York State pension fund's overseer, he kept silent while its outside lawyers stood to earn $10,800 per hour—the same lawyers who later contributed $140,000 to his political campaigns.**

### Max Berger

**Friends in high places and campaign contributions have helped the Bernstein Litowitz partner quietly build the second-biggest class action shop in the law business.**

### G. Anthony Gelderman III

**The New Orleans Brahmin has used political ties to turn Louisiana's pension funds into a profit center for his New York law firm, Bernstein Litowitz.**

McCALL: DANIEL ACKER / BLOOMBERG NEWS; BERNSTEIN: DOUGLAS LEVERE; GELDERMAN: TIM MUELLER / THE ADVOCATE