## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ERIC FORSYTHE, Individually And On Behalf Of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>SUN LIFE FINANCIAL INC., et al., )<br><br>Defendants. ) | Civil Action No. 04cv10584 (GAO)<br><br>**Consolidated Cases Nos.:**<br><br>04cv10764 (GAO)<br>04cv11019 (GAO) |

## CONSOLIDATED AMENDED COMPLAINT

1.      Plaintiffs, by and through their counsel, allege the following based upon the investigation of counsel, which included interviews with persons with knowledge of the conduct complained of herein and a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, and advisories, press releases, media reports, news articles, academic literature, and academic studies.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.      This is a class and derivative action based upon, among other things, the charging of excessive and improper fees and expenses to Massachusetts Financial Services ("MFS") mutual fund investors by the Massachusetts Financial Services Company ("MFS Company"), the investment adviser of the MFS family of mutual funds, and those of its parent, subsidiaries and affiliates also named herein (collectively referred to hereto as "MFS Defendants" or "Defendants").  Defendants then used these fees, in part, to improperly pay kickbacks and induce brokerage firms to steer more investors into MFS mutual funds (the "MFS Funds" or the

"Funds").  As a result of their material omissions and other conduct detailed below, Defendants

are liable under the Investment Advisers Act of 1940 (the "Investment Advisers Act"); the

Investment Company Act of 1940 (the "Investment Company Act"); for unjust enrichment; and

for breaches of their fiduciary duties to a class (the "Class") of all persons or entities who held

one or more shares or other ownership units of MFS Funds, as set forth in Exhibit A hereto,

during the period March 24, 1999 to March 31, 2004, inclusive (the "Class Period"), and who

were damaged thereby.

    3.    In essence, Defendants used MFS Fund investor assets to pay kickbacks to

brokerages in exchange for the brokerages steering their clients into MFS Funds.  Defendants

referred to this as buying "shelf-space" and satisfying "strategic alliances" with brokerages

whereby they made undisclosed and improper payments to brokerages including Morgan

Stanley, Salomon Smith Barney, Wachovia Securities, Merrill Lynch and Chase Investment

Services, among others, to induce them to direct investors into MFS Funds.  Defendants paid the

brokerages to push MFS Funds through the use of directed brokerage -- awarding a brokerage

firm the business, and resulting commissions, of conducting transactions of the fund's underlying

securities -- payments of cash, and through the other means described below.  Then, once

invested in one or more of the MFS Funds, the investors were charged and paid undisclosed fees

to Defendants that were used improperly by Defendants to pay brokers to push MFS Funds on

still more investors in order to increase the level of investments in MFS Funds.

    4.    MFS Company was motivated to engage in this undisclosed plan of charging

excessive fees to Fund investors to capitalize on Defendants' scheme to induce brokers to steer

investors into MFS Funds.  The fees MFS Company collected for managing and advising the

MFS Funds were calculated as a percentage of the Funds' value and, therefore, increased as the

assets invested in the MFS Funds grew.  While MFS Company thus benefited from the increase in Fund assets, neither the Funds nor the Fund investors benefited from expanding the size of the Funds.

5.    Defendants' practice of charging excessive fees and commissions to MFS Funds investors to pay and induce brokers to steer investors into MFS Funds necessarily created material insurmountable conflicts of interest for the brokers who were purportedly acting in the best interests of their clients – but, in fact, were only concerned with their pay-offs from MFS Company.

6.    The practice of charging excessive fees and commissions also created material insurmountable conflicts of interest for the investment advisers to the MFS Funds who had a duty to act in the best interests of fund investors, but were, in fact, primarily concerned with siphoning fees from MFS Funds investors to induce brokers to increase artificially the amount of investment in MFS Funds.

7.    The truth about MFS Company began to emerge on November 17, 2003 when the SEC and the National Association of Securities Dealers ("NASD") fined and sanctioned the brokerage house Morgan Stanley for, among other wrongdoing, accepting Defendants' impermissible payments in exchange for aggressively pushing MFS Funds over other mutual funds through a program known as the "Partners Program."  Pursuant to the November 17, 2003 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions In The Matter of Morgan Stanley DW, Inc. (the "Morgan Stanley SEC Cease-and-Desist Order"), Morgan Stanley was required to "place and maintain on its website within 15 days of the date of entry of the Order disclosures respecting the Partners Program to include . . . the fund complexes participating in the program." *See*

http://www.sec.gov/litigation/admin/33-8339.htm at ¶ 43a.  As a result, on December 1, 2003,

the Morgan Stanley website acknowledged that MFS was one of the fund families that

participated in the Partners Program.  *See* www.morganstanley.com/cgi-

bin/morganstanley.com/pressroom.cgi?action=load&uid=306.

8.     In the action against Morgan Stanley, the SEC condemned practices which

include those identical to the ones complained of herein stating that:

> This matter arises from Morgan Stanley DW's failure to disclose
> adequately certain material facts to its customers . . . [namely that]
> it collected from a select group of mutual fund complexes amounts
> in excess of standard sales loads and Rule 12b-1 trail payments.
>
> *              *              *
>
> Although the Asset Retention Program and Partners funds'
> prospectuses and SAIs [Statements of Additional Information]
> contain various disclosures concerning payments to the broker-
> dealers distributing their funds, none adequately disclose the
> preferred programs as such, nor do most provide sufficient facts
> about the preferred programs for investors to appreciate the
> dimension of the conflicts of interest inherent in them.  For
> example, none of the prospectuses specifically discloses that
> Morgan Stanley DW receives payments from the fund complexes,
> that the fund complexes send portfolio brokerage commissions to
> Morgan Stanley DW or Morgan Stanley & Co. in exchange for
> enhanced sales and marketing, nor do they describe for investors
> the various marketing advantages provided through the programs.

*See* Morgan Stanley Cease And Desist Order, at http://www.sec.gov/litigation/admin/33-

8339.htm.

9.     The SEC concluded that such conduct violated Section 17(a)(2) of the Securities

Act of 1933 ("Securities Act"), among other statutes, that prohibits one from obtaining money or

property "by means of any untrue statement of a material fact or any omission to state a material

fact necessary in order to make the statement made, in light of the circumstance under which

they [were] made, not misleading."  *Id.*

10.     In a similar enforcement action against Morgan Stanley, the NASD also condemned the practices at issue here and concluded that such payments to brokerages violated NASD Rule 2830(k), a rule that prohibits the type of directed brokerage payments made by MFS Company.

11.     Then on March 16, 2004, in an article entitled "MFS Ends 'Soft Dollar' Payments on Concerns Over Ethics," *The Wall Street Journal* broke the story that MFS Company was ending its practice of paying brokers Soft Dollars. In the article, MFS Company recognized that shareholders paying for research services in Soft Dollars wrongfully obscured the true value of the benefits received by the funds and their shareholders. Moreover, the article stated in pertinent part that:

> *Aiming to show its seriousness about mutual-fund ethics, Massachusetts Financial Services Co. has stopped paying brokers in "soft dollars" -- which essentially are inflated stock-trading commissions -- for research and other services.*
>
> \*   \*   \*
>
> *MFS, for its part, has a new nonexecutive chairman, Robert Pozen, who sees the soft-dollar funnel as a lucrative one for brokers, but one that hides the true cost of such services to shareholders. "It's all camouflaged," said Mr. Pozen, a former associate general counsel of the SEC. Now, he added, "If we want something, if we think it's valuable, we will pay cash."*
>
> *Mutual funds and other institutional investors paid about $12.7 billion in commissions in 2002, about half of which was compensation for research and other forms of soft-dollar services*, according to the latest numbers from research firm Greenwich Associates.
>
> MFS and other big fund firms now pay about five cents per share for stock trades in "bundled" soft-dollar arrangements that include research and payment for executing trades. The stripped-down, no-research rate at an electronic-trading service might be as low as two cents a share. *One reason fund companies bundle research into commissions is that commission payments are subtracted directly from shareholder's accounts, rather than being taken out of the management fees paid to the fund companies*.

MFS, a unit of Sun Life Financial Inc., estimates that it will now have to shell out an additional $10 million to $15 million a year out of its own pockets because of its new policy, reducing its mutual-fund advisory fees by 2% annually.

[Emphasis added.]  The March 16th article in *The Wall Street Journal* article also added that MFS had stopped paying brokerage commissions to encourage brokers to push MFS funds, noting that the SEC was investigating MFS for such arrangements.

12.    Finally, on March 31, 2004 the full truth was finally disclosed when the SEC brought an enforcement action directly against MFS Company for violations of the Investment Company Act and Investment Advisers Act based on the same conduct alleged herein.  *See* March 31, 2004 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings and Imposing Remedial Sanctions against MFS, File No. 3-11450, at http://www.sec.gov/litigation/ admin/ia-2224.htm.  ("MFS Cease and Desist Order").  Specifically, as stated in the MFS Cease and Desist Order:

> *Since at least January 1, 2000 through November 7, 2003, MFS allocated brokerage commissions on MFS Funds' portfolios transactions for "shelf space"…MFS had entered into bilateral "Strategic Alliance" arrangements with approximately 100 broker-dealers [with whom] MFS allocated brokerage commissions*

> *             *     *     *

> *MFS did not adequately disclose to MFS shareholders that it allocated fund brokerage commissions to satisfy Strategic Alliances.*

>              *     *     *

Specifically, Item 16(c) of the Form N-1A requires a description in the SAI of "how the Fund will select brokers to effect securities transactions for the Fund" and requires that "[i]f the Fund will consider the receipt of products or services other than brokerage or

research services in selecting brokers, [the Fund should] specify
those products or services."

\*      \*      \*

*From at least January 1, 2000 to November 7, 2003, MFS
Funds' SAIs disclosed that MFS may consider sales of shares of
the funds as a factor in the selection of broker-dealers to execute
the MFS Funds' portfolio transaction.  The SAIs did not make
the distinction, however, between directing commissions in
"consideration of fund sales" and satisfying negiotiated
arrangements for specific amounts with brokerage commissions.
The SAIs did not adequately disclose to shareholders that MFS
had entered into bilateral arrangements in which it agreed to
allocate specific negotiated amounts of fund brokerage
commissions, subject to best execution, to broker-dealers for
"shelf space" or heightened visibility within their distribution
systems.*

*Id.*

13.    Specifically, the actions by MFS Company created insurmountable,
unmanageable conflicts of interest that were not disclosed and that constituted violations of
Defendants' fiduciary duties owed to the Funds' investors, and violations of the Investment
Company Act and Investment Advisers Act.  Defendants purposefully omitted to disclose any of
the improper excessive fees and commissions passed on to Plaintiffs and the other members of
the Class.  Defendants concealed such fees used to induce brokers to push MFS Funds as they
realized that the inducements created an insurmountable conflict of interest material to any
reasonable person deciding whether to invest in MFS Funds.  As described by Senator Peter
Fitzgerald (R-Ill.) in a January 28, 2004 article in *The Los Angeles Times* about a Senate
committee hearing on mutual fund abuses, "'the mutual fund industry is indeed the world's
largest skimming operation,'" tantamount to "'a $7-trillion trough' exploited by fund managers,
brokers and other insiders."

14.     Additional actions by the SEC, NASD, the New York Stock Exchange and/or the California Attorney General's Office, among other regulators, against MFS' sister mutual fund companies Franklin Advisers, Inc.; Franklin-Templeton Distributors, Inc.; PIMCO Advisers Fund Management LLC; and American Funds Distributors; and the brokerage house Edward D. Jones & Co. further illustrate that that the conduct alleged herein violates applicable statutes and regulations during the Class Period.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 34(b), 36(a) and (b) and 48(a) of the Investment Company Act, 15 U.S.C. §§80a-33(b), 80a-35(a) and (b) and 80a-47(a), Sections 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§80b-6 and 80b-15, 28 U.S.C. §§ 1331, 1337, and the common law.

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the Investment Company Act, 15 U.S.C. §80a-43; Section 214 of the Investment Advisers Act, 15 U.S.C. §80b-14; and 28 U.S.C. § 1391(b).  This action is also brought under the doctrine of pendant and supplemental jurisdiction.

17.     Many of the acts charged herein, including the creation and utilization of improper revenue-sharing agreements, the failure to disclose the excessive fees and commissions that Defendants improperly siphoned from MFS Funds investors, and the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Defendants conducted other substantial business within this District and many Class members reside within this District.  Additionally, Defendants maintain their headquarters in this judicial district.

18.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

19.     Plaintiff City of Chicago Deferred Compensation Plan held during the Class Period shares or units of MFS High Income Fund, MFS Growth Opportunity Fund and Massachusetts Investors Growth Stock Fund and has been damaged by the conduct alleged herein.

20.     Plaintiff Eric Forsythe held during the Class Period and continues to own shares or units of the Massachusetts Investors Trust and has been damaged by the conduct alleged herein.  A copy of his verification is attached as Exhibit B, submitted herewith.

21.     Plaintiff Larry R. Eddings held during the Class Period shares or units of MFS Capital Opportunities Fund, MFS Strategic Income Fund, Massachusetts Investors Growth Stock, Massachusetts Investors Trust, MFS Total Return Fund, MFS High Income Fund, and MFS Emerging Growth Fund, and has been damaged by the conduct alleged herein.

