**EXHIBIT G**

As filed with the Securities and Exchange Commission on April 30, 2003

                                             1933 Act File No. 2-11401
                                             1940 Act File No. 811-203

================================================================================

                     SECURITIES AND EXCHANGE COMMISSION
                          WASHINGTON, D.C. 20549


                                 FORM N-1A
                      REGISTRATION STATEMENT UNDER

                       THE SECURITIES ACT OF 1933
                      POST-EFFECTIVE AMENDMENT NO. 83


                                    AND

                      REGISTRATION STATEMENT UNDER
                  THE INVESTMENT COMPANY ACT OF 1940

                            AMENDMENT NO. 34


                      MASSACHUSETTS INVESTORS TRUST
             (Exact Name of Registrant as Specified in Charter)

                500 Boylston, Street, Boston, Massachusetts 02116
                     (Address of Principal Executive Offices)

          Registrant's Telephone Number, Including Area Code: 617-954-5000
                Stephen E. Cavan, Massachusetts Financial Services Co.,
                  500 Boylston Street, Boston, Massachusetts 02116
                     (Name and Address of Agent for Service)

                  APPROXIMATE DATE OF PROPOSED PUBLIC OFFERING:
     It is proposed that this filing will become effective (check appropriate box):

|_| immediately upon filing pursuant to paragraph (b)
|X| on April 30, 2003 pursuant to paragraph (b)
|_| 60 days after filing pursuant to paragraph (a)(i)
|_| on [date] pursuant to paragraph (a)(i)
|_| 75 days after filing pursuant to paragraph (a)(ii)
|_| on [date] pursuant to paragraph (a)(ii) of rule 485.


If appropriate, check the following box:
|_| this post-effective amendment designates a new effective date for a
    previously filed post-effective amendment

```
------------------------------
MASSACHUSETTS INVESTORS TRUST
------------------------------
```

MAY 1, 2003

[logo] M F S(R)                                   STATEMENT OF ADDITIONAL
INVESTMENT MANAGEMENT                                         INFORMATION

500 BOYLSTON STREET, BOSTON, MA 02116
(617) 954-5000


This Statement of Additional Information, as amended or supplemented from time
to time (the "SAI"), sets forth information which may be of interest to
investors, but which is not necessarily included in the Fund's Prospectus dated
May 1, 2003. This SAI should be read in conjunction with the Prospectus. The
Fund's financial statements are incorporated into this SAI by reference to the
Fund's most recent Annual Report to shareholders. A copy of the Annual Report
accompanies this SAI. You may obtain a copy of the Fund's Prospectus and Annual
Report without charge by contacting MFS Service Center, Inc. (see back cover of
Part II of this SAI for address and phone number).


This SAI is divided into two Parts -- Part I and Part II. Part I contains
information that is particular to the Fund, while Part II contains information
that generally applies to each of the funds in the MFS Family of Funds (the "MFS
Funds"). Each Part of the SAI has a variety of appendices which can be found at
the end of Part I and Part II, respectively.

THIS SAI IS NOT A PROSPECTUS AND IS AUTHORIZED FOR DISTRIBUTION TO PROSPECTIVE
INVESTORS ONLY IF PRECEDED OR ACCOMPANIED BY A CURRENT PROSPECTUS.

El presente Documento de Informacion adicional tambien se encuentra disponible
en espanol. Solicite un ejemplar a un representante de servicio de MFS llamando
al 1-800-225-2606. En el caso de discrepancias entre las versiones en ingles y
en espanol, se considerara valida la version en ingles.

                                                              MIT-SAI-5/03

EXPENSE TABLE

This table describes the fees and expenses that you may pay when you buy, redeem and hold shares of the fund.

SHAREHOLDER FEES (fees paid directly from your investment):
...................................................................

| | CLASS A AND 529A | CLASS B AND 529B | CLASS C AND 529C | CLASS R |
|---|---|---|---|---|
| Maximum Sales Charge (Load) Imposed on Purchases (as a percentage of offering price) | 5.75% | 0.00% | 0.00% | 0.00% |
| Maximum Deferred Sales Charge (Load) (as a percentage of original purchase price or redemption proceeds, whichever is less) ...... | See Below(1) | 4.00% | 1.00% | 0.00% |

ANNUAL FUND OPERATING EXPENSES (expenses that are deducted from fund assets):
...................................................................

| | CLASS A | CLASS B | CLASS C | CLASS R |
|---|---|---|---|---|
| Management Fees .................... | 0.33% | 0.33% | 0.33% | 0.33% |
| Distribution and Service (12b-1) Fees(2) ........................ | 0.35% | 1.00% | 1.00% | 0.50% |
| Other Expenses(3) .................. | 0.24% | 0.24% | 0.24% | 0.24% |
| Total Annual Fund Operating Expenses (3) ............................... | 0.92% | 1.57% | 1.57% | 1.07% |

| | CLASS 529A | CLASS 529B | CLASS 529C |
|---|---|---|---|
| Management Fees .................... | 0.33% | 0.33% | 0.33% |
| Distribution and Service (12b-1) Fees(2) ......................... | 0.35% | 1.00% | 1.00% |
| Other Expenses(3)(4) ............... | 0.49% | 0.49% | 0.49% |
| Total Annual Fund Operating Expenses (3) ............................... | 1.17% | 1.82% | 1.82% |

------

(1) For class A shares only, an initial sales charge will not be deducted from your purchase if you buy $1 million or more of class A shares, or if you are investing through a retirement plan and your class A purchase meets certain requirements. However, in either case, a contingent deferred sales charge (referred to as a CDSC) of 1% may be deducted from your redemption proceeds if you redeem your investment within 12 months. Class 529A shares are not subject to any CDSC.

(2) The fund adopted a distribution plan under Rule 12b-1 that permits it to pay marketing and other fees to support the sale and distribution of each class of shares and the services provided to you by your financial adviser (referred to as distribution and service fees). The maximum distribution and service fees under the plan are: 0.35% annually for class A shares; 0.50% annually for class R and class 529A shares; and 1.00% annually for class B, C, 529B and 529C shares. A portion of the class 529A distribution fee equal to 0.15% currently is not being imposed and may be imposed only with the approval of the board of trustees which oversees the fund.

