# Exhibit B

## (Pages 1 – 25)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION<br><br>This Document Relates To:<br>In re MFS<br>    04-md-15863-04 | MDL 1586<br>Case No. 04-MD-15863<br>(Judge J. Frederick Motz) |
| BRUCE RIGGS, et al., Individually and On Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br>    v.<br><br>MASSACHUSETTS FINANCIAL SERVICES COMPANY, et al.<br><br>                 Defendants. | Case No. 04-cv-01162-JFM |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

TABLE OF CONTENTS

Page

I.   NATURE OF THE ACTION ..................................................................................1

II.  JURISDICTION AND VENUE ..............................................................................5

III. PARTIES .................................................................................................................6

   A.   Lead Plaintiff ...............................................................................................6

   B.   Defendants And Significant Non-Parties......................................................6

        1.   Non-Party MFS Fund "Complex" ....................................................6

        2.   The Parent Defendant .......................................................................8

        3.   The Investment Advisor/Fund Sponsor ............................................9

        4.   The Administrator............................................................................10

        5.   Registrants/Issuer Defendants ........................................................11

        6.   The Distributor Defendant ..............................................................13

        7.   Shareholder Servicing Agent ..........................................................13

        8.   The MFS Individual Defendants .....................................................13

        9.   The Timer Defendants .....................................................................15

             a.   Canary.....................................................................................15

             b.   Security Brokerage, Inc. .........................................................16

             c.   Wilshire Associates ................................................................17

             d.   Trout .......................................................................................17

        10.  The Facilitator Broker Defendants ..................................................17

        11.  The Clearing Broker Defendants .....................................................19

        12.  Financier Defendants.......................................................................27

   C.   The John Doe Defendants............................................................................28

IV.   FACTUAL ALLEGATIONS ........................................................... 28

   A.   Overview Of Market Timing/Late Trading Practices............................ 28

      1.   Background Information And The Forward-Pricing Rule .................................................................................... 28

      2.   Subverting The Forward-Pricing Rule Through Market Timing And Late Trading ............................................... 30

   B.   Material Misstatements And Omissions In The MFS Prospectuses Concerning Market Timing................................ 31

   C.   The Defendants' Knowledge And Direct Participation In The Wrongful Conduct ........................................................ 33

      1.   Market Timing at MFS ............................................. 34

         a.   Overview................................................... 34

         b.   Specific Examples Of Timing At MFS ................. 36

            (1)   Canary................................................. 36

            (2)   Security Brokerage, Inc. ..................... 37

            (3)   Wilshire Associates ........................... 39

      2.   Facilitator Broker Defendants' Participation In The Wrongful Conduct ............................................... 40

         a.   Overview................................................... 40

         b.   Examples Of The Wrongful Conduct ................. 41

            i.   Brean Murray.................................... 41

            ii.   CIBC .................................................. 42

            iii.   Salomon Smith Barney....................... 44

            iv.   Morgan Stanley................................... 44

      3.   The Clearing Broker Defendants' Participation In The Wrongful Conduct ............................................... 45

         a.   Overview................................................... 45

         b.   Examples Of The Wrongful Conduct ................. 46

              i.      Bear Stearns ........................................................................46

              ii.     Bank of America ................................................................50

              iii.    Prudential............................................................................51

              iv.    Charles Schwab ..................................................................55

              v.      Security Trust Company ....................................................56

              vi.    J.B. Oxford.........................................................................58

        4.     The Financier Defendants' Participation In The
              Wrongful Conduct ...............................................................60

   D.   Harm To MFS Funds Investors ...............................................61

   E.   The Failure Of The Trustee Defendants ...................................64

   F.   Defendants' Profits From The Unlawful Conduct.....................67

       1.     12b-1 Fees............................................................................67

       2.     Advisory and Management Fees ..........................................69

       3.     Directed Brokerage And Shelf Space Payments To
            Broker Dealers .....................................................................70

V.    CLASS ALLEGATIONS .................................................................74

VI.   CAUSES OF ACTION.....................................................................76

COUNT I
   Against Defendants Massachusetts Investor Trust, Massachusetts
   Investor Growth Stock Fund, MFS Government Securities Fund,
   MFS Series Trust I,  MFS Series Trust II, MFS Series Trust IV,
   MFS Series Trust V, MFS  Series Trust IX, MFS Series Trust X,
   MFD, Ballen, And Parke  For Violations Of § 11 Of The Securities
   Act...........................................................................................................76

COUNT II
   Against Defendants Massachusetts Investor Trust,  Massachusetts
   Investor Growth Stock Fund, MFS Government Securities  Fund,
   MFS Series Trust I, MFS Series Trust II, MFS Series Trust IV,
   MFS Series Trust V, MFS Series Trust IX, MFS Series Trust X,
   And MFD For Violations Of § 12(a)(2) Of The Securities Act.........78

COUNT III
    Against The Sun Life Defendants And Defendants MFS, Ballen,
    And Parke  For Violations Of § 15 Of The Securities Act.................................................80

COUNT IV
    Against All Defendants For Violations Of § 10(b) Of The
    Exchange  Act And Rule 10b-5 Promulgated Thereunder .................................................81

COUNT V
    Against All Defendants For Violations Of § 10(b) Of The
    Exchange Act And Rule 10b-5 Promulgated Thereunder ..................................................84

COUNT VI
    Against The Sun Life Defendants and Defendants MFS, Ballen,
    And Parke For Violations Of § 20(a) Of The Exchange Act ............................................86

COUNT VII
    Against Defendants Massachusetts Investor Trust,  Massachusetts
    Investor Growth Stock Fund, MFS  Government Securities Fund,
    MFS Series Trust I, MFS Series Trust II, MFS Series Trust IV,
    MFS Series Trust V,  MFS Series Trust IX, MFS Series Trust X,
    MFS, Ballen, And Parke For Violations Of § 34(b) Of The
    Investment Company Act ...................................................................................................87

