# Exhibit B

# (Pages 26 – 50)

expense of long-term mutual fund shareholders. Defendant NCC is the current name of the entity engaged in the market timing and late trading activity alleged herein.

72.    Defendant James G. Lewis ("Lewis") was a member of the board of directors, the President and Chief Operating Officer ("COO") of JB Oxford Holdings, Inc. from 1999 until his resignation in April 2004. Lewis was President and CEO of JB Oxford & Co. and NCC from 1999 until his resignation in December 2003. Lewis, along with defendant James Y. Lin, negotiated the agreements by which NCC enabled its customers to engage in late trading.

73.    Defendant Kraig L. Kibble ("Kibble") has been defendant NCC's Director of Operations since September 2002. From January 2002 until his promotion in September 2002, defendant Kibble was the Assistant Vice President of Operations. In his position as the Assistant Vice President of Operations, defendant Kibble supervised NCC's mutual fund department and oversaw the trading by NCC's customers. Throughout 2002 until August 2003, Kibble reported to defendant Lewis. Defendant Kibble transmitted and approved the transmittal of NCC's customers late trades to the mutual fund complexes, including MFS.

74.    Defendant James Y. Lin ("Lin") has been the Vice President of Correspondent Services at JB Oxford & Co. and NCC since at least May 2002. In that position, defendant Lin is responsible for attracting additional correspondent brokers and negotiating clearing agreements between those brokers and NCC. From at least May 2002 through December 2003, Lin reported directly to defendant Lewis. Defendant Lin, along with defendant Lewis, negotiated the agreements by which NCC enabled its customers to engage in late trading.

75.    Defendant Bear Stearns & Co., Inc. ("BSC") is a global investment bank and securities trading and brokerage firm, with its principal executive offices located at 383 Madison Avenue, New York, New York 10179.

76.    Defendant Bear Stearns Securities Corp., ("BSS") is a Delaware corporation with its principal offices located at 383 Madison Avenue, New York, NY 10179. BSS is a broker-dealer and affiliate of BSC.

77.    Defendants BSC and BSS are collectively referred to herein as the "Bear Stearns" defendants.

78.    Defendant Charles Schwab & Co. ("Schwab") is a Delaware corporation with its principal offices located at 120 Kearny, 4th Floor, San Francisco, CA 94104.

79.    Defendant Credit Suisse First Boston (USA) Inc. ("CSFB") is a Delaware corporation with its principal offices located at Eleven Madison Avenue, New York, NY 10010.

80.    Defendants Bank of America, Bear Stearns, Schwab, CSFB, Prudential, Security Trust, NCC, and SSB are collectively referred to herein as the "Clearing Broker Defendants." As explained in detail below, the Clearing Broker Defendants participated in market timing and late trading by transacting wrongful trading activity across the mutual fund industry, including MFS, and by engineering and implementing market timing and late trading strategies and schemes for the Timer defendants, and their brokers. The Clearing Broker Defendants earned substantial fees and other compensation for their participation in the wrongful mutual fund trading schemes described in detail herein.

12.    Financier Defendants

81.    Defendant JP Morgan Chase and Co. ("JPM") is a Delaware corporation, with its principal offices located at 270 Park Avenue, New York, New York 10017.

82.    Defendant JPM, together with previously named defendants Bank of America, Bear Stearns, CIBC and CSFB (in their capacities as financiers of market timing and late trading), are referred to collectively herein as the "Financier Defendants." As explained in detail

herein, during the Class Period the Financier Defendants were lenders to market timers and late traders, including Canary, for the purpose of market timing and shorting mutual funds, including MFS Funds.

### C.      The John Doe Defendants

83.      The true names and capacities of defendants sued herein as John Does 1 through 100 are other active participants with the above-named defendants in the widespread unlawful scheme alleged herein whose identities have yet to be ascertained.   Such defendants were secretly permitted to participate in the market timing and late trading activities detailed herein. Lead Plaintiff will amend this Complaint to state the true names and capacities of said defendants when they have been ascertained.

### IV.   FACTUAL ALLEGATIONS

#### A.      Overview Of Market Timing/Late Trading Practices

##### 1.      Background Information And The Forward-Pricing Rule

84.      Market timing/late trading opportunities stem from inefficiencies in the manner in which shares of individual mutual funds are priced.  Shares of open-end mutual funds are priced daily, based on their NAV at the time of the valuation.  Unlike equity or debt securities that are valued and traded on stock exchanges, open-end mutual funds continuously issue new shares as new investments are received, and redeem shares as investors withdraw assets.  The value of these shares is calculated at 4:00 p.m. Eastern Time ("ET") each day (the close of trading on the New York Stock Exchange ("New York Stock Exchange")), by determining the NAV of the fund (the value of assets less liabilities), and then dividing that amount by the number of shares outstanding.  For example, if a mutual fund with 100,000 shares outstanding holds total assets

with an NAV of $1 million, then it will be priced at $10 per share. Thus, an investor seeking to invest $1,000 in this fund would receive 100 newly issued shares, valued at $10 per share.

