**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ERIC FORSYTHE, Individually And On Behalf Of All Others Similarly Situated, ) <br><br> Plaintiff, ) <br><br> vs. ) <br><br> SUN LIFE FINANCIAL INC., et al., ) <br><br> Defendants. ) | Civil Action No. 04cv10584 (GAO) <br><br> **Consolidated Case Nos.:** <br> 04cv10764 (GAO) <br> 04cv11019 (GAO) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ..................................................................................................................... 4

I.     RELEVANT LEGAL STANDARDS ............................................................... 4

     A.     Plaintiffs' Claims Meet The Requisite Pleading Standards ...................... 4

II.     PLAINTIFFS HAVE ADEQUATELY PLED THAT DEFENDANTS HAVE VIOLATED THE ICA AND OTHER APPLICABLE LAWS ................. 8

     A.     Plaintiffs Properly Alleged A Violation Of § 36(b) .................................. 8

          1.     Defendants' Improper Use of Rule 12b-1 Fees Violated § 36(b) ..................................................................................... 11

          2.     Defendants' Breach of Fiduciary Duties Fall Within § 36(b) ....... 13

          3.     Defendants' Soft Dollar Practices Were Improper and Violated § 36(b) ........................................................... 15

          4.     Defendants' Improper Use of  Directed Brokerage Harmed Class Members ............................................................ 16

     B.     Defendants' Conduct Has Been Universally Condemned by the SEC and other Regulators .................................................. 19

     C.     Plaintiffs' § 36(b) Claims Are Properly Brought Against the Trustee Defendants ............................................................. 21

III.     PLAINTIFFS HAVE STANDING TO ASSERT DIRECT CLAIMS ON BEHALF OF SHAREHOLDERS OF ALL THE MFS FUNDS ...................... 22

     A.     Plaintiffs Have Standing To Assert Claims On Behalf Of All MFS Funds Shareholders .................................................. 22

     B.     Alternatively, Plaintiffs Have Standing to Pursue Their Claims On Behalf of Shareholders in All of the MFS Funds Pursuant to the Juridical Link Doctrine ................................................ 26

     C.     Plaintiffs Have Standing Due to Their Ongoing Financial Interest in the Outcome of the Litigation Regarding All Funds ........................... 31

D.      Plaintiffs Also Have Standing To Bring Count V – The
        Complaint's Sole Derivative Count - as Members of an
        Unincorporated Association Pursuant to Fed. R. Civ. P. 23.1 and
        23.2................................................................................................... 33

IV.     PLAINTIFFS HAVE STATED A CLAIM UNDER §§ 34(B) AND 36(A)
        OF THE ICA ....................................................................................... 34

        A.      Under the Applicable Tests for Determining the Existence of an
                Implied Right of Action, Such a Right Exists for §§ 34(b) and
                36(b) ........................................................................................... 36

        B.      Additional Authority Establishes Private Causes of Action...................... 41

V.      THE COMPLAINT PLEADS A CLAIM UNDER § 48(A) OF THE ICA ......... 44

VI.     PLAINTIFFS HAVE STATED A VIABLE CLAIM UNDER § 215 OF
        THE IAA............................................................................................... 45

        A.      Compliance With the Demand Requirement of Rule 23.1 Should
                Be Excused as Futile ...................................................................... 45

                1.      Under The Massachusetts Statute Applicable To
                        Investment Companies, A Majority Of The MFS Funds
                        Board Is Interested ........................................................... 46

                2.      Demand Is Futile Under Massachusetts Common Law .............. 49

        B.      The Complaint Adequately Alleges a Violation of the IAA ................... 50

                1.      Section 215 Applies To Advisory Contracts That Violate §
                        206 Of The IAA ................................................................ 50

                2.      Section 215 of the IAA Allows for Restitution ............................ 52

VII.    THE COMPLAINT ADEQUATELY PLEADS STATE LAW CLAIMS
        FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING A
        BREACH OF FIDUCIARY DUTY AND UNJUST ENRICHMENT ............... 53

        A.      Plaintiffs' State Law Claims Are Properly Brought as Direct
                Claims........................................................................................... 53

        B.      Plaintiffs' State Law Claims Are Not Preempted by SLUSA ................... 56

        C.      Plaintiffs Have Properly Pled A Breach Of Fiduciary Duty ................... 58

        D.      Plaintiffs Have Stated a Claim for Aiding and Abetting Breach of
                Fiduciary Duty................................................................................ 60

ii

E.    Plaintiffs' Have Stated a Claim for Unjust Enrichment ........................... 61

CONCLUSION ................................................................................................................. 62

## TABLE OF AUTHORITIES

### FEDERAL CASES

**Page(s)**

Adair v. Sorenson,
  134 F.R.D. 13 (D. Mass. 1991) ................................................................. 29

Advance Growth Capital Corp.,
  470 F.2d at 52 ........................................................................................... 8

Alexander v. Sandoval,
  532 U.S. 275 (2001) ...................................................................... 37, 39, 40

Alves v. Harvard Pilgrim Health Care, Inc.,
  204 F. Supp. 2d 198 (D. Mass. 2002) ...................................................... 28

In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.,
  794 F. Supp. 1424 (D. Ariz. 1992) ........................................................... 27

Associated Students of U.C. Riverside v. Kleindienst,
  60 F.R.D. 65 (C.D. Cal. 1973) .................................................................. 34

Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, Inc.,
  825 F.2d 731 (3d Cir. 1987) ..................................................................... 36

Batra v. Investors Research Corp.,
  1991 U.S. Dist. LEXIS 14773 (W.D. Mo. Oct. 4, 1991) ......................... 33

Baum v. Investors Diversified Servs., Inc.,
  409 F.2d 872 (7th Cir. 1969) .................................................................... 57

Bielski v. Cabletron Sys.,
  311 F.3d 11 (1st Cir. 2002) ........................................................................ 6

Blasberg v. Oxbow Power Corp.,
  934 F. Supp. 21 (D. Mass. 1996) .............................................................. 55

Blue Chip Stamps v. Manor Drug Stores
  421 U.S. 723 (1975) ............................................................................ 58, 60

Bogart V. Shearson Lehman Bros.,
  1993 U.S. Dist. LEXIS 1182 (S.D.N.Y. Feb. 3, 1993) ........................... 52

Bonano v. E. Caribbean Airline Corp.,
  365 F.3d 81 (1st Cir. 2004) ...................................................................... 42

iv

Brown v. Bullock,
    294 F.2d 415 (2d Cir. 1961) .......................................................................... 36

Caiola v. Citibank, N.A.,
    295 F.3d 312 (2d Cir. 2002) .......................................................................... 17

Centro Medico del Turabo,
    2005 U.S. App. LEXIS 6627 ........................................................................... 5

Centro Medico del Turabo, Inc. v. Feliciano de Melecio,
    2005 U.S. App. LEXIS 6627 (1st Cir. 2005) ................................................... 5

Chamberlain v. Aberdeen,
    Civ. No. 02-5870, 2005 U.S. Dist. LEXIS 2023 (E.D.N.Y. Jan 21, 2005) ........................... 42

Concha v. London,
    62 F.3d 1493 (9th Cir. 1995) ........................................................................... 7

Cross v. Oneida Paper Products Co.,
    117 F. Supp. 919 (D.N.J. 1954) ...................................................................... 34

Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    395 F.3d 25 (2d Cir. 2005) ............................................................................. 58

Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    906 F.2d 1206 (8th Cir. 1990) ........................................................................ 17

Donatelli v. Nat'l Hockey League,
    893 F.2d 459 (1st Cir. 1990) .......................................................................... 34

Dorchester Investors v. Peak Int'l Ltd.,
    134 F. Supp. 2d 569 (S.D.N.Y. 2001) ............................................................ 42

Dowling v. Narragansett Capital Corp.,
    735 F. Supp. 1105 (D.R.I. 1990) .................................................................... 46

In re Dreyfus Aggressive Growth Mut. Fund Litigation,
    2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 19, 2000) ........................... 24, 25

In re Eaton Vance Corp. Sec. Litig.,
    219 F.R.D. 38 (D. Mass. 2003) ...................................................................... 28

In re Eaton Vance Corp. Secs. Litig.,
    220 F.R.D. 162 (D. Mass. Apr. 1, 2004) ................................................27, 28, 29

Esplin v. Hirschi,
    402 F.2d 94 (10th Cir. 1968) .......................................................................... 36

v

<u>Estates of Unger v. Palestinian Auth.</u>,
    304 F. Supp. 2d 232 (D.R.I. 2004) ................................................................... 34

<u>Fallick v. Nationwide Mutual Insurance Co.</u>,
    162 F.3d 410 (6th Cir. 1998)........................................................................... 26

<u>Feitelberg v. Credit Suisse First Boston LLC</u>,
    2003 U.S. Dist. LEXIS 19116 (N.D. Cal. Oct. 21, 2003) ..................................... 59

<u>Galfand v. Chestnutt Corp.</u>,
    545 F.2d 807 (2d Cir. 1976)........................................................................... 61

<u>Gartenberg v. Merrill Lynch Asset Management, Inc.</u>,
    528 F. Supp. 1038 (S.D.N.Y. 1981) ........................................................... 55, 60

<u>Gartenberg v. Merrill Lynch Asset Management, Inc.</u>,
    694 F.2d 923 (2d Cir. 1982)........................................................................... 11

<u>Generadora de Electricidad del Caribe, Inc. v. Foster Wheeler Corp.</u>,
    2000 U.S. Dist. LEXIS 4641 (D.P.R. Mar. 16, 2000)............................................ 6

<u>Goldberger v. Bear Stearns & Co.</u>,
    2000 U.S. Dist. LEXIS 18714 (S.D.N.Y. Dec. 28, 2000) ...................................... 23

<u>Gollust v. Mendell</u>,
    501 U.S. 115 (1991)................................................................................. 32, 33

<u>Gonzaga Univ. v. Doe</u>,
    536 U.S. 273 (2002)..................................................................................... 40

<u>Goodman v. Lukens Steel Co.</u>,
    777 F.2d 113 (3d Cir. 1985)........................................................................... 24

<u>Gratz v. Bollinger</u>,
    539 U.S. 244 (2003)..................................................................................... 23

<u>Green v. Ameritrade, Inc.</u>,
    279 F.3d 590 (8th Cir. 2002) ......................................................................... 59

<u>Green v. Fund Asset Management, L.P.</u>,
    19 F. Supp. 2d 227 (D.N.J. 1998)........................................................11, 14, 16

<u>Green v. Fund Asset Management, L.P.</u>,
    286 F.3d 682 (3d Cir. 2001) ........................................................................... 14

<u>Halligan v. Standard & Poor's/Intercapital, Inc.</u>,
    434 F. Supp. 1082 (E.D.N.Y. 1977) ........................................................... 22, 23

Heffler v. United States Fidelity & Guaranty Ins. Co.,
  1992 U.S. Dist. LEXIS 3090 (E.D. Pa. Mar. 10, 1992) ............................................ 27

Hicks v. Morgan Stanley & Co.,
  2003 U.S. Dist. LEXIS 11972 (S.D.N.Y. July 16, 2003) .......................................... 24

Howell v. Motorola, Inc.,
  337 F. Supp. 2d 1079 (N.D. Ill. Sep. 23, 2004) ..................................................... 8

ING Principal Protection Funds Derivative Litig.,
  2005 U.S. Dist. LEXIS 8606 (D. Mass. May 9, 2005)............................................ 47

Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp.,
  44 F.3d 40 (1st Cir. 1995) ..................................................................................... 62

Jackson v. Birmingham Bd. of Educ.,
  125 S. Ct. 1497 (Mar. 29, 2005)..........................................................36, 37, 38

Jernberg v. Mann,
  358 F.3d 131 (1st Cir. 2004) ................................................................................. 62

Jerozal v. Cash Reserve Management, Inc.,
  1982 U.S. Dist. LEXIS 16566 (S.D.N.Y. 1982) ..................................................... 45

Kamen v. Kemper Fin. Servs., Inc.,
  500 U.S. 90 (1991) ................................................................................................ 46

Kitchens v. U.S. Shelter Corp.,
  1983 U.S. Dist. LEXIS 12812 (D.S.C. Oct. 13, 1983)............................................ 26

Krinsk v. Fund Asset Mgmt, Inc.,
  875 F.2d 404 (2d Cir. 1989)................................................................................... 15

Krome v. Merrill Lynch & Co.,
  637 F. Supp. 910 (S.D.N.Y. 1986) ........................................................................ 36

LaMar v. H&B Novelty & Loan Co.,
  489 F. 2d 461 (9th Cir. 1973) ............................................................................... 28

Lessler v. Little,
  857 F.2d 866 (1st Cir. 1988) ...............................................................36, 38, 39, 42

Levitt v. Johnson,
  334 F.2d 815 (1st Cir. 1964) ................................................................................. 36

Long Term Care Pharm. Alliance v. Ferguson,
  362 F.3d 50 ........................................................................................................... 42

vii

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992).................................................................................................. 32

Luyando v. Bowen,
    124 F.R.D. 52 (S.D.N.Y. 1989)................................................................................ 27

In re ML-Lee Acquisition Fund II L.P.,
    848 F. Supp. 527 (D. Del. 1994) ........................................................25, 36, 43, 46

Margaret Hall Found. V. Atl. Fin. Mgmt.,
    572 F. Supp. 1475 (D. Mass. 1983)......................................................................... 52

Maywalt v. Parker & Parsley Petroleum Co.,
    147 F.R.D. 51 (S.D.N.Y. 1993)................................................................................ 25

McLachlan v. Simon,
    31 F. Supp. 2d 731 (N.D. Cal. 1998) ................................................................. 36, 62

In re Merrill Lynch & Co., Research Reports Sec. Litig.,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ..................................................................... 42

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,
    456 U.S. 353 (1982).................................................................................................. 44

Meyer v. Oppenheimer Mgmt. Corp.,
    764 F.2d 76 (2d Cir. 1985) ...................................................................................... 36

Meyer v. Oppenheimer Mgmt. Corp.,
    895 F.2d 861 (2d Cir. 1990)....................................................................................... 9

Mgmt. Television Sys., Inc. v. Nat'l Football League,
    52 F.R.D. 162 (E.D. Pa. 1971) ................................................................................ 34

Migdal v. Rowe Price-Fleming International,
    248 F.3d 321 (4th Cir. 2001).............................................................................. 7, 15

Millenco L.P. v. MEVC Adv., Inc.,
    2002 U.S. Dist. LEXIS 19512 (D. Del. Aug. 12, 2002)......................................... 11

In re MobileMedia Sec. Litig.,
    28 F. Supp. 2d 901 (D.N.J. 1998)............................................................................ 27

Moore v. Comfed Sav. Bank,
    908 F.2d 834 (11th Cir. 1990) ................................................................................. 31

Motta v. Samuel Weiser, Inc.,
    768 F.2d 481 (1st Cir. 1985) ................................................................................... 34

viii

Neitzke v. Williams,
    490 U.S. 319 (1989)..................................................................... 5

Nenni v. Dean Witter Reynolds, Inc.,
    1999 U.S. Dist. LEXIS 23351 ....................................................... 27

Newby v. Enron Corp.,
    2004 U.S. Dist. LEXIS 8158 (S.D. Tex. Feb. 24, 2004) ...................... 28

Norman v. Salomon Smith Barney Inc.,
    350 F. Supp. 2d 382 (S.D.N.Y. 2004) ...................................8, 52, 53

In re Nuveen Fund Litig.,
    1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 11, 1996)....................8, 43, 44

Olmsted v. Pruco Life Ins. Co. of N.J.,
    134 F. Supp. 2d 508 (E.D.N.Y. 2000) ........................................ 39

Olmsted v. Pruco Life Insurance Co. of New Jersey,
    283 F.3d 429 (2d Cir. 2002).............................................37, 39, 40, 44

Payton v. County of Kane,
    308 F.3d 673 (7th Cir. 2002) .................................................... 28

Pfeiffer v. Bjurman, Barry & Assoc.,
    2004 U.S. Dist. LEXIS 16924 (S.D.N.Y. Aug. 26, 2004)................11, 12, 13

Press v. Quick & Reilly,
    218 F.3d 121 (2d Cir. 2000) .................................................... 22

In re Prudential Sec. Inc. Ltd. P'ship Litig.,
    163 F.R.D. 200 (S.D.N.Y. 1995) ............................................... 25

Resolution Trust Corp. v. DeLoitte & Touche,
    822 F. Supp. 1512 (D. Colo. 1993) ............................................ 35

Ripon Soc'y v. Nat'l Republican Party,
    525 F.2d 567 (D.C. Cir. 1975) .................................................. 35

Rivera v. Rhode Island,
    402 F.3d 27 (1st Cir. 2005) ...................................................... 5

SEC v. Capital Gains Research Bureau, Inc.,
    375 U.S. 180 (1963).....................................................7, 14, 51, 52, 53

SEC v. Happ,
    392 F.3d 12 (1st Cir. 2004) ..................................................... 41

<u>SEC v. Steadman</u>,
  798 F. Supp. 733 (D.D.C. 1991).................................................................................. 55

<u>Scachitti v. Prudential Sec., Inc.</u>,
  1999 U.S. Dist. LEXIS 19391 (D. Ill. Dec. 10, 1999) ........................................ 53

<u>Scheuer v. Rhodes</u>,
  416 U.S. 232 (1974)............................................................................................... 5

<u>Shaw v. Digital Equip. Corp.</u>,
  82 F.3d 1194 (1st Cir. 1996) ........................................................................... 7, 45

<u>Sosna v. Iowa</u>,
  419 U.s. 393 (1975) .............................................................................................. 24

<u>Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>,
  332 F.3d 116 (2d Cir. 2003) ................................................................................. 59

<u>In re Stratus Computer</u>,
  1991 U.S. Dist. LEXIS 21587 (D. Mass. Dec. 10, 1991).................................... 7

<u>Strougo v. Bassini</u>,
  282 F.3d 162 (2d Cir. 2002) ........................................................................... 41, 56

<u>Strougo v. Scudder, Stevens & Clark, Inc.</u>,
  964 F. Supp. 783 (S.D.N.Y. 1997) ........................... 7, 8, 36, 41, 43, 44, 46

<u>Suna v. Bailey Corp.</u>,
  107 F.3d 64 (1st Cir. 1997) .................................................................................... 6

<u>Sutton v. Medical Serv. Ass'n</u>,
  1993 U.S. Dist. LEXIS 9763 (E.D. Pa. July 20, 1993) ...................................... 24

<u>Tannenbaum v. Zeller</u>,
  552 F.2d 402 (2d Cir.1977) .................................................................................. 13

