the Funds' shares. ¶ 109-13.  In addition, by failing to reduce their management fees to reflect the benefit they were obtaining from the kickbacks, Defendants were improperly inflating their management fees, thus economically harming the funds and the Class members. ¶ 102-103.

### B.    Defendants' Conduct Has Been Universally Condemned by the SEC and other Regulators

Since 1981, the SEC has prohibited mutual funds from paying more than "best execution" commission amounts to brokers in return for the brokers' giving preferential marketing to that funds' shares – the very wrongdoing alleged in the Complaint.  As stated by the SEC in October 2004 when it promulgated its final rule prohibiting the use of <u>any</u> brokerage commissions to finance distribution:

> In 1981, shortly after we adopted rule 12b-1 and in light of its adoption, we concluded that "it is not inappropriate for investment companies to seek to promote the sale of their shares through the placement of brokerage <u>without the incurring of any additional expense.</u>
>
> After reviewing the current directed brokerage practices described above, in February 2004, we proposed to amend rule 12b-1 to prohibit the use of fund brokerage to compensate broker-dealers for selling fund shares.  Our proposal was intended to end practices that we concluded were inconsistent with the rationale of our 1981 decision and involved unmanageable conflicts of interest.

Prohibition on the Use of Brokerage Commissions to Finance Distribution, SEC Release No. IC-26591, 69 Fed. Reg. 54728, 54728-29 (effective Oct. 14, 2004) (emphasis in original Internet version, available at http://www.sec.gov/rules/final/ic-26591.htm).  As alleged in the Complaint and stated above, Plaintiffs have specifically alleged that, in contravention of the SEC's long-standing rules, MFS was paying extra for brokerage services to compensate brokers for pushing their shares. ¶¶44-46.

Additionally, when proposing amendments to the ICA that prohibit all payments for the distribution of fund shares with brokerage commissions, the SEC made clear that the type of

kickback scheme engaged in by MFS creates conflicts of interest that harm investors:

> Broker-dealers may not . . . condition their promotion or sale of
> fund shares on the receipt of brokerage commissions from the fund
> . . .
>
> We believe that the way brokerage has been used to pay for
> distribution involves unmanageable conflicts of interest that may
> harm funds and fund shareholders . . . We are also concerned
> about the effect of this practice on the relationship between broker-
> dealers and their customers.  Receipt of brokerage commissions by
> a broker-dealer in exchange for shelf space creates an incentive for
> the broker to recommend funds that best compensate the broker
> rather than ones that meet the customer's investment needs.

Prohibition on the Use of Brokerage Commissions to Finance Distribution, SEC Release No. IC-26356, 69 Fed. Reg. 9726, 9728-29.  Thus, the governmental agency having paramount expertise and authority with respect to mutual funds has specifically found that shelf-space arrangements create unmanageable conflicts of interest and violate the federal securities laws.

Furthermore, Defendants do not contest that they failed to properly reveal the kickback schemes in their Prospectuses or any other public disclosures.  Nor can Defendants make such an argument in face of the SEC's specific finding that Defendants failed to adequately disclose any of this information as required by the ICA and the federal securities laws.  Reese Decl. Exs. A, G-H.  This failure to disclose underscores the harm to Plaintiffs that is recoverable under § 36(b), as well as allowing distinct causes of action under §§ 34(b) and 36(a) of the ICA.  To wit, the Complaint cites the May 1, 2003 Prospectus and SAI for the MFS Growth Opportunities Fund as an example of one of the misleading disclosures issued by Defendants during the Class Period. ¶¶ 117-27.  The Complaint alleges in detail that the MFS Prospectuses were false and misleading in that they failed to adequately disclose the kickback scheme at issue.  Id.  Specifically, the MFS SAI stated that:

> The Distribution Plan provides that the Fund may pay MFD a
> distribution fee in addition to the service fee described above based

on the average daily net assets attributable to the Designated Class as partial consideration for distribution services performed and expenses incurred in the performance of MFD's obligations under its distribution agreement with the Fund. <u>MFD pays commissions to dealers as well as expenses of printing prospectuses and reports used for sales purposes, expenses with respect to the preparation and printing of sales literature and other distribution related expenses, including, without limitation, the cost necessary to provide distribution-related services, or personnel, travel, office expense and equipment.</u> The amount of the distribution fee paid by the Fund with respect to each class differs under the Distribution Plan, as does the use by MFD of such distribution fees.

<u>Id</u>.

Such statements are inadequate because they omitted material information regarding the MFS Funds' kickback arrangements with Morgan Stanley and other brokerages. [14]

### C.    Plaintiffs' § 36(b) Claims Are Properly Brought Against the Trustee Defendants

Defendants argue that the Trustees were not recipients of the allegedly excessive fees and therefore are not proper defendants. Def. Brf. at 16. In making such an argument, the Defendants are seeking to convert their motion to dismiss into a summary judgment motion, asking the court to rule as matter of law that the payments to the Trustees could not have been compensated in connection with breaching their fiduciary duties. Moreover, Defendants' legal position is wrong. Courts repeatedly have broadly interpreted § 36(b) to apply whenever anyone receives a benefit from a breach of fiduciary duty. In <u>Halligan v. Standard & Poor's/Intercapital, Inc.</u>, 434 F. Supp. 1082, 1084 (E.D.N.Y. 1977), the court upheld plaintiff's §36(b) claim against

---

[14] <u>See</u> <u>Press v. Quick & Reilly, Inc.</u>, 218 F.3d 121, 128-29 (2d Cir. 2000) (holding that when the SEC makes a determination as to whether a broker or mutual fund's disclosure concerning remuneration complies with the requirements of SEC Rule 10b-10, the courts should respect that determination). Following the logic of <u>Press</u>, this Court should defer to the expert determination of the SEC. The SEC's conclusion that the kickback schemes involving directed brokerage that MFS engaged in with brokerages, such as Morgan Stanley, violated the SEC rules carries great weight as to the interpretation of those rules.

Continued on next page

trustee defendants where plaintiff alleged "defendants have directly or indirectly received from [the Corporation] compensation or payments of a material nature." The Halligan court further stated that the allegation was "sufficient to bring plaintiff's claim within the requirement of §36(b)(3) that the action be against 'the recipient of ... compensation or payments [for investment advisory services].'" Id.

