**EXHIBIT A**




U.S. Securities and Exchange Commission

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No. 2224/ March 31, 2004

INVESTMENT COMPANY ACT OF 1940
Release No. 26409 / March 31, 2004

ADMINISTRATIVE PROCEEDING
File No. 3-11450

| In the Matter of<br><br>MASSACHUSETTS FINANCIAL SERVICES COMPANY,<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTIONS 203(e) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940 |
|---|---|

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Massachusetts Financial Services Company ("MFS" or "Respondent").

II.

In anticipation of the institution of these proceedings, MFS has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, MFS consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Making

Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940, and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Order"), as set forth below.

## III.

On the basis of this Order and MFS's Offer, the Commission finds that:

**Respondent**

1. MFS is the investment adviser to the approximately 140 registered investment companies in the MFS Fund Complex, which includes the retail mutual funds, registered closed-end funds, MFS Variable Insurance Trust, MFS Institutional Trust, and variable annuity and variable insurance funds known as MFS/Sun Life Series Trust and Compass Accounts ("MFS Funds").[1] Since 1982, MFS has been registered with the Commission pursuant to Section 203(c) of the Advisers Act. Massachusetts Financial Services Company is the legal name for the registered entity, which does business as MFS Investment Management. MFS is a non-public company and an indirect subsidiary of Sun Life Financial Services Inc. MFS has approximately 370 accounts totaling approximately $140 billion in assets under management. The MFS Funds represent about 70% of the assets under management. MFS Fund Distributors, Inc. ("MFD") and MFS Service Center, Inc. are both wholly-owned subsidiaries of MFS and serve as the distributor and transfer agent for certain MFS Funds, respectively. MFS's and MFD's principal offices are located in Boston, Massachusetts.

**Overview**

2. Since at least January 1, 2000 through November 7, 2003, MFS allocated brokerage commissions on MFS Funds' portfolio transactions to broker-dealers for "shelf space" or heightened visibility within their distribution systems. MFS had entered into bilateral "Strategic Alliance" arrangements with approximately 100 broker-dealers: the broker-dealers provided services designed to promote the sale of the MFS Funds; and MFS allocated brokerage commissions to those broker-dealers based upon individually negotiated formulas relating to gross fund sales and the retention of fund assets. Because MFS allocated fund brokerage commissions, which are paid out of fund assets, to broker-dealers for Strategic Alliances, MFS avoided using its own assets to pay for services obtained under the Strategic Alliances. MFS did not effectively communicate this potential conflict to the MFS Funds' Boards of Trustees (the "MFS Boards" or "Boards").[2]

3. Nor did MFS effectively communicate the terms of the Strategic Alliances to the MFS Boards or MFS Funds' shareholders ("MFS Shareholders"). MFS informed the Boards and the Statements of Additional Information ("SAIs") for the funds disclosed that MFS had a policy of considering the sale of fund shares as a factor in selecting broker-dealers to execute fund portfolio trades, and MFS informed the Boards of the amounts of brokerage commissions allocated to each broker-dealer. MFS, however, did not effectively communicate to the Boards and the SAIs did not adequately disclose that MFS had entered into bilateral arrangements with those broker-dealers to allocate specific negotiated amounts of fund brokerage

commissions for specified marketing and distribution services.

### MFS Entered into Strategic Alliances with Broker-Dealers for "Shelf Space"

4. Since at least January 2000, MFS has had relationships with certain broker-dealers pursuant to which the MFS Funds have received heightened visibility within the broker-dealers' distribution or sales systems. MFS refers to these relationships as "Strategic Alliances." The MFS Funds distributor and a wholly-owned subsidiary of MFS, MFD, negotiates the Strategic Alliances on behalf of MFS and the MFS Funds. At all times, MFS has been aware of and has approved MFD's negotiating these Strategic Alliances.

