**EXHIBIT B**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 50384 / September 15, 2004

INVESTMENT ADVISERS ACT OF 1940
Release No. 2295 / September 15, 2004

INVESTMENT COMPANY ACT OF 1940
Release No. 26598 / September 15, 2004

ADMINISTRATIVE PROCEEDING
File No. 3-11661

| | |
|---|---|
| In the Matter of<br><br>PA FUND MANAGEMENT LLC,<br>PEA CAPITAL LLC, AND<br>PA DISTRIBUTORS LLC,<br><br>Respondents. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTIONS 203(e) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940, AND SECTION 15(b) OF THE SECURITIES EXCHANGE ACT OF 1934 |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act"), and Section 15(b) of the Securities Exchange Act of 1934 against PA Fund Management LLC ("PAFM"), PEA Capital LLC ("PEA") and PA Distributors LLC ("PAD") (collectively "Respondents").

II.

In anticipation of the institution of these proceedings, Respondents have submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, the Respondents consent to the entry of

this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940, Sections 9(b) and 9(f) of the Investment Company Act of 1940, and Section 15(b) of the Securities Exchange Act of 1934 ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offer, the Commission finds[1] that:

### Respondents

1.     PAFM is a Delaware limited liability company located in New York, New York and has been registered as an investment adviser with the Commission since 2000. PAFM is the investment adviser and administrator for the PIMCO Funds: Multi-Manager Series, a registered investment company comprised of 33 separate series of mutual funds (the "MMS Funds").[2] PAFM is responsible for managing either directly, or through others selected by it, the investment activities of the MMS Funds. In exchange for these services, the MMS Funds pay PAFM an annual advisory fee consisting of a percentage of average daily net assets held by the Funds.[3] As of July 31, 2004, PAFM managed approximately $32 billion in assets. The MMS Funds comprise approximately $18 billion of this amount.

2.     PEA is a Delaware limited liability company located in New York, New York and has been registered as an investment adviser with the Commission since 2001. PEA is the sub-adviser for seven of the MMS Funds:  the PEA Growth, PEA Growth & Income, PEA Opportunity, PEA Target, PEA Innovation, PEA Value and PEA Renaissance Funds. As the sub-adviser for these funds, PEA has full investment discretion and makes all determinations on investments and the directing of brokerage commissions, subject to the general supervision of PAFM and the Board of Trustees of the MMS Funds ("MMS Board"). In exchange for these services, the MMS Funds pay PAFM, which in turn pays PEA, an annual advisory fee consisting of a percentage of the average daily net assets held by the Funds.[4] PEA likewise advises institutional and separately managed accounts. As of July 31, 2004, PEA managed assets of approximately $12.63 billion. Of this amount, the seven MMS Funds' assets total $11.52

---

[1]     The findings herein are made pursuant to Respondents' Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2]     There are two trusts within the PIMCO Complex of Funds, the MMS Funds and the Pacific Investment Manager Series, ("PIMS"), (collectively "the Funds"). Each trust is a registered investment company and consists of separate series, each of which is functionally a separate investment company. Each trust has separate board of trustees. The PIMS Funds are managed by Pacific Investment Management Company LLC ("PIMCO"), an indirect subsidiary of Allianz Dresdner Asset Management of America LP ("ADAM"). PIMCO and the PIMS Funds are not parties to this proceeding.

[3]     The percentage varies by fund.

[4]     The percentage varies by fund.

billion and the other institutional and separately managed accounts' assets total $1.11 billion.

3.    PAD is a Delaware limited liability company located in Stamford, Connecticut and is a broker-dealer that has been registered with the Commission under the Exchange Act since 1989. PAD serves as the distributor and underwriter for the Funds.[5]

## Overview

4.    This matter involves the failure of PAFM, PEA and PAD to disclose material facts, including the conflict of interest that arose from PAD's arrangements with nine broker-dealers for increased "shelf space" within the broker-dealers' distribution systems. These shelf space arrangements were paid for by PAD, in whole or in part, through PEA directing brokerage commissions on the MMS Funds' portfolio transactions. The arrangements were designed to promote the sale of all Funds distributed by PAD, not just the MMS Funds, and provide heightened visibility at the brokerage firms, including greater access to registered representatives and placement on preferred lists (hereinafter "Shelf Space arrangements").

5.    The Shelf Space arrangements were based upon individually negotiated formulas relating to gross fund sales and the retention of fund assets. Because PAD and PAFM arranged for PEA, subject to best execution, to direct brokerage commissions, which are fund assets, to broker-dealers to pay for the Shelf Space arrangements, PAD partially avoided using its own assets to pay for these distribution services and benefits. The use of fund assets to benefit and in fact defray the expenses of PAD, a third party to the MMS Funds, creates a conflict of interest that should have been disclosed to the MMS Board.

