**EXHIBIT E**

**NASD**
**OFFICE OF HEARING OFFICERS**

| | |
|---|---|
| Department of Enforcement,<br><br>              Complainant,<br><br>v.<br><br>American Funds Distributors, Inc.,<br>CRD No. 6247,<br><br>              Respondent. | Disciplinary Proceeding<br>No. CE3050003<br><br>Hearing Officer _____<br><br>**COMPLAINT** |

Upon information and belief, Complainant, the Department of Enforcement, alleges as follows:

**SUMMARY**

1. Between January 1, 2001 and December 31, 2003 (the "review period"), American Funds Distributors, Inc. ("AFD"), the principal underwriter and distributor of American Funds, entered into yearly sponsorship arrangements with approximately 50 NASD member firms that were the top sellers of American Funds ("top-selling retailers" or "top-selling retail firms"). As part of these sponsorship arrangements, AFD arranged for approximately $100 million of brokerage commissions generated by American Funds portfolio trades to be directed to these top-selling retailers of American Funds to reward past sales and to encourage future sales.

2. AFD calculated "target commissions" that it intended to direct to each of the top-selling retailers according to a formula that was based upon each of the top-selling retail firms' prior year's sales of American Funds. AFD communicated to each of the top-selling retail firms the specific amount of that firm's "target commissions" and

the fact that the amount was a function of the firm's prior year's sales of American Funds. At the same time, AFD also discussed with the top-selling retail firms the benefits that AFD expected to receive pursuant to the sponsorship arrangements, such as the inclusion of American Funds on the firms' "preferred fund" or "recommended fund" lists, and enhanced access to the firms' sales forces.

3. At the beginning of each year during the review period, AFD provided a chart to the trading desk at Capital Research and Management Company ("CRMC"), the investment advisor to American Funds. The chart listed each of the top-selling retailers with which AFD had a sponsorship arrangement and the amount of "target commissions" for each firm. CRMC's trading desk directed brokerage commissions on American Funds portfolio transactions to the top-selling retailers on the chart based upon the "target commissions" set by AFD for each firm.

4. This practice by AFD violated NASD Conduct Rules 2830(k) and 2110. *First*, by entering into the sponsorship arrangements, AFD, directly or indirectly, offered or promised brokerage commissions to other firms, as a condition to the sale or distribution of shares of American Funds, in violation of NASD Conduct Rule 2830(k). *Second*, AFD violated NASD Conduct Rule 2830(k) by, directly or indirectly, arranging for CRMC to direct to the top-selling retail firms a percentage of directed brokerage commissions conditioned upon that firm's sales or promise of sales of shares of American Funds.

**RESPONDENT AFD**

5. AFD, CRD No. 6247, has been a member of NASD since 1972. It is a wholly owned subsidiary of Capital Research and Management Company ("CRMC") and

2

is headquartered in Los Angeles, California. AFD is the principal underwriter and distributor of American Funds, the third-largest mutual fund family in the United States. American Funds consists of 29 mutual funds, more than $450 billion in assets, and approximately 25 million shareholder accounts. AFD is responsible for selling shares of the American Funds to consumers through financial intermediaries.

### CRMC

6.   CRMC is the investment advisor of American Funds and principally derives its revenue from annual advisory fees paid on the assets of American Funds. CRMC maintains a trading desk that places trades for American Funds' portfolio managers with broker-dealers for execution.

### NASD Conduct Rule 2830(k)

7.   In February 1972, the SEC, in its "Statement on the Future Structure of the Securities Markets" (the "SEC Statement") requested that the NASD direct its members to promptly discontinue the use of reciprocal brokerage for the sale of investment company shares. Among other recommendations, the SEC Statement requested that the NASD require its members to cease the practice of selling investment company shares for the purpose of receiving commission business from the funds whose shares the member sells.

8.   In response, NASD adopted and codified the "Anti-Reciprocal Rule," as an amendment to Article III, Section 26 of the Rules of Fair Practice. The "Anti-Reciprocal Rule," which is now codified as NASD Conduct Rule 2830(k), first became effective on July 15, 1973. The rule is designed to prevent *quid pro quo* arrangements in which brokerage commissions, which are fund assets, are used to compensate member

3

firms for selling fund shares. The rule is also designed to ensure that the execution of portfolio transactions by brokerage firms is guided by the principle of "best execution" and not by other considerations. In addition, the rule is meant to eliminate the danger that a brokerage firm, when recommending mutual fund sales to customers, will base its recommendations on the additional rewards received in portfolio commissions rather than on the investment needs of the customer.

