**EXHIBIT F**

BILL LOCKYER
Attorney General of the State of California
THOMAS GREENE
Chief Assistant Attorney General
MARK BRECKLER
Senior Assistant Attorney General
JON M. ICHINAGA
Deputy Attorney General
State Bar No. 137290
   300 S. Spring Street,
   Los Angeles, CA 90013
   Telephone:
   Facsimile:

Attorneys for Plaintiff the People of the State of California

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>           Plaintiff,<br><br>v.<br><br>AMERICAN FUNDS DISTRIBUTORS, INC., a corporation, CAPITAL RESEARCH AND MANAGEMENT COMPANY, a corporation, and DOES 1 through 100, inclusive,<br><br>           Defendants. | CASE NO.:<br><br>COMPLAINT FOR CIVIL PENALTIES, ANCILLARY RELIEF AND PRELIMINARY AND PERMANENT INJUNCTION BASED ON VIOLATIONS OF THE CALIFORNIA CORPORATE SECURITIES LAW OF 1968<br><br>[Corporations Code sections 25401 and 25216: Anti-Fraud Provisions] |

Plaintiff the People of the State of California ("Plaintiff" or the "People"), by and through Bill Lockyer, Attorney General of the State of California, allege as follows:

**PLAINTIFF AND JURISDICTION**

1. Bill Lockyer is the duly elected Attorney General of the State of California and is the chief law officer of the State. The Attorney General is authorized by Government Code sections 12658 and 12660 to bring actions in the name of the People of the State of California in the superior court to enforce the Corporate Securities Law of 1968 ("CSL").

///

1

COMPLAINT FOR CIVIL PENALTIES, ANCILLARY RELIEF AND INJUNCTION

# DEFENDANTS

2. The defendants are affiliates of the mutual fund complex known as American Funds that includes approximately 29 separate mutual funds ("AF Funds") with combined assets of over $600 billion and with over 20 million shareholders. Defendant American Funds Distributors, Inc. ("AFD") is, and at all times herein was, a corporation organized and existing under the laws of the State of California. AFD is, and at all relevant times was, a wholly owned subsidiary of defendant Capital Research and Management Company, providing distribution services to the AF Funds. At all relevant times, AFD was a "broker-dealer" and an "underwriter" as defined pursuant to Corporations Code sections 25004 and 25022, respectively. AFD's principal place of business is located in Los Angeles, California.

3. Defendant Capital Research and Management Company ("CRMC") is, and at all times mentioned herein was, a privately-held corporation organized and existing under the laws of the State of Delaware. CRMC is the investment manager for the AF Funds and directly or indirectly through various entities owns and/or controls, organizes, manages, advises and distributes shares of the AF Funds. CRMC is compensated by the AF Funds based on a percentage of assets held under management. According to its audited consolidated financial statements, in fiscal years ending June 30, 2000-2003 alone, CRMC and its subsidiaries earned net income totaling over $1.4 billion. CRMC's principal place of business is Los Angeles, California.

4. Each act alleged by defendants were engaged in, authorized, or ratified by defendants' officers, directors, managers, agents, employees, or representatives while engaged in the management, direction, or control of the affairs of the defendants and while acting within the scope and course of their duties.

5. Any reference to any act of defendants means that the act of each defendant acted individually, jointly, and/or in concert with all other defendants.

6. At all times mentioned, each defendant knew that the other defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Each defendant nevertheless intended to, encouraged, facilitated, or assisted in the commission of the

1 unlawful acts, thereby aiding and abetting the other defendants in the unlawful conduct.

2   7.   The violations of law which are the subject of this action occurred throughout the State of California, including but not limited to, the County of Los Angeles.

   8.   The true names and capacities of the defendants sued herein as DOES 1 through 100, inclusive, are unknown to Plaintiff who therefore sues these defendants by fictitious names. Plaintiff will amend this complaint to show the true names of each when they are ascertained.

## THE NATURE OF AND REASON FOR THIS ACTION

   9.   Plaintiff brings this action in response to an industry-wide mutual fund practice involving mostly oral, undisclosed agreements between mutual fund complexes and certain securities broker-dealers ("broker-dealers") who sell fund shares to investors. These agreements benefit the mutual fund complexes and/or these broker-dealers to the detriment of mutual fund investors.