22.     Plaintiff Richard Koslow held during the Class Period and continues to own shares or units of MFS Utilities Fund and has been damaged by the conduct alleged herein.  A copy of his verification is attached as Exhibit B, submitted herewith.

### Defendants

23.     Defendant Sun Life Financial Inc. ("Sun Life") is a financial services company and the ultimate parent of defendants bearing the MFS name.  MFS Company is a subsidiary of Sun Life of Canada (U.S.) Financial Services Holdings, Inc., which in turn is an indirect wholly-

owned subsidiary of Sun Life. Sun Life maintains its U.S. office at One Sun Life Executive Park

SC 2132, Wellesley Hills, Massachusetts 02481.

24.     Defendant MFS Company is a subsidiary of Sun Life and offers investment

products and money management services. MFS Company is registered as an investment adviser

under the Investment Advisers Act and managed and advised the MFS Funds during the Class

Period. MFS Company has ultimate responsibility for overseeing the day-to-day management of

the MFS Funds. MFS Company, which conducts its advisory business under the name MFS

Investment Management, is headquartered at 500 Boylston Street, Boston, Massachusetts 02116.

("MFS Company" "MFS Investment Management" and "Investment Adviser Defendant" are

referred to interchangeably herein). Investment management fees payable to MFS Company are

calculated as a percentage of the funds' average daily net asset value.

**The Officer and Trustee Defendants**

25.     During the Class Period, defendant Jeffrey L. Shames ("Shames") was a

Chairman and Trustee charged with overseeing all of the 112 funds that make up the MFS fund

complex. Additionally, Shames served as Chairman of MFS Company during the Class Period.

Shames' business address is 500 Boylston Street, Boston, Massachusetts 02116. Shames

violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly

participating in, approving, and/or allowing the conduct complained of herein.

26.     During the Class Period, defendant John W. Ballen ("Ballen") was the President

and Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex.

Additionally, Ballen served as Chief Executive Officer and Director of MFS Company during

the Class Period. Ballen's business address is 500 Boylston Street, Boston, Massachusetts

02116.  Ballen violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

27.    During the Class Period, defendant Kevin J. Parke ("Parke") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex.  Additionally, Parke served as President, Chief Investment Officer and Director of the MFS Company during the Class Period.  Parke's business address is 500 Boylston Street, Boston, Massachusetts 02116.  Parke violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

28.    During the Class Period, defendant Lawrence H. Cohn, M.D. ("Cohn") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex.  For his service as a Trustee overseeing the MFS fund complex, Cohn received compensation of $148,006 for the calendar year ended 2002.  Cohn's business address is Brigham and Women's Hospital, PBB J-101, 75 Francis Street, Boston, Massachusetts 02115.  Cohn violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

29.    During the Class Period, defendant William R. Gutow ("Gutow") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex.  For his service as a Trustee overseeing the MFS fund complex, Gutow received compensation of $148,006 for the calendar year ended 2002.  Gutow's business address is 500 Boylston Street, Boston, Massachusetts 02116.  Gutow violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

30.     During the Class Period, defendant J. Atwood Ives ("Ives") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For his service as a Trustee overseeing the MFS fund complex, Ives received compensation of $164,031 for the calendar year ended 2002. Ives' business address is 500 Boylston Street, Boston, Massachusetts 02116. Ives violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

31.     During the Class Period, defendant Abby M. O'Neill ("O'Neill") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For her service as a Trustee overseeing the MFS fund complex, O'Neill received compensation of $146,450 for the calendar year ended 2002. O'Neill's business address is 500 Boylston Street, Boston, Massachusetts 02116. O'Neill violated her fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

32.     During the Class Period, defendant Lawrence T. Perera ("Perera") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For his service as a Trustee overseeing the MFS fund complex, Perera received compensation of $151,574 for the calendar year ended 2002. Perera's business address is 60 State Street, Boston, Massachusetts 02109. Perera violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

33.     During the Class Period, defendant William J. Poorvu ("Poorvu") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For his service as a Trustee overseeing the MFS fund complex, Poorvu received compensation of

$161,463 for the calendar year ended 2002. Poorvu's business address is Harvard Business School, MBA Admissions, Dillon House, Soldiers Field Road, Boston, Massachusetts 02163. Poorvu violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

34.    During the Class Period, defendant J. Dale Sherratt ("Sherratt") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For his service as a Trustee overseeing the MFS fund complex, Sherratt received compensation of $149,006 for the calendar year ended 2002. Sherratt's business address is 500 Boylston Street, Boston, Massachusetts 02116.   Sherrart violated his fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

35.    During the Class Period, defendant Elaine R. Smith ("Elaine Smith") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For her service as a Trustee overseeing the MFS fund complex, Elaine Smith received compensation of $152,574 for the calendar year ended 2002. Elaine Smith's business address is 500 Boylston Street, Boston, Massachusetts 02116.  Elaine Smith violated her fiduciary duties to the Funds and the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

36.    During the Class Period, defendant Ward Smith ("Ward Smith") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For his service as a Trustee overseeing the MFS fund complex, Ward Smith received compensation of $165,334 for the calendar year ended 2002. Ward Smith's business address is 500 Boylston Street, Boston, Massachusetts 02116. Ward Smith violated his fiduciary duties to the Funds and

the Funds' investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

37.    Defendants Shames, Ballen, Parke, Cohn, Gutow, Ives, O'Neill, Perera, Poorvu, Sherratt, Elaine Smith, and Ward Smith are referred to collectively herein as the "Trustee Defendants."

**The Distributor Defendant**

38.    During the Class Period, defendant MFS Distributors, Inc. ("MFD," "MFS Distributors," or the "Distributor Defendant"), MFS Company's wholly-owned broker dealer registered under the Securities Exchange Act of 1934 (the "Exchange Act"), marketed and sold the MFS Funds as the Funds' principal underwriter and promoted and provided information regarding the portfolio management services of the MFS investment adviser(s) to unaffiliated third-party broker/dealer firms.  MFD also implemented the Rule 12b-1 distribution plans entered into between MFD and the MFS Funds.  MFD is located at 500 Boylston Street, Boston, Massachusetts 02116.

**The John Doe Defendants**

39.    Defendants John Does 1-100 were Trustees and/or Officers charged with overseeing the MFS fund complex during the Class Period, and any other wrongdoers later discovered, whose identities have yet to be ascertained and which will be determined during the course of Plaintiffs' counsel's ongoing investigation.

**The MFS Funds**

40.    Nominal defendants the MFS Funds are open-ended management companies consisting of the capital invested by mutual fund shareholders, each having a board of trustees charged with representing the interests of the shareholders in one or a series of the funds.  The MFS Funds are named as nominal defendants to the extent that they may be deemed necessary

14

and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

41.    The MFS Funds offer multiple classes of shares, with each class representing a *pro rata* interest in each MFS Fund. MFS Fund shares are issued to MFS Fund investors pursuant to Prospectuses that must comply with the federal securities laws, including the Investment Company Act. All of the Prospectuses are substantially the same on the matters relevant to this litigation.

42.    Each of the MFS Funds is an open-ended management investment company organized as Massachusetts business trusts. An open-ended company is a management company that "offer[s] for sale or has outstanding any redeemable securit[ies] of which it is the issuer." 15 U.S.C. § 80a-5. A redeemable security is defined as "any security . . . under the terms of which the holder, upon its presentation to the issuer . . . is entitled . . . to receive approximately his proportionate share of the issuer's current net assets, or the cash equivalent thereof." 15 U.S.C. §80a-2(a)(32).

43.    All of the MFS Funds offer securities. Many of the MFS Funds offer multiple separate series of securities which are commonly referred to as Portfolios. Each of the Portfolios, as also identified on the list annexed hereto as Exhibit A, is a separate pool of capital invested by mutual fund shareholders constituting, in effect, a separate fund with its own investment objective, policies, and shares.

44.    All of the MFS Funds are alter egos of one another. The Funds are essentially pools of investor assets that are managed and administered by a common body of officers and employees of MFS Company who administer the MFS Funds generally. The MFS Funds have no independent will and are totally dominated by MFS Company and the common body of

Trustees established by MFS Company. Thus, in substance, the MFS Funds function as components of one unitary organization.

45.     All MFS Funds share MFS Company as their investment adviser and share MFS Distributors as their principal underwriter and distributor. Additionally, the Defendants pool together fees and expenses collected from the MFS Fund investors, resulting the MFS Funds sharing expenses with one another.

## SUBSTANTIVE ALLEGATIONS

### DEFENDANTS IMPROPERLY USED FUND ASSETS TO UNDULY INFLUENCE BROKERS TO PUSH MFS FUNDS ON UNWITING INVESTORS

**Defendants Paid Brokerages to Push Their Unwitting Clients into MFS Funds**

46.     Unbeknownst to Plaintiffs and the other members of the Class, throughout the Class Period, Defendants used the assets of its mutual fund investors to pay kickbacks to various brokerages and participate in "shelf-space" programs at the brokerages, including, but not limited to, Morgan Stanley, Salomon Smith Barney, Wachovia Securities, Merrill Lynch and Chase Investment Services. In fact, MFS Company had "shelf space" arrangements with more than a 100 brokerage firms during the Class Period. Many of these brokerage firms have now admitted their "shelf-space" arrangements for which MFS Company "paid to play" with funds siphoned from Fund shareholders.

47.     Pursuant to the "shelf-space" program agreements, brokers steered unknowing clients into MFS Funds because the brokers were paid more for MFS Funds than for other mutual funds.

48.     These *quid pro quo* "shelf-space" arrangements between Defendants and the brokerage firms called for millions of dollars in additional compensation to be paid from Defendants to the brokerages as incentive to steer unwitting investors into the MFS Funds,

16

resulting in inflated fees being paid by investors.  MFS Company made these payments through a variety of means including:  directing the trades – and the lucrative commissions – in the securities and other investments of the underlying investment portfolios of the MFS Funds to these brokerages ("directed brokerage"); paying excessive commissions under the guise of "Soft Dollars," as defined below; making payments of cash or "hard dollars" from fees collected from investors ("revenue-sharing payments"); and, making other improper payments used as inducements to brokerages to steer their unwitting clients into MFS Funds.  To the extent revenue sharing payments were purportedly made from the assets of the Investment Adviser Defendant or MFS Distributors, those companies reimbursed themselves through management fees and other payments from the MFS Funds, thereby diminishing investors' holdings in the Funds.

49.    With respect to the directed brokerage, MFS would direct Distributor Defendant MFD target amounts of commission required to satisfy the *quid pro quo* arrangements with each broker-dealer.  *Id.*  Moreover, MFS used three methods of allocating brokerage commissions for these *quid pro quo* arrangements: (1) by forwarding portfolio transactions directly to a broker-dealer with whom it had a Strategic Alliance ("distributing broker"); (2) through "step-out" arrangements whereby the broker-dealer who executed the transaction had to pay a part of the commission ("step out" that part of the commission) to another, non-executing broker who had a "shelf space" arrangement with MFS ; and (3) through "introducing broker" arrangements whereby the broker-dealer who executed the transaction had to forward the entire commission amount to an "introducing", non-executing broker who had a "shelf space" arrangement with MFS.  With respect to the latter two methods, the ultimate recipient of the directed brokerage commission did not even make the trade that generated the commission, but, instead, was given

the commission solely to satisfy the *quid pro quo* arrangement between MFS and the broker who had pushed his/her clients into MFS Funds. *Id.*

50.    Moreover, Defendants' use of directed brokerage resulted in churning of the MFS Fund portfolios as Defendants increased the number on trades made in an attempt to meet their brokerage commissions "shelf space" quotas agreed to with the brokerage houses.

51.    With respect to revenue-sharing and other improper payments, MFS had various payment arrangements for the Strategic Alliances. For many Strategic Alliances, MFS paid broker-dealers anywhere from 15 to 25 basis points ("bps") on mutual fund gross sales and/or 3 to 20 bps on aged assets (held over one year). These payments were in addition to existing payments, including dealer concessions, shareholder servicing payments, and payments for services that MFS otherwise would provide, such as sub-accounting.

52.    The costs of MFS Company's shelf space agreements were the burden of the MFS Funds' shareholders through the fees and expenses paid by the shareholders. As described in the Prospectus dated May 1, 2003 for the MFS Growth Opportunities Fund, these "fees and expenses" – the true nature of which was hidden from shareholders - are those that a shareholder will "pay when you buy, redeem and hold shares of the fund." Furthermore, with respect to the 12b-1 fees that Defendants used as kickbacks, the MFS Growth Opportunity Fund states in no uncertain terms that these fees directly impacted shareholders stating that these 12b-1 "fees will increase the cost of your shares."

## THE SEC'S FINE AND CENSURE OF MFS

53.    On March 31, 2004, the SEC fined and censured MFS for much of the same conduct alleged herein. Specifically, the SEC found that "from at least January 1, 2000 through

November 7, 2003, MFS negotiated bilateral agreements, known as "Strategic Alliances" with approximately 100 broker-dealers." *See* MFS Cease and Desist Order.