(3) "Other Expenses" are estimated for class R shares for the fund's current fiscal year. The fund has an expense offset arrangement which reduces the fund's custodian fee based upon the amount of cash maintained by the fund with its custodian and dividend disbursing agent. The fund may enter into other similar arrangements and directed brokerage arrangements, which would also have the effect of reducing the fund's expenses. Any such fee reductions are not reflected in the table. Had these fee reductions been taken into account, "Net Expenses" would be: class A shares 0.91%, class B shares 1.56%, class C shares 1.56%; class R shares 1.06%; class 529A shares 1.16%; class 529B shares 1.81%; and class 529C shares 1.81%.

(4) For the 529 share classes, includes the program management fee described below under "Management of the Fund." The fees and charges a 529 participant will incur are the fund's sales charges and expenses described in the table above, and an annual account maintenance fee and miscellaneous other account fees which may be charged in connection with the administration of the participant's account. See the program description and materials available from your financial representative for details about other account fees.

# EXHIBIT H

As filed with the Securities and Exchange Commission on April 30, 2003

                                 1933 Act File No. 2-11401
                                 1940 Act File No. 811-203

================================================================================

                      SECURITIES AND EXCHANGE COMMISSION
                          WASHINGTON, D.C. 20549


                                 FORM N-1A
                        REGISTRATION STATEMENT UNDER

                       THE SECURITIES ACT OF 1933
                      POST-EFFECTIVE AMENDMENT NO. 83


                                    AND


                       REGISTRATION STATEMENT UNDER
                   THE INVESTMENT COMPANY ACT OF 1940

                            AMENDMENT NO. 34


                      MASSACHUSETTS INVESTORS TRUST
              (Exact Name of Registrant as Specified in Charter)

                 500 Boylston, Street, Boston, Massachusetts 02116
                    (Address of Principal Executive Offices)

          Registrant's Telephone Number, Including Area Code: 617-954-5000
               Stephen E. Cavan, Massachusetts Financial Services Co.,
                  500 Boylston Street, Boston, Massachusetts 02116
                     (Name and Address of Agent for Service)

                 APPROXIMATE DATE OF PROPOSED PUBLIC OFFERING:
     It is proposed that this filing will become effective (check appropriate box):

|_| immediately upon filing pursuant to paragraph (b)
|X| on April 30, 2003 pursuant to paragraph (b)
|_| 60 days after filing pursuant to paragraph (a)(i)
|_| on [date] pursuant to paragraph (a)(i)
|_| 75 days after filing pursuant to paragraph (a)(ii)
|_| on [date] pursuant to paragraph (a)(ii) of rule 485.


If appropriate, check the following box:
|_| this post-effective amendment designates a new effective date for a
    previously filed post-effective amendment

------------------------------
MASSACHUSETTS INVESTORS TRUST
------------------------------

MAY 1, 2003

[logo] M F S(R)
INVESTMENT MANAGEMENT

STATEMENT OF ADDITIONAL
INFORMATION

500 BOYLSTON STREET, BOSTON, MA 02116
(617) 954-5000

This Statement of Additional Information, as amended or supplemented from time
to time (the "SAI"), sets forth information which may be of interest to
investors, but which is not necessarily included in the Fund's Prospectus dated
May 1, 2003. This SAI should be read in conjunction with the Prospectus. The
Fund's financial statements are incorporated into this SAI by reference to the
Fund's most recent Annual Report to shareholders. A copy of the Annual Report
accompanies this SAI. You may obtain a copy of the Fund's Prospectus and Annual
Report without charge by contacting MFS Service Center, Inc. (see back cover of
Part II of this SAI for address and phone number).

This SAI is divided into two Parts -- Part I and Part II. Part I contains
information that is particular to the Fund, while Part II contains information
that generally applies to each of the funds in the MFS Family of Funds (the "MFS
Funds"). Each Part of the SAI has a variety of appendices which can be found at
the end of Part I and Part II, respectively.

THIS SAI IS NOT A PROSPECTUS AND IS AUTHORIZED FOR DISTRIBUTION TO PROSPECTIVE
INVESTORS ONLY IF PRECEDED OR ACCOMPANIED BY A CURRENT PROSPECTUS.

El presente Documento de Informacion adicional tambien se encuentra disponible
en espanol. Solicite un ejemplar a un representante de servicio de MFS llamando
al 1-800-225-2606. En el caso de discrepancias entre las versiones en ingles y
en espanol, se considerara valida la version en ingles.

MIT-SAI-5/03

DISTRIBUTION AND SERVICE FEES

The fund has adopted a plan under Rule 12b-1 that permits it to pay marketing and other fees to support the sale and distribution of each class of shares, and the services provided to you by your financial adviser. These annual distribution and service fees may equal up to: 0.35% for class A shares (a 0.10% distribution fee and a 0.25% service fee); 0.50% for class R shares and class 529A shares (a 0.25% distribution fee and a 0.25% service fee); and 1.00% for each of class B, class C, class 529B and class 529C shares (a 0.75% distribution fee and a 0.25% service fee), and are paid out of the assets of these classes. Over time, these fees will increase the cost of your shares and may cost you more than paying other types of sales charges. For class A shares purchased prior to January 2, 1991, the service fee is 0.15% per annum. A portion of the class 529A distribution fee equal to 0.15% is currently not being imposed and may be imposed only with the approval of the board of trustees which oversees the fund.