COUNT VIII
    Against Defendants MFS, MFD, Ballen, And Parke For Violations
    Of § 36(a) Of The Investment Company Act ....................................................................88

COUNT IX
    Against Defendants Massachusetts Investor Trust,  Massachusetts
    Investor Growth Stock Fund,  MFS Government Securities Fund,
    MFS Series  Trust I, MFS Series Trust II, MFS Series Trust IV,
    MFS Series Trust V, MFS Series Trust IX,  MFS Series Trust X,
    MFS, MFD, And MFSSC For Violations Of § 36(b) Of The
    Investment Company Act ...................................................................................................89

COUNT X
    Against The Sun Life Defendants And Defendants MFS, Ballen,
    And Parke For  Violations Of § 48(a) Of The Investment Company
    Act.....................................................................................................................................90

COUNT XI
    Against Defendants The Sun Life Defendants And  Defendants
    Massachusetts Investor Trust, Massachusetts  Investor Growth
    Stock Fund, MFS Government Securities  Fund, MFS Series Trust
    I, MFS Series Trust II, MFS Series  Trust IV, MFS Series Trust V,
    MFS Series Trust IX, MFS  Series Trust X, MFS, MFD, and
    MFSSC, Ballen, And Parke For Breach Of Fiduciary
    Duty/Constructive Fraud ................................................................................................91

COUNT XII
    Against All Defendants For Aiding And  Abetting Breach Of
    Fiduciary Duty...............................................................................................................92

COUNT XIII
    Against All Defendants For Unjust Enrichment...............................................................93

VII.    PRAYER FOR RELIEF ..........................................................................................94

VIII.   JURY TRIAL DEMANDED......................................................................................94

Lead Plaintiff, the City of Chicago Deferred Compensation Plan ("Chicago"), alleges the following based upon the investigation of Lead Counsel, which included, among other things, a review of internal Massachusetts Financial Services Company ("MFS") documents, United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings and reports and advisories regarding MFS Funds, press releases, media reports, the complaint filed by the SEC and extensive interviews with a confidential witness with direct knowledge of the market timing and late trading activities in MFS Funds and throughout the mutual fund industry ("Timing Witness #1).

I.     NATURE OF THE ACTION

1.     Lead Plaintiff, Chicago, brings this action on behalf of all persons that purchased and/or held shares of MFS mutual funds advised by MFS during the period from December 15, 1998 to December 8, 2003, inclusive (the "Class Period"), and were harmed by a pattern of trading practices known as "market timing" and/or "late trading." The wrongful acts and misconduct alleged herein, much of which has been admitted by defendants, are the subject of administrative actions and investigations by various regulatory agencies, including the SEC, the New York State Attorney General and the Massachusetts Secretary of the Commonwealth.

2.     The MFS fund family consists of over 100 mutual funds into which retail investors could contribute cash for the purpose of creating a pool of assets with which to invest (the "MFS Funds"). These mutual funds hold no assets apart from investors' deposits, nor do they conduct any investment or operating activities on their own. Instead, the funds' operations are controlled by MFS, a separate legal entity which, directly and through its subsidiaries and affiliates, performs all activities necessary to carry out the funds' investment objectives. For performing these services, MFS and its affiliates are paid fees from the funds' deposits in an

1

amount equal to a percentage of the assets under management. Accordingly, the larger the assets under management, the greater the fees MFS receives.

3.    Market timing is a practice whereby certain investors take advantage of inefficiencies in the pricing of mutual fund shares by rapidly trading in and out of these funds on multiple occasions within a short period of time. By executing a significant number of these trades quickly, market timers profit by capitalizing on the differential between the price of the mutual fund itself, and the value of the underlying securities that comprise the mutual fund. Late trading is a variation of market timing, in which certain investors are permitted to trade mutual fund shares at the prior day's prices, in violation of federal law.

4.    Throughout the Class Period, MFS knew or, but for its recklessness, should have known that market timing and late trading caused significant monetary harm to other fund investors. By quickly trading in and out of mutual funds, market timers dilute the investment gains that would otherwise be realized by long-term investors, without sharing any of the losses incurred. Market timers also impose additional transaction costs upon innocent fund investors, due to the huge inflows and outflows of cash resulting from their rapid "in and out" trading. To pay out these market timers on short notice, portfolio managers must invest disproportionate amounts of their funds' assets in cash and other highly liquid assets, paying a significantly lower rate of return than other assets consistent with the fund's investment guidelines. These huge inflows and outflows also required portfolio managers to adopt highly sophisticated and expensive hedging techniques to protect the fund's assets against timing activity, thereby increasing expenses borne by innocent investors in the funds.

5.    Due to the harm to investors caused by market timing, MFS purported to maintain policies that prohibited market timing activity by limiting trading in and out of the mutual funds

2

it advised. The details of these polices were provided in registration statements and prospectuses filed with the SEC throughout the Class Period.

6.     MFS has now admitted, however, that contrary to the representations in the various prospectuses, it permitted market timing to occur during the Class Period, and that innocent investors were harmed as a result of this activity. Indeed, MFS encouraged and facilitated this conduct, despite its knowledge of the harm that market timing caused to long-term investors, primarily to increase the size of the asset portfolios under management and, in turn, MFS's fees for managing these portfolios. As a result of its unlawful conduct, MFS consented to the SEC's entry of an order on February 5, 2004 finding that it had violated anti-fraud provisions of the federal securities laws. MFS also has settled investigations conducted by the New York and New Hampshire Attorneys General. Pursuant to these settlements, MFS has agreed to pay $175 million in disgorgement, $50 million in civil penalties, and a $1 million administrative fine, for a total of $226 million. Furthermore, MFS agreed to cut its management fees by a total of $125 million over the next five years.