85.    Since MFS Funds shares are only priced once per day, the potential exists for an investor to purchase shares at a "stale" price that does not incorporate the latest information, and thereby make a quick profit. For example, if an investor were able to purchase shares of a mutual fund at the NAV calculated before his purchase, with knowledge that the investments held within the fund had risen in value before the next NAV calculation, he could make a risk-free profit by simply buying the shares and then selling them the next day at the new, higher NAV.

86.    To prevent this arbitrage opportunity, the SEC enacted Rule 22c-1 under the ICA, which provides as follows:

> No registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in, any such security shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security *which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security* . . .

(emphasis added)

87.    Under Rule 22c-1, (also known as the "forward-pricing rule"), MFS mutual fund investors who place orders to purchase fund shares during trading hours do not know the exact price at which their orders will be executed; instead, these orders are executed at the NAV calculated after the order is received, at the 4:00 p.m. close of trading on the New York Stock Exchange. Thus, all investors should have the same opportunity to digest "pre-4:00 p.m. information" before they buy or sell, and no investor should have the benefit of "post-4:00 information" prior to making an investment decision. Further, an investor who can avoid forward pricing and buy at the prior NAV has a significant trading advantage, since he can wait

29

until after the market closes for significant news such as a positive earnings announcement to come out, and then buy the fund at the old, lower NAV that does not yet reflect the positive news.

### 2. Subverting The Forward-Pricing Rule Through Market Timing And Late Trading

88.    The forward-pricing rule alone, however, does not eliminate the arbitrage opportunity for frequent traders in mutual funds. This is due to the fact that the NAV of the fund, as calculated after the investor purchases his shares, still might not incorporate all public information.

89.    A typical example is a U.S. mutual fund that holds Japanese shares. Due to time zone difference, the Japanese market may close at 2:00 a.m. ET. If the U.S. mutual fund manager uses the closing prices of the Japanese shares in his fund to calculate a NAV at 4:00 p.m. ET, he is relying on market information that is fourteen hours old. Any positive market moves during the New York trading day that will likely cause the Japanese market to rise when it later opens will not be reflected in the "stale" Japanese prices, and thus the overall fund's NAV will be artificially low.

90.    "Market Timing" is the practice of trying to take advantage of this information delay in the pricing of mutual funds. Specifically, a market timer who purchases the Japanese fund described above, at the "stale" price is virtually assured of a profit that can be realized the next day by selling. Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund.

91.    Market Timing opportunities are not limited to mutual funds holding foreign investments, but instead also arise in mutual funds containing relatively illiquid securities such as high-yield bonds or small capitalization stocks. In such cases, the fact that some of the fund's

30

securities may not have traded for hours before the New York Stock Exchange closing time can render the fund's NAV stale, and thus open to being timed.

B.    Material Misstatements And Omissions In The
       MFS Prospectuses Concerning Market Timing

92.    Throughout the Class Period, in connection with the offering of the MFS Funds, the MFS Registrants filed with the SEC and released to the public over 83 registration statements, each incorporating, either explicitly or by reference, prospectuses, prospectus supplements and/or amendments thereto covering the sale of these MFS Funds to the public (collectively, the "MFS Prospectuses").    Additionally, the MFS Registrants filed some 744 supplemental statements of information (each filed as SEC Form 497, "Definitive Materials") during the Class Period.  A complete list of the MFS Prospectuses is attached as Appendix B.

93.    Although the disclosures in the MFS Prospectuses were modified during the Class Period, each of the prospectuses referred to above failed to disclose that MFS permitted market timing and late trading in its mutual funds.  To the contrary, these prospectuses warranted that MFS did "not permit market timing."  For example, prior to 2001, the MFS Prospectuses, under the heading "MFS Excessive Trading Practices" categorically stated the following:

> The MFS funds *do not permit market timing* or other excessive trading practices. Excessive, short-term (market-timing) trading practices may disrupt portfolio management strategies and harm fund performance.  As noted above, the MFS funds reserve the right to reject or restrict any purchase order (including exchanges) from any investor.  *To minimize harm to the MFS funds and their shareholders*, the MFS funds will exercise these rights if an investor has a history of excessive trading or if an investor's trading, in the judgment of the MFS funds, *has been or may be disruptive to a fund*.  In making this judgment, the MFS funds may consider trading done in multiple accounts under common ownership or control.

(emphasis added)

94.    Moreover, the MFS Prospectuses after the beginning of 2002 contained the following disclosure appearing under the heading "Excessive Trading Practices":

The MFS funds *do not permit market-timing or other excessive trading practices* that may disrupt portfolio management strategies and harm fund performance. As noted above, the MFS funds reserve the right to reject or restrict any purchase order (including exchanges) from any investor. The MFS funds will exercise these rights, including rejecting or canceling purchase and exchange orders, delaying for up to two business days the processing of exchange requests, restricting the availability of purchases and exchanges through telephone requests, facsimile transmissions, automated telephone services, internet services or any electronic transfer service, if an investor's trading, in the judgment of the MFS funds, has been or may be disruptive to a fund. In making this judgment, the MFS funds may consider trading done in multiple accounts under common ownership or control.