<u>Taussig v. Wellington Fund, Inc.</u>,
  313 F.2d 472 (3d Cir. 1963) .................................................................................. 36

<u>Tedesco v. Mishkin</u>,
  689 F. Supp. 1327 (S.D.N.Y. 1988) ..................................................................... 26

<u>Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis</u>,
  444 U.S. 11 (1979)....................................................................................51, 53, 54

<u>United States ex rel. Karvelas v. Melrose-Wakefield Hospital et al.</u>,
  2003 U.S. Dist. LEXIS 8846 (D. Mass. May 21, 2003).................................... 6, 8

x

United States v. Szur,
   289 F.3d 200 (2d Cir. 2002) ............................................................ 63

Vervaecke v. Chiles, Heider & Co.,
   578 F.2d 713 (8th Cir. 1978) (Def. Brf. at 6) ................................... 27

Watterson v. Page,
   987 F.2d 1 (1st Cir. 1993) ............................................................... 51

Wellington Int'l Commerce Corp. v. Retelny,
   727 F. Supp. 843 (S.D.N.Y. 1989) ................................................. 52

White v. Heartland High-Yield Mun. Bond Fund,
   237 F. Supp. 2d 982 (E.D. Wis. 2002) ........................................... 42

Wicks v. Putnam Inv. Mgmt.,
   2005 U.S. Dist. LEXIS 4892 (Mar. 28, 2005) ................. 3, 5, 11, 13, 14, 16

Zurich Capital Mkts., Inc. v. Coglianese,
   332 F. Supp. 2d 1087 (N.D. Ill. 2004) ........................................... 62

**STATE CASES**

Bartlett v. New York,
   109 N.E. 452 (Mass 1915) ............................................................. 46

CALPERS v. Coulter,
   2002 Del. Ch. LEXIS 144 (Del. Ch. May 28, 2002) ....................... 51

Demoulas v. Demoulas Super Mkts., Inc.,
   1993 WL 818844 (Mass. Super. Ct. Nov. 29, 1993) ....................... 62

Harhen v. Brown,
   730 N.E.2d 859 (Mass. 2000) ............................................ 46, 47, 50

Hessleton v. Banknorth, N.A.,
   18 Mass. L. Rep. 7, 8 (May 11, 2004) ........................................... 63

Lopes v. Commonwealth,
   442 Mass. 170 (July 9, 2004) ........................................................ 64

Malone v. Brincat,
   722 A.2d 5 (Del. 1998) .................................................................. 55

Roskind v. Morgan Stanley Dean Witter & Co.,
   80 Cal. App. 4th 345 (1st Dist. 2000) ............................................ 60

Stuchen v. Duty Free Int'l, Inc.,
   1996 WL 33167249 ....................................................................... 62

Tooley v. Donaldson, Lifkin & Jenrette, Inc.,
    845 A.2d at 1033 (Del. 2004).....................................................................................56

White v. Panic,
    783 A.2d 543 (Del. 2001)...........................................................................................50

**DOCKETED CASES**

Chamberlain v. Aberdeen Asset Management Ltd.,
    Civ. No. 02-5870 (E.D.N.Y. Jan. 21, 2005)............................................................42

Dumond v. Massachusetts Financial Services Co.,
    C.A. No. 04-11458 (GAO)........................................................................................11

**FEDERAL STATUTES**

15 U.S.C. § 78bb(e)(i) ......................................................................................................16

15 U.S.C. § 80a-1 .............................................................................................................41

15 U.S.C. § 80a-2(a)(3)(A) ..............................................................................................48

15 U.S.C. § 80a-30(a) .......................................................................................................40

15 U.S.C. § 80a-33(b) .......................................................................................................40

15 U.S.C. § 80a-35(a) ..................................................................................................12, 32

15 U.S.C. § 80a-35(b) .......................................................................................................32

15 U.S.C. § 80a-43 ...........................................................................................................43

15 U.S.C. §80a-47(a) ........................................................................................................45

15 U.S.C. § 80a-8(a) .........................................................................................................40

15 U.S.C. § 80b-15 ...........................................................................................................54

15 U.S.C. § 80b-6 (2004) .................................................................................................51

15 U.S.C.S. § 80a-1 ..........................................................................................................43

1996 U.S.C.C.A.N. 3908 ..................................................................................................39

69 Fed. Reg. 6438 .............................................................................................................30

Fed. R. Civ. P. 8(a) .......................................................................................................5, 6

Fed. R. Civ. P. 9(b) ............................................................................................................6

Fed. R. Civ. P. 15(a) ................................................................................................. 64

Fed. R. Civ. P. 23 ...................................................................................... 23, 34, 35, 46

H.R. Rep. No. 104-622 ............................................................................................. 39

H.R. Rep. No. 1341 .................................................................................................. 44

Investment Company Amendments Act of 1969,
    S. Rep. No. 91-184 ............................................................................................. 32

SEC Release No. IC-26356, 69 Fed. Reg. 9726, 9728-29 ................................. 21, 22

SEC Release No. IC-26591, 69 Fed. Reg. 54728, 54728-29 ................................... 20

S. Rep. No. 1760, 86th Cong., 2nd Sess. 4 (1960) .................................................. 51

**STATE STATUTES**

Mass. Gen. Laws ch. 182, §2B (2005) ..................................................................... 47

Massachusetts Universal Demand Statute, Mass. Gen. Laws ch.156D, § 7.42 .......... 46

Investment Company Institute- Rule 12b-1, 1998 S.E.C. No- Act ........................... 15

**OTHER AUTHORITIES**

Wright and Arthur R. Miller,
    Federal Practice and Procedure § 1297 at 615 (2d ed. 1990) ................................ 6

Arthur R. Miller,
    Federal Practice and Procedure §1356 (1990) ...................................................... 6

xiii

Plaintiffs submit this memorandum of law in opposition to the motion of Defendant

Massachusetts Financial Services Co. ("Def. Brf.") and its related entities named as defendants

(collectively "MFS" or "Defendants") to dismiss the Consolidated Amended Complaint

("Complaint").

## PRELIMINARY STATEMENT

This is a class action on behalf of holders of MFS mutual funds ("MFS Funds" or the

"Funds"), during the period March 24, 1999 through March 31, 2004 (the "Class" and "Class

Period" respectively), alleging a scheme whereby Defendants paid or caused to be paid millions

of dollars in improper kickbacks to brokers as a *quid pro quo* for the brokers pushing as many of

their clients as possible into the Funds.  Defendants referred to this scheme as buying "shelf

space" at the brokerages.  In fact, the scheme was nothing more than a series of secret kickback

payments meant to improperly induce brokers to steer clients into MFS Funds while concealing

the true nature of the kickbacks and unmanageable conflicts of interest resulting from those

kickbacks.  ¶¶ 2-4, 46-51.[1]  For this improper kickback scheme, Defendants have already been

censured and fined $50 million by the Securities and Exchange Commission ("SEC").  <u>See</u>

Exhibit A of the Declaration of Michael R. Reese ("Reese Decl.") (March 31, 2004 SEC Order

Instituting Administrative and Cease-and-Desist Proceedings, Making Findings and Imposing

Remedial Sanctions in <u>In the Matter of Massachusetts Financial Services Co.</u>) (the "MFS Cease-

and-Desist Order"));[2] ¶¶ 12-13, 53-55, 84-85.

---

[1]  All references to "¶ _" are to the Complaint, unless otherwise noted.

[2]  In parallel proceedings against sister mutual fund companies including PA Distributors
("PIMCO"), Franklin-Templeton Distributors ("Franklin"), Putnam Investment Management
("Putnam") and American Funds Distributors ("American Funds"), the SEC, as well as other
government regulators, have repeatedly made clear that such kickback schemes as that engaged
in by MFS are illegal.  Reese Decl. Ex. B (September 15, 2004 SEC Order Instituting

Continued on next page

Defendants paid for these kickbacks using the assets of MFS Fund shareholders. That is, MFS's kickback scheme was financed by excessive and improper fees for undisclosed purposes charged to MFS Fund shareholders themselves. Defendants were motivated to carry out this scheme because MFS reaped millions of dollars in profits from the fees it charged shareholders as the assets of the Funds under its management increased. In contrast, the Class members received no benefit from Defendants' "shelf space" programs. ¶¶ 4, 90, 95, 101, 102. Rather, the Class members were injured by the fees and charges at issue here that they paid as a result of their holdings in the MFS Funds. As this Court has already held in a case presenting a virtually identical scenario, these facts state an actionable claim under the Investment Company Act. See Wicks v. Putnam Inv. Mgmt., 2005 U.S. Dist. LEXIS 4892 (Mar. 28, 2005). Plaintiffs now seek recovery of the millions of dollars of improper fees and charges used to finance Defendants' kickback scheme.

Defendants have moved to dismiss the Complaint on various, unavailing grounds. First, they argue that Plaintiffs have not stated a claim under § 36(b) of the Investment Company Act of 1940 ("ICA"). This assertion directly conflicts with the law in this Circuit, as discussed by this Court in Wicks. Id. Additionally, as numerous SEC, NASD rules, releases and subsequent regulatory actions against brokerage firms and mutual fund families demonstrate, Defendants'

---

Administrative and Cease-and-Desist Proceedings, Making Findings and Imposing Remedial Sanctions in In the Matter of PA Fund Management LLC et al.); Ex. C (December 13, 2004 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings and Imposing Remedial Sanctions in In the Matter of Franklin Advisers, Inc. and Franklin/Templeton Distributors, Inc.); Ex. D (March 23, 2005 SEC Order Instituting Administrative and Cease and Desist Proceedings, Making Findings and Imposing Remedial Sanctions in In the Matter of Putnam Investment Management); see also Reese Decl. Ex. E (February 16, 2005 NASD Disciplinary Proceeding against American Funds Distributors, Inc.); Ex. F (People of State of California v. American Funds Distributors et al. filed by the California Attorney General's Office March 24, 2005).

2

misconduct was expressly prohibited by the SEC and NASD (and various state consumer protection laws enforced by state attorney generals) and constitutes a breach of fiduciary duty to MFS Funds shareholders. [3]

Defendants also argue that Plaintiffs cannot assert direct claims under §§ 34(b), 36(a) and 48(a) of the ICA.  To the contrary, courts have recognized for decades the existence of implied rights of action under these sections.  This recognition derives from the fundamental purpose of the ICA – the protection of mutual fund shareholders.

Defendants also complain that Plaintiffs do not have standing to bring claims on behalf of investors in other Funds within the MFS Funds complex, despite the fact that courts consistently have framed this issue as one of compliance with Federal Rule of Civil Procedure 23, not of Article III standing.  Furthermore, there is substantial authority to support the fact that Plaintiffs may properly assert class claims on behalf of investors in the other Funds in the complex.

Defendants also argue that Plaintiffs' sole derivative claim – Count V brought under the Investment Adviser's Act of 1940 ("IAA") - should be dismissed because Plaintiffs did not make a pre-suit demand.  However, Defendants ignore the allegations in the Complaint demonstrating that demand would have been futile.  Finally, Defendants' argument that Plaintiffs' state law claims are preempted under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") runs counter to the plain language of the statute and the weight of authority.

Accordingly, Defendants' motion to dismiss should be denied in its entirety.

---

[3] See also Reese Decl. Exs. G and H for copies of the SEC's and NASD's Actions against the brokerage Morgan Stanley regarding improper kickback payments it received from Defendants.

<u>ARGUMENT</u>

**I.    RELEVANT LEGAL STANDARDS**

In considering Defendants' motion to dismiss, the Court must presume that the allegations of the Complaint are true, read the Complaint as a whole, and give plaintiffs the benefit of every favorable inference that can be drawn from the allegations.  <u>See</u> <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  <u>Id.</u>; <u>see</u> <u>also</u> <u>Neitzke v. Williams</u>, 490 U.S. 319, 326 (1989). "When considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff."  <u>Id.</u>  Further, a complaint must be upheld if any legal theory included in the complaint could be successful, whether or not plaintiffs have erroneously relied on a different legal theory.  <u>Centro Medico del Turabo, Inc. v. Feliciano de Melecio</u>, 2005 U.S. App. LEXIS 6627, at *5-6 (1st Cir. 2005) (citation omitted).  "A complaint should not be dismissed under Rule 12(b)(6) unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  <u>Wicks</u>, 2005 U.S. Dist. LEXIS, at *13.

**A.    Plaintiffs' Claims Meet The Requisite Pleading Standards**

The entire Complaint is subject to Rule 8's liberal pleading standards.  "A district court charged with the adjudication of a motion to dismiss under Rule 12(b)(6) must apply the notice pleading requirements of Fed. R. Civ. P. 8(a)(2)."  <u>Rivera v. Rhode Island</u>, 402 F.3d 27, 33 (1st Cir. 2005).  As this Court has recognized, when reviewing the Defendants' motion to dismiss, the Court's focus should be on whether the allegations in the complaint set forth "a short and plain statement of the claim showing that the pleader[s] [are] entitled to relief."  <u>Wicks</u>, 2005

U.S. Dist. LEXIS 4892, at *13, citing Fed. R. Civ. P. 8(a)(2); Centro, 2005 U.S. App. LEXIS

6627,at *4.

Perhaps recognizing that the heightened pleading requirements of Fed. R. Civ. P. 9(b)

apply only to claims of fraud, Defendants attempt to recast the Complaint as "sounding in fraud"

so as to create additional pleading burdens for Plaintiffs.  Def. Brf. at 4.  However, none of

Plaintiffs claims are subject to Rule 9(b)'s heightened pleading standard. [4] As courts in this

circuit have noted:

> Since Fed. R. Civ. P. 9(b) is a special pleading requirement and
> contrary to the general approach of simplified pleading adopted by
> the Federal Rules of Civil Procedure, its scope of application shall
> be construed narrowly and not extended to other legal theories or
> defenses.

Generadora de Electricidad del Caribe, Inc. v. Foster Wheeler Corp., 2000 U.S. Dist. LEXIS

4641, at *20 (D.P.R. Mar. 16, 2000) (quoting 4 Charles Alan Wright and Arthur R. Miller,

Federal Practice and Procedure § 1297 at 615 (2d ed. 1990)).

---

[4] Even assuming, *arguendo*, that a Rule 9(b) standard were to apply to any of Plaintiffs' claims
(which it does not), this Court should nevertheless find the Complaint is sufficiently pled to
withstand Defendants' attack on pleading grounds.  To successfully plead a fraud claim, a
complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2)
identify the speaker, (3) state where and when the statements were made, and (4) explain why the
statements were fraudulent."  Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997).  The
Complaint clearly complies with these requirements and meets the four parts of the Suna test.  It
(1) specifies the statements that the plaintiff claims were fraudulent (¶¶ 88-91, 114-27), (2)
identifies those responsible for the statements (¶¶ 23-39), (3) states when and where the
statements were made (¶¶ 88-91, 114-27), and (4) explains why the statements were fraudulent
(¶¶ 114-27).  The Complaint is amply pled to support each and every one of Plaintiffs'
allegations, which clearly identify the Defendants' practices and state how and why said
practices were prohibited.  See Bielski v. Cabletron Sys., 311 F.3d 11, 33 (1st Cir. 2002) (noting
that pleading securities fraud does not require a plaintiff to plead evidence); United States ex rel.
Karvelas v. Melrose-Wakefield Hospital et al., 2003 U.S. Dist. LEXIS 8846, at *13 (D. Mass.
May 21, 2003) ("Rule 9(b) is to be read in conjunction with Fed. R. Civ. P. 8(a), which requires
a 'short and plain statement of the claim' for relief, and, as such, the plaintiff is not required to
"plead all of the evidence or facts supporting it.").

First, Plaintiffs breach of fiduciary duty claims are not subject to Rule 9(b) as none "sound in fraud." [5] Concha v. London, 62 F.3d 1493, 1502 (9th Cir. 1995) ("[W]e have never applied Rule 9(b) in cases in which the plaintiffs allege a breach of fiduciary duty but do not allege fraud"). "Rule 9(b) is not applicable to breach of fiduciary duty . . . claims; it applies only to claims sounding in fraud." Strougo v. Scudder, Stevens & Clark, Inc., 964 F. Supp. 783, 804 (S.D.N.Y. 1997); In re Stratus Computer, 1991 U.S. Dist. LEXIS 21587, at *21 (D. Mass. Dec. 10, 1991) (noting that if a "breach of fiduciary duty derives from conduct that is negligent, rather than fraudulent … Rule 9(b) would not apply") (citation omitted). Here, claims VI and VII of the Complaint, for breach of fiduciary duty against the Investment Adviser and Trustee Defendants, sound in negligence, alleging breach of fiduciary duties based upon "reckless and willful disregard[.]" Similarly, Count VIII, against all Defendants for aiding and abetting a breach of fiduciary duty by the brokerages that accepted payments from the Defendants, sounds in negligence. Likewise, Count IX, against all Defendants for unjust enrichment, prays for equitable relief to remedy alleged negligence.

Finally, the federal statutory causes of action under the ICA and IAA, Counts I-V, are not fraud-based and are also subject to Rule 8's pleading standards. This has been settled by the

---

[5] The cases cited by Defendants on this point are unpersuasive. Def. Brf. at 4. In Migdal v. Rowe Price-Fleming International, 248 F.3d 321 (4th Cir. 2001), unlike the instant action, which is based on the detailed allegations of the Complaint, the court dismissed the complaint because the complaint's allegations were "speculative" and/or "conclusory." Defendants also mischaracterize Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1222 (1st Cir. 1996). There, the court did not state that the non-fraud claims based on scienter and reliance allegations "sound in fraud" as Defendants claim. Def. Brf. at 4. Rather, the court in Shaw specifically stated that "if a plaintiff were to attempt to establish violations of Sections 11 and 12(2) as well as the anti-fraud provisions of the Exchange Act through allegations in a single complaint of a unified course of fraudulent conduct, fraud might be said to 'lie[] at the core of the action.'" Here, the anti-fraud provisions of the Exchange Act are not implicated and, as discussed herein, none of the Complaint's counts rely on a theory of fraud.

overwhelming weight of authority. See, e.g., SEC v. Capital Gains Research Bureau, Inc., 375

U.S. 180, 195 (1963) (holding that scienter is not required to prove identified alleged violations

of IAA § 206); see also Norman v. Salomon Smith Barney Inc., 350 F. Supp. 2d 382, 391-92

(S.D.N.Y. 2004) ("the gravamen of plaintiffs' IAA claim does not rest in fraud, but rather in

breaches, through omission, of the broad regime of fiduciary duty created by the IAA"); Strougo,

964 F. Supp. at 798- 800 (rejecting argument that § 36(a) claim sounds in fraud and need be pled

pursuant to 9(b)); In re Nuveen Fund Litig., 1996 U.S. Dist. LEXIS 8071, at *24-25 (N.D. Ill.