### III.    PLAINTIFFS HAVE STANDING TO ASSERT DIRECT CLAIMS ON BEHALF OF SHAREHOLDERS OF ALL THE MFS FUNDS

Plaintiffs have standing to assert claims with respect to shareholders of all of the MFS Funds, including all classes of such Funds, despite the fact that they did not hold shares in all of the MFS Funds. Defendants do not deny that Plaintiffs have standing to assert their individual claims in connection with losses sustained by them on their own MFS Fund holdings. Def. Brf. at 5, 7. Therefore, Plaintiffs' ability to assert claims as class representatives on behalf of shareholders in all of the MFS Funds is not an issue of standing, but rather an issue for class certification pursuant to Fed. R. Civ. P. 23 and therefore premature to address prior to full briefing on that motion.[15] Nevertheless, as discussed below, considerable authority supports Plaintiffs' ability to assert class claims on behalf of shareholders in the other MFS Funds.

#### A.    Plaintiffs Have Standing To Assert Claims On Behalf Of All MFS Funds Shareholders

Standing is a prerequisite in any action, including a class action, and a potential class representative must possess standing to assert an individual claim. See Gratz v. Bollinger, 539

---

[15] For example, in Goldberger v. Bear Stearns & Co., 2000 U.S. Dist. LEXIS 18714, at *4 n.1 (S.D.N.Y. Dec. 28, 2000), the Court recognized that the question of whether a purchaser of a certain security may represent purchasers of other securities regarding the same course of conduct is a question for the class certification stage of the case, stating that this "question is not presently before the Court because Plaintiffs have not moved for class certification."

U.S. 244, 285 (2003). Once the plaintiff's standing to assert his or her individual claim has been

established, then the plaintiff's ability to represent the class depends solely on whether the

requirements of Rule 23 are met. As stated by the Supreme Court in Sosna v. Iowa:

> A named plaintiff in a class action must show that the threat of
> injury in a case such as this is "real and immediate," not
> "conjectural" or "hypothetical." . . . This conclusion does not
> automatically establish that appellant is entitled to litigate the
> interests of the class she seeks to represent, but it does shift the
> focus of examination from the elements of justiciability to the
> ability of the named representative to "fairly and adequately
> protect the interests of the class."

419 U.S. 393, 402-03 (1975) (emphasis added); see also Goodman v. Lukens Steel Co., 777 F.2d

113, 122 (3d Cir. 1985) ("[C]ontrary to the defendants' contentions, the issue here is one of

compliance with the provisions of Rule 23, not one of Article III standing. Each of the named

plaintiffs has presented claims of injury to himself and has alleged facts which present a case or

controversy under the Constitution"), aff'd on other grounds, 482 U.S. 656 (1987); accord Hicks

v. Morgan Stanley & Co., 2003 U.S. Dist. LEXIS 11972, at *19-20 (S.D.N.Y. July 16, 2003).[16]

In a decision that is directly on point, In re Dreyfus Aggressive Growth Mut. Fund

Litigation, 2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 19, 2000), the court certified plaintiffs

who invested in one mutual fund to represent purchasers in another fund:

> Courts have repeatedly held that on allegations such as these, class
> representatives need not have invested in each security so long as
> the plaintiffs have alleged a single course of wrongful conduct with
> regard to each security. Courts have not addressed this concern vis
> a vis the doctrine of standing, but rather have examined such
> concerns pursuant to Rule 23(a)(3)'s typicality requirement.

---

[16] Even where courts have addressed this issue in terms of standing, the outcome has been the
same, permitting a plaintiff to represent other securities, ERISA plans and mutual funds in
addition to his or her own. Sutton v. Med. Serv. Ass'n, 1993 U.S. Dist. LEXIS 9763, at *13
(E.D. Pa. July 20, 1993).

Id. at *8.  In Dreyfus, certification was supported by the same factors that exist in this case:

> Here, the claims of the named plaintiffs and prospective class
> members derive from the same course of events.  The plaintiffs
> have alleged that both Funds made similar misrepresentations and
> omissions in the Registration Statements, Prospectuses, Statements
> of Additional Information and annual and semi-annual reports used
> to sell the Funds. . . . And indeed the claims of the named plaintiffs
> and prospective class members are based on the same legal
> theories.

Id. at *14.

Similarly, in In re ML-Lee Acquisition Fund II L.P., 848 F. Supp. 527 (D. Del. 1994),

defendants argued that the proposed class representatives could not represent investors in a

mutual fund that they did not own.  The court rejected this contention due to the similarity of the

related mutual funds and of the wrongdoing that impacted both funds at issue.  Id. at 561 (finding

such representation appropriate because the fund securities were "substantially identical" and

were "marketed pursuant to the same Prospectus which [was] the subject of many of Plaintiffs'

allegations of wrongdoing").

In addition to the above-referenced case law in the mutual fund context, other relevant

decisions support the view that Plaintiffs may represent purchasers of other Funds, in light of the

similarity of the claims of all class members against all Defendants and the close

interrelationship between the Defendants.  See, e.g., In re Prudential Sec. Inc. Ltd. P'ship Litig.,

163 F.R.D. 200, 208 (S.D.N.Y. 1995) (finding that "plaintiffs [were] in the same position as

absent Class Members, regardless of the specific [limited] partnership in which they invested,

because of the uniform course of improper conduct and standardized sales approach applied by

defendants"); Maywalt v. Parker & Parsley Petroleum Co., 147 F.R.D. 51, 56-57 (S.D.N.Y.

1993) (plaintiffs who invested in three limited partnerships could represent persons who had

invested in two other limited partnerships, where, as here, the complaint alleged that investors in all five limited partnerships were victims of a single pattern of fraud by defendants).[17]

The decision in Fallick v. Nationwide Mutual Insurance Co., 162 F.3d 410 (6th Cir. 1998), is instructive. There the plaintiff alleged that Nationwide breached its fiduciary duties with respect to the ERISA plan of which he was a member and other ERISA plans of which he was not a member. The district court dismissed the claims as to all ERISA plans other than the plaintiff's plan on standing grounds. Id. at 411-12. The Sixth Circuit reversed, holding that the district court's reasoning was "fundamentally flawed" because it confused the issue of a plaintiffs' Article III standing with the Rule 23 issues relevant to his ability to sue on behalf of a class. Id. at 422. The court concluded that "once a potential ERISA class representative establishes his individual standing to sue his own ERISA-governed plan, there is no additional constitutional standing requirement related to his suitability to represent the putative class of members of other plans to which he does not belong." Id. at 424. The Fallick court also cited with approval authority holding that when a single defendant offers a range of ERISA plans, an individual in one plan can represent a class of plaintiffs – including some belonging to other plans – as long as "the gravamen of the plaintiff's challenge is to the general practices [of the defendant] which affect all of the plans." Id. at 422.