5. The Strategic Alliance broker-dealers provide various types of distribution services in connection with these Strategic Alliances: participation in meetings with registered representatives, primarily for the purpose of providing education and training regarding the MFS Funds; the opportunity for the MFS Funds to be mentioned in communications with a broker-dealer's customers such as on a broker-dealer's website or in customer newsletters; and often, placement on a "preferred list" at a broker-dealer.

6. MFS has had various payment arrangements for the Strategic Alliances. For many Strategic Alliances, MFS has paid broker-dealers anywhere from 15 to 25 basis points ("bps") on mutual fund gross sales and/or 3 to 20 bps on aged assets (held over one year). These payments were in addition to existing payments, including dealer concessions, shareholder servicing payments, and payments for services that MFS otherwise would provide, such as subaccounting.

### MFS Allocated Brokerage Commissions to Satisfy its Strategic Alliances

7. Although many broker-dealers preferred Strategic Alliance payments in the form of cash or "hard dollars," MFS also "allocated" brokerage commissions on the MFS Funds' portfolio transactions to broker-dealers to satisfy these alliances. MFS referred to these allocated fund brokerage commissions as "soft dollars." In the ordinary course, to conduct portfolio transactions necessary to the pursuit of the Funds' investment program, the Funds must pay substantial amounts in brokerage commissions for execution services. MFS allocated the soft dollars from these brokerage commissions paid to effect portfolio transactions for the MFS Funds. MFS made hard dollar payments with cash from MFD's assets.

8. MFS preferred to allocate fund brokerage commissions, subject to best execution, rather than pay hard dollars to satisfy Strategic Alliances because it reduced MFD's expenses. Some MFD employees who negotiated the Strategic Alliances created a draft guide, which, although was not submitted to anyone at MFS for review, stated that: "It is incumbent on the [employee] to negotiate the best deal for MFS. Usually this means trying to cover as many costs through soft dollars as possible."

9. From at least January 1, 2000 through November 7, 2003, MFS allocated fund brokerage commissions to approximately 100 broker-dealers with

whom it had Strategic Alliances. When MFS allocated soft dollars to satisfy Strategic Alliances, MFS allocated 1.5 times (or some other negotiated multiple) the amounts requested by the broker-dealers in basis points to satisfy the same Strategic Alliances in hard dollars.

10. In order for MFS to properly allocate fund brokerage commissions for Strategic Alliances, MFD communicated the commission amounts corresponding to the Strategic Alliances -- that MFS referred to as suggested commission targets ("target commission amounts") -- to the Director of the MFS Equity Trading Department ("Equity Trading"). MFS had Equity Trading policies designed to achieve best execution, including policies that required traders to seek to obtain best execution in determining where to place trades, and reported on best execution annually to the Boards.

11. Periodically, until July 2001, MFD provided the Director of Equity Trading with both Strategic Alliance target commission amounts and the details of the basis point arrangements with each broker-dealer. During the Summer of 2001, MFS directed MFD to cease providing Equity Trading with information reflecting the specifics of the arrangements. Thereafter, MFD sent the Director of Equity Trading only the target commission amounts for each broker-dealer.

12. Periodically throughout the year, MFD communicated modified "Suggested Commission" amounts to Equity Trading. The modifications were often increases to the targets. Frequently, MFD also requested that Equity Trading increase trading to more quickly satisfy a target commission amount with a certain broker-dealer. Equity Trading accepted the modifications, subject to MFS's best execution policies.

13. The Director of Equity Trading circulated daily to the traders a list reflecting the Strategic Alliance commission budget amounts for each broker-dealer, the amount of brokerage commissions already directed and the amount remaining to fully satisfy the current commission budget. The budgeted amounts were derived from the annual target commission amounts. At the close of trading and based upon the daily lists, MFS traders coded certain trades or certain portions of trades for "Sales" or, in other words, allocated for the Strategic Alliances. In addition to coding these trades on MFS's internal records, the MFS trading desk also communicated such coding to the trading desk at the broker-dealers that executed the trades.