6.    Respondents, however, failed to disclose to the MMS Board this conflict of interest. In particular, during the annual reviews of the investment advisory and distribution agreements and during the quarterly presentations regarding the marketing of the MMS Funds, PAFM and PAD did not advise the MMS Board that the MMS Funds' brokerage commissions were being used by PAD to partially pay for Shelf Space arrangements. PAFM and PAD also did not disclose to the MMS Board that PAD was able to reduce its payments to broker-dealers for the Shelf Space arrangements by obtaining credit for the MMS Funds' brokerage. Moreover, PEA should have inquired of PAFM and PAD, and then disclosed to the MMS Board, why PAFM and PAD had asked it to direct brokerage commissions to certain broker-dealers for the benefit of PAD. PAFM likewise failed to disclose the aforementioned pertinent information to shareholders in the MMS Funds' prospectuses or Statement of Additional Information ("SAI"). [6]

---

[5]    PAFM, PEA and PAD are wholly owned, indirect subsidiaries of ADAM.

[6]    The MMS Funds have separate prospectuses, but share one SAI.

3

7.    Finally, in directing the MMS Funds' brokerage commissions to pay for Shelf Space arrangements, Respondents did not ensure that these commissions came from those funds that were promoted by the broker-dealers in connection with the Shelf Space arrangements. In failing to do so, the brokerage commissions paid by some MMS Funds were improperly used to subsidize the distribution of the shares of other Funds in the fund complex.

## PAD Entered into Shelf Space Arrangements with Broker-Dealers

8.    Between 2000 and 2003, PAD was a party to Shelf Space arrangements with broker-dealers pursuant to which broker-dealers promised that the Funds sold and distributed by PAD would receive increased visibility within the broker-dealers' distribution systems; in return, PAD agreed to pay broker-dealers. PAD entered into these Shelf Space arrangements to further the sale of Funds that it sold and distributed and with the knowledge and approval of PAFM, the MMS Funds' investment adviser. Beginning in late 2000 to July 31, 2003, PAD used brokerage commissions on portfolio transactions from ten MMS Funds sub-advised by PEA[7] to satisfy some of its financial obligations in connection with these Shelf Space arrangements. In 2000, PAD had three Shelf Space arrangements in which brokerage commissions were being directed, subject to best execution, to reduce PAD's cash obligation. By 2003, however, the number of such Shelf Space arrangements had increased to nine.

9.    The broker-dealers promised PAD that it would receive various distribution services in connection with these Shelf Space arrangements, including, but not limited to: participation in meetings with registered representatives, such as annual attendance at broker-dealers' sales and marketing conferences; the opportunity for the Funds distributed by PAD to be mentioned in communications with broker-dealers' customers, such as prominent placement on the broker-dealers' websites; and most often, placement on preferred or focus lists at the broker-dealers.

10.    PAD negotiated the financial terms of its participation in the broker-dealers' Shelf Space arrangements in an effort to pay broker-dealers the least amount possible. For example, PAD paid broker-dealers from 15 to 25 basis points ("bps") on the Funds' gross sales and/or 3 to 20 bps on aged assets (assets held over one year). Similarly, PAD often tried to distinguish between equity and fixed-income funds and would negotiate a lower basis point payment for fixed income funds.

11.    Most of these payments for Shelf Space arrangements were in cash (*i.e.*, "hard dollars") and paid out of the assets of PAD. Some were paid, in whole or in part, by PEA directing brokerage commissions on MMS Funds' portfolio transactions, subject to best execution. Often, when Shelf Space payments were made through brokerage commissions, PAD was required to pay between 1.2 to 1.5 times the amounts in brokerage commissions that it would have paid in hard dollars. For example, for every $1.20 PEA directed in brokerage commissions to a broker-dealer requested by PAD,

---

[7]    Since December 31, 2001, three of the ten MMS Funds have either been liquidated or merged so that currently, PEA manages seven MMS Funds.

PAD would receive a credit for $1.00, which would count toward satisfying its payment obligation for a Shelf Space arrangement.

### PAFM and PAD Asked PEA to Direct Brokerage Commissions which PAD then Used to Satisfy its Shelf Space Obligations

12.    Although most broker-dealers preferred Shelf Space payments to be made in hard dollars, many broker-dealers accepted payments in the form of brokerage commissions on portfolio transactions. While hard dollars were paid from PAD's assets, the brokerage commissions were paid from the MMS Funds' assets.

13.    Beginning in late 2000, employees of PAD and PAFM discussed the possibility of reducing PAD's cash payments for Shelf Space arrangements in part through PEA directing brokerage commissions on the MMS Funds' portfolio transactions. PAFM and PAD sought to partially satisfy the Shelf Space arrangements by PEA directing brokerage commissions, thus providing PAD with a cost savings.