9. NASD Conduct Rule 2830(k)(3) provides:

> No member shall, directly or indirectly, offer or promise to another member, brokerage commissions from any source as a condition to the sale or distribution of shares of an investment company and no member shall request or arrange for the direction to any member of a specific amount or percentage of brokerage commissions conditioned upon that member's sales or promise of sales of shares of an investment company.

10. In 1984, NASD issued Notice to Members 84-40 to provide guidance to member firms regarding the Anti-Reciprocal Rule.

11. NTM 84-40 sets forth several examples of specific practices that are inconsistent with the rule. Two of the examples specified are:

   a. "a request by a dealer, or an offer or agreement by a principal underwriter, for a specified percentage of portfolio brokerage commissions relative to the dealer's sale of fund shares;" and

   b. "a request by a dealer, or the offer or agreement by a principal underwriter, that portfolio brokerage commissions be placed on the understanding that this would result in placement of the funds on the dealer's preferred list."

4

### AFD's Sponsorship Program

12. During the review period, AFD entered into yearly sponsorship arrangements, which the firm referred to as "Sponsorship Agreements," with approximately the 50 top-selling retailers of American Funds. The purpose of these sponsorship arrangements was to increase the sales of American Funds by giving AFD enhanced visibility in the retail firms' distribution systems and greater opportunities to introduce American Funds to the sales staff of the retail firms.

13. AFD's process for entering into sponsorship arrangements with the top-selling retailers remained largely the same throughout the review period.

14. First, AFD's senior management compiled a list of approximately fifty retail firms that sold the most American Funds in dollars. This list of top-selling retailers was then separated into tiers, according to sales.

15. AFD prepared a budget for the financial support that it would pay to the retailers each year as part of its sponsorship arrangements. AFD's budget consisted of two components: "target commissions" and "marketing pool." "Target commissions" (or "execution revenue") were brokerage commissions that AFD intended to arrange for CRMC to direct to the top-selling retail firms; target commissions were a function of the firms' prior year's sales of American Funds. "Marketing pool" (or "hard dollars") were cash payments based upon the retail firms' prior year's sales that AFD paid directly to the firms by check.

16. For purposes of budgeting, AFD calculated the marketing pool for each firm by multiplying the top-selling retailers' prior year's sales by five basis points. In 2003, AFD continued using this formula, but also took into consideration other criteria

for each firm, such as gross sales from the previous year, net sales from the previous year, assets under management from the previous year, sales trends, AFD's access to the firm's branches and brokers, AFD's status on the firm's preferred list, the firm's general support of AFD as measured by AFD's access to national and regional firms, AFD's access to top producer and top branch reports, AFD's inclusion in the firm's ticket charge program, AFD's access to shareholder information and the ability to communicate with them, and the firm's ability to provide line of business data to AFD. In 2003, the marketing pool was calculated by multiplying sales by 5 basis points, and then adjusted per these considerations. This amount was paid out of AFD's assets, with an occasional subsidy from CRMC's profits.

17.     For purposes of budgeting, AFD calculated the target commissions for each top-selling retail firm by multiplying the firm's prior year's sales by ten basis points or fifteen basis points, depending upon the prior arrangement with the firm. Firms that were among the highest sellers of American Funds generally received target commissions calculated as fifteen basis points on the prior year's sales of American Funds. In 2003, AFD continued using this formula, but also took into consideration the other criteria as set forth above in paragraph 16. In 2003, the target commissions were calculated by multiplying sales by 10 or 15 basis points, and then adjusted per these considerations. Unlike the marketing pool, target commissions were not derived from AFD's assets. The commissions were paid using American Funds shareholders' assets.

18.     AFD assigned six senior sales staff at AFD, referred to as Dealer Relationship Managers ("DRMs"), to handle the sponsorship arrangements with each of

6

the top-selling retail firms. The President of AFD directly handled the sponsorship arrangements with the top five retailers of the American Funds.