### Background

   10.   A mutual fund is a fund operated by an investment company that raises money and invests in securities. Mutual funds offer professional management, portfolio diversification, liquidity, and securities ownership to millions of individuals who seek to save their nest egg for a child's college education or for their own retirement. Today, over 91 million individuals, comprising nearly half of all U.S. households, own shares in mutual funds. The majority of these investors represent households with moderate annual incomes between $25,000 and $75,000. Mutual fund investors can choose from more than 500 mutual fund complexes offering over 8,000 mutual funds. Robust competition among mutual fund complexes may benefit shareholders by providing lower costs and expenses, investment choice, diversified investments, easier methods to invest, and innovative customer services.

   11.   Mutual funds are distinct legal entities owned by the shareholders of the fund. Each fund contracts separately with an investment adviser who provides management, portfolio selection, and administrative services to the fund. Typically, the investment adviser's compensation is based on a percentage of the fund's total assets. A mutual fund's daily operating costs are periodically deducted from the fund's assets. These costs include such items as the fee

3

COMPLAINT FOR CIVIL PENALTIES, ANCILLARY RELIEF AND INJUNCTION

paid to the fund's investment adviser for managing the fund, accounting expenses and the cost of preparing fund documents. A board of directors reviews each mutual fund's operations and is intended to represent fund shareholders' interests. The board of directors' review should include monitoring for conflicts of interest between the fund and its adviser.

12. A mutual fund sells shares through a variety of distribution channels. One of these involves the sale of shares through third party broker-dealers or their representatives. In these transactions, a mutual fund compensates its selling broker-dealers by levying a sales charge called a load on the investors based on a percentage of the amount being invested. Typically, an investor pays when making the investment (a front-end load) or later when selling or redeeming the shares (a back-end load). Investors may also pay their third party professionals an annual fee based on the total amount of assets invested. Mutual funds may also charge investors ongoing fees as compensation for costs expended in marketing the fund or for servicing the investor's account.

13. Mutual funds provide various disclosures to their shareholders about fees in a written prospectus which includes a fee table that discloses the sales charges, operating expenses, and other fees that investors pay as part of investing in the fund. Specifically, the fee table discloses (1) charges paid directly by shareholders out of their investment such as front or back-end sales loads and (2) recurring charges deducted from fund assets such as management fees, distribution fees, and other expenses charged to shareholder accounts. The fees deducted from the fund's assets on an ongoing basis are reported to investors as a percentage of fund assets and are called the fund's operating expense ratio.

### Shelf-Space Agreements

14. Many mutual fund complexes agree to pay for shelf space from broker dealers in the form of heightened visibility and access to the registered sales representatives of broker-dealers and placement on preferred or recommended lists (referred to generally as "Shelf-Space Agreements"). Broker-dealers have increasingly demanded compensation from mutual fund complexes for selling mutual fund shares in addition to that received in the form of sales loads and other fees. A "Shelf-Space Agreement," also known as a "revenue sharing agreement,"

occurs when a mutual fund pays this additional compensation in exchange for the preferential marketing of its shares by a broker-dealer. Such arrangements are referred to in private communications as "marketing relationships," "preferred sponsorships," "partnership agreements," "preferred partner programs," "partnership programs," or simply "partnerships." Mutual fund complexes make these payments in cash ("hard dollars") and/or in the form of brokerage commissions for fund portfolio transactions ("directed brokerage" or "execution revenue").

15. Shelf-Space Agreements are typically created when a mutual fund's distributor enters into an oral agreement with a broker-dealer to exchange a combination of hard dollars and directed brokerage for a valuable privilege: preferred or exclusive access to the broker-dealer's sales force and heightened visibility within a broker-dealer's distribution or sales systems. The amount of compensation is typically based on percentages of the mutual fund sales by the broker-dealers.

16. Mutual funds have historically not disclosed Shelf-Space Agreements to their investors. They fail to provide their investors a means to understand that their broker-dealer is paid money beyond sales loads to sell a particular fund. Instead, for example, they may represent the payment as "cost sharing" or for reimbursement for costs associated with training of broker dealer employees. Mutual funds additionally fail to disclose that when these payments are being made from fund assets that investors' investment dollars are used to guarantee premium "shelf-space" at the selling broker's office. Shelf-Space payments increase fund expenses and create conflicts of interest between investors and the financial professionals with whom they deal.