54.    The SEC also found that MFS paid for the *quid pro quo* Strategic Alliances through both directed brokerage and revenue sharing payments. *Id.*

55.    The SEC further found that these *quid pro quo* arrangements "were not adequately disclose[d] to MFS shareholders." *Id.* Consequently, the SEC found that MFS had willfully violated section 206 of the Investment Adviser Act which prohibits engaging in "any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client" and 34(b) of the Investment Company Act which makes it "unlawful for any person to make any untrue statement of a material fact in any registration statement…[or]…omit to state therein any fact necessary in order to prevent the statements made therein, in light of the circumstances under which they were made, from being material misleading."

### MFS' IMPROPER SHELF-SPACE ARRANGEMENTS

56.    In its finding against MFS, the SEC stated that MFS had entered into *quid pro quo* arrangements with approximately 100 broker-dealers. Below are just a handful of those broker-dealers with whom MFS had these improper arrangements.

### MFS's  Improper "Shelf-Space" Arrangement with Morgan Stanley

57.    According to internal Morgan Stanley documents as well as former Morgan Stanley brokers who worked for Morgan Stanley during the Class Period, the "shelf-space program" in which MFS Company participated at Morgan Stanley was called the "Asset Retention Program," later renamed the "Partners Program." The Partners Program was nothing more than a vehicle for enabling a series of veiled payments by MFS, and other mutual fund companies, to Morgan Stanley to steer unknowing investors into their funds. ***Under the "Partner's Program," Morgan Stanley brokers improperly and aggressively pushed MFS***

*Funds on unwitting clients solely because they received more cash to do so, not because such*

*funds were in the best interests of the investors.*  According to Morgan Stanley internal

documents, MFS paid millions of dollars during the Class Period in directed brokerage and other

means as part of the *quid pro quo* arrangement with Morgan Stanley to participate in the Morgan

Stanley Partners Program.  In numerous enforcement actions to date, including an action against

MFS Company, such payments have been condemned by the SEC as being improper and

creating conflicts of interest that were not properly disclosed to investors.

58.    According to the Morgan Stanley SEC Cease-and-Desist Order:

> The selective marketing programs that Morgan Stanley DW
> operated, initially known as the Asset Retention Program and later
> as the Partners Program, created an undisclosed conflict of interest
> because Morgan Stanley DW was authorized to offer and sell
> shares of approximately 115 mutual fund complexes, but the firm
> and its FAs received additional compensation for the sale of the
> mutual funds of a select group of fund complexes.

*See* The Morgan Stanley SEC Cease-and-Desist Order, *at* http://www.sec.gov/litigation/admin/

33-8339.htm.

59.    Similarly, the NASD issued a news release, titled "NASD Charges Morgan

Stanley with Giving Preferential Treatment to Certain Mutual Funds in Exchange for Brokerage

Commission Payments" (the "November 17 NASD News Release"), which explained that:

> …Morgan Stanley operated two programs - the Asset Retention
> Program and the Partners Program - in which it gave favorable
> treatment to products offered by as many as 16 mutual fund
> companies out of a total of over 115 fund complexes that could be
> sold by the firm's sales force. In return for these brokerage
> commissions and other payments, mutual fund companies received
> preferential treatment by Morgan Stanley…
>
> **This conduct violated NASD's "Anti-Reciprocal Rule," Conduct
> Rule 2830(k), which prohibits members from favoring the
> distribution of shares of particular mutual funds on the basis of
> brokerage commissions to be paid by the mutual fund companies,
> as well as allowing sales personnel to share in directed brokerage**

> ***commissions. One important purpose of the rule is to help
> eliminate conflicts of interest in the sale of mutual funds.***

*See* The November 17 NASD News Release, *at* http://www.nasd.com/web/idcplg?IdcServce=SS

GET PAGE&ssDocName=NASDW 002819&ssSOurceNodeld=1108.

60.    Through the Asset Retention and Partners Programs, the MFS Defendants paid

excessive commissions as kickbacks to Morgan Stanley brokers to induce them to sell MFS

Funds.  According to brokers employed by Morgan Stanley during the Class Period, and internal

Morgan Stanley documents, pursuant to the Partners Program, Morgan Stanley adopted a broker

"Incentive Compensation" payout grid that reflected these kickbacks and provided greater

compensation for sales of MFS Funds compared to other mutual funds that were not paying

kickbacks.

61.    Because of the improper kickback payments by the MFS Defendants, Morgan

Stanley's management made it clear through firm-wide memos that it wanted its brokers to take

advantage of the payout grid by directing investors into MFS Funds.  As stated by Bruce Alonso,

the managing director of Morgan Stanley's Investor Advisory Services Division, in a firm-wide

message entitled "An Important Message from Bruce Alonso Regarding the 2003 Compensation

Plan" circulated throughout Morgan Stanley in December of 2002:  "the recently announced

2003 Compensation Plan provides you with the opportunity to increase your overall

compensation by focusing on asset-based products," *i.e.*, MFS Funds.

62.    Additionally, in order to further push MFS Funds and reap the benefits of the

extra inducements from MFS, Morgan Stanley management gave MFS Funds priority placement

in the review of fund materials to be distributed to Morgan Stanley brokers; gave MFS access to

Morgan Stanley's branch system at the branch managers' discretion; gave MFS direct access to

Morgan Stanley brokers; included MFS in Morgan Stanley broker events; and invited MFS

Company to participate in programs broadcasted to brokers over Morgan Stanley's internal

systems.

63. In the Administrative Proceeding against Morgan Stanley, the SEC found that:

> In exchange for participation in the program, the Asset Retention
> Program Participants paid Morgan Stanley DW: (i) 15 or 20 basis
> points ("bps") on gross sales of open-end, variable-priced mutual
> fund shares (the "gross sales payments") and (ii) 5 bps on aged
> assets (participating fund shares held over one year), which the
> firm then paid to the FAs responsible for the accounts holding
> these assets. ***These payments were in addition to existing
> payments such as commissions, 12b-1 fees, shareholder servicing
> fees and account maintenance fees.***
>
> *     *     *
>
> In return for their payments, program participants received a
> number of marketing benefits. First, ***Morgan Stanley DW included
> all Asset Retention Program Participants on its "preferred list,"
> which was a list of fund complexes that FAs should look to first
> in making recommendations of mutual fund products.*** *Second, it
> ensured that* ***Asset Retention Program Participants had a "higher
> profile" in Morgan Stanley DW's sales system than non-
> participating fund complexes*** by, among other things, increasing
> the visibility of the Asset Retention Program Participants on its
> FAs' [Financial Advisers] workstations. Third, the program
> participants were eligible to participate in the firm's 401(k)
> programs and to offer offshore fund products to Morgan Stanley
> DW's customers.
>
> ***Morgan Stanley DW also provided "incentives designed to
> support long-term mutual fund asset retention goals."*** In
> particular, Morgan Stanley DW paid the 5bps component of the
> Asset Retention Program payment to FAs, thus incentivizing FAs
> to encourage their customers to make, and then retain over the
> specified time period, their investments in mutual fund complexes
> participating in the Asset Retention Program.

*See* The Morgan Stanley SEC Cease-and-Desist Order, *at* http://www.sec.gov/litigation/admin/

33-8339.htm. [Emphasis added.]

64. Similarly, the November 17, 2003 NASD News Release regarding the NASD

action against Morgan Stanley stated that:

> [T]he participating mutual fund companies [including MFS] paid
> Morgan Stanley an extra 15 to 20 basis points on each sale. This
> was over and above the normal fees earned by the firm for selling
> the funds.

See November 17 NASD News Release, at http://www.nasd.com/web/idcplg?IdcServce=SS

GET PAGE&ssDocName=NASDW 002819&ssSOurceNodeId=1108.

65.    With respect to the "shelf-space" program involving MFS Company discussed

above, Stephen M. Cutler, Director of the SEC's Division of Enforcement, stated that

unbeknownst to investors in the MFS Funds, "Morgan Stanley received monetary incentives

[from MFS Company] -- in the form of 'shelf-space' payments -- to sell particular mutual funds

[i.e., MFS Funds] to its customers.  When customers purchase mutual funds, they should

understand the nature and extent of any conflicts of interest that may affect the transaction." See

SEC Charges Morgan Stanley With Inadequate Disclosure in Mutual Fund Sales - Morgan

Stanley Pays $50 Million To Settle SEC Action, November 17, 2003, at

http://www.sec.gov/news/press/2003-159.htm.

66.    The investigation by the SEC and NASD and the resulting settlement with the

first target, Morgan Stanley, received wide praise, including from members of Congress.  As

stated by Sen. Peter Fitzgerald (R-Ill.) who is leading a Congressional inquiry of the mutual

funds industry:

> [The] settlement 'goes to show that the mutual fund managers as
> well as broker dealers have too often viewed mutual fund
> shareholders as sheep to be sheared.  . . .  Congress has to figure
> out the variety of ways people are being sheared so that we can
> stop it.'

See Brook A. Masters and Kathleen Day, Morgan Stanley Settles with SEC, NASD; Firm

Accused of Failing to Disclose Funds' Payments, THE WASHINGTON POST, Nov. 18, 2003, at E1.

However, Morgan Stanley was not the only brokerage firm that accepted payments from MFS

Company in exchange for pushing investors into MFS Funds.  As seen below, the MFS

Defendants also made "shelf-space" payments during the Class Period to other major brokerage

houses including Salomon Smith Barney and Wachovia Securities, among others.  As stated

above, the SEC in fact found that "from at least Jan. 1, 2000, thorough Nov. 7, 2003, MFS

negotiated bilateral arrangements, known as "Strategic Alliances," with approximately *100*

*broker-dealers.*"  *See* http://www.sec.gov/news/press/2004-44.htm. (emphasis added).

**MFS's Improper Shelf-Space Arrangement With Smith Barney**

67.    In a June 2004 press release on the Smith Barney website entitled "Mutual Funds,

Revenue Sharing and Fund Families." Smith Barney, a division of Citigroup Global Markets

Inc., identified  that the MFS Funds made payments to Smith Barney as part of a "shelf space"

arrangement.  *See* http://www.smithbarney.com/products_services/mutual_funds/

investor_information/revenueshare.html.

**MFS's Improper "Shelf-Space" Arrangement With Wachovia Securities**

68.    Wachovia Securities has also identified on its website that it received payments

from MFS as part of a "shelf space" arrangement.  *See* http://www.wachovia.com/files/

Mutual_Fund_ Guide2.pdf.

**MFS's Improper "Shelf-Space" Arrangement With Janney Montgomery Scott**

69.    On October 21, 2004, Janney Montgomery Scott disclosed that the company

received payments from MFS as part of a "shelf space" arrangement.

**MFS's Shelf-Space" Arrangement With Chase Investment Services Corp.**

70.    Chase Investment Services Corp. ("CISC") disclosed on its website in October

2004 that CISCS received payments from MFS as part of a "shelf space" arrangement.

**MFS's "Shelf-Space" Arrangement With FSC Securities Corporation**

71.     FSC Securities Corporation represents financial advisors under the AIG group umbrella.  The firm's September 14, 2004, "FSC Disclosure Document for Mutual Fund and Variable Annuity Investors" indicates that that MFS participated in "shelf space" arrangements with FSC.  *See* http://www.fscorp.com/EPProgramDisclosure.pdf.  According to the FSC Disclosure Document, MFS paid FSC an amount "in addition to the customary sales charges in connection with sales of mutual funds."  *Id.*  FSC Securities also disclosed that their individual brokers, as well as FSC Securities, are compensated by MFS such that it "may create an incentive for representatives to sell such funds."  Furthermore, on sales of MFS Funds, FSC brokers did not have to pay a ticket charge, further increasing their compensation.

72.     Finally, FSC Securities disclosed that it also received compensation in the form of 12b-1 fees:  "12b-1 fees are payments made by a mutual fund in connection with a distribution of its securities.  The fund company takes 12b-1 fees out of the fund's assets each year for marketing and distribution expenses, which *may include compensating representatives*."  (Emphasis added).

**MFS's "Shelf-Space" Arrangement With Bank One**

73.     In a document entitled "A Guide to Mutual Fund Investing" dated October 2004, Bank One stated it received "shelf space" payments from MFS.  *See* http://www.bank one.com/resources/Guide_to_Mutual_Fund_Investing.pdf.  MFS Company paid Bank One a percentage of the total dollar amount of MFS Funds sold by Bank One brokers.  In addition to this upfront reward for selling MFS Funds, Bank One also received an additional quarterly payment of the total amount held per year.  Finally, on top of all these payments by MFS Company to Bank One for "shelf space", Bank One was reimbursed for expenses incurred for sales meetings, seminars, and conferences.

**MFS's "Shelf-Space" Arrangement With National Planning Holdings, Inc.**

74.    On its website on September 24, 2004, National Planning Holdings, Inc. ("NPH"), a full service broker/dealer, revealed that it had "entered into agreements" with MFS "who provide the BDs [broker/dealers] with marketing and other services and who also provide the BDs with additional compensation."  *See* http://www.siionline.com/public/sii_disclosure.pdf. As a result, MFS paid NPH's brokers up to 40 bps on gross sales of MFS Funds.  In addition, MFS paid up to 5 bps on the amount of MFS assets under management by NHP brokers on an annual basis.  Finally, MFS paid NHP a minimum of $500,000 per year under the program.