**EXHIBIT I**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ERIC FORSYTHE, Individually And On Behalf Of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> SUN LIFE FINANCIAL INC., et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) <br> Civil Action No. 04cv10584 (GAO) |

## DECLARATION OF PROFESSOR BRUCE GREEN IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR APPOINTMENT OF CO-LEAD PLAINTIFFS, CO-LEAD COUNSEL AND LIAISON COUNSEL

I, Bruce A. Green, under penalties of perjury, declare as follows:

1.       I am the Stein Professor at Fordham University School of Law.  Milberg Weiss

Bershad & Schulman LLP ("Milberg Weiss") has retained me as an expert on legal ethics to render an

objective opinion on the conflict of interest questions raised by the Court in its January 13, 2005

Memorandum and Order – namely, whether there would be an impermissible conflict of interest if

Milberg Weiss and its two co-counsel were to represent the plaintiffs in this case while concurrently

serving as co-counsel for plaintiffs bringing market-timing claims in related federal multidistrict

litigation against many of the same defendants.  Based on my review of the material submitted to this

Court in connection with the application to serve as co-lead counsel, my opinion is that the concurrent

representation does not give rise to an impermissible conflict of interest.

## Qualifications

2.       A copy of my professional vita is attached.  Since 1987, I have been a member of the

full-time faculty of Fordham University School of Law, where I direct the Louis Stein Center for Law

and Ethics.  I previously served as a law clerk to Judge James L. Oakes of the U.S. Court of Appeals

for the Second Circuit, as a law clerk to Justice Thurgood Marshall of the U.S. Supreme Court, and as

an Assistant United States Attorney for the Southern District of New York.

3.       I have regularly taught courses in the area of legal ethics at Fordham, I speak

frequently at CLE programs on the subject of legal ethics, and I have authored a variety of scholarly

articles and other writings in the area of legal ethics.

4.       I have engaged in various professional service relating to legal ethics.  Nationally, I

serve as a member of the Multistate Professional Responsibility Examination drafting committee, and

have previously served as chair of the ABA Litigation Section's Committee on Ethics and

Professionalism, as a member of the ABA Litigation Section's Task Force on Settlement Ethics, as reporter to the ABA Commission on Multijurisdictional Practice, and as chair of the Section on Professional Responsibility of the Association of American Law Schools. On the state and local level, I currently serve as a member and immediate past chair of the New York State Bar Association's Committee on Professional Ethics, as a member of the New York State Bar Association's Committee on Standards of Attorney Conduct, and as a member of the Committee on Professional and Judicial Ethics of the Association of the Bar of the City of New York. I previously served as a member of the Departmental Disciplinary Committee of the New York State Supreme Court, Appellate Division, First Department. However, I render opinions in my individual capacity and do not speak on behalf of any of these or other entities.

5.    I have previously testified on legal ethics issues in judicial proceedings and submitted expert opinions to courts both in New York, where I am admitted to practice law, and in other states. *E.g., Apple Corps Ltd. v. International Collectors Soc'y*, 15 F. Supp. 2d 456 (D.N.J. 1998); *In re M&F Worldwide Corp. Shareholders Litigation*, 799 A.2d 1164 (Del. Ch. 2002); *Rudolf Nureyev Dance Foundation v. Noureeva-Francois*, 94 Civ. 7701 (S.D.N.Y.); *Lewis v. Chwasky*, 02 CIV 1314 (S.D.N.Y.); *TCW/Camil Holding LLC v. Fox Horan & Camerini*, LLP, Civ. No. 03-1154-SLR (D. Del.). I am being compensated at my customary rate to render an opinion in this case.

**Procedural Background and Relevant Facts**

**Documents reviewed**

6.    I have no first-hand knowledge of the relevant facts. For purposes of rendering an opinion, Plaintiffs' counsel have provided me the Court's January 13, 2005 Memorandum and Order

2

("Jan. 13, 2005 Opinion") and the following material submitted in connection with that opinion: Memorandum of Law in Support of the Motion for Consolidation (May 14, 2004); The *Dumond* Plaintiffs' Motion to Intervene (July 21, 2004); Memorandum of Law in Opposition to Motions for Consolidation and for Appointment of Co-Lead Counsel (July 21, 2004); Affidavit of Professor Robert H. Aronson (July 20, 2004); Amended Motion for Appointment of Co-Lead Plaintiffs, Appointment of Co-Lead Counsel and Appointment of Liaison Counsel and for Leave to File a Reply Regarding Consolidation (Sept. 14, 2004); Memorandum of Law in Support of the Amended Motion for Appointment of Co-Lead Plaintiffs, Appointment of Co-Lead Counsel and Appointment of Liaison Counsel, and Reply Brief in Support of *Forsythe* and *Eddings* Motion for Consolidation (Sept. 15, 2004); The *Dumond* Plaintiffs' Memorandum in Opposition to Amended Motions for Consolidation and for Appointment of Tri-Lead Counsel (Sept. 29, 2004), and accompanying exhibits; Reply Brief in Support of the *Forsythe* and *Eddings* Plaintiffs' Motion for Consolidation, Appointment of Co-Lead Plaintiffs, Appointment of Co-Lead Counsel, and Appointment of Liaison Counsel (October 13, 2004), and accompanying exhibits; and Proposed Sur-Reply of the *Dumond* Plaintiffs in Opposition to Amended Motions for Consolidation and for Appointment of Tri-Lead Counsel (Oct. 15, 2004). Additionally, Plaintiffs' counsel have provided me the following material to be submitted to the Court, along with this Affidavit, in response to the Court's Jan.13, 2005 Opinion: Declaration of Proposed Co-Lead Plaintiff in Further Support of Plaintiffs' Renewed Motion for Appointment of Co-Lead Plaintiffs, Co-Lead Counsel and Liaison Counsel; Declaration of Robert S. Gans in Further Support of Plaintiffs' Renewed Motion for Appointment of Co-Lead Plaintiffs, Co-Lead Counsel and Liaison Counsel; and Declaration of City of Chicago Deferred Compensation Plan

3

in Further Support of Plaintiffs' Renewed Motion for Appointment of Co-Lead Plaintiffs, Co-Lead

Counsel and Liaison Counsel. Finally, I have reviewed a copy of the Case Management Order No. 1

in the multidistrict market-timing action and the Consolidated Class Action Complaint in the MFS

market-timing case.

### Procedural background

7.    I understand that the relevant procedural background to the question I have been asked

to consider is as follows.