7.     MFS did not act alone, however, in the perpetration of this scheme which cost innocent investors hundreds of millions of dollars in investment losses and improper fees. For example, in addition to selling the right to engage in market timing (generally known as "timing capacity") directly to certain select investors, MFS also engaged various large brokerage firms, including defendants Bank of America, Bear Stearns, Charles Schwab, Prudential, Salomon Smith Barney and Canadian Imperial Bank of Commerce, to sell timing capacity on its behalf. As detailed below, these brokerage firms negotiated for timing capacity in various funds controlled by MFS, and then sold this capacity to the market timers themselves. These brokers received substantial fees from both the timers to whom they sold the capacity, and from the

3

funds controlled by MFS, calculated as a percentage of the amounts traded by the market timers. These same brokers increased their fees further by steering their own clients into these funds in return for additional fees from MFS, without disclosing to their clients that the funds permitted market timing, or the harm to long-term investors that resulted from this activity.

8.      The wrongful conduct of the brokers was not limited to negotiating for and selling timing capacity in the funds. Certain of these brokers also executed, or "cleared," timing transactions with full knowledge of the harmful effects of timing on the performance of mutual funds, in return for fees paid by both the funds managed by MFS, as well as the market timers themselves. These same brokers implemented a variety of deceptive devices and schemes for the purpose of facilitating market timing. Other large brokerage firms provided sophisticated financing arrangements to market timers that included the creation of false accounts to facilitate the timing scheme, all in return for substantial fees and other compensation.

9.      Although each fund within the MFS Fund Complex was nominally governed by its own Board of Trustees ("Board") throughout the Class Period, these trustees were selected and nominated, in most cases, not by the shareholders of the funds themselves, but by MFS. These individuals served on multiple fund boards advised by MFS, and owed their positions, along with the substantial compensation they received as a result, to MFS. As a result, these trustees suffered from inherent conflicts of interest that precluded them from discharging their fiduciary duties of care, loyalty and good faith, which should have included prohibiting market timing, enforcing the terms of the various prospectuses, and otherwise acting to safeguard the best interests of innocent investors in the funds.

4

II.    JURISDICTION AND VENUE

10.    This Court and the United States District Court of the District of Massachusetts (the "Transferor Court") have jurisdiction over the subject matter of this action pursuant to: § 22 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77v); § 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78aa); § 44 of the Investment Company Act of 1940 (the "ICA") (15 U.S.C. §§ 80a-43); and, 28 U.S.C. §§ 1331, 1337. This Court and the Transferor Court also have supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1367.

11.    The claims alleged herein arise under: §§ 11, 12(a)(2) and 15 of the Securities Act (15 US.C. §§ 77k, 77l(a)(2) and 77o); §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §§ 240.10b-5); §§ 34(b), 36(a), 36(b) and 48(a) of the ICA (15 U.S.C. §§ 80a-33(b), 80a-35(a)-(b), 80a-47(a)); and state and common law. In connection with the acts, conduct and other wrongs complained of herein, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities exchange.

12.    Venue is proper in the District of Maryland and the District of Massachusetts ("Transferor District") pursuant to § 22 of the Securities Act (15 U.S.C. §77v), § 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1391(b) and 1391(c). Many of the acts and transactions giving rise to the violations of law complained of herein occurred in the District of Maryland and the Transferor District. Defendants conducted other substantial business within the District of Maryland the Transferor District and many Class members reside within the District of Maryland and the Transferor District. Venue is also proper in the District of Maryland pursuant to the multi-district litigation provisions under 28 U.S.C. § 1407.

III.    PARTIES

     A.    Lead Plaintiff

     13.    Lead Plaintiff, Chicago, is a municipal deferred compensation plan located in Chicago, Illinois. Chicago was formed pursuant to Section 457 of the United States Internal Revenue Code (26 U.S.C. § 457) for the benefit of the current and retired employees of the City of Chicago and their beneficiaries. During the Class Period, Chicago purchased and held shares of certain of the MFS Funds. As a result of the conduct alleged herein, Chicago suffered damages both in connection with its purchases of shares of MFS Funds and by virtue of holding shares of the MFS Funds during the Class Period.

     B.    Defendants And Significant Non-Parties

     1.    Non-Party MFS Fund "Complex"

     14.    The MFS Fund Complex, as discussed herein, consists of all of the MFS Funds and the various entities that administer and control those funds. Included in the MFS Fund Complex are MFS (the fund sponsor and investment advisor), its parent and affiliates, the registrants (or issuers) of the fund shares, the underwriters of the fund shares, the trustees of the funds, and the funds themselves. The chart below illustrates the structure of the MFS Fund Complex:



15.    (a)    Non-Party MFS Funds are open-end mutual funds in which investors contribute cash for the purpose of creating a pool of assets with which to invest and purchase securities. In return for their deposits, investors receive shares in the MFS Fund in an amount directly proportionate to the amount of their investment (*i.e.*, the larger the amount invested, the more shares the investor receives in the fund). This cash is then used to purchase stocks or other securities, consistent with the investment goals and objectives of the fund. The MFS Funds' shares are issued to fund investors pursuant to registration statements and prospectuses that must comply with the Securities Act and the ICA.

(b)    The MFS Funds hold no assets apart from the deposits of their investors, nor do they conduct any operating or investment activities on their own. Instead, the MFS Funds are part of a labyrinthine related structure, commonly known as a "complex," in which separate

legal entities, which are nonetheless related to MFS, perform and control all necessary activities related to the sale and redemption of securities, as well as the management of investments (hereinafter the "MFS Complex"). Indeed, as detailed below, these related entities not only nominate their own representatives to the Board of Trustees charged with the fiduciary duty of protecting the interests of investors in each individual fund, but as a practical matter, also control the appointment of the purportedly "independent" members of these boards. In exchange for the performance of these services, these same related entities within the fund complex receive substantial fees, calculated as a percentage of the value of the total deposits under management, as set forth below. Thus, the larger the amount of deposits under management, the more that these related entities stand to collect in fees from mutual fund investors. This means that, even in the case in which a mutual fund loses money on its investments, the related entities can still increase the fees they earn by simply steering more investor deposits into the funds.