(emphasis added)

95.     The MFS Prospectuses prior to January 2001 also stated the following:

Exchanges may be subject to certain limitations and are subject to the MFS funds' policies concerning excessive trading practices, which are *policies designed to protect the funds and their shareholders from the harmful effect of frequent exchanges*. These limitations and market timing policies are described below under the captions "Right to Reject or Restrict Purchase and Exchange Orders" and "Excessive Trading Practices."

(emphasis added)

96.     In addition, the MFS Prospectuses further stated that MFS would restrict trades in

the best interest of investors as follows:

The MFS funds each reserve the right to reject or restrict any specific purchase or exchange request. Because an exchange request involves both a request to redeem shares of one fund and to purchase shares of another fund, the MFS funds consider the underlying redemption and purchase requests conditioned upon the acceptance of each of these underlying requests. Therefore, in the event that the MFS funds reject an exchange request, neither the redemption nor the purchase side of the exchange will be processed.

97.     The MFS Prospectuses also assured investors that late trading in its funds was

strictly prohibited:

You will receive the *net asset value next calculated,* after the deduction of applicable sales charges and any required tax withholding, if your order is complete (has all required information) and MFSC receives your order by:

the valuation time [defined by MFS as 4:00 p.m. ET], if placed directly by you (not through a financial adviser such as a broker or bank) to MFSC; or MFSC's close of business, if placed through a financial adviser, *so long* as the financial adviser (or authorized designee) received your order by the valuation time [i.e., by 4:00 p.m. ET].

(emphasis added)

98.     Each of the representations referred to above was materially false and misleading, or omitted to state facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.  Specifically, defendants failed to disclose that:  (a) the MFS defendants had entered into agreements permitting select investors to engage in market timing of the MFS Funds; (b) pursuant to these secret agreements, the select investors regularly timed the MFS Funds shares; (c) defendants regularly allowed, and had entered into agreements which allowed, certain investors to engage in trades that were disruptive to the efficient management of the MFS Funds and/or increased the MFS Funds' costs, thereby harming the MFS Funds' actual performance; (d) the amount of compensation paid by the MFS Funds to MFS, because of the increased net assets under management due solely to the illegal market timing funds deposited by the timers into the MFS Funds, provided substantial additional compensation to MFS by the MFS Funds and its shareholders, including Lead Plaintiff and other members of the class; and (e) pursuant to these agreements, the MFS defendants benefited financially at the expense of the ordinary MFS Fund investors, including Lead Plaintiff and other members of the Class.

C.     The Defendants' Knowledge And Direct
       Participation In The Wrongful Conduct

99.     Investigations by Lead Plaintiff, federal regulators, and journalists across the country, as well as interviews with Timing Witness #1, have uncovered a well-organized, systematic approach to market timing and late trading in the MFS Funds throughout the Class

Period involving the most senior levels of MFS management. Ordinary investors were never informed of these arrangements nor the preferential treatment granted to certain investors. Rather, defendants expressly represented that such arrangements were prohibited and publicly marketed the MFS Funds as long-term investments. Specifically, MFS never disclosed that throughout the Class Period it expressly permitted numerous investors to market time at least $2 billion in MFS funds -- one of the largest amounts of market timing uncovered at any fund family. As described in more detail bellows, the defendants knew that the market timing and late trading was "very disruptive" and "could harm the performance of the funds due to higher trading costs as the funds buy and sell due to cash changes."

          1.     Market Timing at MFS

              a.     Overview

100.     The market timing and late trading at MFS was the direct result of the MFS defendants' deliberate plan to increase fees by increasing assets under management. MFS's most senior managers, including defendants Ballen and Parke, instituted the formal polices and procedures for approving and monitoring the market timing arrangements by designating the MFS funds that MFS would permit to be timed. As numerous documents and witnesses revealed, the MFS defendants negotiated the terms of the market-timing capacity with broker-dealers and select investors, and then monitored and managed the arrangements throughout. In fact, market timers referred to MFS as the "fast food of the timing world" because of its centralized management, structured distribution, and ubiquitous availability of capacity through numerous broker dealers.

101.     Indeed, after Ballen chose the list of MFS funds for timing, Parke was responsible for monitoring the market timing activity within the MFS funds. Parke was also responsible for establishing the amount of market timing permitted in the MFS funds during the Class Period.

Defendants referred to the MFS funds available for timing as the "Unrestricted Funds," meaning that MFS permitted market timing "even if a pattern of excessive trading has been detected."

102.    To ensure the increase in net assets under management, and the resulting increase in fees, MFS required that the timers maintain their assets in certain MFS money market funds when not being used for market timing, enabling MFS to draw billions of dollars to its funds, thereby increasing the fees MFS was paid out of the deposits of the innocent investors.

103.    Throughout the Class Period, MFS was well aware of the market timers' practices, routinely communicating with brokers and known timers about the specific details of the timing activity. As detailed below, numerous documents reveal that the brokers and timers provided MFS with precise knowledge of impending market timing trades. In fact, some timers actually provided MFS with details of their timing models.