June 11, 1996) (rejecting argument that ICA § 34(b) cause of action requires reliance, in same

manner as fraud).[6]

       For these reasons, the adequacy of the Complaint's allegations must be reviewed

pursuant to the standards of Federal Civil Procedure Rule 8.[7]

---

[6] See also Advance Growth Capital Corp., 470 F.2d at 52 n.19 (contrasting § 34(b) of the ICA, which does not include any mental state, with the provisions of § 34(a), which requires the acts prohibited be performed "willfully" before a violation will occur). Plaintiffs' claims under § 34(b) are premised on allegations that Defendants negligently misrepresented and failed to disclose material information in the documents identified in the complaint. Such negligence-based claims are not subject to heightened pleading standards. Cf. Howell v. Motorola, Inc., 337 F. Supp. 2d 1079 (N.D. Ill. 2004) ("Although Claim II states a misrepresentation claim, it is premised on Plaintiff's contention that all Defendants negligently misrepresented and failed to disclose material information . . . Such a claim is not subject to the requirements of 9(b).") (Emphasis in original).

[7] Additionally, the allegations of this Complaint are peculiarly within the control and knowledge of the Defendants, and Plaintiffs' Complaint adequately lays out the facts necessary to support those allegations. See United States ex rel. Karvelas, 2003 U.S. Dist. LEXIS 8846, at *13 (noting that "[t]he Rule 9(b) pleading requirement is relaxed when the facts underlying the fraud are 'peculiarly within the defendants' control'").

**II.    PLAINTIFFS HAVE ADEQUATELY PLED THAT DEFENDANTS HAVE VIOLATED THE ICA AND OTHER APPLICABLE LAWS**

Notwithstanding a $50 million fine and sanction by the SEC for the kickback scheme alleged in the Complaint, Defendants maintain that Plaintiffs were not materially harmed by Defendants' actions.  Def. Brf. at 3.  Defendants' argument is unfounded.  Notably, Defendants misled shareholders regarding the true nature and purpose of ***millions of dollars of mutual fund fees paid by shareholders*** by failing to disclose that this money was going towards financing Defendants' kickback scheme instead of the services Defendants represented.  This money that Defendants improperly took from shareholders, for Defendants' own benefit, to finance the kickback scheme directly impacted Plaintiffs and other members of the class and reduced the rate of return on their holdings.

**A.    Plaintiffs Properly Alleged A Violation Of § 36(b)**

Section 36(b) imposes a fiduciary duty on investment advisers and others "with respect to the receipt of compensation for services" and creates an express private right of action "for breach of fiduciary duty in respect of such compensation."  See, e.g.  Meyer v. Oppenheimer Mgmt. Corp., 895 F.2d 861, 866 (2d Cir. 1990).  As this Court made clear in Wicks, the type of conduct alleged in the Complaint is subject to challenge under § 36(b).  Specifically, in Wicks, plaintiff sued the investment manager for certain Putnam Funds based upon the allegation that "***the defendants also direct the payments of excessive commissions to securities broker-dealers to execute trades for the Funds in exchange for 'soft dollars' (said to be a form of kickback) that benefits the defendants and not the Funds.***"  Id. at *3. (emphasis added).  In denying defendants' motion to dismiss, the court held that such allegations are "sufficient to survive a motion to dismiss for failure to state a claim upon which relief can be granted." Id. at *13.

8

Here, Plaintiffs allege several actionable courses of conduct by Defendants.  Here, like in

Wicks, Plaintiffs have properly alleged that Defendants violated the § 36(b) proscription against

payment of excessive management and other fees to the Investment Adviser Defendant and its

affiliates, despite Defendants' conclusory assertion to the contrary (Def. Brf. at 13),. ¶¶ 157-

164.[8]  Among other wrongful activities, as described in detail herein and in the Complaint,

Defendants charged Rule 12b-1 fees (much of which was paid directly to the Distributor

Defendant), soft dollar payments and directed brokerage commissions which benefited

Defendants rather than the Fund owners. Furthermore, Defendants failed to reduce their

management fees to reflect the benefits obtained by Defendants from such payments.  Similarly,

Defendants charged management fees that were wrongfully inflated to cover other improper

revenue sharing payments that were ostensibly made from the assets of the Investment Adviser

and Distributor Defendants.  Courts have resoundingly rejected Defendants' attempts to avoid

the application of § 36(b) in these circumstances.  Id.

Additionally, Defendants wrongly contend that Plaintiffs must "plead facts sufficient to

show that the amount of the advisory fee was 'so disproportionately large that it bears no

reasonable relationship to the services rendered and could not have been the product of arm's-

length bargaining.'"  Def. Brf. at 12, n.9, quoting Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,

694 F.2d 923 (2d Cir. 1982).[9]  As explained by this Court in Wicks:

---

[8] Defendants also incorrectly assert the Complaint is defective because it does not make
"allegation[s] concerning fee levels of the vast majority of the Funds as to which [Plaintiffs]
sue."  Def. Brf. at 14.  Contrary to this assertion, Plaintiffs are not required to plead evidence
about every individual transaction in order to state a claim.

[9] Defendants' argument on this point is found in their Memorandum of Law in Support of
Defendants' Motion to Dismiss Plaintiffs' Complaint, filed in Dumond v. Massachusetts
Financial Services Co., C.A. No. 04-11458 (GAO).  See Def. Brf. at 12 n. 9.

> Gartenberg … does not establish a heightened pleading
> requirement for § 36(b) excessive fee claims. A plaintiff's failure
> to plead certain Gartenberg factors is not itself grounds for
> dismissal. The Court's focus in reviewing the defendants' motion
> to dismiss is on whether the allegations in the complaint set forth
> "a short and plain statement of the claim showing that the
> pleader[s] [are] entitled to relief." (citation omitted).

Wicks, 2005 U.S. Dist. LEXIS 4892, at *13; see also Pfeiffer v. Bjurman, Barry & Assoc., 2004

U.S. Dist. LEXIS 16924, at *18 (S.D.N.Y. Aug. 26, 2004); Millenco L.P. v. meVC Advisors,

Inc., 2002 U.S. Dist. LEXIS 19512, at *9-10 (D. Del. Aug. 12, 2002). And as further explained

in Pfeiffer:

> To prevail in this [§ 36(b)] action, the plaintiff will have to
> demonstrate that the fees were in fact excessive … Whether the
> plaintiff can meet this burden will be decided at a later stage of this
> action. The plaintiff's failure to do so in his pleading is not a
> ground for dismissal.

Id. at *18 (denying motion to dismiss § 36(b) claim) (emphasis added).[10]

Here, the Complaint exceeds the applicable pleading standards. The Complaint details

Defendants' scheme to charge excessive fees and commissions to Fund investors in order to pay

brokers to steer additional investors into the MFS Funds to further increase advisory fees (¶¶ 3-

6); lists a number of the brokerages involved, provides the rate at which the preferential

commission payments were paid, and describes the improper services rendered by the brokers in

exchange for the payments (¶¶ 46-46); alleges that payments were made in amounts that

---

[10]  Other courts have condoned a more liberal standard than Pfeiffer. In Green v. Fund Asset
Management, L.P., 19 F. Supp. 2d at 234, the court sustained a § 36(b) claim where plaintiffs did
not allege that the advisory fees were "excessive" or "disproportionate." The court found that §
36(b) "is not expressly limited to situations in which the advisory fees received by an investment
adviser were excessive, disproportionate or otherwise unreasonable." Id. (emphasis added). Put
simply, "[t]he statute encompasses the receipt of fees by an investment adviser in violation of the
adviser's fiduciary duty." Id. Under either the Pfeiffer or Green standard, Plaintiffs have
adequately pled a violation of § 36(b).

exceeded standard sales loads, commissions, and 12b-1 distribution fees (¶ 105, 120); and

illustrates how Defendants directly and indirectly used investors' assets to push the MFS Funds.

Furthermore, as explained in the Complaint, the absence of a relationship between the services

rendered and costs incurred by investors, in addition to the aggregate amount of investor assets

used by Defendants to acquire shelf space and directed brokerage, rendered the fees excessive.

¶¶ 46-113.  Under <u>Wicks</u>, these allegations are more than sufficient to state a claim for violation

of § 36(b).

> ### 1.    Defendants' Improper Use of Rule 12b-1 Fees Violated § 36(b)

Defendants' actions violated the stated purposes of  SEC Rule 12b-1 that governs several

of the excessive fees at issue here.[11]  The Rule was adopted so that funds could increase assets

and bring economies of scale which would be passed to investors and decrease their expenses.

<u>Bearing of Distribution Expenses by Mutual Funds</u>, Investment Company Act Release No.

11414 (Oct. 28, 1980).  However, as was correctly noted about investment advisers by the

Second Circuit, "this unique mutual fund structure was serious enough to prompt the observation

… that 'self-dealing is not the exception but, so far as management is concerned, the order of the

day.'"  <u>Tannenbaum v. Zeller</u>, 552 F.2d 402, 406 (2d Cir.1977).  Here, though the distribution

---

[11]  Rule 12b-1, promulgated by the SEC pursuant to the ICA, prohibits mutual funds from
directly or indirectly distributing or marketing their own shares unless certain enumerated
conditions set forth in Rule 12b-1 are met.  In order to comply with Rule 12b-1, a mutual fund
must issue a written distribution plan (a "Rule 12b-1 Plan") detailing "all material aspects of the
proposed financing and distribution" of its shares.  <u>Pfeiffer</u>, 2004 U.S. Dist. LEXIS 16924, at *5
(quoting 17 C.F.R. § 270.12b-1(b)).  The Rule 12b-1 Plan must be approved by a majority of the
fund's board of directors, including a majority of the disinterested directors, and may be
implemented or continued "only if the directors who vote to approve such implementation or
continuation conclude, in the exercise of reasonable business judgment and in light of their
fiduciary duties under state law and under sections 36(a) and (b) (15 U.S.C. §§ 80a-35 (a) and
(b)) of the [Investment Company] Act, that <u>there is a reasonable likelihood that the plan will
benefit the company and its shareholders</u>."  <u>Id</u>. (citing 17 C.F.R. § 270.12b-1 (e)) (emphasis
added).

fees are being used to increase Fund assets, the fruits of the economies of scale were enjoyed by Defendants, not Plaintiffs.  Defendants, who took a percentage of the Fund assets as their fee, increased their profits by using investors' money to increase the size of the Funds' assets.  As this Court has held, such conduct is actionable under § 36(b).  Wicks, 2005 U.S. Dist. LEXIS 4892, at *13.

Additionally, the average amount of payments given by advisers to brokers solely for revenue sharing is a proper basis for pleading that the fees were excessive.  In Pfeiffer, the court, in denying a motion to dismiss a § 36(b) claim, found 12b-1 fees of 25 basis points were sufficient to plead that fees were excessive.  Pfeiffer, 2004 U.S. Dist. LEXIS 16924, at *8.  The court took into account that the basis point also included service fees and distribution fees which were incurred in connection with promotion and distribution of the Fund's shares, as well as for services such as maintaining shareholder accounts.  Here, the Complaint alleges that the revenue-sharing amounts paid by MFS to Morgan Stanley also amounted up to 25 basis points.  ¶¶ 63-64.  Moreover, this payment of 25 basis points does not consider Defendants' revenue sharing agreements with various other brokerages that ended up costing investors even more.  See ¶¶ 46, 56-75 (detailing additional revenue-sharing programs between MFS and Morgan Stanley, Salomon Smith Barney, Wachovia Securities, Merrill Lynch and Chase Investment Services, among others).

In conclusion, Defendants' assertion that Plaintiffs' case is merely a "follow-on action for nondisclosure" and that that there are no excessive fee allegations is simply wrong.  Def. Brf. at 12-13.  Defendants attack the pleadings not because they fail to understand the basis for Plaintiffs' claims (their highly detailed memorandum supporting their motion to dismiss conclusively demonstrates their understanding of Plaintiffs' claims), but in order to prevent their

conduct from being examined on the merits. Plaintiffs' allegations are sufficient to sustain a §

36(b) claim. See, e.g., Wicks, 2005 U.S. Dist. LEXIS 4892, at *13.

    **2.**    **Defendants' Breach of Fiduciary Duties Fall Within § 36(b)**

    Moreover, Plaintiffs' claims are not limited to excessive fees and charges, but also

include Defendants' breach of fiduciary duty in connection with the fees they charged, which is

an independent violation of § 36(b). For example, in Green v. Fund Asset Mgmt., L.P., 19 F.

Supp. 2d 227 (D.N.J. 1998), the court sustained a § 36(b) claim where plaintiffs did not allege

that the advisory fees were "excessive" or "disproportionate." The court found that § 36(b) "is

not expressly limited to situations in which the advisory fees received by an investment adviser

were excessive, disproportionate or otherwise unreasonable." Id. at 234 (emphasis added). Put

simply, "[t]he statute encompasses the receipt of fees by an investment adviser in violation of the

adviser's fiduciary duty." Id.

    As repeatedly alleged in the Complaint, Defendants breached their fiduciary duty by both

providing the kickbacks to the brokers and by failing to adequately disclose these compensation

arrangements and resulting conflict of interests. ¶ 76. The SEC, when discussing conflict of

interests arising from an investment adviser's receipt of benefits in exchange for directing

brokerage, stated "an investment adviser has a duty to disclose to clients all material information

which incline an investment adviser consciously or unconsciously to render advice which is not

disinterested." In the Matter of Marvin , et al., IAA Release No. 1841, September 30, 1999,

citing SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 191-92 (1963); see also Green

v. Fund Asset Management, L.P., 286 F.3d 682, 686 (3d Cir. 2001). Defendants' failure to

adequately inform investors about conflicts of interest involving compensation received by the

adviser is a breach of their fiduciary duty under § 36(b) and is one of the bases for Plaintiffs'

claims.

13

Section 36(b) also applies to the distribution fees charged by Defendants to shareholders. When examining whether a fee is excessive, the courts look at the relationship of the advisers' profit to the services rendered to investors, recognizing that § 36(b) was enacted by Congress to "ensure that investment advisers passed on to fund investors the Saving that they realized from these economies of scales." Migdal, 248 F. 3d at 327.  The Second Circuit in Gartenberg noted that fall-out benefits to an adviser could result in advisory fees being unlawful where they are "so disproportionately large" as to label its negotiation a breach of fiduciary duty within the meaning of § 36(b). Id. at 932. Furthermore,  the Second Circuit suggested unreasonable 12b-1 fees should be considered in determining whether the advisor's fees are excessive.  Krinsk v. Fund Asset Mgmt. , Inc., 875 F.2d. 404, 410 (2d Cir. 1989).[12]

Additionally, advisory fees allocated to fund distribution practices, such as revenue sharing where the investment adviser and its affiliates claim to make payments from its own profits, are regulated under Rule 12b-1 and § 36(b).  As the SEC explained, "Rule 12b-1 could apply . . . in certain cases in which the adviser makes distribution related payments out of its own resources….'if any allowance were made in the investment adviser's fee to provide money to finance distribution.'"  Investment Company Institute- Rule 12b-1, 1998 SEC No-Act. Lexis 976, at * 16 (citing Payment of Asset-Based Sales Loads By Registered Open Ended Management Investment Companies, ICA release No. 16431) (emphasis added).

---

[12]  Guidance regarding how 36(b) governs 12b-1 fees was provided by the SEC's rule release adopting 12b-1: "...careful scrutiny to any past, present  or planned expenditures by the investment adviser for distribution, and determine on a basis of the facts of each particular case whether such expenditures constituted an indirect use of fund assets in violation of their fiduciary obligations under section 36 of the Act and in contravention of the rule."  Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11414.

Here, the Complaint alleges a cause of action for this practice as well. ¶¶ 157-164.

Accordingly, Plaintiffs' § 36(b) claim should be sustained for this additional reason. <u>Green</u>, 19

F. Supp. 2d at 234.

> **3.     Defendants' Soft Dollar Practices Were Improper and Violated §
> 36(b)**

The charging of improper or excessive soft dollars used as a kickback as alleged in the

Complaint is actionable under §36(b).  For example, in <u>Wicks</u>, the most recent decision on the

issue, this Court denied defendants' motion to dismiss plaintiffs' §36(b) claim arising from, <u>inter</u>

<u>alia</u>, the allegation that defendants "direct[ed] the payment of excessive commissions to

securities broker-dealers to execute trades for the Funds in exchange for 'soft dollars' (said to be

a form of kickback) that benefit the defendants and not the Funds."  <u>Wicks</u>, 2005 U.S. Dist.

LEXIS 4892, at *3.  Plaintiffs have made substantially similar allegations here and, accordingly,

Defendants' motion to dismiss those allegations should be denied.

Soft dollar payments are protected by a statutory safe harbor.  ¶ 109.  However, to fall

within the safe harbor, the payments must be determined in good faith to be "reasonable in

relation to the value of the brokerage and research services provided."  <u>Id</u>. (quoting 15 U.S.C.

§78bb(e)(1)).  As Plaintiffs have alleged,

> MFS Company's actions went far beyond what is permitted by the
> Section 28(e) safe harbor by routinely using "Soft Dollars" as
> excessive commissions to pay brokers to push unwitting clients
> into MFS Funds.

¶ 112.  Plaintiffs have thus alleged that the payments for "services" under MFS's soft-dollar

practices "went far beyond" the safe harbor because such payments were undisclosed kickbacks

rather than <u>bona fide</u> compensation for "research services."  <u>Id</u>.

15

###### 4. Defendants' Improper Use of Directed Brokerage Harmed Class Members

The Complaint reveals that Defendants paid kickbacks in a variety of forms, including, but not limited to directed brokerage and revenue-sharing.[13] Defendants do not contest Plaintiffs' allegations that the revenue-sharing payments were improper and harmed Plaintiffs. As such, Defendants' motion to dismiss this aspect of the § 36(b) claim must be denied.

With respect to directed brokerage only, Defendants argue that the directed brokerage it paid as a kickback to brokerages did not adversely affect shareholders, claiming that the SEC opined that Defendants' directed brokerage was made "subject to best execution." Def. Brf. at 2. Defendants' argument is misplaced for at least two main reasons. First, to the extent that MFS claims the directed brokerage was "subject to best execution" and, therefore the costs of such commissions paid on the directed brokerage was not any more than would have normally been paid on those trades, Defendants miss the point. The gravamen of the allegations in the Complaint is that MFS' directed brokerage trades should not have occurred in the first place and that any commissions paid with respect to said directed brokerage, regardless of whether it was "subject to best execution", should be returned to shareholders as the trades should have never occurred. This conduct is no different from a broker churning an account to generate commissions where, even though the commissions charged were the normal amount, the activity is wrongful, and the commissions are to be returned to the investor, as the trades should not have occurred in the first place. See Caiola v. Citibank, N.A., 295 F.3d 312, 324 (2d Cir. 2002);

---

[13] "Directed Brokerage" describes kickback payments made through the payments of commissions on promised portfolio trades. "Revenue-sharing" describes kickback payments though other means, including, but not limited to, payments of hard cash that comes out the fees and expenses paid by shareholders.