Similarly, many courts have held that a plaintiff who purchased one type of a corporation's securities may represent persons who purchased other types of the corporation's

---

[17] See also Tedesco v. Mishkin, 689 F. Supp. 1327, 1335-36 (S.D.N.Y. 1988) (investors in various companies and partnerships controlled by defendants could represent a class including investors in other companies and partnerships); Kitchens v. U.S. Shelter Corp., 1983 U.S. Dist. LEXIS 12812 (D.S.C. Oct. 13, 1983) (permitting named plaintiffs to represent purchasers of interests in 12 separate limited partnerships, even though representatives held interests in only three of the partnerships).

securities, when purchasers of both types of securities were subjected to a common course of

wrongful conduct. See e.g., In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig., 794 F.

Supp. 1424, 1461 (D. Ariz. 1992) (explaining how "plaintiffs need not name a representative of

the class for each subgroup of securities, where common issues predominate as to all

securities"); In re MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 911 n.7 (D.N.J. 1998) (stock

purchasers could represent note purchasers).

**B.    Alternatively, Plaintiffs Have Standing to Pursue Their Claims On Behalf of Shareholders in All of the MFS Funds Pursuant to the Juridical Link Doctrine**

Defendants and all the MFS Funds are juridically linked with each other, making

collective prosecution of this action the most efficient means for resolution of the dispute. As

explained in Luyando v. Bowen, 124 F.R.D. 52 (S.D.N.Y. 1989), the "juridical link" doctrine

allows a plaintiff to bring a class claim against a defendant as to which he or she lacks standing if

there exists a "legal relationship which relates all defendants in a way such that single resolution

of the dispute is preferred to a multiplicity of similar actions." Id. at 58; Heffler v. U.S. Fidelity

& Guar. Ins. Co., 1992 U.S. Dist. LEXIS 3090, at *11 (E.D. Pa. Mar. 10, 1992) (noting that a

"juridical link," or legal relationship, would make single resolution of the dispute preferable over

multiple actions).[18]

---

[18] The case relied upon by Defendants do not conduct the proper analysis to determine if there
are "juridical links" as required by the First Circuit. In re Eaton Vance Corp. Sec. Litig. , 220
F.R.D. 162, 164 (D. Mass. 2004) (stating First Circuit remanded case for discussion of Ortiz and
the juridical link doctrine). Specifically, in Nenni v. Dean Witter Reynolds, Inc., 1999 U.S. Dist.
LEXIS 23351, at *5 (D. Mass. 1999) (cited at Def. Brf. at 6), the court improperly viewed the
issue of whether the plaintiff could bring an action on behalf of other funds as a standing issue,
rather than one of typicality, and did not address the applicability of the juridical link doctrine to
the facts of that case. Likewise, in Vervaecke v. Chiles, Heider & Co., 578 F.2d 713 (8th Cir.
1978) (Def. Brf. at 6), unlike in this cases, none of the named plaintiffs had standing to bring any
cause of action against defendants in their own right, and were therefore found not to have
standing to bring claims on behalf of others. Id. Moreover, the court in Veryaecke failed to
Continued on next page

The juridical link doctrine is properly applied where efficiency and expediency allow plaintiffs to join together to address common wrongs by a group of defendants. "The doctrine is a powerful tool that can allow a plaintiff's lawyer to force many defendants (and what might otherwise be numerous class actions) into a single lawsuit at a substantially reduced cost." Newby v. Enron Corp., 2004 U.S. Dist. LEXIS 8158, at *108 (S.D. Tex. Feb. 24, 2004); see also Payton v. County of Kane, 308 F.3d 673, 678-79 (7th Cir. 2002) ("if the plaintiffs as a group - named and unnamed - have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or otherwise 'juridically related in a manner that suggests a single resolution of the dispute would be expeditious,' the claim could go forward") (quoting La Mar v. H&B Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973)).[19]

Defendants citation to In re Eaton Vance Corp. Sec. Litig., 219 F.R.D. 38 (D. Mass. 2003) is misplaced. First, the court in Eaton Vance dealt with a class certification motion - not a motion to dismiss. Id. This fact underscores that it is premature for this Court to rule on the issue now at the motion to dismiss stage, as Defendants insist. Second, the district court in Eaton Vance held that plaintiffs could not represent all four funds because they "failed to demonstrate that their claims are typical of that class." In re Eaton Vance Corp. Secs. Litig., 220 F.R.D. at 169. Plaintiffs here do not have that same problem because Plaintiffs have more than adequately

---

conduct the proper juridical link analysis as required by the First Circuit.

[19] In Alves v. Harvard Pilgrim Health Care, Inc., 204 F. Supp. 2d 198 (D. Mass. 2002) aff'd, 316 F.3d 290 (1st Cir. Mass. 2003), two class representatives brought an ERISA class action against five defendants. Even though neither plaintiff was ever a member of an ERISA plan that the defendants sponsored, the District of Massachusetts concluded that "plaintiffs' claims against [defendants] should not be dismissed for lack of standing. Because these defendants [were] wholly[-]owned affiliates of [the corporate defendant], in which plaintiffs were participants, and the copayment plan provisions [were] substantially the same, a single resolution of the dispute would be expeditious." Id. at 205.

shown how their claims are typical of the claims of all shareholders in all the Funds.[20]