14. MFS used three methods to allocate brokerage commissions for Strategic Alliances: by forwarding portfolio transactions directly to a broker-dealer with whom it had a Strategic Alliance ("distributing broker"); through "step-out" arrangements; and through "introducing broker" arrangements. MFS used the latter two methods in its effort to achieve best execution in circumstances in which the distributing broker had little or no execution capacity.

   a. Under the first method, MFS coded transactions with executing brokers, who were also distributing brokers, as transactions intended to satisfy the Strategic Alliance arrangements.

   b. Under the second method, MFS selected a broker-dealer to execute

the transaction and requested the executing broker to "step out" a portion of the trade and, thus, a portion of the commission, to another broker with whom MFS had a Strategic Alliance.

c. Under the third method, a broker-dealer executed the transaction, and then forwarded the entire commission to an introducing broker with whom MFS had a Strategic Alliance. The introducing broker paid the executing broker for its execution and clearing services.

**MFS's Guidelines for Use of Soft Dollars and Directed Brokerage**

15. Since 1997, MFS has had written guidelines relating to its recognition of broker-dealers for sales of MFS Funds' shares. These guidelines state that consideration of fund sales can be a factor in allocating fund brokerage commissions and must be consistent with best execution. They also provide that the practice must be disclosed in the prospectus or SAI. These guidelines also advise MFD not to enter into legal agreements to direct commissions in recognition of fund sales or to refer to such practices in internal memoranda in any way that would imply a binding agreement. Finally, these guidelines state that MFS should make presentations to a committee of the Boards "which disclose the direction of portfolio transactions to broker-dealers in consideration of sales activities."

16. However, these guidelines do not expressly refer to Strategic Alliances, were not distributed to many MFD employees and, when distributed, some of the provisions were not followed. For instance, although the written guidelines prohibit MFD from entering "into any contracts, letter agreements or oral agreements with respect to soft dollars and directed brokerage arrangements," MFS entered into two written agreements and many oral agreements to satisfy Strategic Alliances with fund brokerage commissions, and thereby breached this guideline. Notwithstanding a prohibition in MFS's guidelines against referring in any internal memoranda "to any non-binding targets for the direction of portfolio transactions in any way which would state or imply that such targets are binding or are being used to offset MFD's legal or contractual obligations," MFD employees often referred to Strategic Alliance allocations of fund brokerage commissions as "obligations," "commitments," or amounts "due" or "owed," and sometimes received invoices from Strategic Alliance brokers.

17. Also contrary to these guidelines, on more than one occasion MFS used fund brokerage commissions to satisfy its payment arrangements for a "hard dollar" Strategic Alliance. For at least one of these guideline breaches, MFS affirmatively disclosed to the Boards the improper use of brokerage commissions paid out of fund assets to satisfy an MFD obligation and reimbursed the brokerage commissions to the affected MFS Funds.

**MFS Did Not Effectively Communicate to the MFS Boards the Alternatives for Satisfying Strategic Alliances**

18. MFS did not effectively communicate to the MFS Boards that it was allocating fund brokerage commissions to satisfy Strategic Alliances. Because MFS satisfied Strategic Alliances with fund brokerage commissions, which are paid out of fund assets, MFS avoided using MFD's assets to satisfy Strategic Alliances. While MFS communicated to the Boards that it was satisfying some Strategic Alliances with hard dollars, it did not

communicate that it was satisfying other Strategic Alliances with brokerage commissions paid out of fund assets.

19. MFS told the Portfolio Trading and Marketing Review Committee of the MFS Boards ("Trading Committee"), which was charged with reviewing the allocation of brokerage commissions for portfolio transactions, that, subject to best execution, MFS "considered the sale of fund shares" when selecting broker-dealers to execute fund portfolio transactions. MFS also disclosed to the Boards the exact amounts of brokerage commissions allocated to every broker-dealer where consideration of fund sales was a factor, but did not disclose that these amounts were actually used to satisfy bilateral arrangements under the Strategic Alliances.