14.    Within the ADAM corporate structure, the sub-advisers perform many of the traditional investment advisory functions and also execute all portfolio transactions for the Funds. On December 31, 2001, PEA and PAFM entered into a Portfolio Management Agreement, whereby PAFM engaged PEA as a sub-adviser to act as portfolio manager to ten funds within the MMS Trust ("Sub-Advisory Agreement").[8] Subject to the supervision of PAFM and the MMS Board, PEA bears responsibility for, among other things, the investment decisions of those MMS Funds and execution of trades on behalf of those MMS Funds.[9] PEA is required to regularly report to the MMS Board on the investment program for each fund for which it acts as a sub-adviser.

15.    Therefore, if PAD wanted to receive credit from brokerage commissions as the broker-dealers allowed, PAD had to approach each sub-adviser to the MMS Funds to request that such sub-adviser direct brokerage commissions on portfolio transactions for PAD's benefit. For this reason, after PAFM and PAD approved the concept of using brokerage commissions to pay for Shelf Space arrangements, they approached PEA, the sub-adviser to the largest MMS equity funds, to discuss whether PEA would be able to direct brokerage commissions to certain broker-dealers whom PAD selected.

---

[8]    Prior to 2001, PEA was a division of PIMCO Advisors LP (which is now known as ADAM), the adviser to the Funds. At that time, PEA, a sub-adviser, was placing trades on behalf of the MMS Funds under the authority granted to PIMCO Advisors under the Investment Advisory Agreement. The Investment Advisory Agreement with PIMCO Advisors was executed in November 1994 and amended in 1997 and 2000. On September 30, 2002, the advisory responsibilities for the MMS Funds were transferred to PAFM through a novation of the Investment Advisory Agreement.

[9]    The Sub-Advisory Agreement was to remain in effect for two years and then, continue thereafter on an annual basis provided that the annual continuance was approved by a majority of the entire MMS Board. The MMS Board initially approved the Sub-Advisory Agreement on December 6, 2001, for a period of two years. On December 3, 2003, the MMS Board again approved and extended the Sub-Advisory Agreement for one additional year beginning January 1, 2004.

16.    PAFM and PAD did not tell PEA that they were asking PEA to direct trades to these broker-dealers to reduce PAD's cash payments for Shelf Space arrangements. PAFM and PAD instead told PEA that trading with these firms would "benefit" PAD. PEA accepted that explanation without asking PAFM or PAD to specifically explain why they asked PEA to direct brokerage commissions to distributing broker-dealers.

17.    Initially, in late 2000 and 2001, PAD requested that PEA direct trades to three broker-dealers, which PEA did. At that time, there was no formal communication between PAD and PEA about the amount of brokerage commissions directed to each broker-dealer. By 2002, however, the process was more formalized and PEA advised PAD, in response to PAD's request, that $5 million in brokerage commissions would likely be available to direct to distributing broker-dealers. At the same time, PAD increased the number of Shelf Space arrangements in which brokerage commissions would be used to reduce PAD's cash payments from three to nine broker-dealers.

18.    PAD subsequently divided the available commissions among the nine broker-dealers with whom it had Shelf Space arrangements and who had agreed to give PAD credit for the directed brokerage commissions. PAD then assigned a target amount of brokerage commissions to be directed to each broker-dealer and provided such targeted amounts to PEA. PAD or PEA then reduced these targeted amounts to a written list. The head trader at PEA then provided this list to the other traders.

19.    Based on these targeted amounts, PEA's traders executed portfolio transactions for the MMS Funds with such broker-dealers in the amounts requested by PAD, subject to best execution.

20.    To ensure proper accounting for these transactions, PEA's traders coded certain portions of the trades for "Mutual Fund Sales." In addition to coding these trades on PEA's internal records, PEA's traders also communicated the designation to the traders at the broker-dealers who executed the trades.

21.    PEA used two methods to direct brokerage commissions to these broker-dealers. Under the first method, PEA sent portfolio transactions directly to the distributing broker-dealer for execution. Under the second method, through "introducing broker" arrangements, PEA executed the portfolio transaction with one broker-dealer, but instructed that broker-dealer to credit the commission to an introducing broker with whom PAD had a Shelf Space arrangement. The introducing broker paid the executing broker for its execution and clearing services.

22.    From time to time at PAD's request, PEA provided PAD with updates about the amount of commissions that had been coded for "Mutual Fund Sales." Occasionally, PAD would receive requests from broker-dealers to increase the amount of trading that was being done in connection with the Shelf Space arrangements and would at times request that PEA increase trading at these broker-dealers, which however, PEA did not do.