19. Typically late in the year or early in the following year, DRMs prepared to meet with their assigned top-selling retailers to discuss the terms of the sponsorship arrangements for the upcoming year. In 2002, for example, DRMs prepared for this meeting by creating a "Sponsorship Discussion Template" to recap the sponsorship arrangement that AFD had with the retailers for 2002, and to use as a basis for discussions with retailers about sponsorship arrangements for 2003. Each Sponsorship Discussion Template contained a section entitled "2002 Sponsorship Agreement." In this section, the DRM listed the "financial arrangement" it had with the firm and the "benefits/ activities" that AFD received from the firm in 2002. The DRM identified the specific targets that AFD had established for the firm in 2002 for marketing pool and target commissions, and, in most cases, usually the specific basis points that were used for each of these calculations. In addition, directly below the targets, the DRM listed the corresponding payments that AFD actually made to the firm in marketing pool and target commissions in 2002. This section also listed the preferential treatment that AFD enjoyed in 2002 pursuant to the sponsorship arrangement.

20. In the Sponsorship Discussion Template, the DRM also listed what he believed the retailer expected for the 2003 sponsorship arrangement, including a financial arrangement premised upon a basis point calculation on the firm's sales for 2002 for both marketing pool and target commissions, and the benefits and activities that AFD could expect to receive. In addition, the Sponsorship Discussion Template also set forth the

DRM's proposed sponsorship for 2003, which included the financial arrangement and the benefits and activities that AFD should seek.

21.     Soon thereafter, the DRMs met with the top-selling firms and discussed the details of their sponsorship arrangements. Either during that meeting, or shortly thereafter, DRMs typically communicated the specific amounts of the marketing pool and target commissions that the firm could expect to receive during the year, that the specific amounts were based upon the firm's prior year's sales of American Funds, and often the formula used to calculate the specific amounts. The President of AFD provided the same information to the top five retailers of American Funds when he met with them.

22.     As part of the sponsorship arrangements, the top-selling retailers agreed to provide AFD various marketing advantages. Among those marketing advantages were: access to the firm's sales force through meetings, conference calls, training classes, and e-mail; access to the firm's top producers; speaking platforms and prime booth space at firm training meetings; exposure, including the ability to provide editorial content, in the firm's newsletters, mailings, pamphlets, marketing plans, and other sales literature; inclusion on the firm's "recommended fund," "preferred fund," and "partner" lists; updated sales representative lists; information on new sales representatives; "hot links" from the firm's web-site to the American Funds website; exposure on the firm's web site; "broadcast e-mails" to brokers about the American Funds; a "focus month" in which AFD would have exclusive representation in the firm's weekly publication; participation in due diligence meetings; participation in commission enhancements; ticket charge reimbursement programs; and exclusive access to the firm's sales reports.

23.    DRMs generally prepared one-year "business plans" that reflected the sponsorship arrangements and provided copies to the top-selling firms. The business plans set forth the marketing advantages that AFD was to receive from the firms during the year. In addition, the business plans stated that AFD would provide financial support in the form of marketing pool and target commissions or execution revenue.

### AFD Arranged for CRMC to Direct Brokerage to the Top-Selling Retailers

24.    In order to provide the top-selling retail firms with the target commissions, AFD arranged for CRMC to direct American Fund portfolio trades and brokerage commissions to the top-selling retailers.

25.    At the beginning of each year during the review period, AFD provided a chart to the trading desk at CRMC. The chart listed each of the top-selling retailers with which AFD had a sponsorship arrangement and the amount of target commissions for each firm for that year.

26.    CRMC's trading desk used this information to direct brokerage commissions on American Funds portfolio transactions to the top-selling retailers on the chart based upon the target commissions set by AFD for each firm.

27.    Throughout the year, CRMC's trading desk provided monthly updates about the brokerage commissions directed to each top-selling retail firm to, among others, the DRMs, the manager of the DRMs, and the President of AFD. In turn, the DRMs occasionally provided updates to the top-selling retailers about how much in target commissions they had received throughout the year.