**Undisclosed Shelf-Space Agreements Increase Mutual Fund Costs**

17. Broker-dealers demand that mutual funds participating in their Shelf-Space programs pay either in cash or in a multiple of that cash amount in the form of directed brokerage. Directed brokerage is an expense charged to the fund and is ultimately borne by the shareholders.

18. To pay for shelf-space with directed brokerage, mutual funds conduct a specified amount of its portfolio transactions with the broker-dealer providing shelf-space. In those instances, the distribution arm of the mutual fund complex informs its securities traders which

5

COMPLAINT FOR CIVIL PENALTIES, ANCILLARY RELIEF AND INJUNCTION

broker-dealers should be used to execute portfolio transactions for the funds and in what aggregate annual amount. In some instances, a broker-dealer ("introducing broker-dealer") does not have the capability of executing trades for the mutual fund. In those cases, the broker-dealer designates a trading agent which actually executes the trade for the mutual fund, keeps part of the commission, and remits the remainder of the commission to the introducing broker-dealer. This practice belies the notion that mutual fund advisers merely consider the selling efforts of the broker(s) involved. These practices are, in fact, negotiated arrangements in which brokerage commissions, a fund asset belonging to the shareholders, is traded to obtain preferential sales efforts by outside broker-dealers. The practice consumes a fund asset that could otherwise be used to negotiate lower commission rates, pay other fund expenses, or obtain cash rebates. Directed brokerage creates a disincentive to the lowering of brokerage commissions because in the absence of directed brokerage, additional hard dollars would have to be found to pay for the Shelf-Space Agreements.

**Undisclosed Potential Conflicts of Interest**

19. Undisclosed Shelf-Space Agreements adversely affect the relationship between broker-dealers and mutual funds on the one hand and their customers on the other. The purpose of shelf-space payments is to create an incentive for a broker-dealer to highlight, feature or recommend funds that best compensate the broker-dealer. This practice creates a potential conflict of interest with respect to which funds to recommend to meet the customer's personal investment needs. The secrecy of these agreements prevents prospective mutual fund investors from recognizing this potential conflict of interest and prevents mutual fund directors from effectively regulating their funds' distribution practices to protect shareholders.

20. Mutual funds using fund assets to promote the sale of fund shares avoid paying fees from their own resources. Although potential conflicts exist with respect to the use of other fund assets to pay for the marketing of fund shares, the use of directed brokerage exacerbates this conflict because mutual fund directors cannot effectively ascertain a fund adviser's true motivations in selecting a broker-dealer or a distributor's involvement in that selection. Mutual funds further impede their directors' ability to protect shareholders by not clearly disclosing

Shelf-Space Agreements.

21. Undisclosed Shelf-Space Agreements create the potential for unmanageable conflicts of interest that may harm funds and their shareholders. Competition among fund distributors to secure a prominent position in the selling brokers' distribution systems creates incentives for mutual funds to direct brokerage based on distribution and sales considerations rather than quality of execution and price considerations. Payment of cash to broker-dealers based on the amount of sales of fund shares may artificially limit the range of choices made available to investors and induce broker-dealers to sell fund shares to investors for whom such investments are not suitable. These incentives may adversely affect decisions about how and where to effect portfolio securities transactions, impact the quality and price of portfolio transactions, increase fund expenses, and result in unsuitable investments.

22. Defendants' failure to disclose the existence, details and significance of defendants' Shelf-Space Agreements to prospective investors constitute violations of the CSL as alleged below.

**American Funds' Shelf-Space Agreements**

23. During the period between January 1, 2000 through the present ("Relevant Period"), AFD offered for sale and sold shares in the AF Funds. Unless otherwise specified, all allegations below occurred during the Relevant Period.

24. AFD's offers for sale and sale of shares of the AF Funds were made by means of written communications in the form of mutual fund prospectuses and statements of additional information ("Disclosure Documents").

25. AFD maintained a yearly average of approximately 100 Shelf-Space Agreements with broker-dealers ("Shelf-Space Brokers"). These Shelf-Space Agreements, referred to by AFD as "Sponsorship Agreements," were overwhelmingly undisclosed, oral agreements entered into between AFD and the Shelf-Space Brokers with express, reciprocal terms that were understood by both parties to the agreements. (Hereinafter, the term "Shelf-Space Agreements" shall refer to the agreements in this paragraph.).