**MFS's "Shelf-Space" Arrangement With Primerica Financial Services**

75.    Primerica Financial Services Investments ("PSFI"), a subsidiary of Citigroup, disclosed on its website, on or about December 10, 2004, that in addition to "sales charges and other fees disclosed in each fund's prospectus fee table, PFSI receives other compensation or "revenue sharing" from MFS.  *See* http://ww3.primerica.com/public/ mutual_fund_disclosures.html.  PFSI also disclosed that in addition to revenue-sharing payments "PFSI may be reimbursed by these fund families or their affiliates for expenses incurred for various meetings, seminars, and conferences held in the normal course of business."  *Id.*

**MFS's "Shelf Space" Arrangement with Merrill Lynch**

According to a former MFD employee who was involved with "shelf space" payments during the Class Period, MFS made payments to Merrill Lynch during the Class Period as part of a "shelf space" arrangement with Merrill Lynch.

## DEFENDANTS CONCEALED THEIR PRACTICES FROM INVESTORS

76.    Defendants knew that these "shelf-space" arrangements present a clear, unmanageable conflict of interest, pitting the financial interest of the broker against that of its clients.  Rather than disclosing this material information, knowing that a recommendation to

purchase MFS Funds would be completely undermined if clients knew that the broker was paid

from Fund assets to give it, Defendants concealed the truth regarding these "shelf space"

arrangements.  In fact, according to a former MFD employee involved in "shelf space" payments

during the Class Period, MFD employees were instructed not to leave a paper trail, and

employees were warned not to talk openly about the "shelf space" payments.

77.    Commenting on the enforcement action against MFS, Stephen M. Cutler, Director

of the SEC's Division of Enforcement stated, "A mutual fund manager's use of fund brokerage

commissions to pay for the marketing and distribution of the fund creates a conflict of interest

that must be fully and fairly disclosed."  *See* http://www.sec.gov/news/press/2004-44.htm.

Defendants failed to do this.  As stated in the Cease-and-Desist Order against MFS, "MFS did

not adequately disclose to MFS shareholders that it allocated fund brokerage commissions to

satisfy strategic alliances."  *See* http://www.sec.gov/litigation/admin/ia-2224.htm.

### DEFENDANTS' "SHELF-SPACE" PROGRAM CREATED UNDISCLOSED CONFLICTS OF INTEREST

78.    Defendants' participation in "shelf-space" programs through the means described

above created undisclosed, insurmountable conflicts of interest.  For example, Defendants'

participation in "shelf-space" programs at the brokerage houses identified above, among others,

created an atmosphere where brokers did everything they could to steer investors into MFS

Funds in order to line their own pockets with money with no concern for the well-being of the

investors.  In addition, Defendants' use of directed brokerage as a means of paying shelf-space

created additional conflicts of interest as creating incentives for brokers to push MFS Funds took

precedence over getting the best execution price for MFS Funds transactions.  The use of

directed brokerage caused Defendants to purchase or sell securities in the Funds' portfolios to

satisfy "shelf space" commitments rather than to benefit these portfolios.  Such inherent conflicts of interest were plainly unmanageable.

## THE "SHELF-SPACE" PROGRAM INJURED THE FUNDS AND THEIR INVESTORS

79.     The massive shelf-space programs described herein benefited MFS Company by increasing the asset value of the funds, thereby increasing the dollar amount of the adviser's percentage fee.  However, the "shelf space" payments did not contribute positively to the net asset value of the funds per share, and damaged the class members by reducing the value of their interest in Funds under the Investment Adviser's management.  The "shelf space" arrangements discussed above resulted in improperly inflated fees charged to investors with no resulting benefit to investors.  As stated in the May 1, 2003 Prospectus for the MFS Growth Opportunities Fund, which is virtually identical in substance to all Prospectuses issued during the Class Period, these fees, which include 12b-1 fees, "will increase the costs of your shares."  This is because, after payment, the 12b-1 fees are specifically assessed against the interests of the individual shareholders.  Furthermore, both 12b-1 and management fees immediately reduce the amount for which shareholders are legally entitled to redeem their shares.  These fees included amounts sufficiently large to pay "shelf space" expenses directly or to reimburse the investment advisor, distributor or their affiliates for such payments.

80.     Moreover, these practices resulted in excessive trades in shareholders' accounts, such that the accounts were effective churned to generate more commissions – at the detriment to shareholders – so that MFS could meet its quotas to satisfy its *quid pro quo* "shelf space" arrangements.  As stated by the SEC in its action against MFS, "frequently, MFD also requested that [MFS] Equity Trading [the MFS branch responsible for placing the directed brokerage

28

trades with broker-dealers] increase trading to more quickly satisfy a target commission amount with a certain broker-dealer." *See* MFS Cease and Desist Order.

81.    Finally, these practices created inherent, unmanageable conflicts of interests that also injured shareholders.  As explained by the National Association of Insurance and Financial Advisors:

> This practice creates numerous potential conflicts of interest, including possible incentives for broker-dealers to base their fund recommendations to customers on brokerage commission considerations rather than on whether a particular fund is the best match for a client.

*See* http://www.naifa.org/frontline/20040428_SEC_aa.html.

### THE TRUTH IS REVEALED

82.    As discussed above, the truth about MFS Company began to emerge on November 17, 2003, when the SEC and the NASD censured Morgan Stanley for, among other wrongdoing, accepting MFS Company's impermissible payments in exchange for aggressively pushing MFS Funds over other mutual funds.  On November 18, 2003, the *Washington Post* published an article which stated "Morgan said [the] companies in its 'Partners Program' included … **MFS Investment Management** …" among others. [Emphasis added.]

83.    On January 14, 2004, *The Wall Street Journal* further explained the "shelf-space" relationship between MFS Company and brokerages including Morgan Stanley.  An article entitled "SEC Readies Cases On Mutual Funds' Deals With Brokers," citing "a person familiar with the investigation," states that the SEC is "close to filing its first charges against mutual fund companies related to arrangements that direct trading commissions to brokerage houses that favor those fund companies' products."  The article stated in pertinent part as follows:

> *The SEC has been investigating the business arrangements*
> *between fund companies and brokerage houses since last spring.*
> It held a news conference yesterday to announce ***it has found***

> *widespread evidence that brokerage houses steered investors to certain mutual funds because of payments they received from fund companies or their investment advisers as part of sales agreements.*
>
> Officials said the agency has opened investigations into eight brokerage firms and a dozen mutual funds that engaged in a longstanding practice known as "revenue sharing." Agency officials said they expect that number to grow as its probe expands. They declined to name either the funds or the brokerage houses.
>
> The SEC said payments varied between 0.05% and 0.04% of sales and up to 0.25% of assets that remained invested in the fund. [. . .]
>
> *People familiar with the investigation say regulators are looking into examples of conflicts of interest when fund companies use shareholder money to cover costs of sales agreements instead of paying the sales costs themselves out of the firm's own pockets. The boards of funds, too, could be subject to scrutiny for allowing shareholders' commission dollars to be used for these sales agreements. In other cases, the SEC is probing whether funds violated policies that require costs associated with marketing a fund to be included in a fund's so-called 12b-1 plan.*

*Id.* [Emphasis added.]

84. On March 16, 2004, in the story "MFS Ends 'Soft Dollar' Payments on Concerns Over Ethics," *The Wall Street Journal* announced that MFS Company was ending its practice of paying brokers Soft Dollars. In the story, MFS Company recognized that shareholders paying for research services in Soft Dollars wrongfully obscures the true value of the benefits received by the funds and their shareholders. The March 16th article also added that MFS had stopped paying brokerage commissions to encourage brokers to push MFS funds, noting that the SEC was investigating such arrangements.

85. Finally, on March 31, 2004, the full truth was disclosed when the SEC brought its action against MFS for the same conduct at issue in this Complaint. *See* MFS Cease and Desist Order. As stated above, the SEC found that MFS had willfully violated the Investment Company

Act and Investment Advisers Act and ordered that MFS pay $50 million in penalties for its

actions.

## THE DEFENDANTS ENGAGED IN IMPROPER CONDUCT

**The Trustee Defendants Breached Their**
**Fiduciary Duties to MFS Funds Investors**

86.     Mutual fund Boards of Directors have a duty to protect investors and closely

guard the fees paid to an Investment Adviser and guarantee that they are not excessive and that

the Investment Adviser is acting in the best interest of the mutual fund investors.  As explained

by William Donaldson, the head of the SEC, in a January 7, 2004 speech to the Mutual Funds

Directors Forum:

> The Board of Directors of a mutual fund has significant
> responsibility to protect investors. By law, directors generally are
> responsible for the oversight of all of the operations of a mutual
> fund. In addition, under the Investment Company Act, directors are
> assigned key responsibilities, such as negotiating and evaluating
> the reasonableness of advisory and other fees, selecting the fund's
> independent accountants, valuing certain securities held by the
> fund, and managing certain operational conflicts.
>
> The role of fund directors is particularly critical in the mutual fund
> context because almost all funds are organized and operated by
> external money-management firms, thereby creating inherent
> conflicts of interest and potential for abuse.  Money-management
> firms operating mutual funds want to maximize their profits
> through fees provided by the funds, but the fees, of course, paid to
> these firms, reduce the returns to fund investors.
>
> Independent directors, in particular, should serve as "independent
> watchdogs" guarding investors' interests - and helping to protect
> fund assets from uses that will be of primary benefit to
> management companies. These interests must be paramount, for it
> is the investors who own the funds and for whose sole benefit they
> must be operated.

http://www.sec.gov/news/speech/spch010704whd.htm.

87.     The Investment Company Institute ("ICI"), of which MFS Company is a member, recently described the duties of mutual fund boards as follows:

> More than 77 million Americans have chosen mutual funds to gain convenient access to a professionally managed and diversified portfolio of investments.
>
> Investors receive many other benefits by investing in mutual funds, including strong legal protections and full disclosure. In addition, shareholders gain an extra layer of protection because each mutual fund has a Board of Directors looking out for shareholders' interests.
>
> ***Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the funds' investors. The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing that directors oversee the advisers who manage and service their investments.***
>
> *         *         *
>
> ***In particular, under the Investment Company Act of 1940, the Board of Trustees of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.***

Understanding the Role of Mutual Fund Directors, available on the ICI's website at http://www.ici.org/issues/dir/bro_mf_directors.pdf. (Emphasis added).[1]

88.     MFS Funds' public filings state that the MFS Funds have boards of trustees that are responsible for the management and supervision of each fund. In this regard, the Statement of Additional Information for various classes of the Massachusetts Investors Trust (the "Statement of Additional Information" or "SAI") issued during the Class Period, which is available to the investor upon request, is typical of the Statements of Additional Information

---

[1]     The ICI describes itself as the national association of the U.S. investment company industry. Founded in 1940, its membership includes approximately 8,500 mutual funds, 600 closed-end funds, 140 exchange-traded funds, and five sponsors of unit investment trusts. Its mutual fund members have 87.7 million individual shareholders and manage approximately $7.8 trillion in investor assets.

available for other MFS Funds.  It states that, "[t]he Board of Trustees which oversees the Fund

provides broad supervision over the affairs of the Fund.  The Adviser is responsible for the

investment management of the Fund's assets, and the officers of the Trust are responsible for its

operations."

89.    Moreover, the Statement of Additional Information states, with respect to the

duties of the trustees vis-à-vis the funds' investment adviser, as follows:

> Investment Advisory Agreement – The Adviser manages the Fund
> pursuant to an Investment Advisory Agreement (the "Advisory
> Agreement") for all of the Funds in the Trust.  Under the Advisory
> Agreement, the Adviser provides the Fund with overall investment
> advisory services.  ***Subject to such policies as the Trustees may
> determine, the Adviser makes investment decisions for the Fund.***
> For these services and facilities, the Adviser receives an annual
> investment advisory fee, computed and paid monthly […]
>
> *    *    *
>
> The Advisory Agreement has an initial two-year term and
> continues in effect thereafter only if such continuance is
> specifically approved at least annually by the Board of Trustees or
> by vote of a majority of the Fund's shares […] and, in either case,
> by a majority of the Trustees who are not parties to the Advisory
> Agreement or interested persons of any such party.

[Emphasis added.]  The trustees of each fund are thus responsible for the review and approval of

the advisory and fee agreements between MFS company and the MFS funds.

90.    The Statement of Additional Information also sets forth in greater detail the

purported process by which the investment adviser is approved:

> In connection with their deliberations with regard to approval of
> the Fund's current investment advisory agreement with MFS
> [Company], the Trustees considered such information and factors
> as they believe, in the light of the legal advice furnished to them
> and their own business judgment, to be relevant to the interests of
> the shareholders of the Fund.  Such factors include the nature,
> quality and extent of the services furnished by MFS to the Fund;
> the investment record of the Fund; ***comparative data as to
> investment performance, advisory fees and expense ratios***;

*possible economies of scale*; the necessity of MFS maintaining its ability to continue to retain and attract capable personnel to serve the Fund; the risks assumed by MFS; possible benefits to MFS from serving as adviser of the Fund and from providing certain administrative services to the Fund and from affiliates of MFS serving as principal underwriter and shareholder servicing agent of the Fund; current and developing conditions in the financial services industry, including the entry into the industry of large and well-capitalized companies which are spending and appear to be prepared to continue to spend substantial sums to engage personnel and to provide services to competing investment companies; the existence of appropriate incentives to assure that MFS will continue to furnish high quality services to the Fund; and various other factors.