8.    On May 14, 2004, Plaintiffs Eddings and Forsythe filed a motion for consolidation and

a motion to appoint co-lead counsel and liaison counsel (the "Consolidation Motion"). Plaintiffs

sought to consolidate their two individual actions, *Eddings v. Sun Life Financial Inc., et. al.* and

*Forsythe v. Sun Life Financial Inc., et. al.*, and appoint Milberg Weiss and Weiss & Lurie as co-lead

counsel.

9.    Subsequent to the filing of the Consolidation Motion, plaintiffs learned of two

additional cases, *Koslow v. Sun Life Financial Inc., et. al.* and *Dumond, et. al. v. Massachusetts

Financial Services Company, et. al.*, that Plaintiffs believed were related cases. On July 12, 2004,

Plaintiffs Eddings and Forsythe filed a Notice of Subsequently Filed Cases Subject to Motion for

Consolidation.

10.    The *Koslow* action alleged the same causes of action as *Forsythe* and *Eddings*.

*Dumond* alleged only a claim under Section 36(b) of the Investment Company Act of 1940 (the

"Investment Company Act") on behalf of 11 MFS Funds. The *Forsythe*, *Eddings*, and *Koslow*

actions also brought a Section 36(b) claim, but their claim was on behalf of all the MFS funds.

4

11.    On July 21, 2004, the *Dumond* Plaintiffs filed an opposition to the motion for consolidation and motion to appoint co-lead counsel arguing that (a) Plaintiffs' counsel had disqualifying conflicts of interest; (b) there were conflicts in bringing class and derivative actions in the same suit; (c) Plaintiffs lacked standing for claims on behalf of the MFS mutual funds; and (d) there were substantial differences in the causes of action brought by Plaintiffs and the *Dumond* Plaintiffs.

12.    On September 15, 2004, Plaintiffs filed an amended motion for consolidation and appointment of co-lead counsel (the "Amended Motion"). The Amended Motion proposed Eddings, Forsythe, and now the City of Chicago Deferred Compensation Plan ("Chicago") as lead plaintiffs. In addition, the Amended Motion proposed Milberg Weiss, Weiss & Lurie, and Bernstein Litowitz Berger & Grossmann ("Bernstein Litowitz") as co-lead counsel. The Amended Motion also addressed the issues raised by the *Dumond* Plaintiffs.

13.    On September 29, 2004, the *Dumond* Plaintiffs filed an opposition to the Amended Motion. The *Dumond* Plaintiffs' opposition focused on Chicago and Bernstein Litowitz and whether they had conflicts preventing them from serving as lead plaintiff and co-lead counsel, respectively. The *Dumond* Plaintiffs also continued to argue that their action was dissimilar to Plaintiffs' actions.

14.    On October 13, 2004, Plaintiffs filed a reply to the *Dumond* Plaintiffs' opposition which, among other things, explained that Chicago and Bernstein Litowitz had no conflicts because the MFS Funds were not defendants in the multidistrict action alleging market timing.

15.    On October 15, 2004, the *Dumond* Plaintiffs filed a Motion for Leave to File a Sur-Reply. The proposed sur-reply again focused on whether the participation of Chicago and Bernstein Litowitz in the market-timing action resulted in a conflict preventing their participation in this action.

16.    On October 18, 2004, Defendants filed a Memorandum in Support of the Motion to Consolidate and to Appoint Lead Counsel. Defendants argued that all the actions should be consolidated because each had a Section 36(b) claim against the same defendants.

17.    On October 20, 2004, the Court heard oral argument on the motion to consolidate and appoint lead counsel. The Court issued its Order on January 13, 2005 and consolidated the *Forsythe*, *Eddings*, and *Koslow* actions.

**Relevant facts**

18.    For purposes of rendering an opinion, I have been asked to rely on the following facts, which are reflected in the material provided for my review.

19.    On January 13, 2005, the Court ordered that *Forsythe v. Sun Life Financial, Inc.*, Civil Action No. 04-10584-GAO (D. Mass.), *Eddings v. Sun Life Financial, Inc., et. al.*, Civil Action No. 04-10764 (D. Mass.) , and *Koslow v. Sun Life Financial, Inc., et. al.*, Civil Action No. 04-11019-GAO (D. Mass.) be consolidated. Plaintiffs are MFS mutual fund investors who were charged excessive and improper fees and expenses by the Massachusetts Financial Services Company ("MFS Company"), the investment adviser of the MFS family of mutual funds. Defendants are the MFS Company, its parent Sun Life Financial Inc., its wholly-owned broker dealer, MFS Fund Distributors, Inc., and 12 trustees of the MFS Funds.

20.    Plaintiffs bring claims under the Investment Advisers Act of 1940 (the "Investment Advisers Act"); the Investment Company Act; for unjust enrichment; and for breaches of the Defendants' fiduciary duties to a class (the "Class") of all persons or entities who held one or more shares or other ownership units of MFS Funds during the period March 24, 1999 to November 17, 2003, inclusive (the "Class Period"), and who were damaged thereby.

21.    Plaintiffs allege that Defendants used MFS Fund investor assets to pay kickbacks to brokerages in exchange for the brokerages steering their clients into MFS Funds. This practice was referred to as buying "shelf-space" at the brokerages. In addition, Defendants allegedly paid brokerages to push MFS Funds through the use of directed brokerage -- awarding a brokerage firm the business, and resulting commissions, of conducting transactions of the fund's underlying securities. The brokerages alleged to have received such payments included Morgan Stanley, Salomon Smith Barney, Wachovia Securities, Chase Investment Services, and UBS Financial Services. Plaintiffs allege that the practice of charging excessive fees and commissions created material insurmountable conflicts of interest for the investment advisers to the MFS Funds who had a duty to act in the best interests of fund investors, but were, in fact, primarily concerned with siphoning fees from MFS Funds investors to induce brokers to increase artificially the amount of investment in MFS Funds. The fees MFS Company collected for managing and advising the MFS Funds were calculated as a percentage of the Funds' value and, therefore, increased as the assets invested in the MFS Funds grew. The MFS Company thus benefited from the increase in Fund assets, but neither the Funds nor the Fund investors benefited from expanding the size of the Funds.