        2.     The Parent Defendant

     16.    (a)    Defendant Sun Life Financial, Inc. ("Sun Life") is the ultimate corporate parent of MFS and controls each of the entities within the MFS Complex. Sun Life is located at 150 King Street West, Toronto, Ontario, M5H 1J9. Sun Life is a publicly traded international financial services company with over CDN$369.6 billion under management. Sun Life's U.S. holding subsidiary is defendant Sun Life Assurance Company of Canada – U.S. Operations Holdings, Inc. ("Sun Life Assurance"), located in Wellesley Hills, MA, which, through wholly-owned subsidiaries defendant Sun Life Financial (U.S.) Investments LLC ("Sun Life Investments") and defendant Sun Life of Canada (U.S.) Financial Services Holdings, Inc. ("Sun Life Holdings") own 93.6% of defendant MFS.

(b)    Sun Life operates and controls each of the subsidiaries and affiliates comprising the MFS Complex, including the Investment Adviser/Fund Sponsor, MFS, the Administrator, the Registrants, and the Distributor, which in turn are responsible for the operations of the MFS Funds. Through these subsidiaries, Sun Life collected fees from the funds themselves for the services rendered, including fees generated by the wrongful conduct alleged herein. Together, defendants Sun Life, Sun Life Assurance, Sun Life Investments and Sun Life Holdings are referred to herein as the "Sun Life Defendants."

### 3.    The Investment Advisor/Fund Sponsor

17.    (a)    Defendant MFS is a wholly-owned subsidiary of Sun Life. MFS is located at 500 Boylston Street, Boston, Massachusetts 02116. MFS, the legal name for the registered entity doing business as MFS Investment Management, a Delaware limited liability company, is a registered investment adviser under the Investment Advisers Act of 1940 ("IAA"). MFS had ultimate responsibility for overseeing the day-to-day management, administration, operation and distribution of the MFS Funds. Throughout the Class Period, MFS permitted select investors to engage in the market timing and late-trading of the MFS Funds at the expense of ordinary, long-term shareholders, such as Lead Plaintiff and the other members of the Class, in return for substantial fees calculated as a percentage of the average daily net assets of the MFS Funds.

(b)    MFS, and through it the Sun Life Defendants, was paid for its services during the Class Period pursuant to investment advisory agreements negotiated between MFS and the trustees of the funds, on behalf of the MFS Funds themselves. The MFS advisory agreements provide for the MFS Funds to pay MFS between 33 and 75 basis points (.33% to .75%) of the net assets under management, calculated on a daily basis and paid monthly, in

9

return for its investment advisory services. Thus, if a fund had an NAV of $1 billion over the course of the year, it paid MFS at least $3.3 million annually, from investors' deposits, for its investment advisory services.

18.     MFS was responsible both for the creation of the individual mutual funds (including the determination of their investment goals and strategy), as well as for managing the day-to-day activities and individual investments of the MFS Funds. MFS, or its subsidiaries or affiliates, is responsible for performing virtually all critical functions of the MFS Funds, including: (i) hiring and employing portfolio managers; (ii) selling shares in the funds to the public; (iii) performing all "back-office" operations; (iv) determining the net asset value ("NAV") of the funds on a daily basis; (v) directing and controlling the investments in the funds; (vi) ensuring that the investment policies of the funds are observed; (vii) enforcing the policies of the funds, including restrictions on trading and other activities that could be detrimental to fund shareholders; and (viii) otherwise managing the day-to-day activities of the funds. While the MFS Complex included hundreds of different individual funds during the Class Period, MFS, or its subsidiaries, were responsible for the management and day-to-day operations for all of the MFS Funds.

> 4.     The Administrator

19.     Defendant MFS also served as the Administrator for the MFS Funds, pursuant to master administrative services agreements dated March 1, 1997 and April 1, 1999 (the "Master Administrative Service Agreements"). As Administrator, MFS was responsible for performing the day-to-day administrative functions associated with the business of the MFS Funds. These tasks include: (i) performing back-office operations; (ii) calculating the NAV of the MFS Funds on a daily basis; and (iii) maintaining books and records for the MFS Funds. The Master Administrative Services Agreements were negotiated between MFS and the trustees, on behalf of

the MFS Funds themselves, and provided for the MFS Funds to pay MFS as much as 1.75 basis points (.0175%) of the net assets under management, calculated on a daily basis and payable monthly or quarterly, in return for its services. Thus, if a fund had an NAV of $1 billion over the course of the year, that fund paid MFS, from investors' deposits, as much as $175,000 annually for its services, in addition to the millions of dollars also paid out of investors' deposits to MFS pursuant to the Advisory Agreement.

5.    Registrants/Issuer Defendants

20.    Defendant MFS Government Securities Fund was the registrant and issuer of shares for the MFS Government Securities Fund during the Class Period. MFS Government Securities Fund was organized as a business trust under the laws of Massachusetts in 1981.

21.    Defendant Massachusetts Investors Trust was the registrant and issuer of shares for the Massachusetts Investors Trust during the Class Period. Massachusetts Investors Trust was organized as a business trust under the laws of Massachusetts in 1924.

22.    Defendant Massachusetts Investors Growth Stock Fund was the registrant and issuer of shares for the Massachusetts Investors Growth Stock Fund during the Class Period. Massachusetts Investors Growth Stock Fund was organized as a business trust under the laws of Massachusetts on July 29, 1985.

23.    Defendant MFS Series Trust I was the registrant and issuer of shares for the following MFS Funds during the Class Period: the Core Growth Fund, the Managed Sectors Fund, the New Discovery Fund, the Cash Reserve Fund, the Japan Equity Fund, the Strategic Growth Fund, the Technology Fund, the Research Growth & Income Fund, the Value Fund, the Global Telecommunications Fund, the Research International Fund and the Global Asset

11

Allocation Fund. MFS Series Trust I was organized as a business trust under the laws of Massachusetts in 1986.