104.    In addition to providing capacity in the MFS Funds, the MFS defendants also provided brokers with portfolio information that the brokers clients' used to profit from hedging against the funds. As frequently as once a month, the MFS defendants provided brokers with highly confidential proprietary information. For instance, in a November 20, 2002 email from Michelle Tartalio, of Brean Murray, to Carlos Brussa, of MFS, she wrote:

> Hey Carlos! Thanks for the information you sent over to me. Like last month, if you don't mind sending me the holdings for the Emerging Growth and Research Funds, I would greatly appreciate it. If you don't mind, not just the top holdings but the whole list! Thank you!!!

105.    Within minutes, MFS's Brussa sent the broker the MFS Emerging Growth Fund Portfolio holdings  Similarly, numerous documents reveal that timers like Canary routinely obtained MFS's portfolio information, which they used for their hedging strategies.

106.    MFS also created arbitrage opportunities for certain of its market timers by allowing late trading in MFS funds, in violation of the forward-pricing rule and its stated

policies. As explained above, the forward-pricing rule requires that in order to receive the NAV calculated as of 4:00 p.m. ET, an order had to be placed before the New York Stock Exchange closing. MFS, however, permitted certain market timers to trade the MFS funds after the New York Stock Exchange close, but at the 4:00 p.m. NAV, with the benefit of information that would impact the following day's NAV. In fact, MFS was very specific about how late trades were to be executed. For example, in arranging market-timing capacity, MFS required that the trades had to be cleared between 6:00 p.m. and 6:50 p.m. ET, even if entered after 4:00 p.m., and still get that day's NAV. To facilitate the late trading, MFS informed market timers that they could use either a broker-dealer or a third-party administrator to process the late trades through the NSCC system, even providing recommendations to the timers of a company to use.

### b.    Specific Examples Of Timing At MFS

#### (1)    Canary

107.    According to Timing Witness #1 and internal MFS documents, Canary obtained at least $200 million in timing capacity in five MFS Funds through at least four broker-dealers, including Bank of America and Brean Murray. As required by MFS, Canary kept hundreds of millions of dollars of trading assets within the MFS family, assuring MFS that it would collect fees on the timing assets, whether the money was "invested" in the Timed Funds, or some other MFS Fund.

108.    Throughout this period, the MFS defendants actively negotiated capacity with Canary and its representatives. For instance, handwritten notes of an MFS employee recorded precisely when and how much of Canary's timing assets would be moving into the MFS Funds. For example, handwritten notes memorializing a discussion between defendant Goldberg, a broker for Canary, and an MFS representative, stated that Canary was seeking "small cap, mid, tech, Managed Sector any global – he won't be > 3% of fund & likes that to be $5-$10MM and

up." In this exchange, Goldberg also informed MFS that Canary had "$1 B w/ negotiated capacity w/ 1 fund . . . huge opps in other areas," in an effort to induce MFS to extend timing capacity to his client.

109. In addition, in August 2000, Canary considered redeeming shares in the MFS Emerging Growth Fund that it had purchased just a week before. Concerned about potentially losing its capacity because of its quick departure from the fund, Canary asked the broker how MFS would respond. In an August 17, 2000, email response, the broker replied, "No. . . . I spoke to the rep who I have known from the other place that I was doing this at and she told me that I did not have to worry about MGEGX [the Emerging Growth Fund] at all," making it clear that frequent trades were part of the deal at MFS.

110. Moreover, the MFS defendants knew that Canary was indeed timing its funds. For instance, handwritten notes of an MFS employee made during the Class Period recorded precisely when and how much of Canary's timing assets would be moving into the MFS Funds. For example, the notes stated that "Stern Family coming in w/ $60MM next wk – B of A is trading platform – # of accounts w/ $4MM max."

### (2)    Security Brokerage, Inc.

111. Defendant Security Brokerage was a Las Vegas-based broker-dealer run by defendant Calugar, who was also the firm's sole client. Security Brokerage's participation in the market timing and late trading scheme involved $400-$500 million traded in various mutual fund families, including as much as $250 million in the MFS Funds alone. Over the two years in which Calugar market timed mutual funds, including the MFS Funds, he made $175 million in profits.

112. Throughout this period, MFS knew that Calugar was timing its funds. For instance, on March 6, 2001, Calugar wrote an email to Andre Behran of MFS setting forth a detailed proposal for market timing capacity in certain MFS Funds:

> I am writing to see if there is any possibility of our taking positions in a number of specific MFS Funds that I have listed at the end of this letter. The offer that I have described below I believe will distinguish Security Brokerage from almost all other market timers, because as I described below, we think we are in a position to compensate MFS the costs of our timing activity....

Calugar went on to provide specifics of how the illegal trades would be placed. He then explained to the MFS defendants that if "there is sufficient capacity at MFS, we are prepared to undertake transactions of this type with $50 million, which would generate annual distributor fees of $1.75 million."

113. MFS negotiated and extended hundreds of millions of dollars in capacity to Security Brokerage during the Class Period. For instance, in April 2003, Calugar requested that MFS permit him to increase his capacity by a total of $129 million, as reflected in an April 28, 2003 email entitled "New Investments," directed to an MFS representative:

> I wanted to ask if you could see whether it would be permissible for me to place some additional investments with MFS in the Mass Investment Trust (MITTX, and in MFS Total Return Fund (MSFRX). I believe that the Total Return Fund is a fund that you had identified previously to me as one in which MFS permits trading, but at the time, I did not have funds to make an investment.