16

Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 906 F.2d 1206, 1218-19 (8th Cir. 1990).

Importantly, in its Cease-and-Desist Order against MFS, the SEC found that MFS had engaged

in such churning, as Defendants used directed brokerage in order to meet kickback quid pro quo

quotas agreed to with the brokerages, and not for legitimate investment purposes.  Reese Decl.

Ex. A at ¶12 (finding that MFS "requested that Equity Trading increase trading to more quickly

satisfy a target commission with a certain broker-dealer."). (Emphasis added).

      Second, despite the fact that the directed brokerage never should have occurred in the

first place, Defendants are also wrong to argue that the commissions paid on the directed

brokerage meet the requirements of "best execution."  Def. Brf. at 2.  Despite Defendants'

misrepresentations to the contrary, the SEC Order does not state that the trades were actually

made at best execution, but rather the trades were "subject to best execution."  See Reese Decl.

Ex. A at ¶ 8.  There is a significant distinction between "best execution" and "subject to best

execution" and the Complaint states in  no uncertain terms that Defendants did not meet the

demands of best execution.  ¶¶ 8, 11, 48-51.  This is also evident from the fact that in its action

against the brokerage Morgan Stanley for accepting kickbacks from MFS, among other mutual

fund companies, the SEC found that the kickbacks paid to Morgan Stanley paid **_more_** than best

execution.  Reese Decl. Ex. G at ¶ 2.

      Likewise, with respect to "soft dollar" payments that made up part of the directed

brokerage payments, the Complaint alleges that such payments were excessive and certainly did

not meet the requirements of "best execution."  As stated in the Complaint, at the end of the

Class Period, Defendants announced they were stopping the practice of "soft dollar" payments.

¶11.  As reported by the Wall Street Journal:

> *Aiming to show its seriousness about mutual-fund ethics,*
> *Massachusetts Financial Services Co. has stopped paying*

> *brokers in "soft dollars" – which essentially are inflated stock-trading commissions…*

¶ 11.

Another example of Defendants' failure to meet the strict requirements of "best execution" was Defendants' use of "step-out" agreements, whereby MFS paid amounts in excess of the trade costs that were then redirected to a broker who had no involvement in the trade. Reese Decl. Ex. A at ¶ 14(b) ("MFS selected a broker-dealer to execute the transaction and requested the executing broker to "step out" a portion of the trade, and, thus, a portion of the commission to another broker with whom MFS had a Strategic Alliance."); see also Reese Ex. G at ¶ 21 (SEC Order against Morgan Stanley) ("the trading desk retained one-third of the commission to cover its expenses, which the remaining two-thirds was to directed to Morgan Stanley").

As shown by Defendants use of "soft dollars", "step-outs" and other means, instead of charging only the amount necessary to execute the trade, i.e. "best execution", the commission rate MFS charged included an excessive amount that served as kickbacks to the brokerages. Therefore, the SEC's language noting the MFS trades were "subject to best execution" merely stands for the mundane proposition that advisers involved with these trades should be judged under the "best execution" standard, and in no way suggests that the trades were legitimate or that they met the "best execution" requirements. As alleged in the Complaint, "[t]he Investment Adviser Defendants went far beyond what is permitted by the Section 28(e) safe harbor by routinely using "Soft Dollars" as excessive commissions to pay brokers to push unwitting clients into the Funds." ¶¶ 102-108. These excessive commissions served as kickbacks to brokers and were charged to the Fund shareholders. ¶ 105. As such, these expenses were unnecessary for management of the Funds investments because the real purpose of such payments was to push

18

the Funds' shares.  ¶ 109-13.  In addition, by failing to reduce their management fees to reflect

the benefit they were obtaining from the kickbacks, Defendants were improperly inflating their

management fees, thus economically harming the funds and the Class members.  ¶ 102-103.

      **B.**     **Defendants' Conduct Has Been Universally Condemned by the SEC and other Regulators**

      Since 1981, the SEC has prohibited mutual funds from paying more than "best

execution" commission amounts to brokers in return for the brokers' giving preferential

marketing to that funds' shares – the very wrongdoing alleged in the Complaint.  As stated by the

SEC in October 2004 when it promulgated its final rule prohibiting the use of <u>any</u> brokerage

commissions to finance distribution:

> In 1981, shortly after we adopted rule 12b-1 and in light of its
> adoption, we concluded that "it is not inappropriate for investment
> companies to seek to promote the sale of their shares through the
> placement of brokerage <u>without the incurring of any additional
> expense</u>.
>
> After reviewing the current directed brokerage practices described
> above, in February 2004, we proposed to amend rule 12b-1 to
> prohibit the use of fund brokerage to compensate broker-dealers
> for selling fund shares.  Our proposal was intended to end practices
> that we concluded were inconsistent with the rationale of our 1981
> decision and involved unmanageable conflicts of interest.

Prohibition on the Use of Brokerage Commissions to Finance Distribution, SEC Release No. IC-

26591, 69 Fed. Reg. 54728, 54728-29 (effective Oct. 14, 2004) (emphasis in original Internet

version, available at <u>http://www.sec.gov/rules/final/ic-26591.htm</u>).  As alleged in the Complaint

and stated above, Plaintiffs have specifically alleged that, in contravention of the SEC's long-

standing rules, MFS was paying extra for brokerage services to compensate brokers for pushing

their shares.  ¶¶44-46.

      Additionally, when proposing amendments to the ICA that prohibit all payments for the

distribution of fund shares with brokerage commissions, the SEC made clear that the type of

kickback scheme engaged in by MFS creates conflicts of interest that harm investors:

> Broker-dealers may not . . . condition their promotion or sale of
> fund shares on the receipt of brokerage commissions from the fund
> . . .
>
> We believe that the way brokerage has been used to pay for
> distribution involves <u>unmanageable conflicts of interest</u> that may
> harm funds and fund shareholders . . .  We are also concerned
> about the effect of this practice on the relationship between broker-
> dealers and their customers.  Receipt of brokerage commissions by
> a broker-dealer in exchange for shelf space creates an incentive for
> the broker to recommend funds that best compensate the broker
> rather than ones that meet the customer's investment needs.

Prohibition on the Use of Brokerage Commissions to Finance Distribution, SEC Release No. IC-

26356, 69 Fed. Reg. 9726, 9728-29.  Thus, the governmental agency having paramount expertise

and authority with respect to mutual funds has specifically found that shelf-space arrangements

create unmanageable conflicts of interest and violate the federal securities laws.

Furthermore, Defendants do not contest that they failed to properly reveal the kickback

schemes in their Prospectuses or any other public disclosures.  Nor can Defendants make such an

argument in face of the SEC's specific finding that Defendants failed to adequately disclose any

of this information as required by the ICA and the federal securities laws.  Reese Decl. Exs. A,

G-H.  This failure to disclose underscores the harm to Plaintiffs that is recoverable under § 36(b),

as well as allowing distinct causes of action under §§ 34(b) and 36(a) of the ICA.  To wit, the

Complaint cites the May 1, 2003 Prospectus and SAI for the MFS Growth Opportunities Fund as

an example of one of the misleading disclosures issued by Defendants during the Class Period.

¶¶ 117-27.  The Complaint alleges in detail that the MFS Prospectuses were false and misleading

in that they failed to adequately disclose the kickback scheme at issue.  Id.  Specifically, the MFS

SAI stated that:

> The Distribution Plan provides that the Fund may pay MFD a
> distribution fee in addition to the service fee described above based

20

on the average daily net assets attributable to the Designated Class as partial consideration for distribution services performed and expenses incurred in the performance of MFD's obligations under its distribution agreement with the Fund. <u>MFD pays commissions to dealers as well as expenses of printing prospectuses and reports used for sales purposes, expenses with respect to the preparation and printing of sales literature and other distribution related expenses, including, without limitation, the cost necessary to provide distribution-related services, or personnel, travel, office expense and equipment</u>. The amount of the distribution fee paid by the Fund with respect to each class differs under the Distribution Plan, as does the use by MFD of such distribution fees.

<u>Id</u>.

Such statements are inadequate because they omitted material information regarding the MFS Funds' kickback arrangements with Morgan Stanley and other brokerages. [14]

**C.    Plaintiffs' § 36(b) Claims Are Properly Brought Against the Trustee Defendants**

Defendants argue that the Trustees were not recipients of the allegedly excessive fees and therefore are not proper defendants. Def. Brf. at 16. In making such an argument, the Defendants are seeking to convert their motion to dismiss into a summary judgment motion, asking the court to rule as matter of law that the payments to the Trustees could not have been compensated in connection with breaching their fiduciary duties. Moreover, Defendants' legal position is wrong. Courts repeatedly have broadly interpreted § 36(b) to apply whenever anyone receives a benefit from a breach of fiduciary duty. In <u>Halligan v. Standard & Poor's/Intercapital, Inc.</u>, 434 F. Supp. 1082, 1084 (E.D.N.Y. 1977), the court upheld plaintiff's §36(b) claim against

---

[14] <u>See</u> <u>Press v. Quick & Reilly, Inc.</u>, 218 F.3d 121, 128-29 (2d Cir. 2000) (holding that when the SEC makes a determination as to whether a broker or mutual fund's disclosure concerning remuneration complies with the requirements of SEC Rule 10b-10, the courts should respect that determination). Following the logic of <u>Press</u>, this Court should defer to the expert determination of the SEC. The SEC's conclusion that the kickback schemes involving directed brokerage that MFS engaged in with brokerages, such as Morgan Stanley, violated the SEC rules carries great weight as to the interpretation of those rules.

Continued on next page

21

trustee defendants where plaintiff alleged "defendants have directly or indirectly received from [the Corporation] compensation or payments of a material nature." The Halligan court further stated that the allegation was "sufficient to bring plaintiff's claim within the requirement of §36(b)(3) that the action be against 'the recipient of … compensation or payments [for investment advisory services].'" Id.

**III.    PLAINTIFFS HAVE STANDING TO ASSERT DIRECT CLAIMS ON BEHALF OF SHAREHOLDERS OF ALL THE MFS FUNDS**

Plaintiffs have standing to assert claims with respect to shareholders of all of the MFS Funds, including all classes of such Funds, despite the fact that they did not hold shares in all of the MFS Funds. Defendants do not deny that Plaintiffs have standing to assert their individual claims in connection with losses sustained by them on their own MFS Fund holdings. Def. Brf. at 5, 7. Therefore, Plaintiffs' ability to assert claims as class representatives on behalf of shareholders in all of the MFS Funds is not an issue of standing, but rather an issue for class certification pursuant to Fed. R. Civ. P. 23 and therefore premature to address prior to full briefing on that motion.[15] Nevertheless, as discussed below, considerable authority supports Plaintiffs' ability to assert class claims on behalf of shareholders in the other MFS Funds.

**A.    Plaintiffs Have Standing To Assert Claims On Behalf Of All MFS Funds Shareholders**

Standing is a prerequisite in any action, including a class action, and a potential class representative must possess standing to assert an individual claim. See Gratz v. Bollinger, 539

---

[15] For example, in Goldberger v. Bear Stearns & Co., 2000 U.S. Dist. LEXIS 18714, at *4 n.1 (S.D.N.Y. Dec. 28, 2000), the Court recognized that the question of whether a purchaser of a certain security may represent purchasers of other securities regarding the same course of conduct is a question for the class certification stage of the case, stating that this "question is not presently before the Court because Plaintiffs have not moved for class certification."

22

U.S. 244, 285 (2003). Once the plaintiff's standing to assert his or her individual claim has been

established, then the plaintiff's ability to represent the class depends solely on whether the

requirements of Rule 23 are met. As stated by the Supreme Court in Sosna v. Iowa:

> A named plaintiff in a class action must show that the threat of
> injury in a case such as this is "real and immediate," not
> "conjectural" or "hypothetical." . . . This conclusion does not
> automatically establish that appellant is entitled to litigate the
> interests of the class she seeks to represent, but it does shift the
> focus of examination from the elements of justiciability to the
> ability of the named representative to "fairly and adequately
> protect the interests of the class."

419 U.S. 393, 402-03 (1975) (emphasis added); see also Goodman v. Lukens Steel Co., 777 F.2d

113, 122 (3d Cir. 1985) ("[C]ontrary to the defendants' contentions, the issue here is one of

compliance with the provisions of Rule 23, not one of Article III standing. Each of the named

plaintiffs has presented claims of injury to himself and has alleged facts which present a case or

controversy under the Constitution"), aff'd on other grounds, 482 U.S. 656 (1987); accord Hicks

v. Morgan Stanley & Co., 2003 U.S. Dist. LEXIS 11972, at *19-20 (S.D.N.Y. July 16, 2003).[16]

   In a decision that is directly on point, In re Dreyfus Aggressive Growth Mut. Fund

Litigation, 2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 19, 2000), the court certified plaintiffs

who invested in one mutual fund to represent purchasers in another fund:

> Courts have repeatedly held that on allegations such as these, class
> representatives need not have invested in each security so long as
> the plaintiffs have alleged a single course of wrongful conduct with
> regard to each security. Courts have not addressed this concern vis
> a vis the doctrine of standing, but rather have examined such
> concerns pursuant to Rule 23(a)(3)'s typicality requirement.

---

[16] Even where courts have addressed this issue in terms of standing, the outcome has been the
same, permitting a plaintiff to represent other securities, ERISA plans and mutual funds in
addition to his or her own. Sutton v. Med. Serv. Ass'n, 1993 U.S. Dist. LEXIS 9763, at *13
(E.D. Pa. July 20, 1993).

<u>Id</u>. at *8.  In <u>Dreyfus</u>, certification was supported by the same factors that exist in this case:

> Here, the claims of the named plaintiffs and prospective class
> members derive from the same course of events.  The plaintiffs
> have alleged that both Funds made similar misrepresentations and
> omissions in the Registration Statements, Prospectuses, Statements
> of Additional Information and annual and semi-annual reports used
> to sell the Funds. . . . And indeed the claims of the named plaintiffs
> and prospective class members are based on the same legal
> theories.

<u>Id</u>. at *14.

Similarly, in <u>In re ML-Lee Acquisition Fund II L.P.</u>, 848 F. Supp. 527 (D. Del. 1994),

defendants argued that the proposed class representatives could not represent investors in a

mutual fund that they did not own.  The court rejected this contention due to the similarity of the

related mutual funds and of the wrongdoing that impacted both funds at issue.  <u>Id</u>. at 561 (finding

such representation appropriate because the fund securities were "substantially identical" and

were "marketed pursuant to the same Prospectus which [was] the subject of many of Plaintiffs'

allegations of wrongdoing").

In addition to the above-referenced case law in the mutual fund context, other relevant

decisions support the view that Plaintiffs may represent purchasers of other Funds, in light of the

similarity of the claims of all class members against all Defendants and the close

interrelationship between the Defendants.  <u>See</u>, <u>e.g.</u>, <u>In re Prudential Sec. Inc. Ltd. P'ship Litig.</u>,

163 F.R.D. 200, 208 (S.D.N.Y. 1995) (finding that "plaintiffs [were] in the same position as

absent Class Members, regardless of the specific [limited] partnership in which they invested,

because of the uniform course of improper conduct and standardized sales approach applied by

defendants"); <u>Maywalt v. Parker & Parsley Petroleum Co.</u>, 147 F.R.D. 51, 56-57 (S.D.N.Y.

1993) (plaintiffs who invested in three limited partnerships could represent persons who had

24

invested in two other limited partnerships, where, as here, the complaint alleged that investors in all five limited partnerships were victims of a single pattern of fraud by defendants).[17]

The decision in Fallick v. Nationwide Mutual Insurance Co., 162 F.3d 410 (6th Cir. 1998), is instructive.  There the plaintiff alleged that Nationwide breached its fiduciary duties with respect to the ERISA plan of which he was a member and other ERISA plans of which he was not a member.  The district court dismissed the claims as to all ERISA plans other than the plaintiff's plan on standing grounds.  Id. at 411-12.  The Sixth Circuit reversed, holding that the district court's reasoning was "fundamentally flawed" because it confused the issue of a plaintiffs' Article III standing with the Rule 23 issues relevant to his ability to sue on behalf of a class.  Id. at 422.  The court concluded that "once a potential ERISA class representative establishes his individual standing to sue his own ERISA-governed plan, there is no additional constitutional standing requirement related to his suitability to represent the putative class of members of other plans to which he does not belong."  Id. at 424.  The Fallick court also cited with approval authority holding that when a single defendant offers a range of ERISA plans, an individual in one plan can represent a class of plaintiffs – including some belonging to other plans – as long as "the gravamen of the plaintiff's challenge is to the general practices [of the defendant] which affect all of the plans."  Id. at 422.

Similarly, many courts have held that a plaintiff who purchased one type of a corporation's securities may represent persons who purchased other types of the corporation's

---

[17] See also Tedesco v. Mishkin, 689 F. Supp. 1327, 1335-36 (S.D.N.Y. 1988) (investors in various companies and partnerships controlled by defendants could represent a class including investors in other companies and partnerships); Kitchens v. U.S. Shelter Corp., 1983 U.S. Dist. LEXIS 12812 (D.S.C. Oct. 13, 1983) (permitting named plaintiffs to represent purchasers of interests in 12 separate limited partnerships, even though representatives held interests in only three of the partnerships).

25

securities, when purchasers of both types of securities were subjected to a common course of wrongful conduct.  See e.g., In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig., 794 F. Supp. 1424, 1461 (D. Ariz. 1992) (explaining how "plaintiffs need not name a representative of the class for each subgroup of securities, where common issues predominate as to all securities"); In re MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 911 n.7 (D.N.J. 1998) (stock purchasers could represent note purchasers).