Specifically, the court in Eaton Vance recognized that the juridical link doctrine does apply in certain situations. Id. at 171. In Eaton Vance though, the court explained that the funds that plaintiffs had purchased were "not sufficiently juridically linked to the other mutual funds" because the plaintiffs had not alleged that the other funds at issue had identical false and misleading statements in the prospectus and registration statements. Id. at 171. Here, by contrast, the facts are very different than those in Eaton Vance. First, Plaintiffs here have clearly alleged in the Complaint that "each of the MFS prospectuses and SAIs issued during the Class Period contained substantially the same materially false and misleading statements, in that they omitted key information regarding the Funds' strategy for growth of assets, revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars" ¶ 116. Moreover, the economics of all the MFS Funds are intertwined as the Defendants pool together the fees and expenses collected from the MFS Fund shareholders (the same fees and expenses that are challenged as improper in the Complaint), such that the MFS Funds share expenses with one another. ¶ 45. Moreover, the Funds are essentially pools of investor assets that are managed and administered by a common body of officers and employees of MFS Company who administer the MFS Funds generally. ¶ 44. All MFS Funds share MFS Company as their investment adviser and share MFS Distributors as their principal underwriter and distributor. Id. Hence, the MFS Funds have no independent will and are totally dominated by MFS Company and the common body of Trustees established by MFS Company. Id. In other words, the MFS Funds function as components of one unitary organization. Id. Accordingly, Eaton Vance is easily distinguishable, and Plaintiffs

---

[20] See also Adair v. Sorenson, 134 F.R.D. 13, 16 (D. Mass. 1991) (decided on class certification by the same judge who decided Eaton Vance). Def. Brf. at 6.

in the instant action have demonstrated sufficient juridical links even under the <u>Eaton Vance</u> standard.

Indeed, the wrongdoing alleged was only possible because the activities and resources of all the Funds were linked together. The Investment Adviser and Distributor Defendants' access to and use of the entire fund complex's assets were what made their kickback programs possible and significant in their impact.[21]   Notably, on March 23, 2005, the SEC fined and censured Citigroup for kickbacks its subsidiary Smith Barney had received from MFS and other mutual fund companies. In its Cease-and-Desist Order regarding the kickbacks to Smith Barney, the SEC specifically noted that the prospectuses "did not specifically disclose the <u>magnitude of the revenue sharing payments that CGMI received from fund complexes</u> or that certain <u>fund complexes</u> had greater access to, or increased visibility in, CGMI's retail network." <u>See</u> Reese Decl. I at ¶ 13 (emphasis added) (March 23, 2005 SEC Order Instituting Administrative and Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions in <u>In the Matter of Citigroup Global Markets, Inc.</u>). Because of these inadequate disclosures, the customers "<u>were not provided with sufficient information to appreciate the dimension of the conflict of interest</u> the revenue sharing program created." <u>Id</u>. (emphasis added). This language illustrates that the conflict of interest not only arises from the inappropriate relationship between advisers and brokers, but also from the amounts that were involved. This undisclosed magnitude

---

[21]   Further emphasizing the juridical links present here is that: "[t]he amount of commissions that a broker-dealer earns through portfolio brokerage arrangements often is based on its total sales of all funds issued by that mutual fund complex" Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds, 69 Fed. Reg. 6438.

was only possible due to the Investment Adviser and Distributor Defendants access to the entire

Fund complex, and as result impacted the entire complex.

Under the juridical link doctrine, the issues involving the MFS Funds would be assured

of efficient and consistent treatment. See Moore v. Comfed Sav. Bank, 908 F.2d 834, 838 (11th

Cir. 1990) (While "[o]ther named plaintiffs could be supplied to match with each named

defendant . . . it would be unwieldy to do so . . . . The case is simpler and more economical with

the class of plaintiffs and the named defendants").[22]  Moreover, the legislative history of § 36(b)

of the ICA demonstrates why prosecution of this action regarding all of the MFS Funds is

appropriate pursuant to the juridical links doctrine.  The legislative history confirms that where

funds pool and share expenses imposed on them by their advisers (as the MFS Funds do), § 36(b)

requires the courts to evaluate the impact of defendants' wrongful conduct on the entire complex

of funds:

> In the event that court action is brought to enforce this fiduciary
> duty of the investment adviser as to compensation or payments
> received by him, it is intended that the court look at all the facts in
> connection with the determination and receipt of such
> compensation, including all services rendered to the fund or its
> shareholders and all compensation and payments received, in order
> to reach a decision as to whether the adviser has properly acted as
> a fiduciary in relation to such compensation.  In the case of fund
> complexes, this could, under certain circumstances, include
> consideration of services rendered by such investment advisers to
> other funds in such complex and compensation or payments made

---

[22]  An investor holding a single fund within a family has a tangible interest in ensuring that the
funds in the entire complex are handled consistently with applicable law, as the investor
bargained for.  One of the identified benefits of having holdings in a fund family is the ability,
without additional sales charges, to switch between funds within a family.  See Reese Decl. Ex. J
(May 1, 2003 Registration Statement for the Massachusetts Investors Trust).  Therefore, a typical
customer in a fund has an inherent interest in the concept that all Funds available to the investor
not charge excessive fees or pay excessive commissions, because part of the benefit of the
bargain in holding a Fund within a particular fund family is the ability to change Funds without
incurring additional sales charges.

by such other funds for such services.

Investment Company Amendments Act of 1969, S. Rep. No. 91-184, at 15 (May 21, 1969) (emphasis added).  Congress thus recognized that the interrelatedness of mutual fund complexes requires courts to examine an adviser's activity vis-à-vis the entire complex in order to determine whether the adviser was obtaining excessive compensation for itself or its affiliates in breach of its fiduciary duties under § 36(b).[23]

### C.    Plaintiffs Have Standing Due to Their Ongoing Financial Interest in the Outcome of the Litigation Regarding All Funds

The United States Supreme Court has stated that standing consists of the following three elements:

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" . . . Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." . . . Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Moreover, under Gollust v.

---

[23]  Additionally, the ICA defines the term "security" broadly and does not limit such definition to a specific class of securities.  Under § 36(b), a plaintiff may bring a claim with respect to a registered investment company by virtue of his being a "security holder of such registered investment company."  15 U.S.C. § 80a-35(b) (emphasis added).  The statute does not require a plaintiff to be a holder of an individual portfolio of the investment company, or a specific share class of such portfolio.  Here, Plaintiffs need only have invested in a "security" from a registered investment company in order to bring a claim regarding all fees paid by such company or its shareholders.  Section 34(b) of the ICA likewise does not limit its remedy to untrue statements in documents pertaining only to certain classes or portfolios of a registered investment company.  Section 36(a) of the ICA similarly authorizes actions to remedy breaches of fiduciary duty "in respect of any registered investment company," without limiting the remedy to specific portfolios or classes of such investment company.  15 U.S.C. § 80a-35(a) (emphasis added).