20. MFS did not effectively communicate to the Boards the full and complete nature of the Strategic Alliance arrangements to allocate fund brokerage commissions: MFS had entered into bilateral arrangements to allocate fund brokerage commissions, subject to best execution, with approximately 100 broker-dealers based on specified basis points on gross sales and/or aged assets for the promotion of MFS Funds sales through "shelf space" or access to those broker-dealers' distribution networks.

21. As a fiduciary, MFS had a duty effectively to disclose to the MFS Boards any potential conflict of interest created by the use of fund brokerage commissions to satisfy Strategic Alliances.

**MFS Did Not Adequately Disclose to MFS Shareholders that it Allocated Fund Brokerage Commissions to Satisfy Strategic Alliances**

22. MFS was responsible for ensuring that the MFS Funds' Prospectus and SAI were in compliance with the requirements of Form N-1A.[3]

23. The information the Commission requires investment companies to disclose in prospectuses and SAIs is set forth in Form N-1A. Specifically, Item 16(c) of the Form N-1A requires a description in the SAI of "how the Fund will select brokers to effect securities transactions for the Fund" and requires that "[i]f the Fund will consider the receipt of products or services other than brokerage or research services in selecting brokers, [the Fund should] specify those products or services."

24. From at least January 1, 2000 to November 7, 2003, MFS Funds' SAIs disclosed that MFS may consider sales of shares of the funds as a factor in the selection of broker-dealers to execute the MFS Funds' portfolio transactions. The SAIs did not make the distinction, however, between directing commissions in "consideration of fund sales" and satisfying negotiated arrangements for specific amounts with brokerage commissions. The SAIs did not adequately disclose to shareholders that MFS had entered into bilateral arrangements in which it agreed to allocate specific negotiated amounts of fund brokerage commissions, subject to best execution, to broker-dealers for "shelf space" or heightened visibility within their distribution systems.

25. As a result of the conduct described above, MFS willfully:[4]

a. Violated Section 206(2) of the Advisers Act, which provides that it is "unlawful for any investment adviser, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

b. Violated Section 34(b) of the Investment Company Act, which provides in pertinent part that it is "unlawful for any person to make any untrue statement of a material fact in any registration statement . . . filed or transmitted pursuant to" the Investment Company Act and to "omit to state therein any fact necessary in order to prevent the statements made therein, in light of the circumstances under which they were made, from being materially misleading."

**Certain Remedial Efforts and Undertakings**

26. In determining to accept the Offer, the Commission considered the efforts voluntarily implemented by MFS:

a. On November 7, 2003, MFS announced internally that, in order to analyze its policies over the next 90 days, it had suspended certain practices, including: 1) "paying, directing or coding of brokerage commissions as in consideration of mutual fund sales" and 2) "hard dollar payments for non-contractual strategic alliance arrangements, including asset and/or sales based programs." In February 2004, MFS extended the suspension for another 90 days and then determined to permanently discontinue the use of soft dollars for Strategic Alliances and third-party research.

b. Since the beginning of 2004, MFS has substantially revamped its governance structure and management team. MFS has established a new position, non-executive chairman, who reports to the Fund Boards, and has appointed a new president and CEO. MFS has also hired a new general counsel and created a new senior position, Executive Vice President for Regulatory Affairs, who is responsible for internal audit, compliance and Fund treasury.

c. MFS will appoint a senior level employee who shall be responsible for implementing within 90 days of the entry of the Order and thereafter maintaining the following written compliance policies and procedures:

i.) Procedures designed to ensure that when the MFS trading desk places trades with a broker-dealer that also sells fund shares, the person responsible for selecting such broker-dealer does not take into account the broker-dealer's promotion or sale of fund shares;

ii.) Procedures requiring the documentation of all Strategic Alliances and requiring MFD to use its best efforts to enter into written contracts memorializing the Strategic Alliances between MFD and the broker-dealer or other intermediary. The documentation of each Strategic Alliance will set forth the payment schedule and the services that the broker-dealer or other intermediary will provide, and include a provision preventing the broker-dealer or other intermediary from accepting compensation for promoting or selling