23.    PAD occasionally received invoices from some of the nine broker-dealers that reflected the amounts that were due under the Shelf Space arrangements. The amounts due were based on the agreed upon basis point formula and the level of sales and aged assets for the period. The invoices reflected how much credit PAD had received as a result of the trading through PEA and requested that any difference between the amount owed and the credited commissions be addressed with a cash payment. PAD did, in fact, make cash payments to satisfy these invoices.

**Respondents Failed to Disclose to the MMS Board the Alternatives
for Satisfying Shelf Space Arrangements and the Conflict of Interest that Existed**

24.    PAFM and PAD did not disclose to the MMS Board that MMS Funds' brokerage commissions were being directed to reduce PAD's payments for the Shelf Space arrangements or that a corresponding conflict of interest existed. For example, although PAFM and PAD made annual presentations to the MMS Board in connection with the annual renewal of the investment advisory and distribution agreements and PAD made quarterly presentations to the MMS Board regarding marketing efforts for the MMS Funds, neither PAFM nor PAD informed the MMS Board that PAD had asked PEA to direct trades to certain distributing broker-dealers. PAD's failure to provide the necessary information regarding the use of brokerage commissions to pay for Shelf Space arrangements resulted in the MMS Funds not describing in their distribution plans these financing arrangements.

25.    PAFM and PAD likewise did not inform the MMS Board that PAD had the option of paying for these arrangements completely from its own assets and that, by receiving a credit for certain brokerage commissions, PAD avoided using its own assets to pay for the services obtained under the Shelf Space arrangements. Although PAFM and PAD had full knowledge of the Shelf Space arrangements and had many opportunities to disclose this information to the MMS Board, they failed to do so.

26.    In addition, as a fiduciary, PAFM had a duty to disclose to the MMS Board any conflict of interest created by the use of fund brokerage commissions to satisfy Shelf Space arrangements or defray the expenses of a third party, yet it failed to do so.

27.    Further, PAFM and PAD did not inform PEA of the details of the Shelf Space arrangements, particularly that PAD sought to receive credit for the MMS Funds' brokerage commissions. However, PEA was advised that PAD would benefit from PEA directing trades to specific firms and PEA itself coded brokerage transactions as "Mutual Fund Sales" and communicated such coding to the receiving broker-dealers. By virtue of this information and as a fiduciary, which controlled the MMS Funds' brokerage commissions, PEA had a duty to inquire about the details, satisfy itself that fund assets were being used properly for the benefit of the MMS Funds and disclose pertinent information to the MMS Board.

28.    For example, although PAFM and PEA disclosed to the MMS Board information regarding PEA's use of brokerage commissions for research and other services in an annual soft dollar report, neither PAFM nor PEA included the use of the

7

brokerage commissions requested by PAD in these reports. Rather than rely on PAFM's and PAD's representations, PEA should have informed itself of the true nature of PAD's request that brokerage commissions be directed to certain broker-dealers and inform the MMS Board accordingly. PEA failed to do so and thereby breached its fiduciary duty to the MMS Funds.

## PAFM Failed to Disclose to MMS Shareholders that it Directed Fund Brokerage Commissions to Satisfy Shelf Space Arrangements

29.    PAFM was responsible for ensuring that the MMS Funds' Prospectuses and SAI were in compliance with the requirements of Form N-1A.[10]

30.    The information the Commission requires investment companies to disclose in prospectuses and SAIs is set forth in Form N-1A. Specifically, Item 16(c)[11] of the Form N-1A requires a description in the SAI of "how the Fund will select brokers to effect securities transactions for the Fund" and requires that "[i]f the Fund will consider the receipt of products or services other than brokerage or research services in selecting brokers, [the Fund should] specify those products or services."

31.    From at least late 2000 to July 31, 2003, MMS Funds' SAI disclosed that PAFM and any sub-adviser "may consider sales of shares of the [MMS] Trust as a factor in the selection of broker-dealers to execute portfolio transactions for the [MMS] Trust."[12] The SAI did not make the distinction, however, between directing brokerage commissions in "consideration of fund sales" and satisfying negotiated arrangements for distribution services by receiving credit for brokerage commissions. The SAI, moreover, did not disclose to shareholders that PAD had entered into arrangements in which it agreed to direct specific negotiated amounts of fund brokerage commissions to broker-dealers for heightened visibility within their distribution systems and other distribution-related services.

## Joint Distribution Arrangement

32.    When Respondents directed the MMS Funds' brokerage commissions to obtain credit for the Shelf Space arrangements, they made no effort to ensure that these commissions came from those funds that were promoted by the broker-dealers in connection with the Shelf Space arrangements. In particular, all nine broker-dealers calculated the amounts PAD owed for participation in their Shelf Space arrangements based on sales and/or assets held in all the Funds sold and distributed by PAD. However, only the MMS Funds sub-advised by PEA financed the Shelf Space arrangements that provided distribution for all the MMS Funds and PIMS Funds.