28.     There were two ways in which CRMC directed brokerage commissions to the top-selling retail firms, depending upon whether the firm possessed the capacity to execute securities transactions.

29.     During the review period, approximately 20 of the top-selling retailers with which AFD had a sponsorship arrangement provided execution services. To provide these firms with target commissions, AFD arranged for CRMC to direct American Funds portfolio transactions directly to these firms. These firms executed the trades and received the directed brokerage commissions. In this manner, AFD arranged for CRMC to direct target commissions to these firms totaling in excess of approximately $71 million during the review period. The target commissions that AFD arranged for CRMC to pay to retailers that provided execution services over the three-year review period ranged from a high of approximately $11 million to one retailer to a low of approximately $491,720 to another retailer.

30.     During the review period, approximately 30 of the top-selling retailers did not have the ability to execute trades for CRMC.

31.     In order to receive the directed brokerage commissions from CRMC, these firms entered into "step out" arrangements with clearing firms. These retailers were called "step out" or "correspondent firms," after the manner in which they received brokerage commissions on trades directed by CRMC.

32.     In a "step out" arrangement, the firm to which the commissions were to be directed identified to AFD and CRMC the clearing firm to which CRMC should direct trades for execution. These trades were designated for the "step out" firm pursuant to the

target commissions established by AFD. CRMC then directed American Fund portfolio transactions to the clearing firm for the benefit of the "step out" firm.

33. The clearing firm, which executed the trade, shared the commission with the "step out" firm, even though the "step out" firm provided no services in connection with the trade. The amount of commission that the "step out" firm received depended upon the agreement between the "step out" firm and the clearing firm. As a result of these agreements, the clearing firm generally credited or paid approximately seventy to ninety percent of the commission to the "step out" firm.

34. In June 2002, AFD decided to stop directing trades to "step out" firms, and "step-out" trades were permanently discontinued by CRMC as of July 1, 2002.

35. Between January 1, 2001 and July 1, 2002, CRMC directed brokerage commissions totaling approximately $29 million in this manner to "step out" firms pursuant to sponsorship arrangements. The target commissions that AFD arranged for CRMC to pay to "step out" retailers over the three-year review period ranged from a high of approximately $5.4 million to one retailer to a low of approximately $112,855 to another retailer.

## CAUSE OF ACTION

### (Violations of NASD Conduct Rules 2830(k)(3) and 2110)

36. The allegations set forth in paragraphs 1 through 35 are re-alleged and incorporated for the purpose of this cause of action.

37. By entering into the sponsorship arrangements, AFD, directly or indirectly, offered or promised to other firms brokerage commissions, as a condition to the sale or distribution of shares of American Funds.

38. In addition, AFD, directly or indirectly, arranged for CRMC to direct to the top-selling retail firms a percentage of directed brokerage commissions conditioned upon that firm's sales or promise of sales of shares of American Funds.

39. During the review period, the total brokerage commissions that AFD arranged for CRMC to direct to the top-selling retailers of American Funds in this manner totaled approximately $100 million.

40. By virtue of these actions, AFD violated NASD Conduct Rules 2830(k)(3) and 2110.

## **PRAYER FOR RELIEF**

WHEREFORE, Complainant, the Department of Enforcement, respectfully requests:

A. Findings of fact and conclusions of law that Respondent committed the violations charged and alleged herein;

B. An order imposing sanctions upon the Respondent in accordance with NASD Rule 2210;

C. An order requiring Respondent to disgorge fully any and all ill-gotten gains and/or make full and complete restitution, together with interest;

D. An order imposing such costs of any proceeding as are deemed fair and appropriate under the circumstances in accordance with NASD Rule 8330; and

E.  An order imposing any other fitting sanction.

DATED:  February 16, 2005

                                      Respectfully submitted,

                                        _____
                                        Jeffrey P. Bloom, Special Counsel
                                        Daniel D. McClain, Senior Attorney
                                        Department of Enforcement
                                        NASD
                                        1801 K Street, NW, Suite 800
                                        Washington, DC 20006
                                        Tele. 202 974-2862
                                        Fax   202 721-8389

Rory Flynn, Of Counsel
Department of Enforcement
NASD
1801 K Street, NW, Suite 800
Washington, DC 20006
202 974-2824