26. Pursuant to the Shelf-Space Agreements, AFD agreed to pay, and did pay, cash

and/or directed brokerage to the Shelf-Space Brokers in return for various exclusive marketing benefits, including: (i) privileged and guaranteed access to the Shelf-Space Brokers' distribution or sales systems; (ii) heightened visibility of the AF Funds within the Shelf-Space Brokers' distribution or sales systems; and (iii) participation in programs in which transaction fees associated with sales are waived.

27. As discussed in greater detail below, AFD's payments, pursuant to the Shelf-Space Agreements, were made in one or all of several ways, including: (i) Broker Marketing Pool; (ii) Broker Partnership Payments; (iii) Directed Brokerage; and, (iv) on information and belief, excessive Networking or Sub-transfer Agency Fees ("Shelf-Space Payments").

28. Until 2004, the top 47 Shelf-Space Brokers in terms of sales of AF Funds' shares were paid with commissions from AF Funds' portfolio transactions ("directed brokerage") in addition to or instead of cash as consideration for their Shelf-Space Agreements. For these Shelf-Space Brokers, AFD set targets based on either 10 or 15 basis points on the prior year's sales of AF Funds' shares ("targets"). AFD communicated these targets to the CRMC portfolio traders at the beginning of each calendar year. The CRMC traders, in turn, placed AF Funds' portfolio trades in order to meet the targets, and designated such trades as fulfilling "sales" obligations in the computerized records of their trades. The basis point formula and the amount of the targets for the directed brokerage were communicated to Shelf-Space Brokers by AFD and were part of the consideration for the Shelf-Space Agreements. Additionally, AFD would sometimes negotiate to use directed brokerage to pay for AFD's participation in "no transaction fee" programs offered by the Shelf-Space Brokers, request that additional portfolio trades with certain Shelf-Space Brokers be made in order to fulfill commitments it made, and, if the CRMC traders exceeded targets in certain years, would insist that the particular Shelf-Space Broker give AFD a "credit" toward its Shelf-Space obligations for the amount of the overage in the following year. CRMC, until 2002, for Shelf-Space Brokers not having the capacity to perform securities trades, traded with the brokers' identified correspondent clearing broker which, in turn, transmitted a percentage of the commissions to the Shelf-Space Broker on whose behalf the trade was made. The correspondent clearing broker typically kept $.01 per share, passing the remainder of the $.05 per

share trading commission to the Shelf-Space Broker. CRMC was aware that, in the absence of directed brokerage, Shelf-Space Brokers would expect AFD to make additional cash payments to pay for their Shelf-Space Agreement. AFD and CRMC were therefore aware that lowering the commissions paid by CRMC for AF Funds' portfolio transactions would increase AFD's cash obligations or would require that additional shares be traded in order to meet targets. Accordingly, AFD's directed brokerage arrangements acted as an incentive not to lower commissions, or to seek rebates of commissions, paid by the AF Funds in its portfolio transactions.

29. Thus, pursuant to the Shelf-Space Agreements, defendants offered, agreed to pay, and did pay, either (a) cash; (b) directed brokerage, or (c) a combination of cash and directed brokerage to the Shelf-Space Brokers who sold AF Funds based on an agreed formula. Specifically, from 2000 through the end of 2003, defendants paid at least $329 million in cash and directed brokerage ($197 million in cash and $132 million in directed brokerage). For 2004, AFD budgeted and, on information and belief, paid over $97 million in cash Shelf-Space Payments. Typically, AFD paid cash, referred to as its "Broker Marketing Pool," calculated on 5 basis points of the previous year's sales. Directed brokerage, referred to by defendants as "execution revenue" or "target commissions," was paid based on either 10 or 15 basis points on previous year's sales of AF Funds' shares. For the top five Shelf-Space Brokers, AFD agreed to pay, and did pay, an additional annual cash payment referred to as "Broker Partnership Payments." The amount of Broker Partnership Payments was set by AFD's co-Chief Executive Officer. On information and belief, Sub-Transfer Agency or Networking Fees were also paid to some Shelf-Space Brokers ostensibly for the cost of record-keeping but were, in part, actually a disguised additional form of Shelf-Space Payments from fund assets. During the relevant period, it was understood by AFD and the Shelf-Space Brokers that the term of the Shelf-Space Agreements was perpetual unless expressly renegotiated or canceled by AFD in its sole discretion.