\* \* \*

Based upon their review, the Trustees determined that the investment advisory agreement was reasonable, fair and in the best interests of the Fund and its shareholders. The Trustees also concluded that the fees provided in the investment advisory agreement were fair and reasonable in light of the usual and customary charges made by others for services of the same nature and quality.

[Emphasis added.]

91. In truth and in fact, the MFS Funds boards of trustees, *i.e.* the Trustee Defendants were captive to and controlled by MFS Company, who induced the Trustee Defendants to breach their statutory and fiduciary duties to manage and supervise the MFS Funds, approve all significant agreements and otherwise take reasonable steps to prevent MFS Company from skimming MFS Funds assets. In many cases, key MFS Funds trustees were employees or former employees of MFS Company and were beholden for their positions, not to MFS Funds investors, but, rather, to MFS Company, whom they were supposed to oversee. The Trustee Defendants served for indefinite terms at the pleasure of MFS Company and formed supposedly independent committees, charged with responsibility for billions of dollars of fund assets (much of which were comprised of investors' college and retirement savings).

34

92.     The MFS Trustees oversaw dozens of MFS Funds rendering it impracticable for them to properly perform their supervisory and monitoring functions.  Therefore, the MFS Funds' Trustees functioned to improperly legitimize MFS Company's improper conduct.

93.     To ensure that the trustees toed the line, MFS Company often recruited key fund trustees from its own ranks.  For example, during the Class Period, defendants Shames, Ballen and Parke were Trustees charged with overseeing all of the 112 funds that make up the MFS fund complex.  Additionally, during the Class Period, Shames served as Chairman of MFS Company, Ballen served as Chief Executive Officer and Director of MFS Company and Parke served as President, Chief Investment Officer and Director of MFS Company.

94.     In exchange for creating and managing the MFS Funds, including the Massachusetts Investors Trust, MFS Company charged the MFS Funds a variety of fees, each of which was calculated as a percentage of the funds' average daily net asset value.  Hence, the more money invested in the funds, the greater the fees paid to MFS Company.  In theory, the fees charged to fund investors are negotiated at arm's-length between the fund board and the investment management company and must be approved by the independent members of the board.  However, as a result of the Trustee Defendants' dependence on the investment management company, and their failure to properly manage the investment adviser, millions of dollars in MFS Funds assets were transferred through fees payable from MFS Funds assets to MFS Company that were of no benefit to fund investors.

95.     These practices proved to be enormously profitable for MFS Company at the expense of Plaintiffs and the other members of the Class who had invested in the MFS Funds.  In this regard, a Forbes article, published on September 15, 2003, stated as follows:

> The average net profit margin at publicly held mutual fund firms
> was 18.8% last year, blowing away the 14.9% margin for the

financial industry overall . . . . ***Economies of scale? This is a business made for them – but, . . . the customers don't see the benefit.***

***The [mutual fund] business grew 71-fold (20 fold in real terms) in the two decades through 1999, yet costs as a percentage of assets somehow managed to go up 29%***. . . .  Fund vendors have a way of stacking their boards with rubber stamps.  As famed investor Warren Buffett opines in Berkshire Hathaway's 2002 annual report: 'Tens of thousands of "independent" directors, over more than six decades, have failed miserably.'  A genuinely independent board would occasionally fire an incompetent or overcharging fund adviser.  That happens just about never."

[Emphasis added].

96.     Due in large part to the conflicted boardroom culture created by MFS Company's Trustees, Plaintiffs and the other members of the Class never knew, nor could they have known, from reading the Fund Prospectuses, Annual or Semi-Annual Reports, or otherwise, of the extent to which the Investment Adviser Defendant were using so-called 12b-1 fees, directed brokerage, excessive commissions, and other revenue sharing payments, to improperly siphon assets from the Funds to the detriment of Plaintiffs and the other members of the Class.

### THE INVESTMENT ADVISER DEFENDANT USED RULE 12B-1 MARKETING FEES FOR IMPROPER PURPOSES

97.     Rule 12b-1 fees were routinely taken from the MFS Funds and their investors. For example, for the fiscal year ended December 31, 2003, distribution and service fees taken from the Massachusetts Investors Trust alone under a 12b-1 Plan were $23,355,344.

98.     By paying excessive brokerage commissions, directed brokerage, and cash payments, MFS Company violated Section 12 of the Investment Company Act because such payments were not made pursuant to a valid Rule 12b-1 Plan.

99.     Section 12(b) of the Investment Company Act prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated

conditions set forth in Rule 12b-1, promulgated by the SEC pursuant to the Investment Company

Act, are met.  The Rule 12b-1 conditions, among others, are that payments for marketing must be

made pursuant to a written plan "describing all material aspects of the proposed financing of

distribution;" all agreements with any person relating to implementation of the plan must be in

writing; the plan must be approved by a vote of the majority of the Board of Trustees; and the

Board of Trustees must review, at least quarterly, "a written report of the amounts so expended

and the purposes for which such expenditures were made."

100.    Additionally, the directors/trustees "have a duty to request and evaluate, and any

person who is a party to any agreement with such company relating to such plan shall have a

duty to furnish, such information as may reasonably be necessary to an informed determination

of whether the plan should be implemented or continued."  The directors/trustees may continue

the plan "only if the Board of Directors who vote to approve such implementation or

continuation conclude, in the exercise of reasonable business judgment, and in light of their

fiduciary duties under state law and section 36(a) and (b) [15 U.S.C. § 80a-35(a) and (b)] of the

Act that *there is a reasonable likelihood that the plan will benefit the company and its

shareholders*."  (Emphasis added).

101.    The exceptions to the Section 12(b) prohibition on mutual fund marketing were

enacted in 1980, principally on the ground that the marketing of mutual funds, all things being

equal, should be encouraged because increased investment in mutual funds would presumably

result in economies of scale, the benefits of which would be shifted from fund managers to

investors.  During the Class Period, the Boards of Directors authorized, and the Investment

Adviser Defendant collected, millions of dollars in purported Rule 12b-1 marketing and

distribution fees.  These excessive fees were paid to MFS Distributor as well as the brokers for pushing MFS Funds.

102.    However, the purported Rule 12b-1 fees charged to MFS Funds investors were highly improper because the conditions of Rule 12b-1 were not met.  There was no "reasonable likelihood" that the plan would benefit the company and its shareholders.  On the contrary, as the Funds were marketed and the number of Fund investors increased, the economies of scale thereby created, if any, were not passed on to MFS Funds investors.  For example, despite the fact the net assets of Class A  shares of the MFS Series Trust VI increased from $187,780,000 to $261,042,000 during the Class Period, the net asset value per share of the fund decreased, falling from $13.98 in 1999 to $12.98 in 2003.  Yet during the same period, expenses charged by Defendants increased, with the ratio of expenses to net assets jumping from 1.48% in 1999 to 1.54% in 2003.

103.    Moreover, Defendants failed to reduce 12b-1 fees as the assets of the Funds increased.  As fund assets increase, certain fixed costs remain the same, thereby reducing the overall costs per investor.  To account for the decline in costs, fees to the Funds and its investors should be reduced.  Despite this fact, Defendants failed to reduce 12b-1 fees that should not have increased as the size of the Fund asserts increased.

104.    The rise in the expense ratio and simultaneous fall in the net asset value of the Fund, while the Funds were expanding, and the failure to reduce 12b-1 fees, were red flags that the Trustee Defendants knowingly or recklessly disregarded.  The MFS Funds' marketing efforts were creating diminished marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance.  The Trustee Defendants ignored or failed to review written reports of the amounts expended pursuant to the MFS Funds Rule 12b-1

38

Plan, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 Plan, on a quarterly basis as required and hence failed to terminate the plans and the payments made pursuant to the Rule 12b-1 Plan, even though such payments harmed MFS Funds shareholders.

105.    Defendants wrongfully inflated advisory fees through the 12b-1 plans by shifting to the Funds or investors expenses which were the responsibility of MFS Company without any corresponding reduction in the advisory fees.  Furthermore, the 12b-1 payments benefited MFS Company by expanding the size of the Funds and thereby increasing the dollar amount of the advisors' fees.  MFS Company improperly failed to reduce its advisory fees by the amount of the benefit they received as a result of the 12b-1 payments.  This resulted in inflated advisory fees and directly impacted the shareholders' investments.

### THE IMPROPER USE OF EXCESSIVE COMMISSIONS AND DIRECTED BROKERAGE

106.    MFS Company paid excessive commissions and directed brokerage business to broker-dealers who steered their clients into MFS Funds as part of a *quid pro quo* "shelf-space" program arrangement between MFS Company and brokerages.  Such payments and directed brokerage payments were used to fund undisclosed financial incentives to further push MFS Funds.  These incentives created an undisclosed conflict of interest and caused brokers to steer clients to MFS Funds regardless of the funds' investment quality relative to other investment alternatives and to thereby breach their duties of loyalty.

107.    By paying the excessive commissions and directing brokerage business to participate in "shelf-space" programs, MFS Company violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 Plan.  Furthermore, the directed brokerage violated applicable SEC regulations because the amounts

paid were over and above standard brokerage costs in order to compensate the brokers for preferential treatment.

108.    The excessive commissions and directed brokerage used by MFS Company did not fund any services that benefited the MFS Funds shareholders.  This practice materially harmed Plaintiffs and other members of the Class from whom the illegitimate and improper fees under the guise of so-called excessive commissions and directed brokerage business were taken.

## IMPROPER USE OF SOFT DOLLARS

109.    Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well.  Specifically, the Section 28(e) "safe harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades.  Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary duties "solely by reason of [their] having caused the account to pay a . . . broker . . . in excess of the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined ***in good faith*** that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. § 78bb(e)(1) (emphasis added).  In other words, funds are allowed to include in "commissions" payment for not only purchase and sales execution, but also for specified services, which the SEC has defined to include, any service that "provides lawful and appropriate assistance to money manager in performance of his investment decision making responsibilities."  The commission amounts charged by brokerages to investment advisers in excess of the purchase and sale charges are known within the industry as "Soft Dollars."

110.     On March 23, 2004, MFS Chairman, Robert Pozen, testified before the U.S.

Senate Banking Committee that, the industry's current system of paying for goods and services

with "soft dollars," taken out of brokerage commissions, is detrimental to mutual fund

shareholders.  *See* "MFS chair discusses mutual fund industry reforms with Congress," at

http://www.mfs.com/news/announcements/content.jhtml?cID=/templatedata/MFSNews/NewsArt

icle/xmldata/pozen_testify_standards.xml&_requestid=113428.

111.     With regard to "soft dollars," the SEC explained the relationship between MFS

and various broker-dealers as follows:

> Although many broker-dealers preferred Strategic Alliance
> payments in the form of cash or "hard dollars," MFS also
> "allocated" brokerage commissions on the MFS Funds' portfolio
> transactions to broker-dealers to satisfy these alliances. MFS
> referred to these allocated fund brokerage commissions as "soft
> dollars." In the ordinary course, to conduct portfolio transactions
> necessary to the pursuit of the Funds' investment program, the
> Funds must pay substantial amounts in brokerage commissions for
> execution services. MFS allocated the soft dollars from these
> brokerage commissions paid to effect portfolio transactions for the
> MFS Funds.
>
> \*          \*          \*
>
> Some MFD employees who negotiated the Strategic Alliances
> created a draft guide, which, although was not submitted to anyone
> at MFS for review, stated that: "It is incumbent on the [employee]
> to negotiate the best deal for MFS. Usually this means trying to
> cover as many costs through soft dollars as possible."
>
> [] From at least January 1, 2000 through November 7, 2003, MFS
> allocated fund brokerage commissions to approximately 100
> broker-dealers with whom it had Strategic Alliances. ***When MFS
> allocated soft dollars to satisfy Strategic Alliances, MFS
> allocated 1.5 times (or some other negotiated multiple) the
> amounts requested by the broker-dealers in basis points to satisfy
> the same Strategic Alliances in hard dollars***.

*See* http://www.sec.gov/litigation/admin/ia-2224.htm. [Emphasis added.]

41

112.     MFS Company's actions went far beyond what is permitted by the Section 28(e) safe harbor by routinely using "Soft Dollars" as excessive commissions to pay brokers to push unwitting clients into MFS Funds.  MFS Company used Soft Dollars to pay for these excessive commissions as well as overhead costs (for items such as computer hardware and software) thus charging MFS Funds investors for costs not covered by the Section 28(e) safe harbor and that, consistent with the Investment Adviser's fiduciary duties, properly should have been borne by the Investment Adviser Defendant MFS Company.