7

22.    Plaintiffs Forsythe, Eddings, and Chicago are moving to be appointed Lead Plaintiffs and to have Milberg Weiss, Weiss & Lurie, and Bernstein Litowitz appointed as Co-Lead Counsel.

23.    Chicago also is Lead Plaintiff in the case alleging "market-timing" in multidistrict litigation in the District of Maryland (the "MDL action"). Bernstein Litowitz represents Chicago in the MDL action.

24.    The MDL action covers market-timing cases, including class actions, derivative actions, and ERISA actions, for 17 different mutual fund families and dozens of other participants in the market-timing activities. Defendants in the action concerning the MFS mutual fund family are MFS Company, Sun Life, MFS Fund Distributors, two executive officers (all of the aforementioned are also defendants in the excessive-fee litigation before this Court), the Registrants of MFS Funds shares, MFS Service Center, Inc., four companies that participated in market-timing activities and certain of their executives, and certain brokers.

25.    The MDL action alleges that defendants participated in a pattern of trading practices known as "market timing" or "late trading." Market timing is a practice whereby investors take advantage of inefficiencies in the pricing of mutual fund shares by rapidly trading in and out on multiple occasions within a short period of time. Through the execution of a significant number of trades quickly, market timers profit by capitalizing on the differential between the price of the mutual fund itself, and the value of the underlying securities that comprise the mutual fund. Late trading is a variation on this scheme, in which certain investors are permitted to trade mutual fund shares at the prior day's prices, in violation of federal law. Market timing causes significant monetary harm to fund investors because market timers, by quickly trading in and out of the funds, dilute the investment

gains that would otherwise be realized by long-term investors and because market timers cause long-term investors to disproportionately bear investment losses. In addition, market timers impose additional transaction costs upon fund investors due to the huge inflows of cash resulting from their rapid trading. As a result of the rapid trading by market timers, portfolio managers must invest disproportionate amounts of fund assets in cash and other highly liquid assets, paying a significantly lower rate of return than other assets. The MDL plaintiffs allege that although the MFS defendants had policies prohibiting market timing, they permitted market timing to occur. The MDL plaintiffs further allege that the MFS defendants encouraged and facilitated market timing in order to increase the assets of the funds and thereby increase management fees.

26.     The structure of the MDL action is set forth in Case Management Order No. 1 ("CMO No. 1"). The CMO No. 1 was the product of discussions and negotiations among all plaintiffs' counsel. The CMO No. 1 divided the 17 mutual fund families into four tracks; each track has a chair/administrative counsel for plaintiffs. Milberg Weiss (through partner David J. Bershad) and Bernstein Litowitz (through partner Alan Schulman) are plaintiffs' co-chairs and chief administrative counsel for the MDL action. The duties of the co-chairs are (1) to serve as a contact point for defense counsel on track-wide administrative issues; (2) to organize monthly conference calls among plaintiffs in the track and other track-wide proceedings; and (3) to serve as the primary spokesperson in conferences and hearings on track-wide issues.

27.     Each of the four tracks contains a subtrack for each fund family assigned to that track. The MDL Court appointed a lead plaintiff and lead counsel for each subtrack. Chicago and Bernstein Litowitz are Lead Plaintiff and Lead Counsel in the MFS subtrack. The MFS subtrack also includes a

derivative case that has separate representation.  The MFS class action and derivative action are coordinated for pretrial purposes.

28.    The MDL action is overseen by a panel of four judges:  the Honorable Catherine C. Blake, the Honorable Andre M. Davis, the Honorable J. Frederick Motz, and the Honorable Frederick Stamp (the "MDL Court").

29.    In many of the actions that were transferred to the MDL Court, the complaints named the mutual funds, including the MFS Funds, as defendants.  The MDL Court, however, questioned whether any funds should be named defendants.

30.    As expressed by the MDL court at a hearing on April 2, 2004 before the four judge MDL panel with all market-timing counsel participating:

> . . . are the plaintiffs in the investor classes really looking for the funds as the source of payment?  I understand the legal theory why the fund's named as a defendant, because of the prospectuses were put out by the fund.  And I understand that some injunctive relief may relate to the fund.
>
> To me, sitting here in the provinces, it doesn't make a lot of sense to me, and maybe I'm not understanding something, why one group of people who own mutual funds, people who, say, maybe bought and sold, should recover against people who still hold the funds.  I mean, that's like one average Joe being victimized by the conduct of third parties allegedly, and then being victimized again by having to compensate the plaintiffs who have already sold.
>
> Maybe I'm missing something.  But these are the kind of things we want you to focus on.

Transcript of Court Hearing in *In re: Mutual Funds Investment Litigation*, MDL No. 1586 (D. Md. Apr. 2, 2004) at 16.

31.    One of the numerous plaintiffs' counsel at the MDL hearing, David Bershad of
Milberg Weiss, agreed with the MDL Court that the issue of naming the Funds as defendants needed
to be addressed in the amended complaints:

> We, on the class side, are cognizant of the issue brought up – do we
> want to take money from the fund and give it to other people who are in
> the fund?  There are lots of issues that we can begin to address and we
> don't know the answers to, such as whether there is insurance, whether
> there may be individuals who should be doing something.  But we are
> going to address that and do it collegially with other counsel in the
> entire plaintiffs' camp.

MDL Hearing Transcript at 40.

32.    As MDL counsel explained at the April 2, 2004 Hearing, there were other reasons to
name the Funds in the MDL complaints, including insurance considerations.

33.    A consolidated amended complaint was filed on September 29, 2004 in the MDL
action and the MFS Funds were not named as defendants.  In fact, individual mutual funds were not
named as defendants in any of the Amended Complaints filed in the MDL action.  The MDL
plaintiffs agreed that the Funds should not be named as defendants in the MDL action.  The Funds
were named as non-parties in the MDL action amended complaints and the entities that are the legal
registrants for the funds and the issuers of the funds' shares (the "Registrants") were named as
defendants.