24.    Defendant MFS Series Trust II was the registrant and issuer of shares for the following MFS Funds during the Class Period: the Large Cap Growth Fund and the Emerging Growth Fund. MFS Series Trust II was organized as a business trust under the laws of Massachusetts on September 7, 1993.

25.    Defendant MFS Series Trust IV was the registrant and issuer of shares for the following MFS Funds during the Class Period: the Money Market Fund, the Government Money Market Fund, the Municipal Bond Fund and the Mid-Cap Growth Fund. MFS Series Trust IV was organized as a business trust under the laws of Massachusetts on September 8, 1975.

26.    Defendant MFS Series Trust V was the registrant and issuer of shares for the following MFS Funds during the Class Period: the Research Fund, the Total Return Fund, the International Strategic Growth & Value Fund and the International New Discovery Fund. MFS Total Return Fund was organized as a business trust under the laws of Massachusetts in 1970.

27.    Defendant MFS Series Trust IX was the registrant and issuer of shares for the following MFS Funds during the Class Period: the Municipal Limited Maturity Fund, the Limited Maturity Fund, the International Investment Grade Bond Fund, the Bond Fund, the Research Bond Fund and the Emerging Opportunities Fund. MFS Series Trust IX was organized as a business trust under the laws of Massachusetts in 1985.

28.    Defendant MFS Series Trust X was the registrant and issuer of shares for the following MFS Funds during the Class Period: the Strategic Value Fund, the Emerging Markets Debt Fund, the Government Mortgage Fund, the New Endeavor Fund, the Global Value &

International Core Equity Fund and the Euro Equity & International Equity Fund. MFS Series Trust X was organized as a business trust under the laws of Massachusetts on 1985.

29.    Each of the MFS registrants identified above (collectively, the "Registrants") is a corporate subsidiary or affiliate of MFS and is the legal issuer of the MFS Funds within that registrant's portfolio. As such, the Registrants issued such shares to the public during the Class Period pursuant to registration statements and prospectuses issued under § 10 of the Securities Act, and are therefore absolutely liable to purchasers of the shares for any material misstatements and omissions in these prospectuses.

### 6.    The Distributor Defendant

30.    Defendant MFS Fund Distributors ("MFD"), a wholly-owned subsidiary of MFS, was the distributor for all of the approximately 104 mutual funds within the MFS family of funds. MFD is a broker-dealer registered with the SEC. MFD also served as the underwriter for the multiple funds within the MFS family of funds during the Class Period. As the underwriter, MFD is strictly liable for any material misstatements or omissions contained in the registration statement and prospectus under the Securities Act.

### 7.    Shareholder Servicing Agent

31.    Defendant MFS Service Center, Inc. ("MFSSC"), a wholly-owned subsidiary of MFS, is the shareholder servicing agent for the MFS Funds. MFSSC receives and processes shareholders' orders for transactions in the MFS Funds. Investors in the MFS Funds paid MFSSC a fee calculated as a percentage of the MFS Funds' average daily net assets at an annual rate of 0.10% during the Class Period.

### 8.    The MFS Individual Defendants

32.    (a)    Defendant John W. Ballen ("Ballen") was president of MFS from August 1998 through 2001 and was MFS's Chief Executive Officer ("CEO") from 2002 to 2003. Since

13

2001, he also served as a trustee of the MFS Funds. In his capacity as trustee, defendant Ballen signed each of the Registration Statement listed on Appendix B that was filed and/or became effective during 2002 and 2003. Defendant Ballen also signed the Registration Statement filed by the MFS Series Trust V on November 29, 2001; the Registration Statement filed by the MFS Series Trust IV on December 28, 2001; the Registration Statement filed by the MFS Series Trust X on November 28, 2001; and the Registration Statement filed by the MFS Series Trust IX on August 28, 2001.

(b)    As detailed herein, Ballen orchestrated the market timing activities at MFS. In particular, Ballen chose the MFS funds that would be open to market timing and negotiated the arrangements with broker-dealers and market timers. As a result of his conduct, defendant Ballen consented to the SEC's entry of an order on February 5, 2004 finding that he willfully violated antifraud provisions of the federal securities laws and ordering him to cease and desist from future violations. The SEC further ordered defendant Ballen to pay a civil money penalty of $250,000, disgorgement of $57,737 and prejudgment interest of $6,322, for a total of $314,059. Additionally, the SEC order banned defendant Ballen from any association with an investment advisor for a nine month period, beginning February 16, 2004. Furthermore, defendant Ballen was banned for a 27-month period from serving as an executive officer, trustee, or board member at MFS or any other investment advisor. For the same length of time, he was banned from performing any duties relating to the sales or administration of mutual funds.

33.    (a)    Defendant Kevin R. Parke ("Parke") was chief equity officer of MFS from August 1998 through early 2001. He was appointed MFS President in 2002 and Chief Investment Officer ("CIO") in 2001. Defendant Parke also was a trustee of the MFS Funds since early 2002. As trustee of the MFS Funds, Defendant Parke signed each of the Registration

Statements list in Appendix B hereto that was filed and/or became effective in 2002 through 2003. As a result of defendant Parke's conduct as alleged herein, in February 2004, the SEC ordered that he cease serving in these capacities at MFS.

(b)    As detailed herein, defendant Parke implemented and oversaw the illegal trading scheme at MFS, including approving and determining the amount of market timing capacity that would permitted. As a result of his unlawful conduct, defendant Parke consented to the SEC's entry of an order on February 5, 2004 finding that he willfully violated antifraud provisions of the federal securities laws and ordering him to cease and desist from future violations. The SEC further ordered defendant Parke to pay a civil money penalty of $250,000, a disgorgement of $58,853 and prejudgment interest of $6,231, for a total of $315,084. Additionally, the SEC order banned defendant Parke from any association with an investment advisor for a six month period, beginning February 16, 2004. Furthermore, defendant Parke was banned for a 30-month period from serving as an executive officer, trustee, or board member at MFS or any other investment advisor. For the same length of time, he was banned from performing any duties relating to the sales or administration of mutual funds.