> \*       \*       \*

> If it is feasible, I would like to make an additional $44 million investment in MITTX to bring my total investment in MITTX up to $70 million . . . I would like to make an investment of $85 million in MSFRX.

> If you give me the OK, I would be in a position to make the new investments early in May. If the amounts I have requested are too large, and smaller amounts would be feasible, please let me know that as well.

114.    Within three days, the MFS defendants approved Calugar's request for the

capacity. Specifically, on May 1, 2003, Calugar emailed MFS to both confirm that the capacity

had been granted and to express his appreciation for MFS' cooperation:

> thank you for the prompt way that you handled my request, and the approvals you
> received for me to make additional investments of $44 million in MFS Mass
> Investment Trust (MITTX) and $85 million in MFS Total Return Fund
> (MSFRX).... It is really a privilege to be able to work with you and to be able to
> invest with MFS.

115.    In this email, Calugar also indicated that Security Brokerage would deposit

"sticky assets" in the MFS Funds. Calugar wrote that he would invest $70 million in the MFS

High Income Fund and/or the MFS Municipal Limited Maturity Fund that would be "'buy and

hold' investments." This offer met with the approval of MFS, as reflected in a May 2, 2003

internal MFS email from Tom Jessee, an employee in the MFD broker-dealer department, to

James Fitzgerald ("Fitzgerald"), then President of MFD, entitled "Timer":

> "Calugar, a known timer, has asked us to take $75 million in Limited Maturity as
> a long term holding (longer than 1 year) and an additional $50 million in Total
> Return which he admittedly will time as he has historically with us . . . . This is
> not a unique situation. I have had several timers propose the same arrangement to
> me. Your thoughts?"

Ultimately, both Fitzgerald and Martin Beaulieu, an MFS executive vice president and director

of MFD, approved Calugar's deposit of sticky assets.

(3)    Wilshire Associates

116.    Market timing was not limited to hedge funds or large individual investors. In

fact, Wilshire Associates, one of the nation's largest and most influential asset managers,

engaged in market timing for nearly a decade in numerous mutual funds, including the MFS

Funds. Wilshire typically engaged in rapid fire trading of hundreds of millions of dollars at a

time spread over numerous fund families. Additionally, Wilshire borrowed over $100 million

from others for the express purpose of leveraging its market timing strategy. Ultimately, the strategy was highly profitable, and in some years generated returns in excess of 100%.

117.    MFS, as well as other fund families, provided Wilshire access to their funds for the express purpose of market timing. In fact, Wilshire did not sneak into funds to trade. As reported in an October 1, 2003 Money magazine article entitled the Great Fund Rip-Off, Wilshire's CEO Dennis Tito "openly told the funds he was going to trade frequently." In turn, investment managers like MFS stood to gain from a relationship with Wilshire, who recommends to pension funds and endowments which investment managers to choose to oversee their billions of dollars in holdings.

> Moreover, documents and witnesses reveal that MFS knowingly permitted Wilshire to time its funds. Wilshire was one of the biggest timers in the MFS Emerging Growth Fund. In addition, internal MFS documents reveal that Wilshire was at times the most aggressive, and perhaps the most damaging, market timer at MFS, redeeming trading shares more frequently then other timers. While other fund firms banned Wilshire from trading, despite knowing this information, MFS permitted Wilshire's trading to continue throughout the class period.

#### 2.    Facilitator Broker Defendants' Participation In The Wrongful Conduct

##### a.    Overview

118.    Throughout the Class Period, the Facilitator Broker Defendants acted as "middlemen" between the MFS Complex and the market timers, collecting substantial fees from both sides. Specifically, these brokers negotiated for and obtained timing capacity from MFS, and then sold this capacity to market timers. In return, the brokers received substantial fees and other compensation both from the timers and from MFS, as a percentage of the assets invested in the timed funds. These same brokers then leveraged their relationship with MFS by steering additional, long-term investors into the timed funds, without disclosing to these investors either

the market timing and late trading activity, or the adverse impact that these activities had on long-term investors.

           b.      <u>Examples Of The Wrongful Conduct</u>

                i.      <u>Brean Murray</u>

119.    Defendants Goldberg and Grady, principals of Brean Murray, were broker dealers who negotiated capacity in the MFS funds for the purpose of "selling" it to known timers. As compensation for the timing capacity negotiated, Brean Murray charged "wrap fees" to these timers totaling as much as $50,000 per month during the Class Period. For example, the September 2001 wrap fees charged to Canary by Goldberg and Grady, through Brean Murray, were $54,824 on total assets of $127,325,625, including significant assets in the MFS Funds.

120.    Both Goldberg and Grady had an open dialogue with MFS regarding their timing activities. For example, in a November 2, 2001 letter from defendant Goldberg to Brian Roach, Assistant Vice President and Associate Director of MFS Investment Management, Goldberg explicitly asked for timing capacity in certain MFS Funds for two of his hedge fund clients, defendants Canary and Trout. In making this offer, Goldberg was very clear about what he was looking for – timing capacity – and how much of it he needed:

> We are proposing a relationship whereby our clients, Canary Management, LLC and Trout Trading Management Co., have approval from your firm to trade on a short-term basis in some of the MFS funds that are normally restricted from short term trading. Our proposal is based on capacity of up to three percent of these funds for trading on a short-term basis. Short term trading can be defined as trading four to five round trips per calendar month.