      **B.**    **Alternatively, Plaintiffs Have Standing to Pursue Their Claims On Behalf of Shareholders in All of the MFS Funds Pursuant to the Juridical Link Doctrine**

Defendants and all the MFS Funds are juridically linked with each other, making collective prosecution of this action the most efficient means for resolution of the dispute.  As explained in Luyando v. Bowen, 124 F.R.D. 52 (S.D.N.Y. 1989), the "juridical link" doctrine allows a plaintiff to bring a class claim against a defendant as to which he or she lacks standing if there exists a "legal relationship which relates all defendants in a way such that single resolution of the dispute is preferred to a multiplicity of similar actions."  Id. at 58; Heffler v. U.S. Fidelity & Guar. Ins. Co., 1992 U.S. Dist. LEXIS 3090, at *11 (E.D. Pa. Mar. 10, 1992) (noting that a "juridical link," or legal relationship, would make single resolution of the dispute preferable over multiple actions).[18]

---

[18] The case relied upon by Defendants do not conduct the proper analysis to determine if there are "juridical links" as required by the First Circuit.  In re Eaton Vance Corp. Sec. Litig. , 220 F.R.D. 162, 164 (D. Mass. 2004) (stating First Circuit remanded case for discussion of Ortiz and the juridical link doctrine). Specifically, in Nenni v. Dean Witter Reynolds, Inc., 1999 U.S. Dist. LEXIS 23351, at *5 (D. Mass. 1999) (cited at Def. Brf. at 6), the court improperly viewed the issue of whether the plaintiff could bring an action on behalf of other funds as a standing issue, rather than one of typicality, and did not address the applicability of the juridical link doctrine to the facts of that case.  Likewise, in Vervaecke v. Chiles, Heider & Co., 578 F.2d 713 (8th Cir. 1978) (Def. Brf. at 6), unlike in this cases, none of the named plaintiffs had standing to bring any cause of action against defendants in their own right, and were therefore found not to have standing to bring claims on behalf of others.  Id.  Moreover, the court in Veryaecke failed to

Continued on next page

26

The juridical link doctrine is properly applied where efficiency and expediency allow plaintiffs to join together to address common wrongs by a group of defendants. "The doctrine is a powerful tool that can allow a plaintiff's lawyer to force many defendants (and what might otherwise be numerous class actions) into a single lawsuit at a substantially reduced cost." Newby v. Enron Corp., 2004 U.S. Dist. LEXIS 8158, at *108 (S.D. Tex. Feb. 24, 2004); see also Payton v. County of Kane, 308 F.3d 673, 678-79 (7th Cir. 2002) ("if the plaintiffs as a group - named and unnamed - have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or otherwise 'juridically related in a manner that suggests a single resolution of the dispute would be expeditious,' the claim could go forward") (quoting La Mar v. H&B Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973)).[19]

Defendants citation to In re Eaton Vance Corp. Sec. Litig., 219 F.R.D. 38 (D. Mass. 2003) is misplaced. First, the court in Eaton Vance dealt with a class certification motion - not a motion to dismiss. Id. This fact underscores that it is premature for this Court to rule on the issue now at the motion to dismiss stage, as Defendants insist. Second, the district court in Eaton Vance held that plaintiffs could not represent all four funds because they "failed to demonstrate that their claims are typical of that class." In re Eaton Vance Corp. Secs. Litig., 220 F.R.D. at 169. Plaintiffs here do not have that same problem because Plaintiffs have more than adequately

_____

conduct the proper juridical link analysis as required by the First Circuit.

[19] In Alves v. Harvard Pilgrim Health Care, Inc., 204 F. Supp. 2d 198 (D. Mass. 2002) aff'd, 316 F.3d 290 (1st Cir. Mass. 2003), two class representatives brought an ERISA class action against five defendants. Even though neither plaintiff was ever a member of an ERISA plan that the defendants sponsored, the District of Massachusetts concluded that "plaintiffs' claims against [defendants] should not be dismissed for lack of standing. Because these defendants [were] wholly[-]owned affiliates of [the corporate defendant], in which plaintiffs were participants, and the copayment plan provisions [were] substantially the same, a single resolution of the dispute would be expeditious." Id. at 205.

shown how their claims are typical of the claims of all shareholders in all the Funds.[20]

Specifically, the court in <u>Eaton Vance</u> recognized that the juridical link doctrine does apply in certain situations. <u>Id</u>. at 171. In <u>Eaton Vance</u> though, the court explained that the funds that plaintiffs had purchased were "not sufficiently juridically linked to the other mutual funds" because the plaintiffs had not alleged that the other funds at issue had identical false and misleading statements in the prospectus and registration statements. <u>Id</u>. at 171. Here, by contrast, the facts are very different than those in <u>Eaton Vance</u>. First, Plaintiffs here have clearly alleged in the Complaint that "each of the MFS prospectuses and SAIs issued during the Class Period contained substantially the same materially false and misleading statements, in that they omitted key information regarding the Funds' strategy for growth of assets, revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars" ¶ 116. Moreover, the economics of all the MFS Funds are intertwined as the Defendants pool together the fees and expenses collected from the MFS Fund shareholders (the same fees and expenses that are challenged as improper in the Complaint), such that the MFS Funds share expenses with one another. ¶ 45. Moreover, the Funds are essentially pools of investor assets that are managed and administered by a common body of officers and employees of MFS Company who administer the MFS Funds generally. ¶ 44. All MFS Funds share MFS Company as their investment adviser and share MFS Distributors as their principal underwriter and distributor. <u>Id</u>. Hence, the MFS Funds have no independent will and are totally dominated by MFS Company and the common body of Trustees established by MFS Company. <u>Id</u>. In other words, the MFS Funds function as components of one unitary organization. <u>Id</u>. Accordingly, <u>Eaton Vance</u> is easily distinguishable, and Plaintiffs

---

[20] <u>See</u> <u>also</u> <u>Adair v. Sorenson</u>, 134 F.R.D. 13, 16 (D. Mass. 1991) (decided on class certification by the same judge who decided <u>Eaton Vance</u>). Def. Brf. at 6.

28

in the instant action have demonstrated sufficient juridical links even under the <u>Eaton Vance</u>
standard.

Indeed, the wrongdoing alleged was only possible because the activities and resources of
all the Funds were linked together.  The Investment Adviser and Distributor Defendants' access
to and use of the entire fund complex's assets were what made their kickback programs possible
and significant in their impact.[21]  Notably, on March 23, 2005, the SEC fined and censured
Citigroup for kickbacks its subsidiary Smith Barney had received from MFS and other mutual
fund companies.  In its Cease-and-Desist Order regarding the kickbacks to Smith Barney, the
SEC specifically noted that the prospectuses "did not specifically disclose the <u>magnitude of the</u>
<u>revenue sharing payments that CGMI received from fund complexes</u> or that certain <u>fund</u>
<u>complexes</u> had greater access to, or increased visibility in, CGMI's retail network."  <u>See</u> Reese
Decl. I at  ¶ 13 (emphasis added) (March 23, 2005 SEC Order Instituting Administrative and
Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions in <u>In the</u>
<u>Matter of Citigroup Global Markets, Inc.</u>).  Because of these inadequate disclosures, the
customers "<u>were not provided with sufficient information to appreciate the dimension of the</u>
<u>conflict of interest</u> the revenue sharing program created."  <u>Id</u>. (emphasis added).  This language
illustrates that the conflict of interest not only arises from the inappropriate relationship between
advisers and brokers, but also from the amounts that were involved.  This undisclosed magnitude

---

[21]   Further emphasizing the juridical links present here is that: "[t]he amount of commissions
that a broker-dealer earns through portfolio brokerage arrangements often is based on its total
sales of all funds issued by that mutual fund complex"  Confirmation Requirements and Point of
Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities,
and Other Confirmation Requirement Amendments, and Amendments to the Registration Form
for Mutual Funds, 69 Fed. Reg. 6438.

was only possible due to the Investment Adviser and Distributor Defendants access to the entire

Fund complex, and as result impacted the entire complex.

Under the juridical link doctrine, the issues involving the MFS Funds would be assured

of efficient and consistent treatment.  See Moore v. Comfed Sav. Bank, 908 F.2d 834, 838 (11th

Cir. 1990) (While "[o]ther named plaintiffs could be supplied to match with each named

defendant . . . it would be unwieldy to do so . . . .  The case is simpler and more economical with

the class of plaintiffs and the named defendants").[22]  Moreover, the legislative history of § 36(b)

of the ICA demonstrates why prosecution of this action regarding all of the MFS Funds is

appropriate pursuant to the juridical links doctrine.  The legislative history confirms that where

funds pool and share expenses imposed on them by their advisers (as the MFS Funds do), § 36(b)

requires the courts to evaluate the impact of defendants' wrongful conduct on the entire complex

of funds:

> In the event that court action is brought to enforce this fiduciary
> duty of the investment adviser as to compensation or payments
> received by him, it is intended that the court look at all the facts in
> connection with the determination and receipt of such
> compensation, including all services rendered to the fund or its
> shareholders and all compensation and payments received, in order
> to reach a decision as to whether the adviser has properly acted as
> a fiduciary in relation to such compensation.  In the case of fund
> complexes, this could, under certain circumstances, include
> consideration of services rendered by such investment advisers to
> other funds in such complex and compensation or payments made

---

[22]  An investor holding a single fund within a family has a tangible interest in ensuring that the
funds in the entire complex are handled consistently with applicable law, as the investor
bargained for.  One of the identified benefits of having holdings in a fund family is the ability,
without additional sales charges, to switch between funds within a family.  See Reese Decl. Ex. J
(May 1, 2003 Registration Statement for the Massachusetts Investors Trust).  Therefore, a typical
customer in a fund has an inherent interest in the concept that all Funds available to the investor
not charge excessive fees or pay excessive commissions, because part of the benefit of the
bargain in holding a Fund within a particular fund family is the ability to change Funds without
incurring additional sales charges.

by such other funds for such services.

Investment Company Amendments Act of 1969, S. Rep. No. 91-184, at 15 (May 21, 1969)

(emphasis added). Congress thus recognized that the interrelatedness of mutual fund complexes

requires courts to examine an adviser's activity vis-à-vis the entire complex in order to determine

whether the adviser was obtaining excessive compensation for itself or its affiliates in breach of

its fiduciary duties under § 36(b).[23]

**C.**      **Plaintiffs Have Standing Due to Their Ongoing Financial Interest in the Outcome of the Litigation Regarding All Funds**

The United States Supreme Court has stated that standing consists of the following three

elements:

> First, the plaintiff must have suffered an "injury in fact" -- an
> invasion of a legally protected interest which is (a) concrete and
> particularized . . . and (b) "actual or imminent, not 'conjectural' or
> 'hypothetical.'" . . . Second, there must be a causal connection
> between the injury and the conduct complained of -- the injury has
> to be "fairly . . . trace[able] to the challenged action of the
> defendant, and not . . . the result [of] the independent action of
> some third party not before the court." . . . Third, it must be
> "likely," as opposed to merely "speculative," that the injury will be
> "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). Moreover, under Gollust v.

---

[23]   Additionally, the ICA defines the term "security" broadly and does not limit such definition to
a specific class of securities. Under § 36(b), a plaintiff may bring a claim with respect to a
registered investment company by virtue of his being a "security holder of such registered
investment company." 15 U.S.C. § 80a-35(b) (emphasis added). The statute does not require a
plaintiff to be a holder of an individual portfolio of the investment company, or a specific share
class of such portfolio. Here, Plaintiffs need only have invested in a "security" from a registered
investment company in order to bring a claim regarding all fees paid by such company or its
shareholders. Section 34(b) of the ICA likewise does not limit its remedy to untrue statements in
documents pertaining only to certain classes or portfolios of a registered investment company.
Section 36(a) of the ICA similarly authorizes actions to remedy breaches of fiduciary duty "in
respect of any registered investment company," without limiting the remedy to specific
portfolios or classes of such investment company. 15 U.S.C. § 80a-35(a) (emphasis added).

31

<u>Mendell</u>, 501 U.S. 115, 126 (1991), standing is grounded in a plaintiff's "distinct and palpable

injury to himself," and his or her ability to "maintain a 'personal stake' in the outcome of the

litigation...." <u>Id.</u>  As pointed out by at least one court in the mutual funds context, <u>Gollust</u>

contradicts Defendants' argument that a mutual fund shareholder may not assert claims regarding

funds in which he did not hold (Def. Brf. at. 5) as long as the shareholder has some financial

interest in the claims involving the other funds.  <u>See</u> <u>Batra v. Investors Research Corp.</u>, 1991

U.S. Dist. LEXIS 14773, at *10 (W.D. Mo. Oct. 4, 1991).

In <u>Batra</u>, Twentieth Century Investors ("TCI") was the registrant of 12 different funds or

"series."  <u>Id</u>. at *1.  The Court held that by holding shares in one fund, the plaintiff had standing

to sue on behalf of other funds because, as a shareholder in the fund, plaintiff benefited from any

recovery of excessive fees from the other mutual funds.  The Court thus stated the following:

> [T]he <u>Gollust</u> holding nullifies the defendants' contention that the
> plaintiff cannot maintain an action on behalf of other funds where
> he held solely Cash Reserve securities.  <u>Gollust</u> provides that
> where a plaintiff satisfies the statutory requirements, he need not
> continue to hold shares <u>so long as he holds some financial interest</u>
> <u>in the outcome of the litigation</u> … As a shareholder in [series he
> owned or in] any other series, he benefits from any recovery of
> excessive fees by TCI.

<u>Id</u>. at *10 (emphasis added).  Here, all the Funds are alleged to have shared the expenses at issue

in the litigation and an accounting with respect to all Funds is necessary to award relief to any of

the Funds.  ¶ 44.  Therefore, Plaintiffs have a financial interest in the outcome with respect to all

the Funds.  In other words, Plaintiffs here are not attempting to challenge conduct from which

they suffered no injury.  Plaintiffs were injured here by all of Defendants' allegedly improper

practices (which impacted <u>all</u> of the MFS Funds), and they thus have standing to bring claims

challenging all such practices.

**D.    Plaintiffs Also Have Standing To Bring Count V – The Complaint's Sole Derivative Count - as Members of an Unincorporated Association Pursuant to Fed. R. Civ. P. 23.1 and 23.2**

In addition, Plaintiffs also have standing to bring Count V, brought pursuant to the IAA, as members of an unincorporated association pursuant to Fed. R. Civ. P. 23.1 and 23.2.

As discussed above, Plaintiffs' IAA claim (Count V) is the sole claim that is brought derivatively. Because this claim involves substantive federal rights, a federal court must apply federal law to determine what constitutes an unincorporated association for capacity (i.e., party-standing) purposes. See Associated Students of U.C. Riverside v. Kleindienst, 60 F.R.D. 65, 67 (C.D. Cal. 1973).

The nominal Fund Defendants constitute an unincorporated association for standing purposes under federal law. See ¶¶ 40-45. An unincorporated association is defined as a body of persons acting together pursuant to a common purpose and/or enterprise. See Motta v. Samuel Weiser, Inc., 768 F.2d 481, 486 (1st Cir. 1985); Estates of Unger v. Palestinian Auth., 304 F. Supp. 2d 232, 258 (D.R.I. 2004). Even if the MFS Funds were individual, distinct legal entities, that would not be dispositive of the principle that the MFS Funds, together, constitute an unincorporated association for the constituents of an unincorporated association may be individually incorporated or otherwise organized as business entities. See Donatelli v. Nat'l Hockey League, 893 F.2d 459, 461 (1st Cir. 1990); Mgmt. Television Sys., Inc. v. Nat'l Football League, 52 F.R.D. 162, 164 (E.D. Pa. 1971).

As discussed above, Plaintiffs allege that the individual Funds comprising the MFS Funds acted with a common purpose and/or as a common enterprise, and function as components of one unitary organization. The goodwill of MFS Funds have been diminished and impaired by the wrongful acts described in the Complaint. See Cross v. Oneida Paper Products Co., 117 F. Supp. 919, 921 (D.N.J. 1954) (recognizing, for federal representative party purposes, that

33

"members of a[n] . . . unincorporated association[] clearly have a joint or common right in its trade-mark"). Moreover, the MFS family of Funds is commonly known by the brand name "MFS." In fact, "MFS" is a registered trademark of MFS Company. Defendants uses this trademark to brand the mutual fund family name to the public and entice them to purchase MFS Funds. Reese Decl. Ex. K (Brand Name Value Among Mutual Funds, Morningstar). This is another illustration of the MFS Defendants' strategy to treat the entire family of Funds as a single, brandable, synergistic unit, in order to maximize the benefits to themselves.[24]

These principles demonstrate Plaintiffs' standing as to Count V.[25] Count V is a derivative claim brought pursuant to § 215 and § 206 of the IAA. In effect, Plaintiffs bring Count V as a "double derivative" claim – derivatively, on behalf of the individual fund; and, double derivatively, on behalf of the unincorporated association of MFS Funds in which Plaintiffs' Funds are members. See Fed. R. Civ. P. 23.2. The MFS Fund family is commonly viewed as a single entity and fairness dictates that it be treated as an unincorporated association here. See Ripon Soc'y v. Nat'l Republican Party, 525 F.2d 567, 571-72 (D.C. Cir. 1975).

**IV.    PLAINTIFFS HAVE STATED A CLAIM UNDER §§ 34(B) AND 36(A) OF THE ICA**

Defendants argue that Plaintiffs have failed to state a claim under §§ 34(b) and 36(a) of the ICA, asserting that no private right of action exists under these sections. Def. Brf. at 8. Defendants are wrong. Notably, in their argument, Defendants fail to mention, let alone discuss,

---

[24]    These "branding" expenses are marketing costs that constitute 12b-1 fees. The fact that these fees are used to market the Funds as a single commodity emphasizes the significance of the pooling of assets by Defendants and the numerous juridical links that provide yet another basis for Plaintiffs' standing, discussed herein.

[25]    See Resolution Trust Corp. v. DeLoitte & Touche, 822 F. Supp. 1512, 1515 (D. Colo. 1993) (discussing representative principles of Fed. R. Civ. P. 23.2).

the most recent Supreme Court case on the matter – <u>Jackson v. Birmingham Bd. of Educ.</u>, 125

S.Ct. 1497 (Mar. 29, 2005) – authority that supports implied rights of action exist under §§34(b)

and 36(a) of the ICA.  Moreover, <u>Jackson</u> shows that the long precedent of private rights of

action under the ICA as recognized both within the First Circuit and other courts for more than

30 years still stands, despite Defendants' representations to the contrary.  <u>See</u> <u>Lessler v. Little</u>,

857 F.2d 866, 871 (1st Cir. 1988) (affirming a private right of action under the ICA and

criticizing defendants for ignoring First Circuit precedent that clearly states implied rights of

action exist under the ICA); <u>Levitt v. Johnson</u>, 334 F.2d 815 (1st Cir. 1964) (affirming a private

right of action under the ICA); <u>see</u> <u>also</u> <u>Strougo v. Scudder, Stevens & Clark, Inc.</u>, 964 F. Supp.