Mendell, 501 U.S. 115, 126 (1991), standing is grounded in a plaintiff's "distinct and palpable injury to himself," and his or her ability to "maintain a 'personal stake' in the outcome of the litigation...." Id. As pointed out by at least one court in the mutual funds context, Gollust contradicts Defendants' argument that a mutual fund shareholder may not assert claims regarding funds in which he did not hold (Def. Brf. at. 5) as long as the shareholder has some financial interest in the claims involving the other funds. See Batra v. Investors Research Corp., 1991 U.S. Dist. LEXIS 14773, at *10 (W.D. Mo. Oct. 4, 1991).

In Batra, Twentieth Century Investors ("TCI") was the registrant of 12 different funds or "series." Id. at *1. The Court held that by holding shares in one fund, the plaintiff had standing to sue on behalf of other funds because, as a shareholder in the fund, plaintiff benefited from any recovery of excessive fees from the other mutual funds. The Court thus stated the following:

> [T]he Gollust holding nullifies the defendants' contention that the plaintiff cannot maintain an action on behalf of other funds where he held solely Cash Reserve securities. Gollust provides that where a plaintiff satisfies the statutory requirements, he need not continue to hold shares so long as he holds some financial interest in the outcome of the litigation … As a shareholder in [series he owned or in] any other series, he benefits from any recovery of excessive fees by TCI.

Id. at *10 (emphasis added). Here, all the Funds are alleged to have shared the expenses at issue in the litigation and an accounting with respect to all Funds is necessary to award relief to any of the Funds. ¶ 44. Therefore, Plaintiffs have a financial interest in the outcome with respect to all the Funds. In other words, Plaintiffs here are not attempting to challenge conduct from which they suffered no injury. Plaintiffs were injured here by all of Defendants' allegedly improper practices (which impacted all of the MFS Funds), and they thus have standing to bring claims challenging all such practices.

**D.    Plaintiffs Also Have Standing To Bring Count V – The Complaint's Sole Derivative Count - as Members of an Unincorporated Association Pursuant to Fed. R. Civ. P. 23.1 and 23.2**

In addition, Plaintiffs also have standing to bring Count V, brought pursuant to the IAA, as members of an unincorporated association pursuant to Fed. R. Civ. P. 23.1 and 23.2.

As discussed above, Plaintiffs' IAA claim (Count V) is the sole claim that is brought derivatively. Because this claim involves substantive federal rights, a federal court must apply federal law to determine what constitutes an unincorporated association for capacity (i.e., party-standing) purposes. See Associated Students of U.C. Riverside v. Kleindienst, 60 F.R.D. 65, 67 (C.D. Cal. 1973).

The nominal Fund Defendants constitute an unincorporated association for standing purposes under federal law. See ¶¶ 40-45. An unincorporated association is defined as a body of persons acting together pursuant to a common purpose and/or enterprise. See Motta v. Samuel Weiser, Inc., 768 F.2d 481, 486 (1st Cir. 1985); Estates of Unger v. Palestinian Auth., 304 F. Supp. 2d 232, 258 (D.R.I. 2004). Even if the MFS Funds were individual, distinct legal entities, that would not be dispositive of the principle that the MFS Funds, together, constitute an unincorporated association for  the constituents of an unincorporated association may be individually incorporated or otherwise organized as business entities. See Donatelli v. Nat'l Hockey League, 893 F.2d 459, 461 (1st Cir. 1990); Mgmt. Television Sys., Inc. v. Nat'l Football League, 52 F.R.D. 162, 164 (E.D. Pa. 1971).

As discussed above, Plaintiffs allege that the individual Funds comprising the MFS Funds acted with a common purpose and/or as a common enterprise, and function as components of one unitary organization. The goodwill of MFS Funds have been diminished and impaired by the wrongful acts described in the Complaint. See Cross v. Oneida Paper Products Co., 117 F. Supp. 919, 921 (D.N.J. 1954) (recognizing, for federal representative party purposes, that

34

"members of a[n] . . . unincorporated association[] clearly have a joint or common right in its trade-mark"). Moreover, the MFS family of Funds is commonly known by the brand name "MFS." In fact, "MFS" is a registered trademark of MFS Company. Defendants uses this trademark to brand the mutual fund family name to the public and entice them to purchase MFS Funds. Reese Decl. Ex. K (Brand Name Value Among Mutual Funds, Morningstar). This is another illustration of the MFS Defendants' strategy to treat the entire family of Funds as a single, brandable, synergistic unit, in order to maximize the benefits to themselves.[24]

These principles demonstrate Plaintiffs' standing as to Count V.[25] Count V is a derivative claim brought pursuant to § 215 and § 206 of the IAA. In effect, Plaintiffs bring Count V as a "double derivative" claim – derivatively, on behalf of the individual fund; and, double derivatively, on behalf of the unincorporated association of MFS Funds in which Plaintiffs' Funds are members. See Fed. R. Civ. P. 23.2. The MFS Fund family is commonly viewed as a single entity and fairness dictates that it be treated as an unincorporated association here. See Ripon Soc'y v. Nat'l Republican Party, 525 F.2d 567, 571-72 (D.C. Cir. 1975).

## IV.    PLAINTIFFS HAVE STATED A CLAIM UNDER §§ 34(B) AND 36(A) OF THE ICA

Defendants argue that Plaintiffs have failed to state a claim under §§ 34(b) and 36(a) of the ICA, asserting that no private right of action exists under these sections. Def. Brf. at 8. Defendants are wrong. Notably, in their argument, Defendants fail to mention, let alone discuss,

---

[24]    These "branding" expenses are marketing costs that constitute 12b-1 fees. The fact that these fees are used to market the Funds as a single commodity emphasizes the significance of the pooling of assets by Defendants and the numerous juridical links that provide yet another basis for Plaintiffs' standing, discussed herein.