MFS Fund shares in the form of commissions on brokerage transactions directed to it from an MFS Fund. The documentation of each Strategic Alliance will include a directive from MFD that the broker-dealer or other intermediary provide point of sale disclosure documents, consistent with current legal requirements;

iii.) Subject to the Boards' approval, MFS will cause the funds to include disclosure in their prospectuses or SAIs about payments made by MFD or MFS to broker-dealers in addition to dealer concessions, shareholder servicing payments, and payments for services that MFS otherwise would provide, such as subaccounting, and that such payments are intended to compensate broker-dealers for various services, including without limitation, placement on the broker-dealers' preferred or recommended fund list, access to the broker-dealers' registered representatives, assistance in training and education of personnel, marketing support, and other specified services;

iv.) At least once per year, MFS will make presentations to the Portfolio Trading and Marketing Committee (or other committee performing similar functions) of each of the Boards, including an overview of MFD's Strategic Alliance arrangements and policies, any material changes to such policies, the number and types of such arrangements, the types of services received, the identity of participating broker-dealers and the total dollar amounts paid. MFS will also provide the Committees with a summary quarterly report setting forth amounts paid by MFD for Strategic Alliances and the broker-dealers that received such payments; and

v.) At least once per year for at least five years MFS will provide the Committees/Boards with a best execution analysis performed by a recognized independent portfolio trading analytical firm. MFS will include lists of: (a) the top ten executing broker-dealers used by the MFS Equity Trading Department and the MFS Fixed Income Trading Department; and (b) the top ten selling broker-dealers conducting business with MFD.

**Undertakings**

27. MFS undertakes the following:

a. Within 30 days of the entry of the Order, MFS shall retain an Independent Distribution Consultant not unacceptable to the staff of the Commission. MFS shall exclusively bear all costs, including compensation and expenses, associated with the retention of the Independent Distribution Consultant. MFS shall retain the Independent Distribution Consultant to develop a Distribution Plan to distribute fairly and proportionately to the MFS Funds the total disgorgement and penalty ordered in paragraph C.3 below based upon the amounts of brokerage commissions coded for fund "Sales" attributed to each fund.

b. In the event that MFS and the Independent Distribution Consultant are unable to agree on a Distribution Plan, MFS shall abide by the recommendation of the Independent Distribution Consultant. The final Distribution Plan shall be submitted, and be acceptable, to the

Commission Staff.

c. Within 60 days of the date of the entry of the Order, the Independent Distribution Consultant shall submit the Distribution Plan for the administration and distribution of disgorgement and penalty funds pursuant to Rule 610 [17 C.F.R. § 201.610] of the Commission's Rules of Practice. Following a Commission order approving a final Distribution Plan, as provided in Rule 613 [17 C.F.R. § 201.613] of the Commission's Rules of Practice, the Independent Distribution Consultant and MFS shall take all necessary and appropriate steps to administer the final Distribution Plan.

d. Within 90 days of the entry of the Order, based on this Distribution Plan, the Independent Distribution Consultant shall calculate the amount that should be distributed to each MFS Fund. The Independent Distribution Consultant shall oversee the actual distribution of the monies to the MFS Funds, which shall take place no later than 120 days from the entry of the Order.

e. MFS shall cooperate fully with the Independent Distribution Consultant and shall provide the Independent Distribution Consultant with access to MFS's files, books, records and personnel as reasonably requested for the Distribution Plan.