---

[10]    The MMS Funds' SAI is incorporated by reference into the prospectuses. PAFM prepared and filed the disclosure documents for the MMS Funds for the 2000 through 2003 time period.

[11]    As of July 4, 2004, the relevant item of the Form N-1A has been changed from Item 16(c) to Item 15(c).

[12]    Although the SAI provided that the Adviser may consider the sale of the MMS Funds in selecting broker-dealers to execute the MMS Funds' portfolio transactions, no authorization was provided to the Adviser or sub-advisers to consider the sale of the PIMS Funds in such broker-dealer selections.

33.    In using the MMS Funds sub-advised by PEA to pay for Shelf Space arrangements for both the PIMS and MMS Funds, a joint distribution arrangement was created whereby brokerage commissions were improperly pooled and those MMS Funds sub-advised by PEA were essentially subsidizing the distribution of the PIMS Funds, a separate trust of mutual funds, and the other MMS Funds.

34.    Neither the MMS Board nor the MMS Shareholders authorized the Respondents to use brokerage commissions to finance the distribution expenses of other MMS or PIMS Funds.

35.    Moreover, from late 2000 to July 31, 2003, Respondents did not apply for and the Commission did not grant an exemption from the statutory provisions that prohibit such joint enterprises or arrangements.

## Violations

36.    As a result of the conduct described above,

a.    PAFM:

    i.    Willfully violated Section 206(2) of the Advisers Act, which provides that it is "unlawful for any investment adviser, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

    ii.    Willfully violated Section 15(c) of the Investment Company Act, which provides in pertinent part that it shall be "the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to such company to furnish, such information as may be reasonably necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as an investment adviser of such company."

    iii.    Willfully violated Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder, which provide in pertinent part that it is unlawful for any "affiliated person of or principal underwriter for any a registered investment company . . . , acting as principal, [to]  participate in, or effect any transaction in connection with, any joint enterprise or other joint arrangement or profit-sharing plan in which any such registered company . . . is a participant . . . unless an application regarding such joint enterprise or

profit-sharing plan has been filed with the Commission and has been granted by an order entered prior to the submission of such plan[.]"

iv.    Willfully violated Section 34(b) of the Investment Company Act, which provides in pertinent part that it is "unlawful for any person to make any untrue statement of a material fact in any registration statement . . . filed or transmitted pursuant to" the Investment Company Act and to "omit to state therein any fact necessary in order to prevent the statements made therein, in light of the circumstances under which they were made, from being materially misleading."

b.    PEA:

i.    Willfully violated Section 206(2) of the Advisers Act, which provides that it is "unlawful for any investment adviser, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

ii.    Willfully violated Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder, which provide in pertinent part that it is unlawful for any "affiliated person of or principal underwriter for any a registered investment company . . . , acting as principal, [to] participate in, or effect any transaction in connection with, any joint enterprise or other joint arrangement or profit-sharing plan in which any such registered company . . . is a participant . . . unless an application regarding such joint enterprise or profit-sharing plan has been filed with the Commission and has been granted by an order entered prior to the submission of such plan[.]"

c.    PAD:

i.    Willfully aided and abetted and caused PAFM's and PEA's violations of Section 206(2) of the Advisers Act, which provides that it is "unlawful for any investment adviser, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

10

ii.    Willfully aided and abetted and caused seven MMS Funds to violate Section 12(b) of the Investment Company Act and Rule 12b-1(b) thereunder by financing the funds' distribution through the direction of brokerage, although such financing was not described in the funds' 12b-1 distribution plans.

iii.    Willfully violated Rule 12b-1(d) promulgated under Section 12(b) of the Investment Company Act by failing to comply with Rule 12b-1(d)'s requirement that "[i]n considering whether a registered open-end management investment company should implement or continue a [written plan describing all material aspects of the proposed financing of distribution] . . . any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may be reasonably necessary to an informed determination of whether such plan should be implemented or continued[.]"

iv.    Willfully violated Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder, which provide in pertinent part that it is unlawful for any "affiliated person of or principal underwriter for any a registered investment company . . . , acting as principal, [to]  participate in, or effect any transaction in connection with, any joint enterprise or other joint arrangement or profit-sharing plan in which any such registered company . . . is a participant . . . unless an application regarding such joint enterprise or profit-sharing plan has been filed with the Commission and has been granted by an order entered prior to the submission of such plan[.]"