///

30. In return for the $426 million in Shelf-Space Payments, AFD was guaranteed and received preferred access for its wholesalers to the Shelf-Space Brokers' registered sales

representatives; heightened visibility within their sales networks, including, among other things, inclusion on preferred lists or the provision of preferred status; and participation in "no transaction fee" programs. In the absence of such benefits, AFD refused to make such payments to a broker-dealer. In fact, on occasion, AFD did refuse to make such payments when its wholesalers were denied access to a broker-dealer's registered sales representatives.

31. The Shelf-Space Agreement between AFD and Edward D. Jones ("Jones"), a Shelf-Space Broker, illustrates the purpose and effect of these secret agreements. Under the AFD/Jones Shelf-Space Agreement:

A. Between 2000 and 2004, AFD paid Jones over $96 million in cash. During 2000-2001 alone, CRMC directed more than $10.5 million in portfolio trades (i.e. directed brokerage) for Jones' credit to a clearing broker since Jones could not do the trades itself. In return for the $106.5 million in cash and directed brokerage, Jones maintained AF Funds' exclusive status as one of its seven preferred funds, provided AF Funds with heightened visibility on Jones' internet and intranet websites, allowed AFD preferential access to its registered sales representatives, and paid special financial incentives to its registered representatives for sales of AF Funds' shares. As a result, between 2000-2003, Jones sold over $45 billion in AF Funds' shares to its customers. In fact, sales the AF Funds' shares, in 2002-2003, constituted over 60% of the total mutual fund shares sold by Jones.

B. When CRMC stopped directed brokerage for Jones, in January 2002, AFD replaced it with more cash. Thus, the cash Shelf-Space Payments to Jones doubled, increasing from $10.7 million in 2001 to $20.7 million in 2002. The increased cash payment to replace the lost directed brokerage was negotiated between AFD and Jones and was not the result of increased sales. The replacement of directed brokerage with more cash, in part, was intended to increase the bonuses Jones could pay to its registered sales representatives for their sales of the AF Funds' shares.

///

**American Funds' Statements in the Disclosure Documents Concerning**

COMPLAINT FOR CIVIL PENALTIES, ANCILLARY RELIEF AND INJUNCTION

**Compensation to Dealers and Execution of Portfolio Transactions**

32. Prior to 2004, the Disclosure Documents, under headings entitled "Other Compensation to Dealers" made the following statements:

A. The Prospectus provided,

"American Funds Distributors may pay, or sponsor informational meetings for, dealers as described in the statement of additional information."

B. The Statement of Additional Information provided,

"The Principal Underwriter [AFD] at its expense (from a designated percentage of its income), currently provides additional compensation to dealers. Currently, these payments are limited to the top 100 dealers who have sold shares of the fund or any other American Funds. These payments are based principally on a pro rata share of a qualifying dealer's sales. The Principal Underwriter will, on an annual basis, determine the advisability of continuing these payments."

33. The prospectus under the heading entitled "Execution of Portfolio Transactions," provided, in relevant part,

"The investment adviser [CRMC] places orders for the fund's portfolio securities transactions. The investment adviser strives to obtain the best available prices in its portfolio transaction taking into account the costs and quality of executions. When, in the opinion of the investment adviser, two or more brokers (either directly or through their correspondent clearing agents) are in a position to obtain the best price and execution, preference may be given to brokers who have sold shares of the fund, as well as shares of other American Funds, or who have provided investment research, statistical, or other related services to the investment adviser. Brokerage allocation on this basis need not be proportional to the broker's sales of the fund's shares, or to the value of the research, statistical and other services used by the investment adviser for the benefit of the fund. The fund does not consider that the investment adviser has an obligation to obtain the lowest available commission rate to the exclusion of price, service and qualitative considerations."