113.     MFS Company paid excessive commissions to broker dealers on top of any legitimate Soft Dollars to steer their clients to MFS Funds and also directed brokerage business to firms that favored MFS Funds.  Such payments and directed-brokerage payments were used to fund sales contests and other undisclosed financial incentives to push MFS Funds.  These improper incentives created an undisclosed conflict of interest and caused brokers to steer clients to MFS Funds regardless of the Funds' investment quality relative to other investment alternatives for the investor and to thereby breach their duties of loyalty to Plaintiffs and the other members of the Class.  By paying the excessive brokerage commissions, MFS Company also violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan.

## THE PROSPECTUSES WERE MATERIALLY FALSE AND MISLEADING

114.     Plaintiffs and the other members of the Class were entitled to, and did receive, prospectuses pursuant to which the MFS Funds shares were offered.

115.     Prospectuses are required to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund.  Section 34(b) of the Investment Company Act, *inter alia*, requires that

such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor.

116.    Each of the MFS Company prospectuses and SAIs issued during the Class Period failed to disclose properly to investors material information about the MFS Funds and the fees and costs associated with them.  As set forth below, each of the MFS prospectuses and SAIs issued during the Class Period contained substantially the same materially false and misleading statements, in that they omitted key information regarding the Funds' strategy for growth of assets, revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars.  Such information was required to be disclosed in "easy to understand language" so that a reasonable investor could make an informed decision whether or not to invest in the Funds.

## MATERIAL OMISSIONS REGARDING STRATEGIES FOR GROWTH

117.    The May 1, 2003 Prospectus for the MFS Growth Opportunities Fund is similar in substance to all MFS Funds Prospectuses issued during the Class Period in that it omits to state that one of the principal methods for increasing assets of the Funds was through participation in "shelf-space programs."

118.    For example, the Prospectus states the Fund's "investment objective is growth of capital."  This statement is materially false and misleading because it failed to disclose that one of the strategies of the Fund was to pay brokers kickbacks to steer clients into the Funds, thereby growing Fund assets in order to maximize management fees payable to the Investment Adviser.

## MATERIAL OMISSIONS REGARDING REVENUE-SHARING

119.    The May 1, 2003 SAI for the MFS Growth Opportunities Fund is similar in substance to all MFS Fund Prospectuses and SAIs issued during the Class Period in that under the heading "Distribution Plan" it stated with respect to its description of the distribution plan and method by which it offered shares to the public:

The Distribution Plan provides that the Fund may pay MFD a distribution fee in addition to the service fee described above based on the average daily net assets attributable to the Designated Class as partial consideration for distribution services performed and expenses incurred in the performance of MFD's obligations under its distribution agreement with the Fund. ***MFD pays commissions to dealers as well as expenses of printing prospectuses and reports used for sales purposes, expenses with respect to the preparation and printing of sales literature and other distribution related expenses, including, without limitation, the cost necessary to provide distribution-related services, or personnel, travel, office expense and equipment***. The amount of the distribution fee paid by the Fund with respect to each class differs under the Distribution Plan, as does the use by MFD of such distribution fees.

[Emphasis added].

120.    The Prospectus, as well as all other MFS Prospectuses, are materially false and misleading in that they failed to disclose, *inter alia*, that the purpose of such payments was not to compensate for normal brokerage costs, but rather for preferential treatment in the marketing of such shares.  They also failed to disclose the massive aggregate amount of such payments as well as the following materially misleading adverse facts which also damaged Plaintiffs and the other members of the Class:

(a)    that the Investment Adviser Defendant and/or MFS Distributors used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf-space" programs whereby the broker steered clients into MFS Funds;

(b)    that the Investment Advisor Defendant and/or MFS Distributors used brokerage commissions and other methods of payment over and above those allowed by Rule 12b-1 to pay for the "shelf-space" programs, and that the revenue-sharing payments were in excess of standard sales loads and 12b-1 payments;

(c)     that the Investment Adviser Defendant and/or MFS Distributors directed brokerage payments to firms that favored MFS Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the MFS Funds Rule 12b-1 Plan and also involved direct costs to the Funds;

(d)     that the Investment Adviser Defendant and/or MFS Distributors compensated themselves out of investor assets for any payment they made pursuant to revenue-sharing agreements;

(e)     that such revenue-sharing payment created undisclosed conflicts of interest;

(f)     that the MFS Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(g)     that any economies of scale achieved by marketing of the MFS Funds to investors were not passed on to MFS Funds investors; but rather, as the MFS Funds grew, fees charged to MFS Funds investors continued to increase; and

(h)     that the Trustee Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, failed to

45

monitor and supervise the Investment Adviser Defendant and, as a

consequence, the Investment Adviser Defendant were able to

systematically skim millions of dollars from the investors of MFS Funds.

**MATERIAL OMISSIONS REGARDING DIRECTED BROKERAGE BUSINESS**

121.    The May 1, 2003 SAI for the MFS Growth Opportunities Fund is similar in

substance to all MFS Fund Prospectuses and SAIs issued during the Class Period in that under

the heading "PORTFOLIO TRANSACTIONS AND BROKERAGE COMMISSIONS" it states:

> In connection with the selection of broker dealers and the placing of
> Fund portfolio transactions, the Adviser seeks for the Fund the best
> overall price and execution available from responsible brokerage firms,
> taking account of all factors it deems relevant, including by way of
> illustration: price; the size of the transaction; the nature of the market
> for the security; the amount of the commission; the timing and impact of
> the transaction taking into account market prices and trends; the
> reputation, experience and financial stability of the broker or dealer
> involved; and the quality of services rendered by the broker or dealer in
> other transactions.
>
> *            *            *
>
> As permitted by Section 28(e) of the Securities Exchange Act of 1934, as
> amended, the ***Adviser may cause the Fund to pay a broker or dealer
> which provides brokerage and research services to the Adviser an
> amount of commission for effecting a securities transaction for the
> Fund in excess of the amount other brokers or dealers would have
> charged for the transaction if the Adviser determines in good faith that
> the greater commission is reasonable in relation to the value of the
> brokerage and research services provided by the executing broker or
> dealer viewed in terms or either a particular transaction or the Adviser's
> overall responsibilities to the Fund and its other clients.***

[Emphasis added].

122.    The above statement is materially false and misleading in that it failed to disclose,

that Defendants chose brokers and/or MFS Distributors to execute sales of the Funds' portfolios

– and thereby directed the commissions from the sales of the portfolio securities to these brokers

46

– to satisfy negotiated arrangements with brokerages to give MFS Company "shelf-space"

visibility and to push their clients into MFS Funds in exchange for directed brokerage.  As stated

by the SEC:

> From at least January 1, 2000 to November 7, 2003, MFS Funds'
> SAIs disclosed that MFS may consider sales of shares of the funds
> as a factor in the selection of broker-dealers to execute the MFS
> Funds' portfolio transactions. ***The SAIs did not make the
> distinction, however, between directing commissions in
> "consideration of fund sales" and satisfying negotiated
> arrangements for specific amounts with brokerage commissions.
> The SAIs did not adequately disclose to shareholders that MFS
> had entered into bilateral arrangements in which it agreed to
> allocate specific negotiated amounts of fund brokerage
> commissions, subject to best execution, to broker-dealers for
> "shelf space" or heightened visibility within their distribution
> systems***.

*See* http://www.sec.gov/litigation/admin/ia-2224.htm. [Emphasis added.]

123.    Additionally, the above statement is materially false and misleading for the

following reasons:

(a)    the Investment Adviser Defendant and/or MFS Distributors used investor

assets to pay broker-dealers to satisfy bilateral arrangements with

brokerages known as "shelf-space" programs whereby the broker steered

clients into MFS Funds;

(b)    the Investment Advisor Defendant and/or MFS Distributors used

brokerage commissions and other methods of payment over and above

those allowed by Rule 12b-1 to pay for the "shelf-space" programs, that

the revenue-sharing payments were in excess of standard sales loads and

12b-1 payments and that the commission payments were higher than what

would be "best execution" or standard in order to compensate brokers for

promoting Fund shares;

47

(c)     the Investment Adviser Defendant and/or MFS Distributors directed brokerage payments to firms that favored MFS Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the MFS Funds Rule 12b-1 Plan;

(d)     such revenue-sharing payments created undisclosed conflicts of interest;

(e)     the MFS Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the Funds and their shareholders;

(f)     any economies of scale achieved by marketing of the MFS Funds to investors were not passed on to MFS Funds investors; but rather, as the MFS Funds grew, fees charged to MFS Funds investors continued to increase; and

(g)     the Trustee Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendant and, as a consequence, the Investment Adviser Defendant were able to systematically skim millions of dollars from the investors of MFS Funds.

## MATERIAL OMISSIONS REGARDING 12B-1 FEES

124.    The May 1, 2003 SAI for the MFS Growth Opportunities Fund is similar in substance to all MFS Fund Prospectuses and SAIs issued during the Class Period in that under the heading "Distribution Plan" it states:

> *The[12b-1] Distribution Plan provides that the Fund may pay MFD a service fee of up to 0.25% of the average daily net assets attributable to the class of shares to which the Distribution Plan relates (i.e., Class A, Class B, Class C, Class R or Class J shares, as appropriate) (the "Designated Class") annually in order that MFD may pay expenses on behalf of the Fund relating to the servicing of shares of the Designated Class*. The service fee is used by MFD to compensate dealers which enter into an agreement with MFD in consideration for all personal services and/or account maintenance services rendered by the dealer with respect to shares of the Designated Class owned by investors for whom such dealer is the dealer or holder of record or for whom the dealer provides such services.

[Emphasis added].

125.    The above statement is materially false and misleading in that it fails to state that MFS Company used 12b-1 fees to participate in "shelf-space programs" to provide kickbacks to brokers for directing their clients into MFS Funds, and it fails to disclose the massive aggregate amounts involved, and it fails to disclose the benefits accorded to the Investment Advisers from that program.  Additionally, the above statement is materially false and misleading for the following reasons:

(a)    the Investment Adviser Defendant and/or MFS Distributors used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf-space" programs whereby the broker steered clients into MFS Funds;

(b)    the Investment Advisor Defendant and/or MFS Distributors used brokerage commissions and other methods of payment over and above

those allowed by Rule 12b-1 to pay for the "shelf-space" programs, and that the revenue-sharing payments were in excess of standard sales loads and 12b-1 payments;

(c)     the Investment Adviser Defendant and/or MFS Distributors directed brokerage payments to firms that favored MFS Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the MFS Funds Rule 12b-1 Plan;

(d)     the Investment Adviser Defendant and/or MFS Distributors compensated themselves out of investor assets for any payment they made pursuant to revenue-sharing agreements;

(e)     such revenue-sharing payments created undisclosed conflicts of interest;

(f)     the MFS Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the Funds and their shareholders;

(g)     any economies of scale achieved by marketing of the MFS Funds to investors were not passed on to MFS Funds investors; but rather, as the MFS Funds grew, fees charged to MFS Funds investors continued to increase; and

(h)     the Trustee Defendants had abdicated their duties under the Investment

Company Act and their common law fiduciary duties, failed to monitor

and supervise the Investment Adviser Defendant and, as a consequence,

the Investment Adviser Defendant were able to systematically skim

millions of dollars from the investors of MFS Funds.

## MATERIAL OMISSIONS REGARDING SOFT DOLLARS

126.    The May 1, 2003 Prospectus for the MFS Opportunity Growth Fund is similar in

substance to all MFS Funds Prospectuses issued during the Class Period in that under the

heading "PORTFOLIO TRANSACTIONS AND BROKERAGE COMMISSIONS" it states:

> As permitted by Section 28(e) of the Securities Exchange Act of
> 1934, as amended, the Adviser may cause the Fund to pay a broker
> or dealer which provides brokerage and research services to the
> Adviser an amount of commission for effecting a securities
> transaction for the Fund in excess of the amount other brokers or
> dealers would have charged for the transaction if the Adviser
> determines in good faith that the greater commission is
> reasonable in relation to the value of the brokerage and research
> services provided by the executing broker or dealer viewed in
> terms or either a particular transaction or the Adviser's overall
> responsibilities to the Fund and its other clients.

127.    The Prospectus, as well as all other MFS Prospectuses, are materially false and

misleading in that they failed to disclose, *inter alia*, the following materially misleading adverse

facts which damaged Plaintiffs and the other members of the Class:

(a)     the Investment Adviser Defendant and/or MFS Distributors used investor

assets to pay broker-dealers to satisfy bilateral arrangements with

brokerages known as "shelf-space" programs whereby the broker steered

clients into MFS Funds;

(b)     the Investment Advisor Defendant and/or MFS Distributors used

brokerage commissions and other methods of payment over and above

those allowed by Rule 12b-1 to pay for the "shelf-space" programs, and that the revenue-sharing payments were in excess of standard sales loads and 12b-1 payments;

(c)    the Investment Adviser Defendant and/or MFS Distributors directed brokerage payments to firms that favored MFS Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the MFS Funds Rule 12b-1 Plan;

(d)    the Investment Adviser Defendant and/or MFS Distributors compensated themselves out of investor assets for any payment they made pursuant to revenue-sharing agreements;

(e)    such revenue-sharing payments created undisclosed conflicts of interest;

(f)    that the soft dollar commissions were not for payment of legitimate research costs, but were a concealed method of paying brokers for preferential treatment in the marketing of MFS shares, and as such constituted an integral part of the revenue sharing program;

(g)    the MFS Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the Funds and their shareholders;

(h)     any economies of scale achieved by marketing of the MFS Funds to
investors were not passed on to MFS Funds investors; but rather, as the
MFS Funds grew, fees charged to MFS Funds investors continued to
increase; and

(i)     the Trustee Defendants had abdicated their duties under the Investment
Company Act and their common law fiduciary duties, failed to monitor
and supervise the Investment Adviser Defendant and, as a consequence,
the Investment Adviser Defendant were able to systematically skim
millions of dollars from the investors of MFS Funds.