34.    The Registrants were named as defendants to seek recovery from any assets they hold
apart from investor deposits (including securities, cash, or other assets related to or traceable thereto),
and to ensure the fullest possible recovery for the injured investors based upon the various theories of
liability, many of which stem from alleged Registrant misconduct.

35.    To the extent the Registrants may have monies beyond the Fund assets, recovery may be sought. But a recovery from the assets of the Funds is not being sought in the MDL action because, as the MDL Court recognized, doing so would be the same as seeking a recovery from the plaintiff shareholders. No recovery will be sought from the Funds in the MDL action.

36.    Chicago has stated that, as the lead plaintiff in the MFS subtrack of the MDL action, it will not seek or accept any money from the MFS funds in the MDL action under any circumstances. Chicago had a financial interest in excess of $40 million in the MFS mutual funds. Chicago therefore has a huge stake in the outcome of the excessive-fee litigation before this Court, ensuring that it fairly will represent the Class and the MFS Funds in which the Class invested.

37.    Because the MDL action is comprised of cases against 17 fund families, as well as numerous other defendants, has 18 plaintiffs firms working together to litigate and manage the cases, and has four judges to oversee the proceedings, it is unlikely, if not impossible, that either the particular parties before this Court or their counsel has the ability to manipulate the potential multi-billion dollar MDL action to gain an advantage in the one case before this Court.

**Opinion**

38.    The Court has asked the law firms seeking to serve as co-lead counsel in this case for a response to the concern that they may have a potential conflict of interest under Rule 1.7 of the Massachusetts Rules of Professional Conduct arising out of their concurrent representation of plaintiffs in the market-timing cases in the multidistrict litigation in the District of Maryland. Jan. 13, 2005 Opinion at 4-6. The Court's opinion raised two particular questions. First, is the law firms' representation of plaintiffs in the market-timing cases adverse to the MFS mutual funds on whose

12

behalf the law firms are asserting derivative claims in the excessive-fee action before this Court, because the plaintiffs in the market-timing cases, if successful, will recover from those MFS mutual funds? *Id.* at 4. Second, insofar as the plaintiffs in the market-timing cases have committed *not* to seek a recovery from the MFS mutual funds, is that decision a product of, and evidence of, their counsels' conflict of interest; that is, has the law firms' exercise of professional judgment in the market-timing cases been limited by their interest in serving as counsel in this case? *Id.* at 4-5. Additionally, the Court's opinion raised the general question whether the law firms' representation of "former shareholders [in the market-timing cases] might be materially limited by the law firm's responsibilities to the funds in the present action, or vice versa," and if so, whether the "various potentially affected clients have consented after consultation." In my opinion, for the reasons discussed below, the Court's concerns are adequately resolved by the submissions being made to the Court in response to its January 13, 2005 Opinion.

39.    A law firm may not represent a party adversely against another current client without the consent of both clients. *See, e.g.*, Restatement (Third) of the Law, The Law Governing Lawyers, § 128, Cmt. e (2000). The reason for this rule is that when a law firm's activities are directly adverse to a current client, the client will reasonably perceive that the law firm is acting disloyally, and the client's trust and confidence in the firm's lawyers will be eroded as a result. *See generally* Charles W. Wolfram, Modern Legal Ethics 350 (1986). As noted, the Court's opinion raised a specific concern that in the market-timing cases, the law firms represent plaintiffs adversely against the mutual funds whom they seek to represent derivatively in this case. In my opinion, this concern is fully answered by the additional facts submitted to this Court. As a formal matter, the plaintiffs in the market-timing

13

cases are not adverse to the MFS mutual funds because the amended complaint in the market-timing cases makes the Funds a non-party. Likewise, as a substantive matter, the plaintiffs in the market-timing cases are not adverse either to the MFS mutual funds or to their shareholders. The submissions of Chicago, the Lead Plaintiff in the market-timing litigation, and counsel in that litigation, make explicit that the plaintiffs in the market-timing cases are not in fact seeking to recover any monies from the MFS mutual funds. Finally, the harms against which conflict of interest rules protect are not implicated. Although the MFS mutual funds would be represented derivatively, the funds' shareholders are the real interested parties and as co-lead counsel, the law firms would be consulting with representative shareholders. There is no indication that the shareholders perceive the law firms' role in the market-timing cases as adverse or disloyal to them, and there is no reason why they would. Thus, there is no reason for concern that the law firms' role in the MDL action would impair their relationship with the plaintiffs in the fee litigation before this Court.

40.    As the Court further noted, a conflict of interest is also present when one client's representation will be materially limited by responsibilities to another client or by the lawyer's self-interest. The Court raised a concern that in *not* naming the funds as defendants in the MDL litigation, the law firms had permitted their interest in serving as co-lead counsel in the excessive-fee case to impair their loyalty to the plaintiffs in the MDL litigation. This concern is also fully resolved by the additional submissions, which make clear that the reasons for not seeking recovery from the funds and not naming them as defendants were unrelated to the law firms' possible role as co-lead counsel in the excessive-fees case. Rather, plaintiffs' counsel in the MDL litigation – most of whom are not

14

involved in the excessive-fee case – decided, in line with the MDL court's observation, that it did not make sense, and would be unfair, to seek to recover, in effect, from the current fund shareholders.

41.    Finally, the Court raised the general question whether the law firms' representation of plaintiffs in the market-timing cases might materially limit their responsibilities to the Plaintiffs in this case, or vice versa. Based on the submissions, however, there is no evident reason why the representation of one set of clients would limit the representation of the other. Plaintiffs in the MDL action and the excessive-fee litigation are investors in MFS Funds. The Class definition in both cases is similar, although the MDL action covers a slightly longer time frame. The cases share some common defendants, although they are based on different legal theories and allege different improper activities by defendants. Because both actions seek a recovery on behalf of an almost identical class of investors, a recovery in either action will benefit essentially the same investors. Similarly, a recovery on behalf of the funds, in either case, will benefit all current investors. The cases are complementary in that they seek to recover all potential damages on various legal theories.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed this 16th day of March 2005 at New York, NY.