9.    The Timer Defendants

a.    Canary

34.    Defendant Edward J. Stern ("Stern"), a resident of New York County, New York, was at all relevant times herein, the Managing Principal of defendants Canary Capital Partners, LLC, Canary Investment Management, LLC and Canary Capital Partners, Ltd. (referred to collectively herein as "Canary").

35.    Defendant Canary Capital Partners, LLC is a limited liability company organized and existing under the laws of the State of New Jersey, with offices at 400 Plaza Drive, Secaucus, New Jersey.

15

36.    Defendant Canary Investment Management, LLC is a limited liability company organized and existing under the laws of the State of New Jersey, with offices at 400 Plaza Drive, Secaucus, New Jersey.

37.    Defendant Canary Capital Partners, Ltd. is a Bermuda limited liability company.

38.    Throughout the Class Period, the MFS defendants and its subsidiaries entered into agreements with Stern and Canary, either directly or through intermediaries, that permitted them to engage in the improper market timing and late-trading of the MFS Funds, at the expense of ordinary long-term MFS investors, such as Lead Plaintiff and the other members of the Class.

              b.    <u>Security Brokerage, Inc.</u>

39.    Defendant Security Brokerage, Inc. ("Security Brokerage") was a registered broker-dealer firm registered with the SEC and located in Las Vegas, Nevada. Security Brokerage engaged in late trading in numerous mutual fund families, including MFS. As a result of its wrongful conduct, on September 19, 2003, Security Brokerage filed Form BDW with the SEC seeking to withdraw its broker-dealer registration. On December 23, 2003, the SEC filed securities fraud charges against Security Brokerage in the United States District Court for the District of Nevada.

40.    Defendant Daniel G. Calugar ("Calugar") was President and 95% owner and the sole customer of Security Brokerage. Calugar is a resident of both Las Vegas, Nevada and Los Angeles, California. As a result of his wrongful conduct, on December 23, 2003, the SEC filed securities fraud charges against Calugar in the United States District Court for the District of Nevada.

41.    Defendants Security Brokerage and Calugar are referred to herein as the "Security Brokerage Defendants."

c.    Wilshire Associates

42.    Defendant Wilshire Associates Incorporated ("Wilshire Associates") is a global investment advisory firm with assets under management totaling more than $12.5 trillion. Wilshire Associates is located at 1299 Ocean Avenue, Suite 700 Santa Monica, CA 90401. Throughout the Class Period, Wilshire Associates engaged in market timing activity in numerous mutual fund families, including MFS.

d.    Trout

43.    Defendant Trout Trading Management Co. ("Trout") is a hedge-fund located at Rose Bank Centre, Bermudiana Road 14, Pembroke, Bernuda. Throughout the Class Period, Trout engaged in market timing activity in numerous mutual fund families, including MFS.

10.    The Facilitator Broker Defendants

44.    Defendant Ryan Goldberg ("Goldberg") was employed by brokerage firm Brean Murray & Co. ("Brean Murray") and was actively involved in the market timing activities alleged herein. Specifically, Goldberg offered market timing capacity in the MFS Funds to various market timers, including Canary and Trout. In the summer of 2001, defendant Goldberg opened accounts for Canary and Trout at Brean Murray for the express purpose of market timing mutual funds, including the MFS Funds. As a result of his illegal activity, defendant Goldberg is the subject of ongoing investigations by the offices of the New York and New Jersey Attorney Generals and the SEC.

45.    Defendant Michael Grady ("Grady") was employed by Brean Murray and was actively involved in the market timing activities alleged herein. Specifically, Grady offered additional market timing capacity in the MFS Funds to various market timers, including Canary and Trout. In the summer of 2001, defendant Grady opened accounts for Canary and Trout at Brean Murray for the express purpose of market timing mutual funds, including the MFS Funds.

As a result of his illegal activity, Grady is the subject of ongoing investigations by the offices of the New York and New Jersey Attorney Generals and the SEC.

46.     Defendant Canadian Imperial Bank of Commerce ("CIBC") is a Canadian financial institution with significant operations based in New York.  CIBC provided defendant Canary financing for the express purpose of market timing the MFS Funds.  At all relevant times, CIBC controlled defendant Canadian Imperial Holdings, Inc.

47.     Defendant Canadian Imperial Holdings, Inc. is a subsidiary of CIBC.  CIHI provided the financing used by Canary and the other hedge funds to market time and late trade the MFS Funds.  CIHI is located at 425 Lexington Avenue.

48.     Defendant Paul A. Flynn ("Flynn") was a Managing Director of Canadian Imperial Holdings, Inc.'s equity investments, which was part of the Equity Arbitrage Department of Canadian Imperial Holdings, Inc., a subsidiary of CIBC.  Defendant Flynn worked for Canadian Imperial Holdings, Inc., and CIBC at their New York offices.  Defendant Flynn negotiated and implemented late trading capacity in the MFS Funds for defendant Canary through defendant Security Trust Company, N.A. ("Security Trust").  Additionally, defendant Flynn negotiated and provided financing from CIBC to defendant Canary for the express purpose of timing the MFS Funds.  On February 3, 2004, he was charged criminally by the New York State Attorney General for first degree grand larceny and engaging in a scheme to defraud in the first degree.  Also that day, the SEC instituted an administrative proceeding against Flynn alleging violations of Section 10(b) and Rule 10(b)(5), and Section 17(a) of the Exchange Act.

49.     Defendant Citigroup, Inc. ("Citigroup") is the ultimate parent of the Salomon Smith Barney defendants named herein.  Citigroup is incorporated in Delaware and its principal executive offices are located at 399 Park Avenue, New York, New York 10043.