121.    In exchange for the capacity, Brean Murray was willing to have their clients deposit long-term "sticky assets" into the MFS fund complex. For instance, in his November 2, 2001 letter, Goldberg stated:

> Additionally, Canary and Trout will make a commitment of long-term assets to a MFS bond fund, a MFS money market fund or to the fund that is being traded.

Our clients are generally comfortable with depositing 25% of the total trading assets into the long-term assets placed in a bond, money market or mutual fund with a long-term investment in an internal hedge fund. There is also the possibility of our clients making the deposit of long-term assets into a separate managed account with a fee that you deem acceptable.

122.    Moreover, MFS's senior executives were aware of, and approved, the agreements with Brean Murray. For example, on July 3, 2002, Jim Sweeney, an MFS "Investment Management Consultant" who served as a sales representative responsible for certain brokers' accounts, in an email entitled "timing policy," informed his clients, defendants Grady and Goldberg, that their request for additional timing capacity was approved, but only in part. Rather than grant them the full request for $45 million in capacity at that time, Sweeney explained that defendant Parke had approved $20 million of the request, but would consider raising the amount in the coming months:

This is to follow up the conversation I had with Mike [Grady] yesterday regarding your desire to add as much as $45 million to the unrestricted MFS funds.

Given the amount that you already have in these funds, I checked with our senior people in Boston to see whether the proposed additional investment might create any problems. Our Chief Equity Officer, Kevin Parke, responded that with all that is going on at this time we would be more comfortable with an additional $20 million but not the full $45 million.

He did say that you should check back with us in a month or so to see if conditions at that time would make us feel more comfortable with the additional money.

ii.    CIBC

123.    The CIBC defendants knowingly steered market timers to the MFS Funds for the purpose of market timing. Furthermore, during the Class Period, MFS knew of CIBC's market timing activities.

124.    For instance, in April 2000, defendant CIBC, as a representative of defendant Canary, negotiated market timing capacity in the MFS Funds to be traded through defendant

Security Trust's platform. In particular, defendant Flynn contacted defendant Seeger regarding Security Trust's ability to provide market timing capacity and late trading in various mutual funds, including the MFS Funds. CIBC had identified Security Trust as an excellent trading platform for Canary and Samaritan to market time because the platform allowed for late trading.

125.    CIBC advised the hedge funds to time the MFS Fund by using the Security Trust platform. In fact, in September 2001, defendant Flynn conducted due diligence of Security Trust's electronic trading platform. Flynn memorialized his findings in an October 12, 2001 memorandum, describing the benefits of using Security Trust's "Same Day/Late Day Trading Platform:" "[A] pricing list is prepared by the company and submitted to our clients who are then able to run their timing models against actual closing process instead of the previous day before they submit trades." Ultimately, as much as 99% of the trades were transmitted to Security Trust after 4:00 p.m.ET, and as many as 82% of their trades were transmitted between 6:00 p.m. and 9:00 p.m.

126.    Furthermore, the MFS defendants knew that CIBC was engaging in market timing related activities, including that CIBC controlled over $183 million in timing capacity at MFS in 2002 alone. In addition, MFS internal documents reveal that at least one other CIBC broker controlled tens of millions of dollars in capacity in MFS funds. Nevertheless, MFS permitted CIBC to continue its illegal trading through 2003.

127.    Moreover, CIBC further facilitated the market timing and late trading in the MFS Funds. In particular, defendant Flynn arranged for CIBC to lend Canary and Samaritan large sums of money for the express purpose of market timing the MFS Emerging Growth Fund. Specifically, Flynn negotiated and structured swap and loan agreements through CIBC to provide the hedge funds with financing to trade mutual fund shares with financial leverage.

43

iii.    <u>Salomon Smith Barney</u>

128.    In addition, MFS was part of SSB's "Strategic Partners Program," wherein MFS paid SSB monies in addition to existing up front commissions, 12b-1 trailing commissions paid after the initial sale, shareholder servicing fees and account maintenance fees. Specifically, through the market timing and late trading activities, and the resultant large infusions of cash paid by investors, including Lead Plaintiff and other members of the Class, MFS gained significant sums that it used to steer investors into the MFS Funds, thus further increasing the net assets under management and the fees collected on those assets. Pursuant to the Strategic Partners Program, MFS made these additional payments to SSB in exchange for SSB directing its clients, and the market timers, into the MFS Funds.

129.    As described above, in return for these payments and the shelf space, MFS received: (i) identification of their funds on an internal list distributed to all SSB brokers over the firm's corporate intranet; (ii) a higher profile in SSB's sales system than non-participating fund complexes, including procedures making it easier for SSB brokers to process sales of shares in participating funds than non-participating funds; and (iii) the ability to market their funds directly to SSB brokers.