783, 796 (S.D.N.Y. 1997) ("[c]ourts have long held that a private litigant may commence an

action under Section 36(a) of the ICA"); <u>Brown v. Bullock</u>, 294 F.2d 415 (2d Cir. 1961)

(affirming finding of a private right of action under § 36); <u>Taussig v. Wellington Fund, Inc.</u>, 313

F.2d 472, 476 (3d Cir. 1963) (finding a private right of action under the ICA); <u>Esplin v. Hirschi</u>,

402 F.2d 94, 102 (10th Cir. 1968) (private right of action under § 36).[26]

   Implied rights of action under ICA §§ 34(b) and 36(a) have a long, established history

and fulfill Congress's clear intent under the ICA to protect mutual fund investors.  Moreover, as

explained below, applying the principles articulated by the United States Supreme Court on the

issue of implied rights of action, it is clear from the provisions of the statutory scheme

established by §§ 34(b) and 36(a) that the Plaintiffs fall within the class of persons intended to be

---

[26]  The substantial line of precedent recognizing implied rights of action under the ICA also
includes, but is not limited to, the following:  <u>Meyer v. Oppenheimer Mgmt. Corp.</u>, 764 F.2d
76, 88 (2d Cir. 1985); <u>In re ML-Lee Acquisition Fund II L.P.</u>, 848 F. Supp. at 539-45; <u>Krome v.
Merrill Lynch & Co.</u>, 637 F. Supp. 910, 917-20 (S.D.N.Y. 1986); <u>Bancroft Convertible Fund,
Inc. v. Zico Inv. Holdings, Inc.</u>, 825 F.2d 731, 735 (3d Cir. 1987); <u>McLachlan v. Simon</u>, 31 F.
Supp. 2d 731, 737 (N.D. Cal. 1998).

protected by these sections and that, therefore, a private right of action for shareholders exists.

In other words, the text and structure of §§ 34(b) and 36(a), as well as the legislative history,

strongly support Plaintiffs' position that private rights of action exist for these claims.

      **A.**    **Under the Applicable Tests for Determining the Existence of an Implied Right of Action, Such a Right Exists for §§ 34(b) and 36(b)**

Defendants rely on <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001) and <u>Olmsted v. Pruco</u>

<u>Life Insurance Co. of New Jersey</u>, 283 F.3d 429 (2d Cir. 2002) for the proposition that there is

no private right of action under §§ 34(b) and 36(a).  Def. Brf. at 9-10.  As stated above,

Defendants fail to mention, let alone discuss, the <u>most recent</u> Supreme Court case on the matter.

Defendants' failure to discuss <u>Jackson</u> is fatal to their argument as <u>Jackson</u> leaves no doubt that a

private right of action exists for these sections of the ICA.

Notably, in reaching its decision in <u>Jackson</u> that an implied right of action existed, the

Supreme Court further clarified its opinion in <u>Sandoval</u>, the very case relied upon by Defendants

to argue that no implied rights of action exist under the ICA (see <u>e.g.</u> Def. Reply at 8-9).

Importantly, in <u>Jackson</u>, the Supreme Court explained that <u>Sandoval</u> stood for the simple

proposition that a private right to enforce a <u>statute</u> does not necessarily include a private right to

enforce <u>regulations</u> promulgated thereunder, especially when the enabling statute explicitly

forbids one type of activity (in <u>Sandoval</u>, intentional misconduct) and the private right claimed

under the regulations is based upon a different theory absent from the text of the statute (in

<u>Sandoval</u>, a "disparate-impact" theory).  <u>Jackson</u>, 125 S. Ct. at 1506.  In <u>Jackson</u>, the Supreme

Court used such an analysis and found an implied right of action under Title IX for claims of

retaliation, even though such a private cause of action was not apparent from the text of the

statute.

The Supreme Court decision in <u>Jackson</u> shows the error of Defendants' argument that

36

there is no private right of action for §§ 34(b) and 36(a).  First, Plaintiffs here allege ICA

<u>statutory</u> violations that support private rights of action under a statute, rather than ICA rules or

regulations.  Second, the alleged conduct falls squarely within the conduct proscribed by the ICA

and the ICA counts in the Complaint do not rely upon novel theories of liability outside the

scope of the plain statutory language of the ICA.

      Furthermore, the Supreme Court decision in <u>Jackson</u> is important as it rests, in part, on

the fact that implied rights of actions under Title IX had been upheld by the courts for more than

25 years.  <u>Id.</u> at 1504.  Here, as in <u>Jackson</u>, the courts have upheld <u>for decades</u> implied rights of

action under the ICA as a means of protection for mutual fund investors.  As the First Circuit

noted in <u>Lessler</u> when it upheld a private right of action under the ICA, courts routinely have

upheld implied rights of action for private litigants for more than 30 years.  <u>Lessler</u>, 857 F.2d at

871 (citing <u>Levitt v. Johnson</u>, 224 F.2d 815 (1st Cir. 1964); <u>Moses v. Burgin</u>, 445 F.2d 369, 373

(1971)).

      Furthermore, even under the improper test proposed by Defendants that does not reflect

the most recent Supreme Court authority on the issue, Defendants are wrong as §§ 34(b) and

36(a) meet the standard asserted by Defendants.  Notably, in <u>Olmsted</u>, the court stated that

"courts must look to the intent of Congress in determining whether a federal private right of

action exists for violations of a federal statute." [27]  <u>Id</u>. at 432.  In making this determination, an

---

[27]  <u>Olmsted</u> is distinguishable from the instant case as it involved different facts and the
application of different sections of the ICA.  <u>Olmsted</u> does not even mention §§ 34(b) or 36(a) in
its analysis of whether a private right of action can be implied under the ICA.  Rather, in
<u>Olmsted</u>, the Second Circuit merely affirmed the District Court's holding that there is no private
right of action for violations of §§ 26(f) or 27(i) of the ICA.  <u>Id</u>. at 429.  Plaintiffs in <u>Olmsted</u>
invested in variable annuity contracts and unit investment trusts that combined both insurance
and investment features, something not at issue here.  The difference between the type of
investment covered by §§ 26 and 27 of the ICA and the type of investment covered by other

                                     Continued on next page

important factor is whether the statute discusses "the individuals [to be] protected."  Sandoval,

532 U.S. at 289.  If it does not, there exists "no implication of an intent to confer rights on a

particular class of persons" and, consequently, no implied right of action.  Id.  However, if the

statute discusses the group of "individuals [to be] protected," then an implied right of action

exists.  Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284 (2002) (noting that an implied

right of action exists if the test of the statute is "phrased in terms of the persons benefited").

       Here, the language of the statutory schemes of §§ 34(b) and 36(a) states in no uncertain

terms that Congress intended for §§ 34(b) and 36(a) to be "for the protection of investors" -

---

sections of the ICA – i.e. mutual funds – was discussed by the trial court in Olmsted, which
noted that other sections of the ICA had been widely construed to create implied rights of action.
As explained by the district court in Olmsted, the ICA sections involved in that case addressed
exceptions to the statute rather than provisions that embodied the basic purposes of the ICA:

> The mere fact that courts have interpreted other ICA sections to
> imply private rights of action does not compel the conclusion that
> Congress intended §§ 80a-26(e) and 80a-27(i) to be interpreted
> the same way.  Subsections 80a-26(e) and 80a-27(i) address
> exceptions made specifically for variable insurance contracts and
> unit investment trusts, financial vehicles different in many respects
> from other funds covered by the ICA.  See, e.g., H.R. Rep. No.
> 104-622, at 45 ("The [1996] legislation recognizes that variable
> insurance contracts and periodic payment plan certificates are
> different products that should not be treated identically under the
> [ICA] . . . ."), reprinted in 1996 U.S.C.C.A.N. 3908.  Thus, it does
> not follow that the existence of implied private rights of action in
> other sections of the ICA requires a finding that §§ 80a-26(e) and
> 80a-27(i) also incorporate implicit private rights of action. And,
> because Congress was legislating on a clean slate with respect to
> §§ 80a-26 and 80a-27, its silence in 1996 with respect to private
> rights of action for these sections does not now support their
> inference.

Olmsted v. Pruco Life Ins. Co. of N.J., 134 F. Supp. 2d 508, 516-17 (E.D.N.Y. 2000) aff'd, 283
F.3d 429 (2d Cir. 2002) (emphasis added).  In affirming, the Second Circuit in Olmsted relied on
the court's analysis below as it found the District Court's opinion to be "thorough and well-
reasoned."  Olmstead, 283 F.3d at 431-32.

38

language that demonstrates that a private right of action exists under §§ 34(b) and 36(a).

(emphasis added.)[28]  Section 34(b) makes "it unlawful for any person to make any untrue

statement of a material fact" in "any registration statement…or other document filed or

transmitted pursuant to this title or the keeping of which is required pursuant to § 31(a)."  15

U.S.C. § 80a-33(b).  Section 31(a) of the ICA states that its requirements are intended "for the

protection of investors."  15 U.S.C. § 80a-30(a) (emphasis added.)  Likewise, § 8 of the ICA,

which sets out the reporting requirements for the registration statement discussed in § 34(b),

states in no uncertain terms that the purpose of such a registration statement is "for the protection

of investors."  15 U.S.C. § 80a-8(a) (emphasis added).

      Furthermore, the "registration statement" discussed in § 34(b) is SEC Form N-1A, the

express goal of which is to protect investors.  Specifically, as stated in Form N-1A, the purpose

of its reporting requirements is to "provide essential information about the Fund in a way that

will help investors to make informed decisions about whether to purchase the Fund's shares

described" therein.  Reese Decl. Ex. L, at 6, C.2 (a) (emphasis added).

      That § 34(b) is aimed at protecting investors is also evident from the fact that it

proscribes omission of facts "necessary in order to prevent the statements made therein, in the

light of the circumstances under which they were made, from being materially misleading."

(emphasis added.)  The phrase "materially misleading" only makes sense in the context of

protecting investors, as the test for materiality focuses on the investor.  See, e.g., SEC v. Happ,

---

[28] Following the logic of the Supreme Court in Sandoval, the court in Olmsted refused to recognize a private right of action for §§ 26(f) and 27(i) of the ICA because "[t]he language of these sections only describes actions by insurance companies that are prohibited; it does not mention investors such as the plaintiffs."  Olmsted, 283 F.3d at 433 (emphasis added).  Here, by contrast, §§ 34(b) and 36(a) do, in fact, expressly state that investors are the group to be protected by the conduct proscribed in §§ 34(b) and 36(a).

392 F.3d 12, 21 (1st Cir. 2004) (noting that a fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable <u>investor</u> as having significantly altered the 'total mix' of information made available") (quoting <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988) (emphasis added)).

  With respect to § 36(a), a private right of action for § 36(a) "is supported by the text of Section 36." <u>Strougo</u>, 964 F. Supp. at 796. Specifically, § 36(a) states that, like § 34(b), it is for "<u>the protection of investors</u>." (emphasis added.) Moreover, § 36(a) also incorporates § 1(b) of the ICA which states that the purpose of Sections such as 36(a) is to protect the "<u>interests of investors</u>." 15 U.S.C. § 80a-1 (emphasis added.).

  Almost simultaneously with its decision in <u>Olmsted</u>, the Second Circuit reaffirmed its recognition of an implied right of action under § 36(a) in the case of <u>Strougo v. Bassini</u>, 282 F.3d 162 (2d Cir. 2002), in which it held that mutual fund shareholders had standing under Maryland law to bring direct actions asserting private rights of action under §§ 36(a) and 48 of the ICA. In doing so, the Second Circuit emphasized that "the general policy statement of the ICA" regarding mutual funds includes the objectives of "protecting all classes of investment company security holders from the special interests of directors, officers … and preventing investment companies from failing to protect 'the preferences and privileges of the holders of their outstanding securities.'" <u>Id</u>. at 176 (citing ICA § 1(b)). In light of <u>Strougo</u>, it is clear that the Second Circuit has not rejected private rights of action under the ICA as Defendants argue. Def. Brf. at 10.[29]

---

[29]  <u>Strougo</u> was amended on March 11, 2002, <u>after</u> the March 7, 2002 <u>Olmsted</u> decision, confirming that courts have recognized implied rights of action under the ICA in light of <u>Olmsted</u> despite Defendants' erroneous contention to the contrary. Def. Brf. at 10.

Finally, Defendants rely on a handful of cases to support their argument that there is no private right of action under § 34(b). Def. Brf. at 9. These cases cited by Defendants, in which the trial courts held that a private cause of action did not exist for §§ 34(b) (and 36(a)), wrongly assumed that <u>Olmsted</u> precluded any private right of action.[30] Notably, none of these cases were decided after the controlling Supreme Court precedent was established in <u>Jackson</u> – authority that shows the error of the cases relied upon by Defendants.[31]

### B.    Additional Authority Establishes Private Causes of Action

The First Circuit has long recognized the importance of implied rights of action under the ICA to protect mutual funds investors. <u>Lessler</u>, 857 F.2d at 871 (citing <u>Levitt</u>, 224 F.2d at 815). Accordingly, courts have repeatedly recognized private rights of actions under §§ 34(b) and 36(a). <u>See</u> <u>e.g.</u> <u>Strougo</u>, 964 F. Supp. at 798 (upholding implied right of action under 36(a) <u>In re ML-Lee Acquisition Fund II L.P.</u>, 848 F. Supp. at 539 (same).

Importantly, with respect to § 34(b), the court's analysis in <u>In re Nuveen Fund Litig.</u>, 1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 11, 1996) is telling as the court specifically

---

[30] <u>See</u> <u>Chamberlain v. Aberdeen Asset Management Ltd.</u>, Civ. No. 02-5870 (E.D.N.Y. Jan. 21, 2005); <u>Dorchester Investors v. Peak Int'l Ltd.</u>, 134 F. Supp. 2d 569, 581 (S.D.N.Y. 2001); <u>White v. Heartland High-Yield Mun. Bond Fund</u>, 237 F. Supp. 2d 982, 987-88 (E.D. Wis. 2002); and <u>In re Merrill Lynch & Co., Research Reports Securities Litigation</u>, 272 F. Supp. 2d 243 (S.D.N.Y. 2003) and 289 F. Supp. 2d 429, 437-38 (S.D.N.Y. 2003).

[31] Defendants citation to <u>Bonano v. East Caribbean Airline Corp.</u>, 365 F.3d 81 (1st Cir. 2004) is inapposite. Def. Brf. at 9. <u>Bonano</u> deals with the Federal Aviation Act – something simply not at issue here. Moreover, in <u>Bonano</u>, the court specifically noted that "it is abundantly clear that Congress, in crafting the [Federal Aviation Act (Act)], intended public, not private, enforcement. Consequently, we join a long list of other courts that have concluded that neither the Act nor the regulations create implied private rights of action." <u>Bonano</u> at 86. Furthermore, the court also explicitly noted that the Act does "not focus on a benefited class." <u>Id.</u> at 85. As discussed herein, the same cannot be said about Plaintiffs' §§ 34(b) and 36(a) claims. Defendants' reliance on <u>Long Term Care Pharmacy Alliance v. Ferguson</u>, 362 F.3d 50 (1st Cir. 2004), Def. Brf. at 10, is misplaced for the same reasons.

41

addresses the issue of whether a private cause of action exists under § 34(b).  In <u>Nuveen</u>, as here, plaintiffs alleged that defendants violated § 34(b) by not acting in the best interests of mutual fund shareholders in trying to increase the funds' assets and therefore increased advisory fees with no corresponding benefit to the shareholder through any economies of scale.  <u>See</u>, <u>e.g.</u>, ¶¶ 81, 104(g), 106(g), 106(h), 119(f).  The court in <u>Nuveen</u>, held that shareholders had a private right of action under § 34(b) because "<u>the language and structure of the statute</u>" demonstrated that a private right of action existed.  <u>Id</u>. at *12 (emphasis added).

Moreover, <u>Nuveen</u> also conducted a detailed analysis of Congress's intent and concluded that it supported the finding that a private right of action for § 34(b) exists as demonstrated by the language and structure of the statute.  Specifically, when Congress passed the ICA in 1940, it explicitly granted jurisdiction "of all suits in equity and actions at law brought to enforce any liability or duty created by…regulations or orders thereunder."  15 U.S.C. § 80a-43.  Moreover, § 1(b) of the ICA directs courts to interpret its provisions liberally in order to "mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors."  15 U.S.C.S. § 80a-1.

Equally important, "subsequent legislative history arising from amendments to the ICA indicates that Congress contemplated that the courts should imply private causes of action" for cases involving mutual funds.  <u>Nuveen</u>, 1996 U.S. Dist. LEXIS 8071, at *13.  Consequently, in the context of mutual funds, "[f]ederal courts have widely implied private causes of action under the ICA for over thirty years."  <u>Id</u>. (citing <u>Fogel,</u> 668 F.2d at 110-11 (recounting precedent implying private right under the ICA)).  And even though Congress has revisited the sections of the ICA involving mutual funds three times since courts began to imply such causes of action, it has never indicated any concern regarding the practice of recognizing implied rights of action

42

that protected mutual fund investors.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,

456 U.S. 353 (1982).  Moreover, when Congress amended the ICA in 1980 to expand protection

for mutual fund investors, the House Committee report made clear that it intended that private

causes of action be recognized:

> The Committee wishes to make plain that it expects the courts to
> imply private rights of action under this legislation, where the
> plaintiff falls within the class of persons protected by the statutory
> provision in question.  Such a right would be consistent with and
> further Congress' intent …

H.R. Rep. No. 1341, 96th Cong. 2d Sess. 28-29 (1980), reprinted in 1980 U.S.C.C.A.N. 4800,

4810-11; see also Strougo, 964 F. Supp. at 798.

After conducting a thorough analysis, the court in Nuveen held that plaintiffs could assert

a private cause of action under § 34(b).  Nuveen, 1996 U.S. Dist. LEXIS 8071, at *11.

Specifically, the court concluded that "[i]n light of the ICA's remedial purposes, the substantial

line of precedent recognizing implied private rights action under the ICA . . . the legislative

intent attendant to two subsequent amendments to the ICA," and the plain "language and

structure of the statute," a private cause of action existed under § 34(b).  Id. at *11-12.

Plaintiffs submit that Nuveen's analysis is correct.  Furthermore, the specific language of

§ 34(b) and the ICA provisions incorporated by reference in that section confirm that Plaintiffs

here are members "of the class for whose especial benefit the statute was enacted."  Olmsted,

283 F.3d at 434 (citing Cort v. Ash, 422 U.S. 66, 78 (1975)) (emphasis in Olmsted).  Using the

statutory text in this manner to interpret legislative intent is fully consistent with controlling

Supreme Court authority and supports implication of a private right of action for §§ 34(b) and

36(a).