[25]    See Resolution Trust Corp. v. DeLoitte & Touche, 822 F. Supp. 1512, 1515 (D. Colo. 1993) (discussing representative principles of Fed. R. Civ. P. 23.2).

the most recent Supreme Court case on the matter – Jackson v. Birmingham Bd. of Educ., 125

S.Ct. 1497 (Mar. 29, 2005) – authority that supports implied rights of action exist under §§34(b)

and 36(a) of the ICA.  Moreover, Jackson shows that the long precedent of private rights of

action under the ICA as recognized both within the First Circuit and other courts for more than

30 years still stands, despite Defendants' representations to the contrary.  See Lessler v. Little,

857 F.2d 866, 871 (1st Cir. 1988) (affirming a private right of action under the ICA and

criticizing defendants for ignoring First Circuit precedent that clearly states implied rights of

action exist under the ICA); Levitt v. Johnson, 334 F.2d 815 (1st Cir. 1964) (affirming a private

right of action under the ICA); see also Strougo v. Scudder, Stevens & Clark, Inc., 964 F. Supp.

783, 796 (S.D.N.Y. 1997) ("[c]ourts have long held that a private litigant may commence an

action under Section 36(a) of the ICA"); Brown v. Bullock, 294 F.2d 415 (2d Cir. 1961)

(affirming finding of a private right of action under § 36); Taussig v. Wellington Fund, Inc., 313

F.2d 472, 476 (3d Cir. 1963) (finding a private right of action under the ICA); Esplin v. Hirschi,

402 F.2d 94, 102 (10th Cir. 1968) (private right of action under § 36).[26]

Implied rights of action under ICA §§ 34(b) and 36(a) have a long, established history

and fulfill Congress's clear intent under the ICA to protect mutual fund investors.  Moreover, as

explained below, applying the principles articulated by the United States Supreme Court on the

issue of implied rights of action, it is clear from the provisions of the statutory scheme

established by §§ 34(b) and 36(a) that the Plaintiffs fall within the class of persons intended to be

_____

[26]  The substantial line of precedent recognizing implied rights of action under the ICA also
includes, but is not limited to, the following:  Meyer v. Oppenheimber Mgmt. Corp., 764 F.2d
76, 88 (2d Cir. 1985); In re ML-Lee Acquisition Fund II L.P., 848 F. Supp. at 539-45; Krome v.
Merrill Lynch & Co., 637 F. Supp. 910, 917-20 (S.D.N.Y. 1986); Bancroft Convertible Fund,
Inc. v. Zico Inv. Holdings, Inc., 825 F.2d 731, 735 (3d Cir. 1987); McLachlan v. Simon, 31 F.
Supp. 2d 731, 737 (N.D. Cal. 1998).

protected by these sections and that, therefore, a private right of action for shareholders exists.

In other words, the text and structure of §§ 34(b) and 36(a), as well as the legislative history,

strongly support Plaintiffs' position that private rights of action exist for these claims.

A.   Under the Applicable Tests for Determining the Existence of an Implied Right of Action, Such a Right Exists for §§ 34(b) and 36(b)

Defendants rely on Alexander v. Sandoval, 532 U.S. 275 (2001) and Olmsted v. Pruco

Life Insurance Co. of New Jersey, 283 F.3d 429 (2d Cir. 2002) for the proposition that there is

no private right of action under §§ 34(b) and 36(a). Def. Brf. at 9-10. As stated above,

Defendants fail to mention, let alone discuss, the most recent Supreme Court case on the matter.

Defendants' failure to discuss Jackson is fatal to their argument as Jackson leaves no doubt that a

private right of action exists for these sections of the ICA.

Notably, in reaching its decision in Jackson that an implied right of action existed, the

Supreme Court further clarified its opinion in Sandoval, the very case relied upon by Defendants

to argue that no implied rights of action exist under the ICA (see e.g. Def. Reply at 8-9).

Importantly, in Jackson, the Supreme Court explained that Sandoval stood for the simple

proposition that a private right to enforce a statute does not necessarily include a private right to

enforce regulations promulgated thereunder, especially when the enabling statute explicitly

forbids one type of activity (in Sandoval, intentional misconduct) and the private right claimed

under the regulations is based upon a different theory absent from the text of the statute (in

Sandoval, a "disparate-impact" theory). Jackson, 125 S. Ct. at 1506. In Jackson, the Supreme

Court used such an analysis and found an implied right of action under Title IX for claims of

retaliation, even though such a private cause of action was not apparent from the text of the

statute.

The Supreme Court decision in Jackson shows the error of Defendants' argument that

there is no private right of action for §§ 34(b) and 36(a).  First, Plaintiffs here allege ICA statutory violations that support private rights of action under a statute, rather than ICA rules or regulations.  Second, the alleged conduct falls squarely within the conduct proscribed by the ICA and the ICA counts in the Complaint do not rely upon novel theories of liability outside the scope of the plain statutory language of the ICA.

Furthermore, the Supreme Court decision in Jackson is important as it rests, in part, on the fact that implied rights of actions under Title IX had been upheld by the courts for more than 25 years.  Id. at 1504.  Here, as in Jackson, the courts have upheld for decades implied rights of action under the ICA as a means of protection for mutual fund investors.  As the First Circuit noted in Lessler when it upheld a private right of action under the ICA, courts routinely have upheld implied rights of action for private litigants for more than 30 years.  Lessler, 857 F.2d at 871 (citing Levitt v. Johnson, 224 F.2d 815 (1st Cir. 1964); Moses v. Burgin, 445 F.2d 369, 373 (1971)).

Furthermore, even under the improper test proposed by Defendants that does not reflect the most recent Supreme Court authority on the issue, Defendants are wrong as §§ 34(b) and 36(a) meet the standard asserted by Defendants.  Notably, in Olmsted, the court stated that "courts must look to the intent of Congress in determining whether a federal private right of action exists for violations of a federal statute."[27]  Id. at 432.  In making this determination, an

---

[27] Olmsted is distinguishable from the instant case as it involved different facts and the application of different sections of the ICA.  Olmsted does not even mention §§ 34(b) or 36(a) in its analysis of whether a private right of action can be implied under the ICA.  Rather, in Olmsted, the Second Circuit merely affirmed the District Court's holding that there is no private right of action for violations of §§ 26(f) or 27(i) of the ICA.  Id. at 429.  Plaintiffs in Olmsted invested in variable annuity contracts and unit investment trusts that combined both insurance and investment features, something not at issue here.  The difference between the type of investment covered by §§ 26 and 27 of the ICA and the type of investment covered by other

Continued on next page

important factor is whether the statute discusses "the individuals [to be] protected." Sandoval, 532 U.S. at 289.  If it does not, there exists "no implication of an intent to confer rights on a particular class of persons" and, consequently, no implied right of action.  Id.  However, if the statute discusses the group of "individuals [to be] protected," then an implied right of action exists.  Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284 (2002) (noting that an implied right of action exists if the test of the statute is "phrased in terms of the persons benefited").