f. To ensure the independence of the Independent Distribution Consultant, MFS: (i) shall not have the authority to terminate the Independent Distribution Consultant, without the prior written approval of the Commission's Staff; (ii) shall compensate the Independent Distribution Consultant, and persons engaged to assist the Independent Distribution Consultant, for services rendered pursuant to the Order at their reasonable and customary rates; (iii) shall not be in and shall not have an attorney-client relationship with the Independent Distribution Consultant and shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Distribution Consultant from transmitting any information, reports, or documents to the Commission or the Commission's Staff.

g. To further ensure the independence of the Independent Distribution Consultant for the period of the engagement and for a period of two years from completion of the engagement, the Independent Distribution Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with MFS, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity. Any firm with which the Independent Distribution Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the Commission's Staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with MFS, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

h. In *In re Massachusetts Financial Services Co.*, Rel. No. IA-2213, 2004 WL 226714 (Feb. 5, 2004), MFS agreed to several undertakings including those requiring MFS to retain an Independent Compliance

    Consultant to conduct a comprehensive review of MFS's policies and procedures designed to prevent and detect conflicts of interest, breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by MFS and its employees. MFS further agrees to direct the Consultant also to review the completeness of its disclosures concerning Strategic Alliances to the Boards and MFS shareholders.

### IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions specified in the Offer submitted by MFS.

Accordingly, it is hereby ORDERED that:

A. MFS is censured.

B. MFS shall cease and desist from committing or causing any violations and any future violations of Section 206(2) of the Advisers Act and Section 34(b) of the Investment Company Act.

C. MFS shall, within 120 days of the entry of the Order, pay $1 in disgorgement and a civil money penalty in the amount of $50 million. Such payment shall be: (1) made by wire transfer, United States postal money order, certified check, bank cashier's check or bank money order; (2) made payable to the Securities and Exchange Commission; (3) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Alexandria, Stop 0-3, VA 22312; and (4) submitted in connection with a cover letter that identifies MFS as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and wire confirmation, money order or check shall be sent to Merri Jo Gillette, Associate District Administrator, Philadelphia District Office, U.S. Securities and Exchange Commission, Mellon Independence Center, 701 Market Street, Suite 2000, Philadelphia, PA 19106. Such civil money penalty may be distributed pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 ("Fair Fund distribution"). Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, MFS agrees that it shall not, in any Related Investor Action, benefit from any offset or reduction of any investor's claim for compensatory damages by the amount of any Fair Fund distribution to such investor in this proceeding that is proportionately attributable to the civil penalty paid by MFS ("Penalty Offset"). If the court in any Related Investor Action grants such an offset or reduction, MFS agrees that it shall, within 30 days after entry of a final order granting the offset or reduction, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed against MFS in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against MFS by or on behalf of one or more investors based on substantially the same facts

as alleged in the Order in this proceeding.

D. MFS shall comply with the undertakings enumerated in Section III.27 above.

By the Commission.

                              Jonathan G. Katz
                              Secretary

---

[1] The MFS Funds are managed by two separate boards. The Funds' Board oversees the retail funds, closed-end funds, MFS Variable Insurance Trust and MFS Institutional Trust. The Compass Board oversees mutual funds sold in connection with variable annuity and variable insurance products known as MFS/Sun Life Series Trust and Compass Accounts.

[2] Until 2002, MFS had four different boards of Trustees for the MFS Funds: "Compass," "Institutional," "Red" and "Crimson." Minutes from the meetings of these boards reflect that MFS provided these boards with the same disclosures. In 2002, the Red, Crimson and Institutional boards were consolidated into one board -- the MFS Funds Board -- and since that time there have been two boards: the MFS Funds Board and the Compass Board.

[3] The MFS Funds' SAIs are incorporated by reference into the prospectuses.

[4] "Willfully" as used in this Order means intentionally committing the act which constitutes the violation, see *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000); *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965). There is no requirement that the actor also be aware that he is violating one of the Rules or Act. *Id*.

*http://www.sec.gov/litigation/admin/ia-2224.htm*