### Certain Remedial Efforts

37.    In determining to accept the Offer, the Commission considered the following remedial efforts that the Respondents have already implemented and/or offered to implement:

a.    By July 31, 2003, PEA ceased directing brokerage commissions on portfolio transactions for Shelf Space arrangements.

b.    Since May 2004, PAFM, PEA and PAD have substantially reorganized their governance structure and management team, replacing their respective chief executive officers, and the MMS Funds' chairman of the board also has been replaced.  Further, the legal and compliance structures at PAFM, PEA and PAD have been reorganized and

11

additional personnel have been added. Also, the General Counsel of ADAM now supervises the legal and compliance functions at PAFM, PEA and PAD.

### **Undertakings**

38.    Respondents undertake the following:

a.    PAFM, PEA and PAD shall, within 90 days from the date of entry of the Order, require a senior level employee to implement and maintain the following written compliance policies and procedures:

i.    Procedures designed to ensure that when the PEA trading desk (or any other sub-adviser's trading desk) places trades with a broker-dealer that also sells fund shares, the person responsible for selecting such broker-dealer is not informed by PAD of and does not take into account the broker-dealer's promotion or sale of fund shares, subject to modification only in the event that the Independent Trustees of the MMS Funds determine it is not in the best interests of the MMS Funds.

ii.    Procedures which require PAD to use its best efforts to enter into written contracts memorializing all future Shelf Space arrangements between PAD and any broker-dealer or other intermediary. The documentation of each Shelf Space arrangement will set forth the payment arrangement and the services the broker-dealer or other intermediary will provide, and include a provision preventing the broker-dealer or other intermediary from accepting compensation for promoting or selling MMS Fund shares in the form of brokerage commissions directed to it from an MMS Fund. The documentation of each Shelf Space arrangement will include a request from PAD that the broker-dealer or other intermediary provide point of sale disclosure documents consistent with applicable legal requirements as in effect from time to time.

iii.    All Shelf Space arrangements must be approved in writing by the General Counsel of ADAM, or his delegate, and presented to the Board of Trustees of the MMS Funds prior to implementation.

iv.    PAD will supplement its compliance manual to establish guidelines for entering into Shelf Space arrangements, which shall not be inconsistent with the terms of the Order. The language of the guidelines must be presented to and reviewed by the MMS Board and approved by PAD's chief legal officer.

v.    Subject to the MMS Board's approval, PAFM and PAD will cause the MMS Funds to include disclosure in their prospectuses or SAI about payments to be made by PAFM, PEA or PAD to broker-dealers that are in addition to dealer concessions, shareholder servicing payments, and payments for services that PAFM, PEA or PAD would otherwise provide, such as sub-accounting, and has disclosed, where applicable, that such payments are intended to compensate broker-dealers for various services provided in exchange for such payments, including, without limitation, Shelf Space arrangements, placement on the broker-dealers' preferred or recommended fund list, access to the broker-dealers' registered representatives, assistance in training and education of personnel, marketing support and other specified services.

b.    Within 90 days from the date of entry of the Order, PAFM, PEA and PAD shall maintain a compliance infrastructure having the following characteristics:

PAFM, PEA and PAD shall establish an Internal Compliance Controls Committee to be chaired by the Director of Compliance for ADAM (or if he so designates PAFM's Chief Compliance Officer), which Committee shall have as its members the chief executive officers and chief financial officers of PAFM's, PEA's and PAD's operating businesses, or their delegates. Notice of all meetings of the Internal Compliance Controls Committee

13

shall be given to the outside independent counsel of the MMS Board, who shall be invited to attend and participate in such meetings provided that the involvement of the outside independent counsel of the MMS Board shall be limited to compliance issues relating to the MMS Funds. The Internal Compliance Controls Committee shall review compliance issues throughout the businesses of PAFM, PEA and PAD, endeavor to develop solutions to those issues as they may arise from time to time, and oversee implementation of those solutions. The Internal Compliance Controls Committee shall provide reports on internal compliance matters to the MMS Board with such frequency as the MMS Board may reasonably instruct, and in any event at least quarterly. PAFM, PEA and PAD shall also provide such reports to their respective Audit Committees and the Audit Committee of the MMS Board.

c.     PAFM, PEA and PAD shall at their own expense cause there to be a senior-level employee whose responsibilities shall include compliance matters regarding conflicts of interests relating to the business of PAFM, PEA or PAD, as the case may be. This officer shall report directly to the chief compliance officers of PAFM, PEA and PAD and shall have oversight over compliance matters related to conflicts of interests at PAFM, PEA and PAD.

d.     PAFM, PEA and PAD shall require that PAFM's, PEA's and PAD's chief compliance officers or members of their staffs review compliance with the policies and procedures established at PAFM, PEA and PAD to address compliance issues under the Investment Advisers Act, Investment Company Act and any other applicable federal securities laws and that any violations be reported to the Internal Compliance Controls Committee.