11

COMPLAINT FOR CIVIL PENALTIES, ANCILLARY RELIEF AND INJUNCTION

Case 1:04-cv-10584-GAO    Document 80-7    Filed 05/25/2005    Page 13 of 17

## American Funds' Omissions of Material Facts

34.    The Disclosure Documents omitted the following material facts ("Undisclosed Matters") that made the statements about other compensation to dealers and execution of portfolio transactions misleading:

   A.    The existence and *quid pro quo* nature of and the potential and actual conflicts of interest created by the Shelf-Space Agreements with specific Shelf-Space Brokers: that over $426 million was paid to guarantee preferential or exclusive access for AFD wholesalers to the broker-dealers' sales force; that preferential access often included being designated as a "preferred" or "recommended" fund; and that, in certain cases, a "no transaction fee" or "low transaction fee" was provided making the AF Funds cheaper for the Shelf-Space Brokers' registered sales representatives to sell.

   B.    That directed brokerage, a fund asset, was used to pay for the Shelf-Space Agreements and that cash and directed brokerage were used in the case of the top 47 Shelf-Space Brokers as an interchangeable means of payment.

   C.    That three of AFD's largest Shelf-Space Brokers, Jones, Morgan Stanley Dean Witter and Piper Jaffray, passed Shelf-Space Payments through to their registered sales representatives or their branch offices in the form of heightened bonuses, cash payments, and/or as credits toward an award of travel to resort destinations in order to induce additional sales of AF Funds and to increase the amount of AFD's Shelf-Space payments, creating potential or actual conflicts of interest.

   D.    That defendants concealed from its independent fund board members their Shelf-Space Agreements and its payments thereunder, use of cash and directed brokerage, and, on information and belief, sub-transfer agency fees, for preferred access to broker-dealers and for other exclusive marketing benefits as set forth above. The independent directors were falsely and affirmatively told by CRMC executives and interested directors that AFD did not have such agreements, that directed brokerage was not used to purchase shelf-space, and that AFD never disclosed brokerage targets to the broker-dealers. This important information was withheld from the very individuals responsible for protecting the interests of small individual investors and, in

12
COMPLAINT FOR CIVIL PENALTIES, ANCILLARY RELIEF AND INJUNCTION

fact, the independent directors were misled about such activities.

  E. On information and belief, that sub-transfer agency fees or networking fees were excessive and were used, in part, as a disguised form of Shelf-Space Payments to certain Shelf-Space Brokers.

  F. That CRMC subsidized AFD's cash Shelf-Space Payments when AFD did not have the means to make such payments.

35. Although the statements in the Disclosure Documents concerning other compensation to dealers were modified in or around March 2004, with the exceptions of those relating to directed brokerage (which was stopped in or around December 2003), the Undisclosed Matters still render those modified statements misleading.

## FIRST CAUSE OF ACTION

(Violations of Corporations Code Section 25401 Against All Defendants)

36. Plaintiff refers to and realleges paragraphs 1 through 35, inclusive above, and incorporates those paragraphs by reference as though fully set forth herein.

37. The AF Funds' shares offered for sale and sold by the AFD, as alleged above, are "securities" as defined in Corporations Code section 25019.

38. In offering for sale, and/or selling, the AF Funds' shares, AFD violated Corporations Code section 25401 by failing to disclose to purchasers and prospective purchasers of the AF Funds' shares the Undisclosed Matters, as the Undisclosed Matters, singly or in any combination, are "material facts" necessary in order to make the statements about other compensation to dealers and about execution of portfolio transactions as set forth in the Disclosure Documents, in light of the circumstances under which they were made, not misleading. More precisely, the Undisclosed Matters are matters which a "reasonable investor" would consider important in deciding whether to invest in the AF Funds' shares.

39. AFD's omissions of material facts were in connection with the offer and sale of securities within the meaning of Corporations Code section 25017.

40. AFD's omissions of material facts took place within the State of California within the meaning of Corporations Code section 25008.

13
COMPLAINT FOR CIVIL PENALTIES, ANCILLARY RELIEF AND INJUNCTION

41. Pursuant to Corporations Code section 25403, CRMC knowingly:

a. Directly or indirectly controlled and induced AFD to violate Corporations Code section 25401, as alleged above; and/or

b. Provided substantial assistance to AFD in connection with the violations of Corporations Code section 25401, as alleged above.

42. Defendants' pattern of conduct demonstrates the necessity for: (i) granting injunctive relief, restraining such and similar acts in violation of Corporations Code section 25401; (ii) granting ancillary relief, including providing restitution or disgorgement to purchasers; and (iii) imposing appropriate civil penalties.