### PLAINTIFFS' CLASS ACTION ALLEGATIONS

128.    Plaintiffs bring these claims (except for Count V that is brought derivatively on
behalf of the MFS Funds) as a class action pursuant to Federal Rule of Civil Procedure 23(a) and
(b)(3) on behalf of a Class, consisting of all persons or entities who held shares, units, or like
interests in any of the MFS Funds between March 24, 1999 and March 31, 2004 inclusive (the
"Class Period"), and who were damaged thereby (the "Class").  Excluded from the Class are
defendants, members of their immediate families and their legal representatives, heirs, successors
or assigns and any entity in which defendants have or had a controlling interest.

129.    The members of the Class are so numerous that joinder of all members is
impracticable.  While the exact number of Class members is unknown to plaintiffs at this time
and can only be ascertained through appropriate discovery, plaintiffs believe that there are many
thousands of members in the proposed Class.  Record owners and other members of the Class
may be identified from records maintained by MFS Company, MFS Distributors, and other

defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

130.    Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal and state law that is complained of herein.

131.    Plaintiffs will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class and securities litigation.

132.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    (a)    whether the Investment Company Act was violated by Defendants' acts as alleged herein;

    (b)    whether the Investment Advisers Act was violated by Defendants' acts as alleged herein;

    (c)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and financial statements of the MFS Funds;

    (d)    whether Defendants breached their common law fiduciary duties and/or knowingly aided and abetted common law breaches of fiduciary duties; and

    (e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

133.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## DEMAND ON THE BOARDS TO TAKE CORRECTIVE ACTION WOULD BE FUTILE

134.    Plaintiffs have not made any demand on the Boards of Trustees of the MFS Funds (the "Boards") to institute this action for its derivative claim brought pursuant to the Investment Adviser Act in Count V below.  Such demand would be a futile act because the Boards are incapable of making an independent and disinterested decision for the following reasons:

135.    As alleged in detail herein, each of the Trustee Defendants was appointed by, and serves at the pleasure of, the Investment Adviser Defendant.  Each of the Trustee Defendants is controlled by and beholden to the Investment Adviser Defendant for his or her position and substantial compensation as a Trustee.  Although as a technical matter, the shareholders have a right to vote out the Trustee, the Trustees know that this is extremely unlikely if the Investment Adviser support the Trustees, which they have done throughout the Class Period. Accordingly, each of the MFS Trustees is incapable of evaluating a demand independently and disinterestedly.

136.    Because of their lack of independence from the Investment Adviser Defendant, the Trustee Defendants wrongfully approved advisor fees, revenue sharing, directed brokerage, 12b-1 fees, Soft Dollars, and the materially misleading disclosures in the MFS Prospectuses in each of the years they served as Trustee.

137.    As alleged in detail herein, each of the Trustee Defendants knowingly participated in, approved, and/or recklessly disregarded the wrongs complained of herein. The conduct of the Trustee Defendants was in breach of their fiduciary duties and could not have been an exercise of good faith business judgment.

138.    The Trustee Defendants allowed a course of conduct that prejudiced the MFS Funds and investors as the Trustee Defendants allowed the excessive fees to be charged and shareholder investments to be used for improper purposes such as kickbacks to brokers. The payment of kickbacks to brokers was conduct that should have been prevented by the Trustee Defendants, but was not.

139.    The Trustee Defendants also were self-interested in the improper kickbacks paid to brokers who steered their clients' assets into the MFS Funds in order to increase the assets in the Funds. Growth of a mutual fund is one of the keys to its survival, for if a mutual fund's assets stagnate or decrease, there is a great likelihood that the fund will be disbanded or merged with another fund. If the mutual fund is disbanded or merged, the board members for that fund necessarily lose their positions on the fund's board as well as the compensation for sitting on the fund's board.

140.    Additionally, each of the Trustee Defendants' received substantial payments and benefits by virtue of his or her membership on one or more Boards and his or her control of hundreds of MFS Funds. For example:

    a)    Defendant Cohn oversaw 112 funds in the MFS fund complex and received compensation of $148,006 for the calendar year ended 2002.

    b)    Defendant Gutow oversaw 112 funds in the MFS fund complex and received compensation of $148,006 for the calendar year ended 2002.

    c)    Defendant Ives oversaw 112 funds in the MFS fund complex and received compensation of $164,031 for the calendar year ended 2002.

d)    Defendant O'Neill oversaw 112 funds in the MFS fund complex and received compensation of $146,450 for the calendar year ended 2002.

e)    Defendant Perera oversaw 112 funds in the MFS fund complex and received compensation of $151,547 for the calendar year ended 2002.

f)    Defendant Poorvu oversaw 112 funds in the MFS fund complex and received compensation of $161,463 for the calendar year ended 2002.

g)    Defendant Sherratt oversaw 112 funds in the MFS fund complex and received compensation of $149,006 for the calendar year ended 2002.

h)    Defendant Elaine Smith oversaw 112 funds in the MFS fund complex and received compensation of $152,574 for the calendar year ended 2002.

i)    Defendant Ward Smith oversaw 112 funds in the MFS fund complex and received compensation of $165,334 for the calendar year ended 2002.

141.    Each of the Trustee Defendants has thus benefited from the wrongdoing herein alleged, has engaged in such conduct to preserve his or her positions of control and the benefits thereof, and has been compensated for such conduct.

142.    Each of the Trustee Defendants were Directors during the Class Period and most continue to serve as a Director, and the Trustee Defendants comprise the Boards.  Thus, in order to bring this action for breaching their fiduciary duties, the Trustee Defendants would be required to sue themselves and their fellow Directors with whom they have had close business and personal relationships throughout the Class Period.  Accordingly, a majority of the Boards is incapable of evaluating a demand independently and disinterestedly.

## INVESTMENT COMPANY ACT CLAIMS

### COUNT I

**AGAINST MFS COMPANY AND
THE TRUSTEE DEFENDANTS FOR VIOLATIONS OF SECTION
34(b) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS**

143.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegations of fraud.

144.    This Count is asserted against MFS Company in its role as investment adviser to the MFS Funds and against the Trustee Defendants for their roles in the creation, approval, and dissemination of the materially false and misleading Annual Reports, Semi-Annual Reports, Registration Statements, Prospectuses, and Statements of Additional Information.

145.    MFS Company and the Trustee Defendants made untrue statements of material fact in Registration Statements and Annual and Semi-Annual Reports filed and disseminated pursuant to the Investment Company Act and omitted to state facts necessary to prevent the statements made therein, in light of the circumstances under which they were made, from being materially false and misleading.  MFS Company and Trustee Defendants failed to disclose the following:

(a)    that the Investment Adviser Defendant authorized the payment of excessive commissions to broker dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12b of the Investment Company Act, and unprotected by any "safe harbor";

(b)    that the Investment Adviser Defendant and/or MFS Distributors compensated themselves out of investor assets for payments made pursuant to revenue-sharing agreements;

(c)    that the Investment Adviser Defendant and/or MFS Distributors directed brokerage and other payments to firms that favored MFS Funds, which was a form of marketing that was not disclosed in or authorized by the MFS Funds Rule 12b-1 Plan;

(d)    that the MFS Funds Rule 12b-1 Plan was not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(e)    that by paying brokers to aggressively steer their clients to the MFS Funds, the Investment Adviser Defendant were knowingly or recklessly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

(f)    that any economies of scale achieved by marketing of the MFS Funds to new investors were not passed on to MFS Funds investors; on the contrary, as the MFS Funds grew, fees charged to MFS Funds investors increased;

(g)    that defendants improperly used Soft Dollars and excessive commissions, to pay for overhead expenses the cost of which should have been borne by Defendants and not MFS Funds investors; and

(h)    that the Trustee Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, that the Trustee Defendants failed to monitor and supervise the Investment Adviser Defendant and that, as a consequence, the Investment Adviser Defendant were able to systematically skim millions and millions of dollars from the MFS Fund investors.

146.     By reason of the conduct described above, MFS Company and the Trustee Defendants violated Section 34(b) of the Investment Company Act.

147.     As a direct, proximate and foreseeable result of MFS Company's and Trustee Defendants' violation of Section 34(b) of the Investment Company Act, MFS Funds investors have incurred millions of dollars in damages.  For example, the "shelf space" arrangements discussed above resulted in improperly inflated fees charged to investors with no resulting benefit to investors.  Additionally, the "shelf-space" payments did not contribute positively to the net asset value of the funds per share, and damaged the class members by reducing the value of their interest.

148.     Plaintiffs and the other members of the Class have been specially injured by the defendants' violations of Section 34(b) of the Investment Company Act.  Such injuries were suffered directly by the shareholders.

149.     MFS Company and the Trustee Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal such adverse material information.

## COUNT II

### AGAINST MFS DISTRIBUTORS, MFS COMPANY, AND THE TRUSTEE DEFENDANTS PURSUANT TO SECTION 36(a) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

150.     Plaintiffs repeat and reallege each and every allegation contained above and otherwise incorporates the allegations contained above, except for allegations of fraud.

151.     This Count is brought by Plaintiffs (as MFS Funds securities holders), on behalf of themselves and the other members of the Class, against MFS Distributors, MFS Company,

and the Trustee Defendants for breaches of their fiduciary duties as defined by Section 36(a) of the Investment Company Act.

152.    MFS Distributors, MFS Company, and the Trustee Defendants each had a fiduciary duty to Plaintiffs and the other members of the Class.

153.    MFS Distributors, MFS Company, and the Trustee Defendants violated Section 36(a) by improperly charging investors in the MFS Funds purported Rule 12b-1 marketing fees; by drawing on MFS Fund investor assets to make undisclosed payments of Soft Dollars, directed brokerage, and excessive commissions, in violation of Rule 12b-1; by making improper revenue-sharing payments and directly or indirectly imposing the cost of such payments on to Funds and their shareholders;

154.    By reason of the conduct described above, MFS Distributors, MFS Company, and the Trustee Defendants violated Section 36(a) of the Investment Company Act.

155.    As a direct, proximate, and foreseeable result of MFS Distributors', MFS Company's, and the Trustee Defendants' breaches of the fiduciary duties in their roles as principal underwriter, investment adviser, and Directors and officers, respectively to MFS Funds investors, Plaintiffs and the other members of the Class have incurred millions of dollars in damages.  For example, the "shelf space" arrangements discussed above resulted in improperly inflated fees charged to investors with no resulting benefit to investors.  Additionally, the "shelf-space" payments did not contribute positively to the net asset value of the funds per share, and damaged the class members by reducing the value of their interest.

156.    Plaintiffs, in this Count, seek to enjoin defendants from engaging in such practices in the future, as well as recover, on their own behalf and on behalf of the other members of the Class improper Rule 12b-1 fees, Soft Dollars, excessive commissions and management fees

charged to the MFS Funds and the individual investors by MFS Distributors, MFS Company, and the Trustee Defendants.

## COUNT III

### AGAINST MFS DISTRIBUTORS, MFS COMPANY AND THE DIRECTOR DEFENDANTS PURSUANT TO SECTION 36(b) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

157.    Plaintiffs repeat and reallege each and every allegation contained above and otherwise incorporates the allegations contained above, except any allegations of fraud.

158.    This Count is brought by Plaintiffs (as MFS Funds securities holders), on behalf of themselves and the other members of the Class, against MFS Distributors, MFS Company and the Trustee Defendants for breach of their fiduciary duties as defined by Section 36(b) of the Investment Company Act.

159.    MFS Distributors, MFS Company, and the Trustee Defendants had a fiduciary duty to the MFS Funds investors with respect to the receipt of compensation for services and of payments of a material nature made by and to the MFS Distributors, MFS Company, and the Trustee Defendants.

160.    MFS Distributors, MFS Company, and the Trustee Defendants violated Section 36(b) by improperly charging investors in the MFS Funds purported Rule 12b-1 marketing fees, failing to reduce their advisory fees to reflect the benefit received by MFS Company from the 12b-1 payments, and by drawing on assets of the investors of MFS Funds to make undisclosed payments of Soft Dollars and excessive commissions in violation of Rule 12b-1, despite the fact that the payments at issue benefited only the Defendants and not the Funds or their investors. In addition, Defendants violated Section 36(b) by wrongfully inflating their advisory fees in an amount that would compensate them for further revenue-sharing payments made ostensibly from

the assets of MFS Company or MFS Distributors.  By virtue of the forgoing, Defendants charged a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

161.    By reason of the conduct described above, MFS Distributors, MFS Company, and the Trustee Defendants violated Section 36(b) of the Investment Company Act.