BRUCE A. GREEN

15

# EXHIBIT J

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ERIC FORSYTHE, Individually And On Behalf Of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>    vs.<br><br>SUN LIFE FINANCIAL INC., et al.,<br><br>               Defendants. | Civil Action No. 04cv10584 (GAO) |

DECLARATION OF ROBERT S. GANS IN FURTHER
SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR APPOINTMENT
OF CO-LEAD PLAINTIFFS, CO-LEAD COUNSEL AND LIAISON COUNSEL

I, ROBERT S. GANS, under penalty of perjury pursuant to 28 U.S.C. 1746, declare as follows:

1.    I am a member of the Bars of New York and California, and the law firm of Bernstein Litowitz Berger & Grossmann LLP. I am submitting this declaration in support of Plaintiffs' Renewed Motion For Appointment Of Co-Lead Plaintiffs, Co-Lead Counsel And Liaison Counsel. I am fully familiar with the facts set forth herein.

2.    This firm is counsel of record for the City of Chicago Deferred Compensation Plan ("Chicago"), a movant for co-lead plaintiff in this action and the court-appointed lead class plaintiff in *In re MFS (Bruce Riggs, et al. v. Massachusetts Financial Services Company, et al.)* MDL 1586, District of Maryland Case No. 04-md-15863-04 (the "MDL Action"). I have conferred with Chicago in preparing this Declaration.

3.    The MDL Action names, *inter alia*, MFS Government Securities Fund, Massachusetts Investors Trust, Massachusetts Investors Growth Stock Fund, MFS Series Trust I, MFS Series Trust II, MFS Series Trust IV, MFS Series Trust V, MFS Series Trust IX, MFS Series Trust X (the "Registrants") as defendants. Chicago will not seek any recovery in any action from monies held by any of the Registrants consisting of investor deposits (including securities, cash or other assets related or traceable thereto). Instead, the Registrants are named as defendants in the MDL Action to seek recovery from any assets that they hold apart from investor deposits, and also to ensure the fullest recovery possible for injured MFS investors based upon various theories of liability, many of which stem from alleged Registrant misconduct.

4.      Chicago was fully informed of and agreed to the decision not to name the Funds themselves as defendants in the Consolidated Amended Complaint filed in the MDL Action and in this Action, as well as to forego any recovery from investor deposits (including securities, cash or other assets related or traceable thereto). Indeed, contrary to the suggestion made by other parties to this litigation, Chicago has never sued or sought any recovery from the MFS mutual funds themselves, with the exception of the typographical error detailed in paragraph 6, below. Prior to being appointed a Lead Plaintiff in the MDL Action, numerous complaints already had been filed against MFS by other parties unrelated to Chicago, and without Chicago's knowledge or consent, which named the funds as defendants. These separate actions were consolidated under the leadership of Chicago, which the Court then directed to file a Consolidated Amended Complaint superseding the initial complaints no later than September 30, 2004. In consultation with my law firm in connection with the preparation of the Consolidated Amended Complaint, Chicago determined that the funds themselves were inappropriate defendants, since any recovery taken from investor deposits (including securities, cash or other assets related or traceable thereto) would simply take money from the same Class of persons on whose behalf the lawsuit was brought. The Lead Plaintiffs in the other mutual fund family tracks in the MDL Action arrived at the same conclusion. As a result, none of the consolidated amended complaints filed in the MDL Action on September 30, 2004 included the funds themselves as defendants.

5.      Further, Chicago did not name the registrants of the various funds as defendants in the MDL Action for the purpose of obtaining a recovery from investor deposits (including securities, cash or other assets related or traceable thereto). Instead,

Chicago named these entities as defendants in the MDL Action solely to the extent that they have a separate corporate existence from the funds themselves, and only for the purpose of seeking a recovery from assets aside from investor deposits (including securities, cash or other assets related or traceable thereto) held by the registrants. If, after an opportunity for discovery, Chicago learns that these entities have no assets aside from investor deposits, then it will drop them as defendants in the MDL Action.

6.     Accordingly, no MFS mutual fund was explicitly or intentionally named as a defendant in the MDL Action, filed on September 30, 2004. In fact, the MFS mutual funds are specifically designated as non-parties in the MDL Action. However, two paragraphs of the MDL Action complaint, in the Section 20(a) "control person" count, contained typographical errors, wherein the word "Fund" was inadvertently used instead of "Registrant" when identifying the "controlled" entities. These typographical errors were corrected through an amendment of the complaint by interlineation filed by Chicago on December 7, 2004.

7.     Neither this declaration nor any of its contents is intended to waive any attorney-client privilege.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _16th_ day of March, 2005.

_Robert S. Gans_

ROBERT S. GANS

::ODMA\PCDOCS\BLBGCA\178240\5

-3-

# EXHIBIT K

040204mutualfundslitigation

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF MARYLAND
 2                          NORTHERN DIVISION

 3

 4

 5      IN RE: MUTUAL FUNDS
        INVESTMENT LITIGATION
 6      _____/

 7

 8
                            MDL No. 1586
 9                       Friday, April 2, 2004
                          Baltimore, Maryland
10

11                          .