50.     Defendant Citigroup Global Markets Holdings Inc. ("Citigroup Global"), f/k/a Salomon Smith Barney Holdings Inc., operating through its subsidiaries, is a full-service investment banker and securities brokerage. Citigroup Global is a subsidiary of Citigroup and the sole parent of defendant Salomon Smith Barney, Inc. Citigroup Global is incorporated in New York with its principal executive offices at 388 Greenwich Street, New York, New York 10013.

51.     Defendant Salomon Smith Barney, Inc., now known as Citigroup Global Markets, Inc, and doing business as Smith Barney Asset Management ("SSB"), is registered as an investment adviser under the IAA. SSB is located at 399 Park Avenue, New York, New York 10022. SSB is also a registered broker-dealer and employer of broker-dealers and financial advisers. SSB's broker-dealer operations are located at 388 Greenwich Street, New York, New York 10013.

52.     Defendants Citigroup, Citigroup Global and SSB shall be referred to herein collectively as "SSB Defendants."

53.     Defendant Morgan Stanley DW ("Morgan Stanley"), a broker-dealer registered with the SEC pursuant to Section 15 of the Exchange Act since 1968, is a subsidiary of the publicly traded entity Morgan Stanley. Morgan Stanley is also a member of the National Association of Securities Dealers ("NASD"). Morgan Stanley DW's principal offices are located at 825 Third Avenue, New York, New York.

11.     The Clearing Broker Defendants

54.     (a)     Defendant Bank of America Corporation, through its subsidiary Banc of America Securities LLC (collectively "Bank of America"), is registered as a broker-dealer under the Exchange Act and an investment advisor under the IAA. Throughout the Class Period, Bank

19

of America facilitated market timing in the MFS Funds, including timing by Canary, among others.

(b)    For example, as early as 2001, Bank of America: (1) provided Canary with a state-of-the-art electronic late trading platform, allowing it to trade late in the hundreds of mutual funds that the bank offers to its customers, including the MFS Funds; (2) provided Canary with approximately $300 million of credit to finance this late trading and market timing activity in the hundreds of mutual funds that the bank offers its customers, including the MFS Funds; and (3) sold Canary the derivative short positions it needed to time the funds as the market dropped, including the MFS Funds. All of this activity was coordinated through Bank of America broker, defendant Theodore C. Sihpol, III.

55.    Defendant Theodore C. Sihpol, III ("Sihpol") was employed as a broker in the New York office of defendant Bank of America Securities' Private Client Services ("PCS") high net-worth group and was actively involved in the market timing activities alleged herein. Specifically, defendant Sihpol facilitated the market timing and late trading transactions through Bank America. In March 2004, defendant Sihpol was indicted on 40 counts of fraud, larceny and falsifying statements in connection with his late trading and market timing activities.

56.    Defendant Prudential Financial, Inc. ("Prudential") is a publicly-owned holding company, traded on the New York Stock Exchange ("New York Stock Exchange"), whose operating subsidiaries are insurance and investment managers, including defendant Prudential Securities, Inc. At all relevant times, Prudential knowingly approved of and engaged in market timing activities in the MFS Funds, as well as numerous other fund complexes.

57.    Defendant Prudential Securities, Inc. ("Prudential Securities") is a wholly-owned broker-dealer subsidiary of defendant Prudential with its main office located in New York City.

On July 1, 2003, Prudential transferred its ownership in Prudential Securities to defendant Wachovia Securities, LLC, a joint venture subsidiary of defendants Wachovia and Prudential. At all relevant times, Prudential Securities knowingly cleared market timing transactions, including its own, in the MFS Funds, as well as numerous other fund complexes. As a result of its wrongful conduct, on November 4, 2003, the Massachusetts Secretary of the Commonwealth filed charges against Prudential Securities, including charges of securities fraud.

58.    Defendant Wachovia Corporation ("Wachovia"), is a publicly held North Carolina corporation traded on the New York Stock Exchange with headquarters in Charlotte, North Carolina. Wachovia is a multi-bank holding company, and is the parent of defendant Wachovia Securities. On July 1, 2003, Prudential transferred its ownership in defendant Prudential Securities to defendant Wachovia Securities, LLC, a joint venture subsidiary of defendants Wachovia and Prudential.

59.    Defendant Wachovia Securities, LLC ("Wachovia Securities"), is a private company joint venture subsidiary of defendants Wachovia and Prudential formed on July 1, 2003, when defendant Prudential transferred its ownership in defendant Prudential Securities to defendant Wachovia Securities. Specifically, Wachovia owns 62% and Prudential owns 38% of the joint venture. Moreover, Wachovia Securities is a securities broker-dealer headquartered in Richmond, Virginia and is incorporated in Delaware. From at least as early as July 1, 2003, Wachovia Securities knowingly facilitated market timing transactions, including its own, in the MFS Funds.

60.    Defendant Martin Druffner ("Druffner") was a registered representative of Prudential Securities from April 1996 to July 2003. Druffner then became a registered representative of Wachovia Securities until September 29, 2003, when he was permitted to

21

resign. At all relevant times, Druffner served as the head of a group of broker-dealers based in Prudential Securities' Boston office who facilitated and cleared market timing transactions at numerous mutual fund complexes, including MFS, on behalf of six off-shore hedge funds (the "Druffner Group"). As a result of his illegal activities, on November 4, 2003, the Massachusetts Secretary of the Commonwealth and the SEC filed charges against Druffner, including charges of securities fraud. The SEC is seeking an order requiring Druffner to disgorge any ill-gotten gains and profits from his illegal activities.

61.    Defendant Justin Ficken ("Ficken") was a registered representative of Prudential Securities from October 1999 to July 2003. Ficken then became a registered representative of Wachovia Securities until September 29, 2003, when he was permitted to resign. At all relevant times, Ficken was a member of the Druffner Group and facilitated and cleared market timing transactions at numerous mutual fund complexes, including MFS, on behalf of six off-shore hedge funds. As a result of his illegal activities, on November 4, 2003, the Massachusetts Secretary of the Commonwealth and the SEC filed charges against Ficken, including charges of securities fraud. The SEC is seeking an order requiring Ficken to disgorge any ill-gotten gains and profits from his illegal activities.