130.    These practices were intimately connected to the market timing and late trading activities throughout the mutual fund industry, including MFS. In particular, MFS paid improper fees to brokers and brokerage firms, including SSB, to attract additional market timing assets to the fund complexes. Moreover, the increased transaction costs incurred by MFS as a direct result of the sophistication required of the portfolio managers to accommodate the market timing activity resulted in excessive management and advisory fees being charged to the innocent long-term investors, including Lead Plaintiff and the other members of the Class.

iv.    <u>Morgan Stanley</u>

44

131.    Similarly, MFS also paid Morgan Stanley to bring market timers into the MFS Funds. Specifically, Morgan Stanley negotiated timing capacity in the MFS Funds directly with MFS, and would then market and sell that capacity to market timers in exchange for the fees paid to Morgan Stanley by MFS. MFS entered into arrangements with Morgan Stanley as part of the broker's "Partners Program," whereby MFS paid excess fees in return for additional shelf space. MFS never disclosed the nature of these payments to its investors.

3.    The Clearing Broker Defendants'
        Participation In The Wrongful Conduct

a.    Overview

132.    The active collaboration in and facilitation of market timing and/or late trading by financial institutions, acting as clearing platforms for market timing and late trading, was central to the success of the Trader and Broker defendants' scheme. During the Class Period, many of the largest financial firms in the country, including defendants Bank of America Corp. and Banc of America Securities LLC ("Bank of America"), Bear Stearns, Schwab, CSFB, Security Trust and Prudential (hereinafter the "Clearing Broker Defendants") acted as key conduits of the market timing/late trading activities described herein. The Clearing Broker Defendants serviced both brokers who specialized in timing (including brokers from within the ranks of the Clearing Broker Defendants, who often earned as much as $15 million a year in commissions from timing activities alone) and timers directly.

133.    The Clearing Broker Defendants disregarded the excessive mutual fund trades being transacted through their trading systems, or "platforms," by the market timers and they substantially assisted and participated in such excessive trading. Moreover, the Clearing Broker Defendants specifically engineered trading strategies that catered exclusively to timers and late traders. For instance, Prudential developed a "shotgun" system that allowed a market timer to

scatter trades across various mutual funds to enable the timers to successfully execute larger and more frequent trades over a wide variety of fund complexes. Other Clearing Broker Defendants, such as Bear Sterns and Bank of America actually installed special equipment for timers and their brokers to allow them to execute market timing and late trading transactions themselves, while the Clearing Platform Defendants captured the resulting fees and commissions.

134.    The Clearing Broker Defendants were motivated to engage in such conduct by the many sources of income offered by opening their execution systems to market timers and late traders, including the fees and commissions (including contingent deferred sales charges, or "CDSCs") they received for processing the market timer and late trading transactions. The Clearing Broker Defendants also benefited from their role as the executors of market timing and late trading by leveraging various quid pro quo benefits from market timers and timing brokers, including the ability to cross-sell other products and services they offered to the timers and brokers, including financing and private client services. By collecting such fees and other benefits, the Clearing Broker Defendants directly benefited from the rapid in-and-out trading by certain of the market timers, while harming long-term fund investors who bore the transaction costs and other harms, as described herein, of such excessive trading.

b.    Examples Of The Wrongful Conduct

i.    Bear Stearns

135.    Throughout the Class Period, Bear Stearns in its role as a clearing broker-dealer facilitated market timing throughout the mutual fund industry. Bear Stearns actively facilitated the illegal trading of mutual funds by knowingly permitting its affiliated broker-dealers to execute market timing and late trades over its clearing platform. Bear Stearns's use of its platform involved trading in several mutual fund complexes, including at least Alliance, Fremont, Invesco, MFS, PBHG, Pimco, and Van Eck. Moreover, Bear Stearns' employees

expressly approved this trading, and actively communicated with various market timers and mutual fund firms to further the illegal trading via the firm's platform.

136.    Bear Stearns knowingly facilitated the market timing and late trading through a network of introducing broker-dealers, to whom Bear Stearns provided access to its clearing platform. Bear Stearns' network of broker-dealers included Brean Murray and Kaplan & Co., which had core businesses of market timing mutual funds on behalf of hedge fund clients. Additionally, certain in-house broker-dealers at Bear Stearns were known to use its platform for market timing and late trading.

137.    Specifically, senior Bear Stearns employees approved the use of the firm's trading platform for this purpose. For instance, during the Class Period, representatives of Brean Murray met with Zackman of Bear Stearns to specifically discuss arranging market-timing and late-trading capabilities through the firm's platform. This meeting resulted in Bear Stearns installing a computer in Brean Murray's offices that accessed its trading platform, known internally as the Bear Stearns Mutual Fund Routing System ("MFR System"). The MFR System provided Brean Murray with a direct link to Bear Stearns' clearing platform through which Brean Murray could make automated market timing trades at will.

138.    Bear Stearns also provided its network of brokers with access to the MFR System so that they could engage in late trading. For instance, Bear Stearns permitted its affiliated brokers at Brean Murray to enter trades as late as 5:30 p.m. ET, but at the NAV set as of 4:00 p.m. ET. Furthermore, Bear Stearns permitted its brokers to employ deceptive strategies to avoid detection from regulators. For example, the time stamp function on the MFR System was disabled so that there was no record of the when the late trades were placed.