43

## V.     THE COMPLAINT PLEADS A CLAIM UNDER § 48(a) OF THE ICA

Section 48(a) imposes liability on control persons for violations of §§ 34(b), 36(a) and 36(b) of the ICA. Defendants argue that there is no implied right of action under § 48(a). Def. Brf. at 17. Defendants fail to cite any legal support for their position and the case law clearly shows that a private right of action exists for §48(a). See e.g. Jerozal v. Cash Reserve Mgmt., Inc., 1982 U.S. Dist. LEXIS 16566, at *19 (S.D.N.Y. 1982). Consequently, Defendants' motion to dismiss the §48(a) claim must be denied.

Defendants also argue that allowing a claim for §48(a) would "impermissibly" expand the scope of persons liable under § 36(b).[32] Defendants fail to cite any case law for this proposition. Nor can they as § 48(a) is no different from § 15 of the Securities Act of 1933 that expands the scope of persons liable under section §11 of the Securities Act the same way that § 48(a) does for §36(b). Courts have long recognized this as permissible. See e.g. Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996).

Defendants finally argue that there was no "procurement" of a violation of the ICA. Def. Brf. at 18.[33] Plaintiffs have adequately alleged that MFS caused the Distributor and the Investment Adviser Defendants to violate the ICA in contravention of §48(a) of that statute. See,

---

[32] Notably, Defendants do not challenge that §48(a) imposes liability for those who caused others to violate §§ 34(b) and 36(a).

[33] Defendants' contention that Plaintiffs have not alleged that MFS "procured" violations of the ICA is a red herring because §48(a) does not require a talismanic invocation of the word "procure" for Plaintiffs to establish a violation of the statute. Indeed, as Defendants concede, the word "procurement" does not actually appear in the body of the statute, which instead makes it unlawful "to cause" a defendant to engage in certain conduct. 15 U.S.C. §80a-47(a).

e.g., ¶¶ 166, 168.  Courts have consistently held that such allegations are sufficient to establish

violations of §48(a).[34]

## VI.    PLAINTIFFS HAVE STATED A VIABLE CLAIM UNDER § 215 OF THE IAA

### A.    Compliance With the Demand Requirement of Rule 23.1 Should Be Excused as Futile

Defendants contend that Plaintiffs' derivative claim should be dismissed because the

Complaint does not satisfy Fed. R. Civ. P. 23.1 ("Rule 23.1").  Def. Brf. at 19.  Generally, "a

plaintiff 'must establish that … all available means to obtain relief through the corporation itself

are exhausted by making demand on the corporation's board of directors to prosecute the

litigation."  Harhen v. Brown, 730 N.E.2d 859, 765 (Mass. 2000) (quoting Bartlett v. New York,

N.H. & H.R. Co., 109 N.E. 452 (Mass 1915)).  Under Massachusetts law,[35] courts will dispense

with the demand requirement "provided it appears by appropriate allegations that [demand]

would have been an idle ceremony."  Bartlett, 109 N.E. at 454.[36]  The status of a majority of the

---

[34]  Strougo, 964 F. Supp. at 806 (allegations "that the purportedly 'independent' directors of the Fund were in fact controlled by the Scudder Defendants, who 'caused' the independent directors to approve the Rights Offering" were sufficient to establish a § 48(a) violation); sIn re ML-Lee Acquisition, 848 F. Supp. at 545 (allegations "that the transactions at issue in the Complaint were undertaken illegally between 'affiliated' entities and that the alleged controlling Defendants caused those actions to be taken" were sufficient to establish a §48(a) claim); Dowling v. Narragansett Capital Corp., 735 F. Supp. 1105, 1110, 1123 (D.R.I. 1990).

[35]  Defendants agree that the law of the State of Massachusetts, which is the state of incorporation of the MFS Funds, governs demand futility in this case.  Def. Brf. at 19; Cf. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-109 (1991) ("a court that is entertaining a derivative action under [the IAA] must apply the demand futility exception as it is defined by the law of the State of incorporation").  Both Fed. R. Civ. P. 23.1 and Mass. R. Civ. P. 23.1 (individually and together, "Rule 23.1") codify the demand requirement and its exception, excusing plaintiffs from making an initial demand if they "allege with particularity …the reasons…for not making the effort."

[36]  The recently enacted Massachusetts Universal Demand Statute, Mass. Gen. Laws ch.156D, § 7.42 (enacted on July 1, 2004), does not apply because the statute is not retroactive and Plaintiffs' initial complaint was filed before the statute was passed.  Def. Brf. at 19, n. 16.

board as either "interested" or "disinterested" is the determining factor in a Massachusetts

demand futility case. Harhen, 730 N.E.2d at 864. Therefore, while Plaintiffs have not made any

demand on the Boards of Trustees of the MFS Funds to institute a derivative action under §215

of the IAA, the Court must nonetheless allow their claim to go forward as the Complaint alleges

sufficient facts to show why demand should be excused as futile. See ¶¶ 44-45, 88-96, 134-42.[37]

### 1. Under The Massachusetts Statute Applicable To Investment Companies, A Majority Of The MFS Funds Board Is Interested

Massachusetts law looks to the ICA to determine whether an investment company trustee

should be deemed independent or interested when making any determination or taking any action

as a trustee. Mass. Gen. Laws ch. 182, §2B (2005); see also ING Principal Prot. Funds Deriv.

Litig., 2005 U.S. Dist. LEXIS 8606, at *21 (D. Mass. May 9, 2005). Yet contrary to Defendants'

claim, the Complaint establishes that a majority of the Trustees of the MFS Funds must be

deemed "interested persons" under the ICA at the time the Action was originally filed.

According to the MFS Funds' 2003 Annual Report, two of the 12 Trustees sitting on the

Boards of the MFS Funds at the time the original complaint was filed on March 25, 2004 must

be considered "interested persons" within the meaning of the ICA as they simultaneously served

as officers of MFS Company.[38] However, the ICA's definition of "interested person" also

includes "any person directly or indirectly controlling, controlled by, or under common control

with, such other person." 15 U.S.C. §§ 80a-2(a)(3)(C), (19)(A)(i). The specific facts alleged in

---

[37] For the same reasons discussed herein, Plaintiffs satisfy Rule 23.1's demand requirements by adequately pleading that demand should be excused as futile. See Def. Brf. at 27.

[38] The particular annual report referenced herein is for the MFS Research Series and dated December 31, 2003 (the "2003 Annual Report"), and states that each trustee serves as a board member of the other funds within the MFS Family of Funds. All information concerning the Board of Trustees is materially and substantially similar in each and every MFS Fund's Annual Report released at or around the same date.

the Complaint show that each of the Trustee Defendants sitting on the Boards of the MFS Funds at the time the original complaint was filed must be considered "interested persons" because each of them were captive to and controlled by the Investment Adviser Defendant who recruited and overpaid Trustee Defendants for their services as part of an illegal agreement to misappropriate fund assets.  ¶¶ 91, 135.

The Complaint specifically charges that "[t]he MFS Funds have no independent will and are totally dominated by MFS Company."  ¶ 44.  In support of this contention, Plaintiffs allege that all MFS Funds share MFS Company as their investment adviser and share MFS Distributors as their principal underwriter and distributor.  ¶ 45.  Moreover, all Funds share a common body of Trustees established by MFS Company, including several key Fund trustees recruited from MFS Company's own ranks, and are managed and administered by a common body of officers and employees of MFS Company.  ¶¶ 44, 93.  And, although shareholders technically have a right to vote out Trustees, the Trustees know that this is extremely unlikely if the Investment Adviser supports the Trustees.  ¶ 135.  The Funds even share expenses with each other by pooling fees and expenses collected from the MFS Funds' investors, so that "in substance, the MFS Funds function as components of one unitary organization."  ¶¶ 44-45.  From the standpoint of the Trustee Defendants, the MFS Funds did not exist as separate entities from MFS Company.  The Court can infer from the close-knit structure of the MFS organization described in the Complaint and herein summarized, that even the supposed "independent" members of the Boards felt they owed their duties of loyalty to MFS Company (and its shareholders) rather than to the investors of the MFS Funds.

Each Trustee Defendant benefited directly from the wrongdoing in order to preserve his/her lucrative position as a Trustee.  The Complaint alleges that each of the Trustee

47

Defendants were paid large sums of money and served for indefinite terms at the pleasure of the Investment Adviser Defendant. ¶¶ 91, 140. The Trustee Defendants were also self-interested in the improper kickbacks paid to brokers who steered their clients' assets into the MFS Funds in order to increase the assets in the Funds, thereby decreasing the likelihood that the mutual fund would be disbanded or merged and that the Trustee Defendants thus could maintain their positions and compensation for sitting on the Fund's board. ¶ 139.

Additionally, the Complaint alleges that, due to their lack of independence from MFS Company, each Trustee Defendant knowingly participated in, approved, and/or recklessly disregarded the wrongs complained of in the Complaint. ¶¶ 136-37. In particular, extensive red flags were ignored for over five years by the Trustee Defendants. For example, the Complaint alleges that the Trustee Defendants disregarded their statutory and fiduciary duties to manage and supervise the MFS Funds by rubber-stamping all significant agreements with MFS Company and allowing MFS Company to skim millions of dollars from the MFS Funds shareholders' assets. ¶¶ 89-96, 138. This course of conduct supports Plaintiffs' contention that the Trustee Defendants acted in the interest of MFS Company rather than in the best interest of the MFS Funds' investors.

The Trustee Defendants, who must be considered "interested persons" under the ICA as they were controlled by and beholden to the Investment Adviser Defendant, comprise at least eight of the 12 Trustees serving on the Board at the time the original complaint was filed (and two other Trustees must be treated as "interested persons" as they were simultaneously serving as officers of MFS Company). Therefore, the Court can deem a majority of the MFS Funds' Trustees to be "interested" under the ICA, and excuse demand in this case as futile.

48

### 2.    Demand Is Futile Under Massachusetts Common Law

Plaintiffs also meet ordinary Massachusetts demand futility standards.  In order to determine whether a director is "interested," the Supreme Judicial Court of Massachusetts adopted the definition stated in the ALI Principles of Corporate Governance.  Harhen, 730 N.E.2d at 865.  Relevant to this case is the following definition of the term by the ALI:

> (a) A director…is "interested" in a transaction or conduct if…
>
> (4) The director…is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director's… judgment with respect to the transaction or conduct in a manner adverse to the corporation.

Id. at 865 n.5 (quoting the ALI Principles of Corporate Governance: Analysis and Recommendations § 1.23 (1994) (the "ALI Principles")).

As the analysis above shows, all Trustee Defendants would likewise be considered "interested" under the ALI Principles.  See ¶¶ 44-45, 86-96, 134-42.  Plaintiffs adequately allege that as a majority of the Trustees had significant pecuniary interests in the challenged transactions, the Board could not reasonably be expected to "exercis[e] its power and authority to pursue the derivative claims directly."  White v. Panic, 783 A.2d 543, 551 (Del. 2001); ¶¶ 139-141.  Plaintiffs also adequately allege that the Trustee Defendants were controlled by and beholden to the Investment Adviser Defendant so that a majority of the Boards could not have independently and disinterestedly considered whether to bring this claim.  ¶¶ 44-45, 91-96, 135-38.

In considering a motion to dismiss, the Court must also take all facts alleged in a well-pled complaint as true and make all reasonable inferences in favor of Plaintiff.  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  Defendants attempt to defeat Plaintiffs' demand futility

49

allegations by treating each allegation in isolation, but this is not the law. Rather, the Court must consider the Complaint as a whole when deciding demand futility. Even if no single allegation would suffice on its own to raise a reasonable doubt about director independence, when taken together, Plaintiffs' allegations show that the Trustees participated in the wrongdoing or were otherwise interested. See CALPERS v. Coulter, 2002 Del Ch. LEXIS 144, at *29 (Del. Ch. May 28, 2002).

In light of Plaintiffs' well-pled allegations concerning demand futility, the Court should permit their derivative claims against MFS Company to go forward.

**B.    The Complaint Adequately Alleges a Violation of the IAA**

The primary purpose of the IAA is to protect mutual fund investors against those "who may give [investors] biased advice or misuse their funds or securities." S. Rep. No. 1760, 86th Cong., 2nd Sess. 4 (1960). The Supreme Court has held that the IAA reflects a "congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which was not disinterested." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 191-92 (1963). Specifically, § 206 establishes federal fiduciary standards governing the conduct of investment advisors in order to benefit investors by proscribing certain conduct. 15 U.S.C. §§ 80b-6 (2004); Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 19 (1979).

**1.    Section 215 Applies To Advisory Contracts That Violate § 206 Of The IAA**

Defendants mistakenly assert that the applicability of § 215 depends on an allegation that the advisory contracts by their terms violate the IAA. Def. Brf. at 26-28. In fact, the only cases Defendants cite to support their contention construe § 29(b) of the Securities Exchange Act of 1934 (the "1934 Act") and not § 215 of the IAA. However, Defendants cannot and do not cite a

50

single case that draws a direct nexus between § 29(b) of the 1934 Act and Plaintiff's IAA claims because no federal court has ever dismissed IAA claims on that basis.  To the contrary, federal courts, including those in the First Circuit, routinely permit § 215 claims seeking to void investment advisory contracts for § 206 violations to move forward so long as plaintiffs can establish a violation of § 206 regardless of whether the contracts at issue <u>could</u> be performed without violating the federal securities laws.  <u>E.g.</u> <u>Margaret Hall Found. v. Atl. Fin. Mgmt.</u>, 572 F.Supp. 1475, 1485 (D. Mass. 1983) ("That the Section 215 claim is triggered by a Section 206 violation does not convert it into a Section 206 claim); <u>Norman</u>, 350 F. Supp. 2d at 391-92 (denying defendant's motion to dismiss plaintiff's IAA claim, which rested on defendant's breach of its fiduciary duties under the IAA); <u>Bogart V. Shearson Lehman Bros.</u>, 1993 U.S. Dist. LEXIS 1182, at *6-7 (S.D.N.Y. Feb. 3, 1993) ("Plaintiff correctly notes that the Supreme Court in [<u>TAMA</u>] recognized a private right of action…if they are void under Section . . . 215 for violating a provision of the IAA, including [§ 206], which plaintiff alleges was violated here.") (internal citations omitted); <u>Wellington Int'l Commerce Corp. v. Retelny</u>, 727 F. Supp. 843, 845 (S.D.N.Y. 1989) ("any contract which violates section 206 is void under section 215").

Although the language of § 29(b) & § 215(b) is similar in that the fundamental purpose of both the 1934 Act and the IAA is to "substitute a philosophy of full disclosure for the philosophy of caveat emptor," <u>Capital Gains</u>, 375 U.S. at 186, the two Acts have distinctly dissimilar characteristics.  The IAA "attempts to preserve the 'personalized character of the services of investment advisers,' and to eliminate conflicts of interest between the investment adviser and the clients as safeguards both to 'unsophisticated investors' and to 'bona fide investment counsel.'" <u>Scachitti v. Prudential Sec., Inc.</u>, 1999 U.S. Dist. LEXIS 19391, at *26 (D. Ill. Dec. 10, 1999) (quoting <u>Capital Gains</u>, 375 U.S. at 191-192); <u>accord</u> <u>Norman</u>, 350 F.

51

Supp. 2d at 391.  Unlike Rule 10-b of the 1934 Act, "§ 206(2) is more than an anti-fraud

provision because it establishes fiduciary duties for investment advisers."  Morris v. Wachovia

Sec., Inc., 277 F. Supp. 2d 622, 644 (D. Va., 2003); Norman, 350 F. Supp. 2d at 391. ("The IAA

does prohibit fraud and deceit in investment adviser dealings with client, but it is not simply an

anti-fraud measure like section 10(b)").  As such, the private remedies under § 215 are triggered

without requiring proof of scienter "where an investor brings suit on the investment adviser's

allegedly improper conduct (or vice versa) pursuant to a contract for services, and seeks a

remedy consistent with a determination that the contract is void."  Norman, 350 F. Supp. 2d at

388.

Even if the Court were to consider Defendants' overreaching argument that § 215 is

inoperable absent an allegation that the relevant contract itself is illegal or cannot be performed

without violating the federal securities laws, Plaintiffs have adequately pled that the advisory

contracts at issue cannot be performed by MFS Company without violating § 206.  The

Complaint details how the advisory contracts at issue constituted part of MFS Company's overall

scheme and, therefore, the contracts, by their terms, violate the federal securities laws.  ¶¶ 46-

113.  MFS Company's violations of §§ 206(1) and 206(2) in its performance of the advisory

contracts entitles Plaintiffs, on behalf of the MFS Funds, to assert a claim under § 215 for any

and all remedies that are "the customary legal incidents of voidness," including the equitable

remedy of restitution of consideration paid under the investment advisory contracts if they are

void under § 215.  TAMA, 444 U.S. at 19.

> **2.    Section 215 of the IAA Allows for Restitution and Rescission of the Advisory Contract**

While no private right of action exists under § 206, a party to an investment advisory

contract does possess the limited private right to have that contract voided under § 215 if the

formation or performance of the contract violates the IAA.  15 U.S.C. §§ 80b-15; TAMA, 444

U.S. at 24.  Plaintiffs agree with Defendants that there is no private right of action for damages

under the IAA.  However, the Supreme Court expressly permits private litigants to seek the

remedies of injunction, rescission, and restitution of any contract which violates the IAA through

its formation or performance.  TAMA, 444 U.S. at 19.  A plain reading of Count V of the

Complaint shows that the sole remedy sought by Plaintiffs, who bring this claim on behalf of the

MFS Funds, is "to rescind the Funds' investment advisory contracts with the Investment Adviser

Defendant and recover all fees paid in connection with such agreements."  ¶ 178.

## VII.   THE COMPLAINT ADEQUATELY PLEADS STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY AND UNJUST ENRICHMENT

### A.   Plaintiffs' State Law Claims Are Properly Brought as Direct Claims

Defendants do not contest that the fees and expenses charged to shareholders that were

used to finance the kickback scheme harmed investors.  Instead, Defendants claim that, under

Massachusetts law, Plaintiffs' state law claims are still, somehow, derivative in nature and,

therefore must be dismissed.  As demonstrated below, Defendants are wrong.[39]

---

[39] Notably, Defendants do not contest that Plaintiffs' §§ 34(b), 36(a), 36(b) or 48(a) claims are properly brought as direct, class claims.  Nor can they, as those claims are also direct in nature. This is because mutual fund companies such as the MFS Funds are very different from traditional corporations in that the fund "is a pool of assets, consisting primarily of portfolio securities, and belonging to the individual investors holding shares in the fund." *Burks*, 441 U.S. at 480, 99 S. Ct. at 1838 (citation omitted).  A mutual fund investment also differs from investing in a traditional corporation because:

> [a] mutual fund share represents a fractional ownership in a large investment account.  It is, in essence, a service contract between the investor and the investment company whereby the investor places his money in the hands of the investment company in expectation of realizing a financial gain.