Here, the language of the statutory schemes of §§ 34(b) and 36(a) states in no uncertain terms that Congress intended for §§ 34(b) and 36(a) to be "for the protection of investors" -

---

sections of the ICA – i.e. mutual funds – was discussed by the trial court in Olmsted, which noted that other sections of the ICA had been widely construed to create implied rights of action. As explained by the district court in Olmsted, the ICA sections involved in that case addressed exceptions to the statute rather than provisions that embodied the basic purposes of the ICA:

> The mere fact that courts have interpreted other ICA sections to imply private rights of action does not compel the conclusion that Congress intended §§ 80a-26(e) and 80a-27(i) to be interpreted the same way.  Subsections 80a-26(e) and 80a-27(i) address exceptions made specifically for variable insurance contracts and unit investment trusts, financial vehicles different in many respects from other funds covered by the ICA.  See, e.g., H.R. Rep. No. 104-622, at 45 ("The [1996] legislation recognizes that variable insurance contracts and periodic payment plan certificates are different products that should not be treated identically under the [ICA] . . . ."), reprinted in 1996 U.S.C.C.A.N. 3908.  Thus, it does not follow that the existence of implied private rights of action in other sections of the ICA requires a finding that §§ 80a-26(e) and 80a-27(i) also incorporate implicit private rights of action. And, because Congress was legislating on a clean slate with respect to §§ 80a-26 and 80a-27, its silence in 1996 with respect to private rights of action for these sections does not now support their inference.

Olmsted v. Pruco Life Ins. Co. of N.J., 134 F. Supp. 2d 508, 516-17 (E.D.N.Y. 2000) aff'd, 283 F.3d 429 (2d Cir. 2002) (emphasis added).  In affirming, the Second Circuit in Olmsted relied on the court's analysis below as it found the District Court's opinion to be "thorough and well-reasoned."  Olmstead, 283 F.3d at 431-32.

language that demonstrates that a private right of action exists under §§ 34(b) and 36(a). (emphasis added.)[28] Section 34(b) makes "it unlawful for any person to make any untrue statement of a material fact" in "any registration statement...or other document filed or transmitted pursuant to this title or the keeping of which is required pursuant to § 31(a)." 15 U.S.C. § 80a-33(b). Section 31(a) of the ICA states that its requirements are intended "for the protection of investors." 15 U.S.C. § 80a-30(a) (emphasis added.) Likewise, § 8 of the ICA, which sets out the reporting requirements for the registration statement discussed in § 34(b), states in no uncertain terms that the purpose of such a registration statement is "for the protection of investors." 15 U.S.C. § 80a-8(a) (emphasis added).

Furthermore, the "registration statement" discussed in § 34(b) is SEC Form N-1A, the express goal of which is to protect investors. Specifically, as stated in Form N-1A, the purpose of its reporting requirements is to "provide essential information about the Fund in a way that will help investors to make informed decisions about whether to purchase the Fund's shares described" therein. Reese Decl. Ex. L, at 6, C.2 (a) (emphasis added).

That § 34(b) is aimed at protecting investors is also evident from the fact that it proscribes omission of facts "necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading." (emphasis added.) The phrase "materially misleading" only makes sense in the context of protecting investors, as the test for materiality focuses on the investor. See, e.g., SEC v. Happ,

---

[28] Following the logic of the Supreme Court in Sandoval, the court in Olmsted refused to recognize a private right of action for §§ 26(f) and 27(i) of the ICA because "[t]he language of these sections only describes actions by insurance companies that are prohibited; it does not mention investors such as the plaintiffs." Olmsted, 283 F.3d at 433 (emphasis added). Here, by contrast, §§ 34(b) and 36(a) do, in fact, expressly state that investors are the group to be protected by the conduct proscribed in §§ 34(b) and 36(a).

392 F.3d 12, 21 (1st Cir. 2004) (noting that a fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable <u>investor</u> as having significantly altered the 'total mix' of information made available") (quoting <u>Basic Inc. v. Levinson,</u> 485 U.S. 224, 231-32 (1988) (emphasis added)).

With respect to § 36(a), a private right of action for § 36(a) "is supported by the text of Section 36." <u>Strougo,</u> 964 F. Supp. at 796. Specifically, § 36(a) states that, like § 34(b), it is for "<u>the protection of investors.</u>" (emphasis added.) Moreover, § 36(a) also incorporates § 1(b) of the ICA which states that the purpose of Sections such as 36(a) is to protect the "<u>interests of investors.</u>" 15 U.S.C. § 80a-1 (emphasis added.).

Almost simultaneously with its decision in <u>Olmsted,</u> the Second Circuit reaffirmed its recognition of an implied right of action under § 36(a) in the case of <u>Strougo v. Bassini,</u> 282 F.3d 162 (2d Cir. 2002), in which it held that mutual fund shareholders had standing under Maryland law to bring direct actions asserting private rights of action under §§ 36(a) and 48 of the ICA. In doing so, the Second Circuit emphasized that "the general policy statement of the ICA" regarding mutual funds includes the objectives of "protecting all classes of investment company security holders from the special interests of directors, officers … and preventing investment companies from failing to protect 'the preferences and privileges of the holders of their outstanding securities.'" <u>Id.</u> at 176 (citing ICA § 1(b)). In light of <u>Strougo,</u> it is clear that the Second Circuit has not rejected private rights of action under the ICA as Defendants argue. Def. Brf. at 10.[29]

---

[29] <u>Strougo</u> was amended on March 11, 2002, <u>after</u> the March 7, 2002 <u>Olmsted</u> decision, confirming that courts have recognized implied rights of action under the ICA in light of <u>Olmsted</u> despite Defendants' erroneous contention to the contrary. Def. Brf. at 10.