e.     PAFM, PEA and PAD shall require the chief compliance officers of PAFM, PEA and PAD to report to the MMS Chief Compliance Officer who shall report to the Board any breach of fiduciary duty owed to the MMS Board and/or violations of the federal securities laws of which they become aware in the course of carrying out their duties, with such frequency as the MMS Board may instruct, and in any event at least quarterly, provided however that any material breach (i.e., any breach that would be important, qualitatively or quantitatively, to a reasonable board member) shall be reported promptly.

f.    At least once per year, PAFM and PAD shall make a presentation to the Independent Trustees (or such committee as the Independent Trustees may designate) of the MMS Board, including an overview of PAD's Shelf Space arrangements and policies, any material changes to such policies, the number and types of such arrangements, the types of services received, the identity of participating broker-dealers and the total dollar amounts paid. PAFM and PAD will also provide the Audit Committee with a summary quarterly report setting forth the amounts paid by PAD for Shelf Space arrangements and the broker-dealers that received such payments.

g.    At least once a year, PAFM shall provide the Audit Committee of the MMS Board with a detailed written analysis of the use by all sub-advisers to the MMS Funds of all brokerage commissions at broker-dealers, including the practices of directing brokerage commissions, if any, performed by each of the sub-advisers to the MMS Funds.

h.    At least once a year, for at least the next five years, PAFM shall provide the Audit Committee of the MMS Board with a written best execution analysis of the sub-advisers to the MMS Funds performed by a recognized independent portfolio trading analytical firm. In such analysis, PAFM will include lists of: (a) the top ten executing broker-dealers used by each of the MMS Funds' sub-adviser's trading department; and (b) the top ten selling broker-dealers conducting business with PAD.

i.    PAFM's Chief Compliance Officer shall be responsible for monitoring the soft dollar and directed brokerage practices of the various sub-advisers to the MMS Funds. On a quarterly basis, for at least the next 5 years, PAFM's Chief Compliance Officer shall prepare and present to ADAM's General Counsel and the MMS Board a written report regarding such monitoring activities.

Independent Compliance Consultant

j.    PAFM, PEA and PAD shall retain, within 60 days from the date of entry of the Order, the services of an Independent Compliance Consultant not unacceptable to the Staff of the Commission and a majority of the Independent Trustees of the MMS Funds. The Independent Compliance Consultant's compensation and expenses shall be borne exclusively by PAFM, PEA or PAD. Respondents shall require the Independent Compliance Consultant to conduct

15

a comprehensive review of PAFM's, PEA's and PAD's supervisory, compliance, and other policies and procedures designed to prevent and detect conflicts of interest, breaches of fiduciary duty and violations of the federal securities laws by PAFM, PEA and PAD and their employees. This review shall include, but shall not be limited to, a review of PAD's Shelf Space arrangements, and a review of PAFM's, PEA's and PAD's compliance procedures, including, but not limited to, policies and procedures concerning conflicts of interest. PAFM, PEA and PAD shall cooperate fully with the Independent Compliance Consultant and shall provide the Independent Compliance Consultant with access to their files, books, records, and personnel as reasonably requested for the review.

k.    At the conclusion of the review, which in no event shall be more than 120 days from the date of entry of the Order, PAFM, PEA and PAD shall require the Independent Compliance Consultant to submit a Report to PAFM, PEA, PAD, the MMS Board, and the Staff of the Commission. The Report shall address the issues described in paragraph j. of these undertakings, and shall include a description of the review performed, the conclusions reached, the Independent Compliance Consultant's recommendations for changes in or improvements to PAFM's, PEA's and PAD's policies and procedures and a procedure for implementing the recommended changes in or improvements to such policies and procedures.

l.    PAFM, PEA and PAD shall adopt all recommendations contained in the Report of the Independent Compliance Consultant; provided, however, that within 150 days from the date of entry of the Order, PAFM, PEA and PAD shall each in writing advise the Independent Compliance Consultant, the MMS Board and the Staff of the Commission of any recommendations that any of them consider to be unnecessary or inappropriate. With respect to any recommendation that PAFM, PEA and PAD consider unnecessary or inappropriate, the entity need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose.

m.    As to any recommendation with respect to PAFM's, PEA's and PAD's policies and procedures on which these entities and the Independent Compliance Consultant do not agree, Respondents shall attempt in good faith to reach an

agreement within 180 days from the date of entry of the Order. In the event these entities and the Independent Compliance Consultant are unable to agree on an alternative proposal acceptable to the Staff of the Commission PAFM, PEA and PAD will abide by the determinations of the Independent Compliance Consultant.