## SECOND CAUSE OF ACTION

(Violations of Corporations Code Section 25216(a) Against All Defendants)

43. Plaintiff refers to and realleges paragraphs 1 through 42, inclusive above, and incorporates those paragraphs by reference as though fully set forth herein.

44. In offering for sale, and/or selling, the AF Funds' shares, and failing to disclose the Undisclosed Matters to purchasers and prospective purchasers of the AF Funds' shares, AFD violated Corporations Code section 25216(a), pursuant to the definition of the phrase "manipulative, deceptive, or other fraudulent scheme, device, or contrivance," as set forth in California Code of Regulations, title 10, section 260.216(b). That definition includes any omission of a material fact necessary to make the statements made, in the light of the circumstances under which they are made, not misleading, if the person making the omission knows or has reasonable grounds to believe that it is misleading.

45. The Undisclosed Matters, singly or in any combination, are material facts necessary in order to make the statements about other compensation to dealers and about execution of portfolio transactions as set forth in the Disclosure Documents not misleading, in light of the circumstances under which were made. More precisely, the Undisclosed Matters are matters which a "reasonable investor" would consider important in deciding whether to invest in the AF Funds' shares.

46. Defendants knew, or had no reasonable basis to believe otherwise, of the

14

COMPLAINT FOR CIVIL PENALTIES, ANCILLARY RELIEF AND INJUNCTION

differences between the actual practices by AFD and the disclosures set forth in paragraphs 32 and 33 and that failing to disclose the Undisclosed Matters to the AF Funds' investors was misleading.

47. As an example, shortly after learning that their "revenue sharing practices" were the subject of both state and federal government investigations, defendants apparently believed it was necessary to ensure that the AFD sales force would all tell the same "*story*." Thus, on January 9, 2004, AFD's co-CEO left a global voice mail message for the entire "Sales Force" informing them that AFD made,

> ". . . additional payments to broker/dealers to help defray some of the expenses of training and educating brokers so they have the knowledge necessary to help the clients make proper choices in our funds. All of this is designed to help those investors achieve their long-term investment objectives."

As the AFD co-CEO further stated,

> ". . . I think it's important that you be on message because *this is the message that we have been using with regulators* involved when this started back in August. *This will be the story that we will use with regulators* and dealers going forward, and I think you'll see it in time incorporated in our disclosure." (Emphasis added)

48. Pursuant to Corporations Code section 25403, CRMC knowingly:

a. Directly or indirectly controlled and induced AFD to violate Corporations Code section 25216(a), as alleged above; and/or

b. Provided substantial assistance to AFD in connection with the violations of Corporations Code section 25216(a), as alleged above.

49. Defendants' pattern of conduct demonstrates the necessity for: (i) granting injunctive relief, restraining such and similar acts in violation of Corporations Code section 25216; (ii) granting ancillary relief, including providing restitution or disgorgement to purchasers; and (iii) imposing appropriate civil penalties.

///

///

WHEREFORE, Plaintiff prays for judgment against defendants, and each of them, as follows:

1. For a preliminary and permanent injunction, enjoining defendants, and each of them, their agents, servants, and employees, and all persons acting under, in concert with, or for them, from directly or indirectly or in any other manner engaging in the conduct as above alleged in violation of Corporations Code sections 25401 and/or 25216;

2. For an order that each defendant pay to Plaintiff, a civil penalty in the maximum sum of $25,000 for each violation of Corporations Code sections 25401 and/or 25216;

3. For an order disgorging all profits and compensation obtained by defendants as a result of their violations of Corporations Code sections 25401 and/or 25216;

4. For an order requiring defendants to make restitution to the purchasers of the AF Funds' shares with interest from the date of purchase of such shares on the amount of any such principal amounts remaining unpaid;

5. For Plaintiff's cost of suit incurred herein; and

6. For such other and further relief as this Court deems just and proper.

Dated: March 24, 2005

BILL LOCKYER
Attorney General of the State of California

THOMAS GREENE
Chief Assistant Attorney General

MARK BRECKLER
Senior Assistant Attorney General


JON M. ICHINAGA
Deputy Attorney General

Attorneys for Plaintiff the People of the State of California

COMPLAINT FOR CIVIL PENALTIES, ANCILLARY RELIEF AND INJUNCTION