162.    The Trustee Defendants received improper payments, in that they were compensated in very large amounts in return for their violation of their fiduciary duties to Plaintiffs and the other members of the Class.

163.    As a direct, proximate and foreseeable result of the MFS Distributors', MFS Company's, and the Trustee Defendants' breach of the fiduciary duties in their roles as principal underwriter, investment adviser and Trustees, respectively, to the MFS Funds investors, Plaintiffs and the other members of the Class have incurred millions of dollars in damages.  For example, the "shelf space" arrangements discussed above resulted in improperly inflated fees charged to investors with no resulting benefit to investors.  Additionally, the "shelf-space" payments did not contribute positively to the net asset value of the funds per share, and damaged the class members by reducing the value of their interest.

164.    Plaintiffs on behalf of themselves and the other members of the Class, in this count seek to recover all of the improper 12b-1 fees, Soft Dollars, excessive commissions, and management fees improperly charged to the MFS Funds and the individual investors by MFS Distributors, MFS Company, and the Trustee Defendants as alleged herein.

## COUNT IV

**AGAINST SUN LIFE (AS A CONTROL PERSON OF MFS COMPANY) AND MFS COMPANY (AS CONTROL PERSON OF THE TRUSTEES AND MFS DISTRIBUTORS) FOR VIOLATION OF SECTION 48(a) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS**

165.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegations of fraud.

166.    This Count is brought Plaintiffs on their own behalf and on behalf of all other members of the Class pursuant to Section 48(a) of the Investment Company Act against Sun Life who caused MFS Company to commit the violations of the Investment Company Act alleged herein, and the MFS Company, who caused the Trustee Defendants and MFS Distributors to commit the violations of the Investment Company Act alleged herein.  It is appropriate to treat these defendants as a group for pleading purposes and to presume that the misconduct complained of herein is the collective actions of Sun Life, MFS Company, the Trustee Defendants, and MFS Distributors.

167.    MFS Company, the Trustee Defendants and MFS Distributors are liable under Section 34(b), 36(a), and 36(b) of the Investment Company Act to Plaintiffs and the other members of the Class as set forth herein.

168.    Sun Life and was a "control person" of MFS Company, and MFS Company was a "control person" of  the Trustee Defendants and MFS Distributors respectively, that caused the violations complained of herein.  By virtue of their positions of operational control and/or authority over MFS Company, the Trustee Defendants and MFS Distributors, respectively, Sun Life and MFS Company and indirectly, had the power and authority, and exercised the same, to cause MFS Company, the Trustee Defendants and MFS Distributors to engage in the wrongful conduct complained of herein.

64

169.    Pursuant to Section 48(a) of the Investment Company Act, by reason of the foregoing, Sun Life and MFS Company are liable to Plaintiffs and the other members of the Class to the same extent as are MFS Company, the Trustee Defendants and MFS Distributors for their primary violations of Sections 34(b), and 36(a) and (b) of the Investment Company Act.

170.    By virtue of the foregoing, Plaintiffs, and the other members of the Class are entitled to damages against Sun Life and MFS Company.

## INVESTMENT ADVISER ACT CLAIMS

### COUNT V

**AGAINST THE INVESTMENT ADVISER DEFENDANT MFS COMPANY UNDER SECTION 215 OF THE INVESTMENT ADVISERS ACT FOR VIOLATIONS OF SECTION 206 OF THE INVESTMENT ADVISERS ACT DERIVATIVELY ON BEHALF OF THE MFS FUNDS**

171.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

172.     This Count is brought by Plaintiffs derivatively against the Investment Adviser Defendant on behalf of the MFS Funds based upon Section 215 of the Investment Advisers Act, 15 U.S.C. §80b-15.

173.     The Investment Adviser Defendant had advisory contracts with the MFS Funds and served as "investment adviser" to the MFS Funds and the MFS Funds investors pursuant to the Investment Advisers Act.  The MFS Funds, and their shareholders, were the intended beneficiaries of these advisory contracts and investment advisor services.

174.     As fiduciaries pursuant to the Investment Advisers Act, the Investment Adviser Defendant was required to serve the MFS Funds in a manner in accordance with the federal fiduciary standards set forth in Section 206 of the Investment Advisers Act, 15 U.S.C. §80b-6, governing the conduct of investment advisers.

175.     During the Class Period, the Investment Adviser Defendant breached its fiduciary duties to the MFS Funds by engaging in a deceptive contrivance, scheme, practice and course of conduct pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon the MFS Funds.   The Investment Adviser Defendant breached its fiduciary duties owed to the MFS Funds by engaging in the aforesaid transactions, practices and courses of business knowingly or recklessly so as to

constitute a deceit and fraud upon the MFS Funds.  The Investment Adviser Defendant is liable as a direct participant in the wrongs complained of herein.

176.    The Investment Adviser Defendant had a duty to (1) disseminate accurate and truthful information with respect to the MFS Funds; and (2) truthfully and uniformly act in accordance with their stated policies and fiduciary responsibilities to the MFS Funds.  The Investment Adviser Defendant participated in the wrongdoing complained of herein in order to prevent the MFS Funds from knowing of the Investment Adviser Defendant's breaches of fiduciary duties including:  (1) the charging of improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" to satisfy *quid pro quo* shelf space arrangements; and (4) charging excessive and improper commission payments to brokers.

177.    As a result of the Investment Adviser's multiple breaches of it fiduciary duties owed to the MFS Funds, the MFS Funds were damaged.

178.    The MFS Funds are entitled to rescind their investment advisory contracts with the Investment Adviser Defendant and recover all fees paid in connection with such agreements.

**BREACH OF FIDUCIARY DUTY CLAIMS**

**COUNT VI**

**BREACH OF FIDUCIARY DUTY AGAINST MFS COMPANY
ON BEHALF OF THE CLASS**

179.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein, except allegations of fraud.

180.    This count is brought by Plaintiffs on their own behalf and on behalf of all other members of the Class against MFS Company for breach of fiduciary duty.

181. As investment adviser to the MFS Funds, MFS Company was a fiduciary to Plaintiffs and the other members of the Class and were required to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor.

182. As set forth above, MFS Company breached its fiduciary duties to Plaintiffs and the other members of the Class.

183. Plaintiffs and the other members of the Class have been specially injured as a direct, proximate and foreseeable result of such breach on the part of MFS Company and have suffered substantial damages.  For example, the "shelf space" arrangements discussed above resulted in improperly inflated fees charged to investors with no resulting benefit to investors. Additionally, the "shelf-space" payments did not contribute positively to the net asset value of the funds per share, and damaged the class members by reducing the value of their interest.

184. Because MFS Company acted with reckless and willful disregard for the rights of Plaintiffs and the other members of the Class, the Investment Adviser Defendant is liable for punitive damages in an amount to be determined by the jury.

## COUNT VII

### BREACH OF FIDUCIARY DUTY AGAINST THE TRUSTEE DEFENDANTS ON BEHALF OF THE CLASS

185. Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein, except allegations of fraud.

186. As MFS Funds Trustees and Officers, the Trustee Defendants had a fiduciary duty to the MFS Funds and MFS Funds investors to supervise and monitor the Investment Adviser Defendant MFS Company.

187. The Trustee Defendants breached their fiduciary duties by reason of the acts alleged herein, including their failure to prevent MFS Company from (1) issuing deceptive

documents to investors; (2) charging improper Rule 12b-1 marketing fees; (3) making improper undisclosed payments of Soft Dollars; (4) making unauthorized use of "directed brokerage" to satisfy *quid pro quo* shelf space arrangements; (5) charging excessive and improper commission payments to brokers; and (6) making improper revenue-sharing payments, the cost of which was borne by the MFS Fund investors.

188.    Plaintiffs and the other members of the Class have been specially injured as a direct, proximate and foreseeable result of such breach on the part of the Trustee Defendants and have suffered substantial damages.  For example, the "shelf space" arrangements discussed above resulted in improperly inflated fees charged to investors with no resulting benefit to investors.  Additionally, the "shelf-space" payments did not contribute positively to the net asset value of the funds per share, and damaged the class members by reducing the value of their interest.

189.    Because the Trustee Defendants acted with reckless and willful disregard for the rights of Plaintiffs and the other members of the Class, the Trustee Defendants are liable for punitive damages in an amount to be determined by the jury.

## COUNT VIII

### AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS ON BEHALF OF THE CLASS

190.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein, except any allegations of fraud.

191.    At all times herein, the broker dealers that sold MFS Funds had fiduciary duties of loyalty to their clients, including Plaintiffs and the other members of the Class.

192.    Defendants knew or should have known that the broker dealers had these fiduciary duties.

193.    By accepting improper Rule 12b-1 fees, Soft Dollars and excessive commissions in exchange for aggressively pushing MFS Funds, and by failing to disclose the receipt of such fees for such purposes, the brokerages breached their fiduciary duties to Plaintiffs and the other members of the Class.

194.    Defendants possessed actual or constructive knowledge that the brokerages were breaching their fiduciary duties, but nonetheless knowingly provided substantial assistance to the brokerages by continuing the improper payments, as described herein, for brokerages to push MFS Funds.

195.    Defendants' actions, as described in this complaint, were a substantial factor in causing the losses suffered by Plaintiffs and the other members of the Class. By participating in the brokerages' breaches of fiduciary duties, Defendants are liable therefore.

196.    As a direct, proximate and foreseeable result of the defendants' knowing participation in the brokerages' breaches of fiduciary duties, Plaintiffs and the other members of the Class have suffered damages. For example, the "shelf space" arrangements discussed above resulted in improperly inflated fees charged to investors with no resulting benefit to investors. Additionally, the "shelf-space" payments did not contribute positively to the net asset value of the funds per share, and damaged the class members by reducing the value of their interest.

197.    Because Defendants acted with reckless and willful disregard for the rights of Plaintiffs and the other members of the Class, Defendants are liable for punitive damages in an amount to be determined by the jury.

## UNJUST ENRICHMENT

## COUNT IX

## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT ON BEHALF OF THE CLASS

198.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein, except any allegations of fraud.

199.    Defendants benefited from their unlawful acts through the excessive and improper fees they charged and received from Plaintiffs and the other members of the Class.  It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiffs and other members of the Class retained by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(A)    Determining that this action is a proper class action and certifying Plaintiffs as the Class representative and Plaintiffs' counsel as Class counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(B)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C)    Awarding punitive damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(D)    Awarding the MFS Funds rescission of their contracts with the Investment Adviser Defendant, including recovery of all fees which would otherwise apply, and recovery of all fees paid to the Investment Adviser Defendant;

(E)     Ordering an accounting of all MFS Funds-related fees, commissions, and Soft Dollar payments;

(F)     Ordering restitution of all unlawfully or discriminatorily obtained fees and charges;

(G)     Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants' assets to assure that Plaintiffs and the Class have an effective remedy;

(H)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(I)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated March 3, 2005

**MOULTON & GANS, P.C.**

By: __/s/ Nancy Freeman Gans_____
    Nancy Freeman Gans (BBO #184540)
33 Broad Street, Suite 1100
Boston, Massachusetts  02109-4216
(617) 369-7979

*Counsel for Plaintiffs Eric Forsythe and Larry R.*
*Eddings and Proposed Liaison Counsel for*
*Plaintiffs and the Class*

**MILBERG WEISS BERSHAD**
  **& SCHULMAN LLP**
Jerome M. Congress
Janine L. Pollack
Michael R. Reese
One Pennsylvania Plaza
New York, New York  10119-0165
(212) 594-5300

*Counsel for Plaintiff Eric Forsythe and Proposed*
*Co-Lead Counsel for Plaintiffs and the Class*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Alan Schulman
Robert S. Gans
Timothy A. DeLange
Jerald D. Bien-Willner
12544 High Bluff Drive, Suite 150
San Diego, CA 92130
(858) 793-0070

*Counsel for Plaintiff Chicago Deferred*
*Compensation Plan and Proposed Co-Lead*
*Counsel for Plaintiffs and the Class*

73

**WEISS & LURIE**
Joseph H. Weiss
Richard Acocelli
551 Fifth Avenue, Suite 1600
New York, New York  10176
(212) 682-3025

*Counsel for Plaintiff Larry R. Eddings and*
*Proposed Co-Lead Counsel for Plaintiffs and the*
*Class*

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
Marshall N. Perkins
The World Trade Center – Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland  21202
(410) 332-0030

*Counsel for Plaintiff Eric Forsythe*

**STULL, STULL & BRODY**
Jules Brody
Mark Levine
Aaron Brody
6 East 45th Street
New York, New York  10017
(212) 687-7230

*Counsel for Plaintiff Larry R. Eddings*

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania  19004
(610) 667-7706

*Counsel for Plaintiff Richard  Koslow*

**GILMAN AND PASTOR LLP**
David Pastor (BBO #391000)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, Massachusetts  01906
(781) 231-7850

*Counsel for Plaintiff Richard Koslow*

### CERTIFICATE OF SERVICE

I, Nancy Freeman Gans, hereby certify that a true copy of the above document was served upon each party by hand and/or by regular mail, postage prepaid, on March 3, 2005.

/s/ Nancy Freeman Gans
Nancy Freeman Gans