12      Before:   Honorable Catherine C. Blake, Judge
                  Honorable Andre M. Davis, Judge
13                Honorable J. Frederick Motz, Judge
                  Honorable Frederick Stamp, Judge
14

15

16      Appearances:

17          On Behalf of the Plaintiffs:
              John B. Isbister, Esquire
18            David J. Bershad, Esquire
              Ronald B. Rubin, Esquire
19            Mark C. Rikfin, Esquire
              Stanley M. Grossman, Esquire
20            Karen L. Morris, Esquire
              Alice McInerney, Esquire
21            Steven J. Toll, Esquire
              Michael D. Braun, Esquire
22            Alan Schulman, Esquire
              Elizabeth H. Cronise, Esquire
23            Andrew S. Friedman, Esquire
              Joel Strauss, Esquire
24

25
```

2

```
 1              On Behalf of Janus Capital:
```

Page 1

040204mutualfundslitigation

17

1    particularly the derivative mutual fund claims and the investor

2    class claims.  And subject to hearing from you presumptively, it

3    would seem that perhaps separate counsel may be necessary.  I'm

4    just telling you based upon what we've seen on the submissions.

5            We want to tell you something else, though.  If we do

6    end up with more than one plaintiff group, we do not want and are

7    not going to permit duplicative work.  If there's differences on

8    the mutual fund derivative funds as to legal rights allocations,

9    that should be addressed separately.  But we don't want people --

10   I'm not saying who's going to be appointed what, but we're not

11   going to have two different classes of plaintiffs conducting

12   discovery on the underlying merits against third parties or

13   against mutual fund advisers or whatever.  Obviously, that is a

14   matter of common interest.  That will be a total waste , assuming

15   that there's ever any recovery at the end, of potential recovery

16   for the class.

17           So it's got to be worked out.  If we do end up, that's

18   something we're not sure of yet, we are going to insist that one

19   group of plaintiffs' counsel take the lead on everything other

20   than issues particular to the other client, to the other category

21   of plaintiffs.

22           We want you to focus on the end game now, is the best

23   way, the best phrase I can say.  Some of you, some of the

24   defendants have already established settlement funds, are in the

25   process of doing that.  And they may have legal ramifications,

18

1    which should be addressed by motions to dismiss.  So some of you

2    have already focused on the end game before the game has begun in

Page 15

040204mutualfundslitigation
3    this court.

4            Having just alluded to the appointment of counsel issue
5    and recognizing that there are different legal rights and things,
6    I will say, and I just have a question, which is an end game
7    question which I'm interested in and you don't have to address it
8    today because we're not going to decide the appointment of
9    counsel issue, but are plaintiffs really looking, are the
10   plaintiffs in the investor classes really looking for the funds
11   as the source of payment?  I understand the legal theory why the
12   fund's named as a defendant, because of the prospectuses were put
13   out by the fund.  And I understand that some injunctive relief
14   may relate to the fund.

15           To me, sitting here in the provinces, it doesn't make a
16   lot of sense to me, and maybe I'm not understanding something,
17   why one group of people who own mutual funds, people who, say,
18   maybe bought and sold, should recover against people who still
19   hold the funds.  I mean, that's like one average Joe being
20   victimized by the conduct of third parties allegedly, and then
21   being victimized again by having to compensate the plaintiffs who
22   have already sold.

23           Maybe I'm missing something.  But these are the kind of
24   things we want to, we want you to focus on.  Obviously, it may
25   impact upon appointment of counsel issues.  Maybe that's the kind

                                                              19

1    of thing that has to be fleshed out by having these issues
2    briefed.

3            Avoiding Lexecon.  For years, I thought I'd been
4    avoiding Lexecon, been telling people to avoid it by filing
5    consolidated amended complaint in the case once you're in
6    Maryland, alleged venue and jurisdiction in Maryland,

# EXHIBIT L

No. 82-1200

# In the Supreme Court of the United States

## OCTOBER TERM, 1982

DAILY INCOME FUND, INC. AND
REICH & TANG, INC., PETITIONERS

*v.*

MARTIN FOX

ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT

## BRIEF FOR THE SECURITIES AND EXCHANGE COMMISSION AS AMICUS CURIAE IN SUPPORT OF AFFIRMANCE

REX E. LEE
*Solicitor General*

LOUIS F. CLAIBORNE
*Deputy Solicitor General*

DANIEL L. GOELZER
*General Counsel*

SAMUEL A. ALITO, JR.
*Assistant to the Solicitor General*

PAUL GONSON
*Solicitor*

*Department of Justice*
*Washington, D.C. 20530*
*(202) 633-2217*

JACOB H. STILLMAN
*Associate General Counsel*

RICHARD A. KIRBY
*Senior Special Counsel*

SARAH A. MILLER
MYRNA SIEGEL
*Attorneys*

*Securities and Exchange Commission*
*Washington, D.C. 20549*

19

tive or representative nature of the security holder action was eliminated, together with the reference in the intervention provision to actions brought by the investment company itself. See S. 2224, *supra*, § 22. This legislative history unmistakably suggests that Congress intended for the Commission and security holders to be the sole enforcers of the fiduciary duty imposed on investment advisers by Section 36(b).[8]

b.  It is irrelevant for present purposes that a security holder action under Section 36(b) is brought "on behalf of such company." That language indicates that such an action is brought for the company's benefit and that any recovery is to be paid to the company rather than the individual security holder plaintiff.[9] But it does not follow that the company itself is authorized to bring suit. As the Second Circuit recognized, "[t]he [Section 36(b)] action is not, strictly speaking, 'derivative' in the sense of deriving from a right properly asserted by the corpora-

---

[8] Our position here is consistent with the argument recently made by the Commission in *Herman & MacLean* v. *Huddleston*, No. 81-680 (Jan. 24, 1983), in which the Commission contended that implied rights of action should be recognized under another provision of the securities laws. In that case, we were concerned that if an implied right of action was not recognized there would be no damage remedy for certain misconduct. Here, Section 36(b) expressly affords investors a useful remedy, and no implied action is necessary to make that statute effective.

[9] Furthermore, in the case of an open-end investment company like the Fund in this case, it is largely a legal fiction to state that recovery obtained in a Section 36(b) action is on behalf of the company rather than the security holders. An open-end investment company issues securities redeemable at a price calculated as a pro rata portion of the current net asset value of the company. See Sections 2(a)(32) and 5(a)(1) of the Act, 15 U.S.C. 80a-2(a)(32) and 80a-5(a)(1). Any increase in this net asset value as a result of a favorable judgment would automatically be reflected in the redemption price of the securities. Thus, while recovery in a Section 36(b) suit would initially be paid to the investment company, the company would serve as a conduit for the benefit of holders of redeemable securities.