62.    Defendant Skifter Ajro ("Ajro") was a registered representative of Prudential Securities from April 2001 to July 2003. Ajro then became a registered representative of Wachovia Securities until September 29, 2003, when he was permitted to resign. At all relevant times, Ajro was a member of the Druffner Group and facilitated and cleared market timing transactions at numerous mutual fund complexes, including MFS, on behalf of six off-shore hedge funds. As a result of his illegal activities, on November 4, 2003, the Massachusetts Secretary of the Commonwealth and the SEC filed charges against Ajro, including charges of

securities fraud.  Furthermore, the SEC is seeking an order requiring Ajro to disgorge any ill-gotten gains and profits from his illegal activities.

63.    Defendant Michael Vanin ("Vanin") was a registered representative of Prudential Securities from August 1989 to November 2001.  Vanin was the branch manager of Prudential's Boston office at all relevant times until November 2001.  In this capacity, he approved and oversaw the market timing activities of the Druffner Group.  As a result of his activities, on November 4, 2003, the Massachusetts Secretary of the Commonwealth issued charges against Vanin, including allegations of securities fraud.

64.    Defendant Robert Shannon ("Shannon"), was a registered representative of Prudential Securities from September 1996 to July 2003.  Shannon then became a registered representative of Wachovia Securities until September 29, 2003, when he was permitted to resign.  Shannon was the Branch Manager of Prudential's Boston office at all relevant times until November 2001.  In this capacity, he approved and oversaw the market timing activities of the Druffner Group.  As a result of his wrongful conduct, on November 4, 2003, the SEC and the Massachusetts Secretary of the Commonwealth issued charges against Shannon, including allegations of securities fraud.

65.    Defendant John Peffer ("Peffer") was a registered representative of Prudential Securities beginning in 1995.  At all relevant times, Peffer served as the head of a group of broker-dealers based in Prudential Securities' Boston office who engaged in market timing activities at numerous mutual fund complexes, including MFS, on behalf of two off-shore hedge funds (the "Peffer Group").  As a result of his wrongful conduct, on November 4, 2003, the SEC filed charges against Peffer, including charges of securities fraud.  As a result of his wrongful

conduct, on November 4, 2003, the SEC and the Massachusetts Secretary of the Commonwealth issued charges against Peffer, including allegations of securities fraud.

66.     Defendant Marc C. Bilotti ("Bilotti") was a registered representative of Prudential Securities beginning in 1999. At all relevant times, Bilotti was a member of the Peffer Group and engaged in market timing activities at numerous mutual fund complexes, including MFS, on behalf of two off-shore hedge funds. On November 4, 2003, the SEC filed charges against Bilotti, including charges of securities fraud. Furthermore, the SEC is seeking an order requiring Bilotti to disgorge any ill-gotten gains and profits from his illegal activities.

67.     The defendants defined in the foregoing ¶¶ 56 - 66 are referred herein collectively as the "Prudential Defendants."

68.     Defendant Security Trust Company, N.A., ("Security Trust"), was based in Phoenix, Arizona. Security Trust was an uninsured national banking association that provided trust and custody-related services to high net-worth individuals, private trusts and entities, and retirement plans and their administrators. As of August 31, 2003, Security Trust held $12.9 billion in assets under administration. Security Trust was instrumental in market timing of the MFS Funds by certain hedge funds, which were permitted to use the firm's electronic trading platform to execute late trades and engage in market timing. On October 29, 2003, the Federal Reserve ordered Security Trust to cease operations. On November 24, 2003, the SEC filed a complaint in the United States District Court for the District of Arizona alleging that Security Trust committed securities fraud, in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and violated Rule 22c-1 promulgated under Section 22(c) of the ICA. Security Trust was bought by American Stock Transfer & Trust Company of New York and is now called the AST Trust Co.

24

69.     Defendant Grant D. Seeger ("Seeger") was Security Trust's CEO from 1998 until his resignation on October 5, 2003.  Seeger established the relationship with various hedge funds, including Canary, negotiated increased fees for Security Trust, and actively facilitated the late trading and market timing in the MFS Funds by various market timers.

70.     Defendant JB Oxford Holdings, Inc., a Utah corporation located in Beverly Hills, California, is a holding company that provides clearing and execution services and discount brokerage services.  JB Oxford Holdings, Inc, is the parent of JB Oxford & Co. and defendant National Clearing Corporation.  Through its subsidiaries, JB Oxford Holdings, Inc., entered into numerous agreements with its customers that enabled its customers to engage in late trading and market timing activities in over 600 mutual funds, including the MFS Funds.

71.     Defendant National Clearing Corporation ("NCC"), a wholly-owned subsidiary of defendant JB Oxford Holdings, Inc., is located in Beverly Hills, California.  NCC is a broker-dealer registered with the SEC.  Prior to April 2003, JB Oxford Holdings, Inc. had one subsidiary, JB Oxford & Co.  On or about April 2003, JB Oxford & Co. was reorganized into two subsidiaries – JB Oxford & Co., which served as a retail brokerage firm, and defendant NCC, which served as a clearing firm.  Defendant NCC clears transactions for correspondent brokers, including JB Oxford & Co., hold funds and securities for JB Oxford & Co., and handles institutional business previously handled by JB Oxford & Co.  NCC entered into numerous agreements with its customers that enabled its customers to engage in late trading and market timing activities in over 600 mutual funds, including the MFS Funds.  Through its participation in the late trading and market timing activity alleged herein, defendant NCC realized almost $1 million in proceeds from compensation arrangements with its customers who engaged in late trading and market timing and allowed those customers to reap at least $8 million in profits at the