47

139.    Similarly, senior managers at Bear Stearns assured market timers that it permitted illegal late trading over its platform.  For example, according to Timing Witness #1, in 2000, a representative of Canary met with a Bear Stearns broker-dealer, Kaplan & Co., who had direct access to Bear Stearns' clearing platform, and expressly approved Canary's use of Bear Stearns' trading platform for its illegal trading activity.  Additionally, Bear Stearns provided financing to certain market timers to further facilitate their illegal late trading, including Trout Trading Management Co. ("Trout"), a hedge fund engaged in market timing and late trading.

140.    In addition, during the Class Period, Matt Mills ("Mills"), a Bear Stearns-affiliated broker, negotiated capacity of $80 million in four of the MFS Funds.  According to handwritten notes of an MFS employee, Mills made a pitch to MFS for more capacity, totaling $150-$200 million by year-end.  Shortly thereafter, Mills informed MFS that he was "set to do $50MM," but would often make requests totaling hundreds of millions of dollars in additional capacity.

141.    Bear Stearns profited from its participation in the wrongful conduct through the receipt of commissions and fees generated from timers trading over the firm's platform.  Bear Stearns also profited from the various other arrangements extended to timers, including financing of the wrongful conduct.

142.    Moreover, both Bear Stearns and the MFS defendants knew that their market timing and late trading activity was harming long-term investors.  For instance, as detailed above, MFS tracked market timing by defendants Goldberg and Grady that Bear Stearns facilitated through the use of its platform.  Nevertheless, the market timing and late trading continued because the impact on long-term investors was overshadowed at all times by the defendants' profit motive.  In particular, the MFS defendants viewed Bear Stearns' market

48

timing assets as essential for maintaining its competitive position among its peers. In fact, the MFS defendants were most concerned that the assets that cleared over the Bear Stearns platform continued to be used for trading within the MFS Funds. In April 2003, for instance, Martin Beaulieu, MFS Executive Vice President, raised his concern about Bear Stearns' trading after receiving a report that indicated that it had engaged in $22.9 million in market timing trades in a single day. His concern, however, was not that the trading was hurting investors, but whether the trading resulted in an outflow of funds to other mutual fund families, thereby preventing MFS from collecting fees on these timing assets:

> [n]ot to be a noodge on this, and I know a number of people are working on this, but those purchases from Bear Stearns seem like timer money? *I hope, in general, timer money is not impacting share*."

(emphasis added)

143.    Beaulieu's question was met with a quick response from Michael J. Londergan, an MFS employee, who explained that timing assets were leaving the funds, but that he along with Fitzgerald would look further into the impact of the Bear Stearns' market timing:

> On the Bear Stearns business since they are moving in and out of the MFS complex the timing is impacting market share. Market share is also impacted by those relationships that process exchanges between MFS funds as redemptions and purchases.
>
> I am meeting with Jim, Larry and Tom tomorrow to discuss timers and commissions.

144.    The MFS defendants continued to permit Bear Stearns to facilitate the timing and late trading in the MFS Funds.

145.    Moreover, throughout this time, the MFS defendants and Bear Stearns maintained an open dialogue to further their trading scheme and ensure that the trading was within the negotiated parameters. For instance, in July 2003 MFS contacted Bear Stearns to inform it that the market timing policy had been revised pursuant to Fitzgerald's direction. Specifically, MFS

sent Bill Steinberg ("Steinberg") from the home office of Bear Stearns a letter confirming that then-current market timing assets that Bear Stearns permitted to be traded over its platform could continue to be timed, but that new timing assets would not be accepted. On numerous occasions during the Class Period, Ellen Bradley ("Bradley") of MFS contacted Bear Stearns to inform it that its trading may violate the agreed upon terms. For instance, on July 29, 2003, Bradley emailed Evelyn Cardenas ("Cardenas") of Bear Stearns regarding a number of trades in the MFS Government Mortgage Fund. In this email, Bradley directed Bear Stearns to simply use different MFS Funds for market timing, writing that "in the future, we ask that the rep use the MFS Money Market Fund or MFS Government Securities Fund as an alternative for his timing program. . . ."

ii.    Bank of America

146.    Like Bear Stearns, Bank of America and its affiliates provided various timers, including Canary, with an electronic trading system that facilitated the market timing and late trading scheme. Beginning in 2001, Bank of America: (1) installed a state-of-the-art electronic late trading platform at various timers, including Canary, allowing them to trade as late as 8:30 p.m. ET in the hundreds of mutual funds that the bank offered its customers at the 4:00 p.m. ET NAV; (2) provided Canary with approximately $300 million of credit to finance its late-trading and market timing activity in the hundreds of mutual funds that Bank of America could access by virtue of its size and power; and (3) sold Canary the derivative short positions it needed to time the funds as the market dropped. As a result, Canary became one of Bank of America's largest customers.

147.    Bank of America profited greatly from the fees generated by market timing, including millions of dollars in "finder's fees" from MFS. According to Timing Witness #1, these so-called finder's fees were equal to as much as 100 basis points (1%) of a timer's assets

50