Continued on next page

53

Under Massachusetts law, "[w]hat differentiates a direct from a derivative suit is … the source of the claim of right itself. . . . If the right flows from the breach of a duty owed directly to the plaintiff independent of the plaintiff's status as a shareholder, investor, or creditor of the corporation, the suit is direct." Blasberg v. Oxbow Power Corp., 934 F. Supp. 21, 26 (D. Mass. 1996).  Here, Defendants owe directly to the shareholders the fiduciary duty to disclose all material information regarding fund management and have a duty to protect the interests of shareholders.  See, e.g., SEC v. Steadman, 798 F. Supp. 733, 744 (D.D.C. 1991) (noting that there is a fiduciary duty owed the Funds' shareholders in protecting them from material misrepresentations and omissions in the Funds prospectuses); Gartenberg v. Merrill Lynch Asset Management, Inc., 528 F. Supp. 1038 (S.D.N.Y., 1981) (explaining that a duty of full disclosure is owed to the shareholders of the fund).  Plaintiffs were fraudulently induced through material omissions to hold their investments and pay excessive fees and expenses that financed the kickback scheme detailed in the Complaint.  Such a claim is direct under Massachusetts law. See Blasberg, 934 F. Supp. at 26 ("[I]f a plaintiff alleges that she, as an individual investor, was misled or defrauded in the purchase of her investment, this kind of claim is a 'direct' one.")  In addition, Plaintiffs allege they were personally and directly injured by the wrongful charges.

Here, there can be little doubt that Defendants' failure to disclose material information to the shareholders of the MFS Funds, while in a fiduciary relationship with them, is cognizable as a direct action, not a derivative one.  Indeed, the fiduciary duty of candor is well-recognized, and direct actions for breach of that duty are routinely brought (usually as putative class actions) by shareholders against corporate directors.[40]

---

Baum v. Investors Diversified Servs., Inc., 409 F.2d 872, 874 (7th Cir. 1969).

[40] See, e.g., Malone v. Brincat, 722 A.2d 5, 12 (Del. 1998).

In addition, the class members have sustained direct and distinct injury from Defendants' wrongful utilization of shareholder and Fund assets to effectuate their kickback scheme. The rates paid by the classes are different and, therefore, the individual stockholders falling within each class of fund shares are directly, rather than indirectly, impacted by such payments. For example, MFS's own Prospectuses and accompanying Statements of Additional Information confirm that Defendants' wrongful 12b-1 payments were not assessed uniformly against Fund shareholders. As stated in the MFS Investor Trust's Prospectus the "Total Annual Fund Operating Expenses" differ for class members stating that that the fees and expenses for each shareholder – the very fees and expenses challenged in the Complaint -are as follows: 0.92% (A shares), 1.57% (B shares), 1.57% (C shares); and 1.07% (R shares). Id.

Moreover, a direct action is necessary because a derivative action would not fully redress the harms Defendants caused. Although in certain instances the fees may have in some manner increased fund assets, at the same time they injured the individual shareholders, who bore the cost of the fees but received no benefit in return. For this reason, only a direct action will fully vindicate the shareholders' rights. See Strougo, 282 F.3d at 175. Furthermore, as the Class Period ended on March 31, 2004, numerous members of the proposed Class who paid the excessive fees and expenses no longer hold their shares of the Shelf Space Funds and would not be protected if the Court required this case to proceed as a derivative action.[41] Only a direct action would cover these Class members.

---

[41] Indeed, if as Defendants argue, these claims are properly derivative claims, then the recovery would go solely to the Funds, which would create a windfall for whomever happens to own fund shares at the time of recovery and would deprive those who were fund shareholders during the wrongdoing – i.e., those who were actually harmed – of any remedy for the harm they suffered. See, e.g., Tooley v. Donaldson, Lifkin & Jenrette, Inc., 845 A.2d at 1033 (Del. 2004) (stating that to decide whether action is properly direct or derivative, the court should consider who will

Continued on next page

**B.      Plaintiffs' State Law Claims Are Not Preempted by SLUSA**

Defendants argue that Plaintiffs' state law claims are preempted by the SLUSA.  Def.

Brf. at 31.  Defendants are wrong.  SLUSA is not applicable to Plaintiffs' state law claims, which

do not involve misrepresentations and are brought on behalf of a class of **holders** of MFS Funds.

SLUSA only preempts claims that would otherwise be brought under the Securities Exchange

Act of 1934 or the Securities Act of 1933.  Plaintiffs' claims are based solely on fees paid

because of their holder status—no purchases or sales are alleged.  The method in which Plaintiffs

acquired the Funds is irrelevant to their claims.

Notably, in a case against the Lord Abbett investment adviser for its involvement in a

similar mutual fund kickback scheme, the court rejected the arguments raised here, holding that

"Defendants have not identified (nor has the Court discovered any) authority to support

Defendants' assertion that Plaintiffs' state law claims are preempted by SLUSA."  See Reese

Decl. Ex. M (In re Lord Abbett Mutual Funds Fee Litigation, 04cv0559 (D.N.J. 2004).  As in

Lord Abbett, no grounds for SLUSA preemption exists here either. This is because SLUSA only

preempts claims involving the "purchase or sale" of a security and "SLUSA does not preempt

claims that ***do not allege purchases or sales made by the plaintiff or the alleged class***

***members.***"  Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 395 F.3d 25, 28 (2d Cir.

2005).[42]  Here, the Complaint pointedly and precisely limits the definition of the Class to: "all

––––––––––––––––––––––––

receive the benefit of remedy, the corporation or the individual stockholders).

[42] This only makes sense as claims made in connection with the holding of a security lack
standing under the federal securities laws.  See Blue Chip Stamps v. _____, 421 U.S.
at 748 (standing for §10(b) of the Exchange Act is limited to purchasers and not non-sellers or
holders); Dabit, 395 F.3d at 43 ("[W]e hold that in enacting SLUSA Congress sought only to

Continued on next page

persons or entities who held one or more shares of MFS mutual funds, set forth in Exhibit A [to

the Complaint], during the period March 24, 1999 to March 31, 2004." ¶ 2. Therefore,

Plaintiffs' claims are based on their <u>holder</u> status and SLUSA is inapplicable.

     Furthermore, the plain language of SLUSA makes it clear it was not intended to preempt

all claims in which a security was involved and subject them to the strictures of the PSLRA.

<u>See</u>, <u>e.g.</u>, <u>Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 332 F.3d 116, 124 (2d Cir.

2003) ("SLUSA does not, however, preclude all state enforcement or private causes of action in

securities fraud cases."); <u>Green v. Ameritrade, Inc.</u>, 279 F.3d 590, 598 (8th Cir. 2002)

("Ameritrade argues that we must interpret the 'in connection with' requirement flexibly, but we

cannot ignore the plain language of the statute and the cases applying that language, both in the

context of SLUSA and as interpreted in Rule 10b-5 and §10(b) cases."). Accordingly, courts

have held where, in cases such as the instant one, the plaintiff class framed its claims on behalf

of the holders of securities, SLUSA does not preempt Plaintiffs' claims. <u>See</u> <u>Feitelberg v. Credit</u>

<u>Suisse First Boston LLC</u>, 2003 U.S. Dist. LEXIS 19116, at *15-16 (N.D. Cal. Oct. 21, 2003)

("Plaintiff expressly limits the class to individuals who held shares during the class period, and

therefore we cannot find that this claim arises 'in connection with' the purchase or sale of a

covered security.").

     Running counter to the weight of these authorities, Defendants now seek to expand the

explicit reach of SLUSA to include not only purchases or sales of a covered security (which

implicate the federal securities laws), but also claims involving only holding securities (which do

not implicate the federal securities laws). Such an expansion is unwarranted and unsupportable,

---

ensure that class actions brought by plaintiffs who satisfy the Blue Chip Stamps v. Manor Drug
Stores, 421 U.S. 723 (1975) purchaser-seller rule are subject to the federal securities laws").

as the claims here on behalf of holders of securities could not have been brought under §10(b) of the Exchange Act and do not invoke the policy concerns which prompted the passage of SLUSA. This is consistent with the rationale of <u>Blue Chip Stamps</u>, in which the Supreme Court held that limiting §10(b) claims to purchasers and sellers would be mitigated "to the extent that remedies are available to non-purchasers and non-sellers under state law." <u>Blue Chip Stamps</u>, 421 U.S. at 739; <u>see also</u> <u>Roskind v. Morgan Stanley Dean Witter & Co.</u>, 80 Cal. App. 4th 345, 352 (1st Dist. 2000) ("The Securities Exchange Act of 1934 … makes it clear that, except to the extent it has been subsequently modified by [SLUSA], federal law in this [securities trading] arena supplements, but does not displace state regulation and remedies.").

Simply put, SLUSA only preempts claims of fraud in connection with the purchase or sale of a covered security. Since Plaintiffs have not raised claims "in connection with the purchase or sale" of a covered security, their claims are not susceptible to SLUSA preemption.

### C. Plaintiffs Have Properly Pled A Breach Of Fiduciary Duty

Defendants' argue that Plaintiffs fail to state a claim because they do not show that there was any relationship between the Plaintiffs and the Investment Adviser or Trustee Defendants. Def. Brf. at 32. Defendants' argument is baseless. The Complaint makes clear that the Investment Adviser and Trustee Defendants had a fiduciary duty to the Plaintiffs and other members of the Class to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor. ¶ 181. Furthermore, the Complaint clearly alleges that the Investment Adviser and Trustee Defendants breached their fiduciary duty by, <u>inter alia</u>, directing shareholders' assets to particular brokers for trading regardless of cost, and failing to disclose that it was paying brokers excessive fees to generate sales of MFS Funds under the guise of investment adviser fees, 12b-1 fees, and Soft Dollars. ¶¶ 48, 97-113.

Defendants mistakenly argue, without support, that the Investment Adviser Defendant owed no fiduciary duties to the shareholders. Def. Brf. at 32-33. Indeed, Congress codified such a fiduciary duty in § 36(b) of the ICA. See Gartenberg, 528 F. Supp. at 1047 ("The conduct of the investment adviser must be governed by the 'duty of uncompromising fidelity' and 'undivided loyalty' to the Fund's shareholders that is imposed by Section 36(b)"). Furthermore, in the mutual fund context, the law holds, stating with no uncertainty that "[t]he vulnerability of mutual fund shareholders to unscrupulous advisers prompted Congress to enact Section 20 of the Investment Company Act of 1970 *imposing a fiduciary duty* on the investment adviser with respect to its receipt of compensation for services rendered." Galfand v. Chestnutt Corp., 545 F.2d 807, 809 (2d Cir. 1976) (upholding trial court's judgment that investment adviser had breached its fiduciary duty to investors and had made material misstatements and omissions").

With respect to a breach of fiduciary duty by the Trustee Defendants, the SEC has made clear that:

> The board of directors of a mutual fund has significant responsibility to protect investors. By law, directors generally are responsible for the oversight of all of the operations of a mutual fund. In addition, under the Investment Company Act, directors are assigned key responsibilities, such as negotiating and evaluating the reasonableness of advisory and other fees, selecting the fund's independent accountants, valuing certain securities held by the fund, and managing certain operational conflicts.

> The role of fund directors is particularly critical in the mutual fund context because almost all funds are organized and operated by external money-management firms, thereby creating inherent conflicts of interest and potential for abuse. Money-management firms operating mutual funds want to maximize their profits through fees provided by the funds, but the fees, of course, paid to these firms, reduce the returns to fund investors.

> Independent directors, in particular, should serve as "independent watchdogs" guarding investors' interests — and helping to protect fund assets from uses that will be of primary benefit to management companies. These interests must be paramount, for it is the investors who own the funds and for whose sole benefit

59

they must be operated.

¶ 86. [43]  Consequently, the Trustee Defendants also had a duty to shareholders, which, as stated

in the Complaint, they violated.  ¶¶ 86-96; 185-189.

### D.       Plaintiffs Have Stated a Claim for Aiding and Abetting Breach of  Fiduciary Duty

Under Massachusetts law, " [t]he tort of aiding-abetting requires an underlying tort,

defendant's awareness of the illegal act, and substantial assistance in committing the illegal act."

Def. Brf. at 34 citing  Demoulas v. Demoulas Super Mkts,, Inc., 1993 WL 818944,  (Mass.

Super. Ct. Nov. 29, 1993).  Plaintiffs have adequately pleaded these elements here.

The Complaint alleges that Defendants aided and abetted the brokers to breach their

duties by paying them kickbacks.  Specifically, according to the Complaint, the brokers breached

their fiduciary duty through the improper use of excessive fees and directed brokerage which

"created an undisclosed conflict of interest and caused brokers to steer clients to MFS Funds

regardless of the funds' investment quality relative to other investment alternatives and to

---

[43] Defendants' cases are inapposite to the facts presented in the Complaint. Def. Brf. at 32-33.
Defendants misinterpret Jernberg v. Mann, 358 F.3d 131, 135 (1st Cir. 2004) to argue that
Trustees only owe a fiduciary duty to the Funds.  Def. Brf. at 33.  However, the Jernberg court
explains that "[w]hile it is sometimes said that directors and officers owe a fiduciary duty to the
corporation and its shareholders, any responsibility to the latter is anchored in the duty to the
former…their fiduciary obligations arise from and are bounded by the corporate relationship."
Id.  Likewise, in Industrial General Corp. v. Sequoia Pacific Systens Corp., 44 F.3d 40, 44 (1st
Cir. 1995), the court found that there was not a sufficient managerial role between the parties to
create a fiduciary relationship.  Here, the Investment Adviser and Trustee Defendants had
significant management control over Plaintiffs' assets.  In Zurich Capital Markets, Inc. v.
Coglianese, 332 F. Supp. 2d 1087, 1121 (N.D. Ill. 2004), the court found that plaintiffs did not
plead that they were third party beneficiaries or could bring a derivative claim under the IAA.
Here, Plaintiffs have adequately plead a viable derivative claim under the IAA.  In McLachlan v.
Simon, 31 F. Supp. 2d 731, 740-41 (N.D. Cal. 1998), the court concluded that an adviser would
have a fiduciary duty to shareholders, but the plaintiffs had not proven that the defendant was an
adviser.  Id. at 738-40.  Finally, in Stuchen v. Duty Free Int'l, Inc., 1996 WL 33167249, is not
applicable because it is applying Delaware law to state claims.

thereby breach their duties of loyalty" to the their clients.  ¶ 106.  Plaintiffs have adequately alleged that the brokers owed their clients fiduciary duties, and the Complaint thoroughly makes clear that Defendants' conduct not only aided and abetted the brokers' breach of fiduciary duty, but was absolutely necessary for the brokers' breach.  See e.g United States v. Szur, 289 F.3d 200, 211 (2d Cir. 2002) (Even where a broker lacks discretionary investment authority, "a relationship of trust and confidence [exists] between a broker and a customer with respect to those matters that have been entrusted to the broker.").

Finally, Defendants' argument that Plaintiffs have failed to allege that Defendant knew of the kickback scheme.  This argument  is belied by both the Complaint and the findings by the SEC that Defendants had knowledge of such kickback scheme.  ¶¶ 2-13; 46-77; Reese Decl. Ex. A.

**E.    Plaintiffs' Have Stated a Claim for Unjust Enrichment**

Plaintiffs have satisfied the pleading requirement of unjust enrichment under Massachusetts law.  In analyzing claims of unjust enrichment, Massachusetts courts look to see if there was: "1)  A benefit conferred upon the defendant by the plaintiff, 2) an appreciation or knowledge by the defendant of the benefit; and 3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable . . . for the defendant to retain the benefit without the payment of its value."  Hessleton v. Banknorth, N.A., 18 Mass. L. Rep. 7, 8 (May 11, 2004).

Plaintiffs allege that they suffered injury due to the fraudulent and excessive fees imposed on them by Defendants.  ¶¶ 76-81.  Defendants used these fees to receive a benefit of increased fees for themselves as a result of the larger funds.  ¶ 4.  It would be inequitable for Defendants to retain this benefit.  Defendants' argument that an equitable remedy is unavailable here is wrong.  Defendants mischaracterize the claim as being contract based, but the claim is

61

based on unjust enrichment that arose from Defendants' tortious breach of fiduciary duty.

However, even if this claim was based on a breach of contract that caused unjust enrichment, a

claim can be brought for both.  Lopes v. Commonwealth, 442 Mass. 170, 179 (July 9, 2004).

Therefore, Defendants' motion to dismiss Plaintiffs' claim for unjust enrichment should be

denied.

**CONCLUSION**

For the foregoing reasons, the Complaint should be sustained in its entirety.[44]

Dated:   May 25, 2005                         Respectfully submitted,

**MOULTON & GANS, P.C.**

By:   /s/ Nancy Freeman Gans
        Nancy Freeman Gans (BBO #184540)
33 Broad Street, Suite 1100
Boston, Massachusetts  02109-4216
(617) 369-7979

**Counsel for Plaintiffs and Proposed Liaison
Counsel**

**MILBERG WEISS BERSHAD
  & SCHULMAN LLP**
Jerome M. Congress
Janine L. Pollack
Michael R. Reese
One Pennsylvania Plaza
New York, New York  10119-0165
(212) 594-5300

**Counsel for Plaintiffs and Proposed Co-Lead
Counsel**

---

[44] In the event that all or any portion of Plaintiffs' Complaint is dismissed, Plaintiffs respectfully request leave to replead pursuant to Fed. R. Civ. P. 15(a).

62

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
Alan Schulman
Robert S. Gans
 Jerald D. Bien-Willner
12544 High Bluff Drive, Suite 150
San Diego, California 92130
(858) 793-0070

**Counsel for Plaintiffs and Proposed Co-Lead
Counsel**

**WEISS & LURIE**
Joseph H. Weiss
Richard Acocelli
551 Fifth Avenue, Suite 1600
New York, New York  10176
(212) 682-3025

**Counsel for Plaintiffs and Proposed Co-Lead
Counsel**

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
Marshall N. Perkins
The World Trade Center – Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland  21202
(410) 332-0030

**STULL, STULL & BRODY**
Jules Brody
Aaron Brody
6 East 45th Street
New York, New York  10017
(212) 687-7230

**GILMAN AND PASTOR LLP**
David Pastor (BBO #391000)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, Massachusetts  01906
(781) 231-7850

**Additional Plaintiffs' Counsel**

63

**CERTIFICATE OF SERVICE**

I, Michael R. Reese, hereby certify that I served a copy of the foregoing document upon counsel for all parties by mailing a copy of the same, postage prepaid, to each attorney of record, this 25th day of May, 2005.

    /s/ Michael R. Reese
    Michael R. Reese