Finally, Defendants rely on a handful of cases to support their argument that there is no

private right of action under § 34(b). Def. Brf. at 9. These cases cited by Defendants, in which

the trial courts held that a private cause of action did not exist for §§ 34(b) (and 36(a)), wrongly

assumed that Olmsted precluded any private right of action. [30] Notably, none of these cases were

decided after the controlling Supreme Court precedent was established in Jackson – authority

that shows the error of the cases relied upon by Defendants. [31]

### B.    Additional Authority Establishes Private Causes of Action

The First Circuit has long recognized the importance of implied rights of action under the

ICA to protect mutual funds investors. Lessler, 857 F.2d at 871 (citing Levitt, 224 F.2d at 815).

Accordingly, courts have repeatedly recognized private rights of actions under §§ 34(b) and

36(a).   See e.g. Strougo, 964 F. Supp. at 798 (upholding implied right of action under 36(a) In

re ML-Lee Acquisition Fund II L.P., 848 F. Supp. at 539 (same).

Importantly, with respect to § 34(b), the court's analysis in In re Nuveen Fund Litig.,

1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 11, 1996) is telling as the court specifically

---

[30] See Chamberlain v. Aberdeen Asset Management Ltd., Civ. No. 02-5870 (E.D.N.Y. Jan. 21, 2005); Dorchester Investors v. Peak Int'l Ltd., 134 F. Supp. 2d 569, 581 (S.D.N.Y. 2001); White v. Heartland High-Yield Mun. Bond Fund, 237 F. Supp. 2d 982, 987-88 (E.D. Wis. 2002); and In re Merrill Lynch & Co., Research Reports Securities Litigation, 272 F. Supp. 2d 243 (S.D.N.Y. 2003) and 289 F. Supp. 2d 429, 437-38 (S.D.N.Y. 2003).

[31] Defendants citation to Bonano v. East Caribbean Airline Corp., 365 F.3d 81 (1st Cir. 2004) is inapposite. Def. Brf. at 9. Bonano deals with the Federal Aviation Act – something simply not at issue here. Moreover, in Bonano, the court specifically noted that "it is abundantly clear that Congress, in crafting the [Federal Aviation Act (Act)], intended public, not private, enforcement. Consequently, we join a long list of other courts that have concluded that neither the Act nor the regulations create implied private rights of action." Bonano at 86. Furthermore, the court also explicitly noted that the Act does "not focus on a benefited class." Id. at 85. As discussed herein, the same cannot be said about Plaintiffs' §§ 34(b) and 36(a) claims. Defendants' reliance on Long Term Care Pharmacy Alliance v. Ferguson, 362 F.3d 50 (1st Cir. 2004), Def. Brf. at 10, is misplaced for the same reasons.

addresses the issue of whether a private cause of action exists under § 34(b). In <u>Nuveen</u>, as here, plaintiffs alleged that defendants violated § 34(b) by not acting in the best interests of mutual fund shareholders in trying to increase the funds' assets and therefore increased advisory fees with no corresponding benefit to the shareholder through any economies of scale. <u>See, e.g.</u>, ¶¶ 81, 104(g), 106(g), 106(h), 119(f). The court in <u>Nuveen</u>, held that shareholders had a private right of action under § 34(b) because "<u>the language and structure of the statute</u>" demonstrated that a private right of action existed. <u>Id</u>. at *12 (emphasis added).

Moreover, <u>Nuveen</u> also conducted a detailed analysis of Congress's intent and concluded that it supported the finding that a private right of action for § 34(b) exists as demonstrated by the language and structure of the statute. Specifically, when Congress passed the ICA in 1940, it explicitly granted jurisdiction "of all suits in equity and actions at law brought to enforce any liability or duty created by...regulations or orders thereunder." 15 U.S.C. § 80a-43. Moreover, § 1(b) of the ICA directs courts to interpret its provisions liberally in order to "mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors." 15 U.S.C.S. § 80a-1.

Equally important, "subsequent legislative history arising from amendments to the ICA indicates that Congress contemplated that the courts should imply private causes of action" for cases involving mutual funds. <u>Nuveen</u>, 1996 U.S. Dist. LEXIS 8071, at *13. Consequently, in the context of mutual funds, "[f]ederal courts have widely implied private causes of action under the ICA for over thirty years." <u>Id</u>. (citing <u>Fogel,</u> 668 F.2d at 110-11 (recounting precedent implying private right under the ICA)). And even though Congress has revisited the sections of the ICA involving mutual funds three times since courts began to imply such causes of action, it has never indicated any concern regarding the practice of recognizing implied rights of action

that protected mutual fund investors.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353 (1982).  Moreover, when Congress amended the ICA in 1980 to expand protection for mutual fund investors, the House Committee report made clear that it intended that private causes of action be recognized:

> The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class of persons protected by the statutory provision in question.  Such a right would be consistent with and further Congress' intent …

H.R. Rep. No. 1341, 96th Cong. 2d Sess. 28-29 (1980), reprinted in 1980 U.S.C.C.A.N. 4800, 4810-11; see also Strougo, 964 F. Supp. at 798.

After conducting a thorough analysis, the court in Nuveen held that plaintiffs could assert a private cause of action under § 34(b).  Nuveen, 1996 U.S. Dist. LEXIS 8071, at *11.  Specifically, the court concluded that "[i]n light of the ICA's remedial purposes, the substantial line of precedent recognizing implied private rights action under the ICA . . . the legislative intent attendant to two subsequent amendments to the ICA," and the plain "language and structure of the statute," a private cause of action existed under § 34(b).  Id. at *11-12.

Plaintiffs submit that Nuveen's analysis is correct.  Furthermore, the specific language of § 34(b) and the ICA provisions incorporated by reference in that section confirm that Plaintiffs here are members "of the class for whose especial benefit the statute was enacted."  Olmsted, 283 F.3d at 434 (citing Cort v. Ash, 422 U.S. 66, 78 (1975)) (emphasis in Olmsted).  Using the statutory text in this manner to interpret legislative intent is fully consistent with controlling Supreme Court authority and supports implication of a private right of action for §§ 34(b) and 36(a).