n.    PAFM, PEA and PAD: (i) shall not have the authority to terminate the engagement of the Independent Compliance Consultant, without the prior written approval of a majority of the Independent Trustees of the MMS Board and the Staff of the Commission; (ii) shall compensate the Independent Compliance Consultant, and persons engaged to assist the Independent Compliance Consultant, for services rendered pursuant to the Order at their reasonable and customary rates; and (iii) shall not be in and shall not have an attorney-client relationship with the Independent Compliance Consultant and shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Compliance Consultant from transmitting any information, reports, or documents to the Trustees or Staff of the Commission.

o.    PAFM, PEA and PAD shall require that the Independent Compliance Consultant, for the period of the engagement and for a period of two years from completion of the engagement, shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with PAFM, PEA and PAD, or any of their present or former affiliates, directors, officers, employees, or agents acting in their capacity as such.  PAFM, PEA and PAD shall require that any firm with which the Independent Compliance Consultant is affiliated in performance of his duties under the Order shall not, without prior written consent of the Independent Trustees of the MMS Board and the Staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with PAFM, PEA and PAD, or any of their present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

Periodic Compliance Review

p.    Commencing in 2006, and at least once every other year thereafter, PAFM, PEA and PAD shall undergo a compliance review by a third party, who is not an interested

17

person, as defined in the Investment Company Act, of PAFM, PEA or PAD. At the conclusion of the review, the third party shall issue a report of its findings and recommendations concerning PAFM's, PEA's and PAD's supervisory, compliance, and other policies and procedures designed to prevent and detect breaches of fiduciary duty and federal securities law violations by any of these entities and any of their employees in connection with their duties and activities on behalf of and related to the MMS Funds. Each such report shall be promptly delivered to PAFM's, PEA's and PAD's Internal Compliance Controls Committee and to the Audit Committee of the MMS Board.

<u>Certification</u>

q.     No later than twenty-four months after the date of entry of the Order, the chief executive officers of the PAFM, PEA and PAD shall certify to the Commission in writing that PAFM, PEA and PAD have fully adopted and complied in all material respects with the undertakings set forth in paragraphs a. through p. above and with the recommendations of the Independent Compliance Consultant or, in the event of material non-adoption or non-compliance, shall describe such material non-adoption and non-compliance.

<u>Recordkeeping</u>

r.     PAFM, PEA and PAD shall preserve for a period not less than six years from the end of the fiscal year last used, the first two years in an easily accessible place, any record of each of PAFM's, PEA's and PAD's compliance with the undertakings set forth in paragraphs a. through p. above.

<u>Extension of Time</u>

s.     For good cause shown, the Commission's Staff may extend any of the procedural dates set forth above.

**IV.**

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions specified in the Offer submitted by the Respondents.

Accordingly, it is hereby ORDERED that:

A.     PAFM, PEA and PAD are censured.

B.    PAFM shall cease and desist from committing or causing any violations and any future violations of Section 206(2) of the Advisers Act, and Sections 15(c), 34(b) and 17(d) of the of the Investment Company Act and Rule 17d-1 thereunder.

C.    PEA shall cease and desist from committing or causing any violations and any future violations of Section 206(2) of the Advisers Act and Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder.

D.    PAD shall cease and desist from committing or causing any violations and any future violations of Section 206(2) of the Advisers Act, and Sections 12(b) and 17(d) of the Investment Company Act and Rules 12b-1(b), 12b-1(d) and 17d-1 thereunder.

E.    PAFM, PEA and PAD shall, within 30 days from the date of entry of the Order, jointly and severally pay disgorgement plus prejudgment interest in the amount of $6,602,000 to the MMS Funds, based upon the amount of brokerage commissions from each fund used to pay for the Shelf Space arrangements. The MMS Board has reviewed the calculations and approved the amounts to be distributed to each of the affected MMS Funds. The amounts that will be paid to each MMS Fund are detailed below:

| | |
|---|---|
| PEA Growth Fund | $    877,235 |
| PEA Growth & Income Fund | $      38,847 |
| PEA Opportunity Fund | $      29,218 |
| PEA Value Fund | $ 1,115,103 |
| PEA Target Fund | $    168,746 |
| PEA Innovation Fund | $ 1,336,871 |
| PEA Renaissance | $ 3,035,980 |

F.    Within 30 days from the date of entry of the Order, PAFM and PAD shall jointly and severally pay a civil money penalty in the amount of $4 million and PEA shall pay a civil money penalty in the amount of $1 million to the United States Treasury. Such payment shall be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (D) submitted under cover letter that identifies PAFM, PEA and PAD as Respondents in these proceedings, and the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Arthur Gabinet, District Administrator, Philadelphia District Office, Securities and Exchange Commission, 701 Market Street, Suite 2000, Philadelphia, PA 19106.

G.    PAFM, PEA and PAD shall comply with the undertakings enumerated in
Section III.38 above.


By the Commission.


Jonathan G. Katz
Secretary