**EXHIBIT G**



Home | Previous Page

**UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION**

Securities Act of 1933 Release No. 8339 / November 17, 2003

Securities Exchange Act of 1934
Release No. 48789 / November 17, 2003

Administrative Proceedings
File No. 3-11335

| | |
|---|---|
| In the Matter of<br><br>MORGAN STANLEY DW INC.,<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), and Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Morgan Stanley DW Inc. ("Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, Respondent consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933, and Sections 15(b) and 21C of the Securities Exchange Act of 1934, ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Respondent

1. Morgan Stanley DW, a broker-dealer registered with the Commission pursuant to Section 15 of the Exchange Act since 1968, is a subsidiary of the publicly traded entity Morgan Stanley. It is also a member of the National Association of Securities Dealers ("NASD"). Morgan Stanley DW's principal offices are located at 825 Third Avenue, New York, New York. It has approximately 500 branch offices, which provide retail brokerage services nationwide.

### Overview

2. This matter arises from Morgan Stanley DW's failure to disclose adequately certain material facts to its customers in the offer and sale of mutual fund shares, thereby violating Section 17(a)(2) of the Securities Act and Rule 10b-10 under the Exchange Act. At issue in this matter are two distinct disclosure failures. The first relates to Morgan Stanley DW's operation of mutual fund marketing programs in which it collected from a select group of mutual fund complexes amounts in excess of standard sales loads and Rule 12b-1 trail payments.[2] These programs were designed to specially promote the sale of those mutual funds with enhanced compensation to individual registered representatives, known as financial advisors ("FAs"), and branch managers as well as increased visibility in its extensive retail distribution network. The second disclosure failure related to Morgan Stanley DW's sales of Class B shares of its proprietary mutual funds in connection with sales in excess of $100,000. Morgan Stanley DW did not adequately disclose at the point of sale, in connection with its recommendations to purchase Class B shares, that such shares were subject to higher annual fees and that those fees could have a negative impact on the customers' investment return.

3. The selective marketing programs that Morgan Stanley DW operated, initially known as the Asset Retention Program and later as the Partners Program, created an undisclosed conflict of interest because Morgan Stanley DW was authorized to offer and sell shares of approximately 115 mutual fund complexes, but the firm and its FAs received additional compensation for the sale of the mutual funds of a select group of fund complexes. Morgan Stanley DW chose to rely on the disclosures that the fund companies made in their prospectuses and statements of additional information ("SAIs"), although most of those disclosures did not provide facts that would enable Morgan Stanley DW's customers to understand the conflict of interest.

4. As to the sale of Morgan Stanley Funds Class B mutual fund shares, at the point of sale, Morgan Stanley DW's FAs recommended Class B shares to customers without adequately disclosing the differences in share classes, including information about commissions and annual expenses and, importantly, that an equal investment in Class A shares at certain dollar levels could yield a higher return.

**The Asset Retention Program**

5. On January 1, 2000, Morgan Stanley DW implemented the Asset Retention Program to: (1) "[p]rovide quality mutual fund products for clients across various distribution channels;" (2) "[s]upport strategic long-term investment behavior by rewarding retention efforts;" and (3) "[m]aximize monetary value of the MS distribution channel in a uniform manner." The program was implemented and managed by the External Mutual Funds Group (the "EMF Group"), which is a department within Morgan Stanley DW.

6. Fourteen (14) mutual fund complexes out of the approximately 115 with which Morgan Stanley DW had distribution agreements participated in the Asset Retention Program. Two of the participating fund complexes were Morgan Stanley DW affiliated or proprietary fund complexes and twelve were external or non-proprietary fund complexes (the "Asset Retention Program Participants").

7. In exchange for participation in the program, the Asset Retention Program Participants paid Morgan Stanley DW: (i) 15 or 20 basis points ("bps") on gross sales of open-end, variable-priced mutual fund shares (the "gross sales payments") and (ii) 5 bps on aged assets (participating fund shares held over one year), which the firm then paid to the FAs responsible for the accounts holding these assets. These payments were in addition to existing payments such as commissions, 12b-1 fees, shareholder servicing fees and account maintenance fees.

8. Although Morgan Stanley DW requested and preferred gross sales payments in the form of cash ("hard dollars"), the firm often accepted Asset Retention Program payments in the form of brokerage commissions on participants' portfolio transactions.[3]

9. Six of the fourteen participant fund complexes, including the Morgan Stanley DW affiliated funds, made their gross sales payment solely in hard dollars. The remaining eight paid either with portfolio brokerage commissions or a combination of hard dollars and brokerage commissions

10. All of the Asset Retention Program Participants, except one, paid the 5 bps on aged assets with hard dollars.

11. In return for their payments, program participants received a number of marketing benefits. First, Morgan Stanley DW included all Asset Retention Program Participants on its "preferred list," which was a list of fund complexes that FAs should look to first in making recommendations of mutual fund products. Second, it ensured that Asset Retention Program Participants had a "higher profile" in Morgan Stanley DW's sales system than non-participating fund complexes by, among other things, increasing the visibility of the Asset Retention Program Participants on its FAs' workstations. Third, the program participants were eligible to participate in the firm's 401(k) programs and to offer offshore fund products to Morgan Stanley DW's customers.

12. Morgan Stanley DW also provided "incentives designed to support long-term mutual fund asset retention goals." In particular, Morgan Stanley DW

paid the 5bps component of the Asset Retention Program payment to FAs, thus incentivizing FAs to encourage their customers to make, and then retain over the specified time period, their investments in mutual fund complexes participating in the Asset Retention Program.

## The Partners Program

13. On December 1, 2002, Morgan Stanley DW replaced the Asset Retention Program with the Partners Program. The new program is similar to the Asset Retention Program, with a number of significant differences. Notably, the participants in the Partners Program ("Partners") receive greater access to Morgan Stanley DW's sales system, and have the prospect of greater sales as a result of compensation incentives that Morgan Stanley DW provides to the sales force on the sale of Partners' funds.

14. The Partners Program consists of sixteen mutual fund complexes, twelve of which had participated in the Asset Retention Program. Four new fund complexes joined the Partners Program, one Asset Retention Program Participant declined to join the Partners Program, and one Asset Retention Program Participant had dropped from the program in 2001.

15. Under the Partners Program, all fund complexes made the 5 bps aged asset payments in hard dollars. As in the Asset Retention Program, although Morgan Stanley DW requested and preferred gross sales payments in the form of hard dollars, some fund complexes paid the 15 or 20 bps gross sales payments with hard dollars, some paid with portfolio brokerage commissions, and some paid with a combination of hard dollars and brokerage commissions.

16. As mentioned above, one of the enhancements implemented in the Partners Program was greater access to FAs. This was achieved by affording Partners: (i) priority placement in queue for due diligence review of fund materials that will be distributed to Morgan Stanley DW's FAs; (ii) access to Morgan Stanley DW's branch system at the Branch Manager's discretion; (iii) access to FAs via training and customer seminars; (iv) inclusion in FA events; and (v) invitations to participate in "BTV" programs that are broadcast over Morgan Stanley DW's internal systems to its FAs. All of these benefits provide FAs with significantly more information on the Partners' funds than non-participating funds and provide Partners' funds with enhanced access to Morgan Stanley DW's FAs.

17. A second enhancement of the Partners Program is the increased incentives Morgan Stanley DW provided to its sales force. On December 1, 2002, Morgan Stanley DW adopted a new FA "Incentive Compensation" grid that, generally, provided greater compensation for "asset based products" versus "transaction based products." Partners' funds' shares are considered "asset based products," while non-participating funds' shares are considered either "transaction based products" or "asset based products," depending upon the type of account in which they were held. Under the new system, for instance, a broker whose annual production is over $1 million received 42% of the commissions on "asset based products" and 40% of the commissions on "transaction based products." Accordingly, under Morgan Stanley DW's current compensation grid, FAs generally receive a higher payout from the sale of Partners' funds than non-Partners'

funds.

18. At the same time, Morgan Stanley DW implemented a system under which Branch Managers stood to earn a higher bonus for the sale of shares of Partners' funds than for the sale of non-Partners' funds. Branch Manager compensation consists of three components: salary, "Management Incentive Compensation" and a "Discretionary Challenge Bonus." Management Incentive Compensation, which is based on the profitability of the branch, includes an expense allocation based on product type: (i) 10% of revenues is charged on proprietary mutual funds for overhead; (ii) 20% of revenues is charged on Partners' funds for overhead; and (iii) 40% of revenues is charged on non-Partners' funds for overhead.[4] Thus, branches are more profitable and the managers' incentive compensation is greater if they sell more Partners' funds as compared to non-Partners' funds.

19. In addition, in early 2003, Morgan Stanley DW enhanced the sales efforts for the Partners' funds by replacing the head of the EMF Group with an individual who had previously been responsible for encouraging FAs to sell the firm's proprietary products and, thus, had experience focusing Morgan Stanley DW's sales system to increase sales of specific, targeted products.

### Program Payments via Cash and Brokerage Commissions

20. Periodically, the Asset Retention Program Participants and the Partners provided sales figures to the EMF Group. The EMF Group in turn calculated the payments owed based on those sales figures and billed those amounts to the participants. The participants then either sent a check or sent trades with sufficient brokerage commissions to satisfy payment. Most of the participants that paid via brokerage commissions executed portfolio trades on Morgan Stanley DW's trading desk until January 2002 and, thereafter, on the trading desk of Morgan Stanley & Co., an affiliate, which then earmarked a portion of the commission for payment to Morgan Stanley DW.

21. The Asset Retention Program Participants and Partners that paid via brokerage commissions were required to pay in portfolio commissions a negotiated multiple of the amount they would have paid via hard dollars. The trading desk retained one-third of the commission to cover its expenses, while the remaining two-thirds was directed to Morgan Stanley DW. Thus, for a program participant that agreed to pay 15 bps on gross sales via brokerage commissions with a multiplier of 1.5, generated a revenue stream of 22.5 bps on gross sales with one-third, or 7.5 bps, being retained by the trading desk, and 15 bps directed to Morgan Stanley DW.

22. When Asset Retention Program Participants and Partners called in the trades to Morgan Stanley & Co. that they intended to use for program payments, they typically "flagged" those trades as "for the benefit of DW."

### Morgan Stanley Did Not Disclose Either Program to Customers

23. Morgan Stanley DW discloses information to customers concerning mutual fund purchases primarily through its FAs' direct contacts with customers and by supplying customers with the prospectuses and if requested, the SAIs issued by the mutual funds.[5] Morgan Stanley DW has

never had policies and procedures requiring FAs to disclose the above-discussed aspects of the Asset Retention or Partners Programs to customers when discussing customers' purchases of mutual fund shares.

24. Although Morgan Stanley DW relied on the disclosures in the participating funds' prospectuses and SAIs to fulfill its disclosure obligations, it made no effort until 2003 to review the funds' prospectuses and SAIs to ascertain the content of the funds' disclosures regarding the fund complexes' payments and the enhanced marketing treatment provided to the participating funds.

25. Although the Asset Retention Program and Partners funds' prospectuses and SAIs contain various disclosures concerning payments to the broker-dealers distributing their funds, none adequately disclose the preferred programs as such, nor do most provide sufficient facts about the preferred programs for investors to appreciate the dimension of the conflicts of interest inherent in them. For example, none of the prospectuses specifically discloses that Morgan Stanley DW receives payments from the fund complexes, that the fund complexes send portfolio brokerage commissions to Morgan Stanley DW or Morgan Stanley & Co. in exchange for enhanced sales and marketing, nor do they describe for investors the various marketing advantages provided through the programs.

26. Based on the above-described conduct, Morgan Stanley DW willfully[6] violated:

   a. Section 17(a)(2) of the Securities Act, which provides that it is "unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they made, not misleading;" and

   b. Rule 10b-10 under the Exchange Act, which provides in pertinent part that "it shall be unlawful for any broker or dealer to effect for or with an account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security . . . unless such broker or dealer, at or before completion of such transaction, gives or sends to such customer written notification disclosing . . . the source and amount of any other remuneration received or to be received by the broker in connection with the transaction."

Neither Section 17(a)(2) nor Rule 10b-10 require a showing of scienter.[7]

By virtue of the portfolio brokerage commission payments, as described above, Morgan Stanley DW also contravened the dictates of Rule 2830(k) of the NASD, which essentially prohibits NASD members from favoring the sale of mutual fund shares based on the receipt of brokerage commissions.

### Sale of Morgan Stanley Funds Class B Shares

28. Since 2000, Morgan Stanley DW has sold more than sixty individual

funds offered by Morgan Stanley Funds. The funds are offered in different classes of shares, representing interests in the same mutual fund assets. Each share class (A, B, C and D) has different features, including differences in sales loads[8] to purchase the shares, annual fees, and considerations to determine whether a particular class of shares may be more appropriate for certain customers.

29. The different share classes and their respective features are described in Morgan Stanley Funds prospectuses. In particular, Class A shares of equity funds are subject to a front-end load of 5.25% at the time of purchase for purchases of $25,000 and less. The front-end load is decreased for larger purchases at specified investment increments or "breakpoints."[9] For instance, amounts between $25,000 and $49,999 are subject to an initial sales charge of 4.75%. An investment between $50,000 and $99,999 reduces the sales charge to 4%; between $100,000 and $249,999 reduces the sales charges to 3%; between $250,000 and $499,999 reduces the sales charge to 2.5%; between $500,000 and $999,999 reduces the sales charge to 2%; and there is no sales charge for an investment of $1 million or more.[10]

30. In contrast, investors who purchase Class B shares pay no front-end load. Rather, Class B shares become subject to the CDSC, only if they are redeemed before the end of a six-year holding period. The amount of the CDSC declines as a percentage of the account's value over the six-year holding period (5%, 4%, 3%, 2%, 2%, and 1%). Class B shares automatically convert to Class A shares in the month following the ten-year anniversary of their purchase. In contrast to Class A shares, breakpoint discounts are not available for purchases of Class B shares, regardless of the size of the investments, and the annual 12b-1 fee is significantly higher: a maximum of 1% for Class B shares as compared to .25% for Class A equity funds.

31. The prospectuses of Morgan Stanley Funds contain two tables that illustrate the impact of costs on the investment. These tables compare the costs of all classes of shares over one year, three years, five years and ten years, assuming a hypothetical investment of $10,000 and return of 5% per year and a hypothetical investment decision to either hold or sell the investment at the end of each period. The 2001 Information Fund prospectus, for example, demonstrates generally that, based on these assumptions, for a $10,000 investment, where the investor sold the shares at the end of each period, Class A shares had lower total costs than Class B shares.

32. The compensation that FAs receive for the sale of Class B shares is higher than for Class A shares. Specifically, for Class B shares, Morgan Stanley DW FAs received gross sales credits at the time of purchase of 5% for all amounts, until a March 2002 policy and procedures change described below, thereby making it more lucrative for the FAs to sell Class B, rather than Class A, shares. For Class A shares, the FAs' compensation decreases similar to the breakpoint discounts, with the FAs receiving a gross sales credit at the time of sale of equity funds of 5% for purchases of less than $25,000; 4.5% for purchases between $25,000 - $49,999; 3.75% for purchases between $50,000 - $99,999; 2.75% for purchases between $100,000 - $249,999; 2.25% for purchases between $250,000 - $499,999; 1.8% for purchases between $500,000 - $999,999; and 1% for purchases

of $1 million and above.[11]

**Morgan Stanley DW's Mutual Fund Policies and Procedures**

33. Morgan Stanley DW did not have a policy restricting large purchases of Class B shares by its customers until October 1, 2001. At that time, the firm implemented a policy whereby "[t]he Morgan Stanley Funds generally will not accept purchase orders for Class B shares in amounts of $100,000 or greater. Purchases of $100,000 or greater but less than $1 million generally can be made only in Class A or Class C shares." Moreover, according to the Morgan Stanley Funds Multi-Class Manual, also dated October 1, 2001,[12] "[a]ggregate purchases of $100,000 or greater in Class B shares of Morgan Stanley Funds require the Branch Manager to first discuss the intended investment with the prospective investor to ensure that the investor understands the relative fees, expenses and features of the different classes."

34. The Multi-Class Manual summarized the considerations relating to sales of mutual funds that have multi-classes as follows:

> You should consider, among other things, sales charges and ongoing expenses in estimating the costs of investing in a particular class of shares before making an investment recommendation. Although Class B and C shares do not pay front-end sales charges, the 12b-1 distribution fees payable on Class B and Class C shares may over time cost more than the sales charges and 12b-1 distribution fees imposed on the same amount investment in Class A shares. Class B shares are subject to higher annual distribution fees than Class A shares for a period of ten (10) years, after which they convert to Class A shares, whereas Class C shares do not convert to Class A shares, so they continue to have higher ongoing annual expenses.

Additionally, the Multi-Class Manual identified the following as important factors to be considered prior to recommending a share class for investment: the investment amount, the expected term of the investment, the fees and expenses associated with each class of shares, and the investor's personal and financial circumstances and investment objectives, in addition to the suitability of the investment. Moreover, for Class B shares, the manual identified client profiles and practice considerations for each share class. The Class B share client profile describes the investors as: (1) investors who do not qualify for reduced sales charges on purchases of Class A; (2) investors who may benefit from the Class B CDSC waivers when considered in view of the higher ongoing 12b-1 distribution expenses; and (3) small investors who prefer to spread the cost of investing over several years. The manual states that "it should be pointed out that they will bear higher on-going 12b-1 distribution expenses in the first ten (10) years and, if they qualify for reduced Class A sales charges, will generally have lower returns than if the investment were made in Class A shares."

36. On or about March 6, 2002, Morgan Stanley DW further modified its Class B share policy by increasing the restrictions on its Class B share sales to impose a limit on Class B share sales of $100,000 over a rolling 45-day period, rather than a single purchase limitation. The limit applied to the total amount invested in a single fund, fund family and across fund families (including both internal and external funds). Moreover, in the event a

purchase is made above these limits, even at the customer's insistence, the policy reduced the FA's payout to the Class A payout for the sales in the amount of $100,000 or greater.

### Morgan Stanley DW's Disclosures Respecting Share Class

37. The disclosures made by Morgan Stanley DW FAs to customers about the relative costs and expenses associated with different Morgan Stanley mutual funds share classes differed. In some instances, the FAs discussed with their customers the various share classes and features, and the customers chose to purchase Class B shares, nonetheless. As to other customers, in some instances the customers followed the recommendations of their FAs to purchase Class B shares, but did so without being informed by Morgan Stanley DW FAs that other classes of shares existed or what the differences between them were. Still others purchased Class B shares, but did not know this fact until they saw their confirmations or monthly account statements.

38. Morgan Stanley DW FAs also were inconsistent in disclosing the other features that may make Class A shares more attractive to some customers, including breakpoint discounts, rights of accumulation and letters of intent.

### Sales of $100,000 or Greater and Compliance Monitoring

39. During the time period from January 1, 2000 through July 31, 2003, Morgan Stanley DW executed over 7,000 transactions in which customers purchased Class B shares in amounts of $100,000 or greater. After the Class B share policy was implemented in October 2001, the number of such transactions decreased substantially.

40. According to Morgan Stanley DW's Multi-Class Manual, branch managers are required to contact customers prior to their purchases of Class B shares in amounts of $100,000 or greater to confirm the transaction. However, this policy is not always followed and there is no requirement that the branch manager document the mandated customer contact. Although Morgan Stanley DW's Class B Share Policy Statement of March 2002 contains a form letter (stating the differences in sales charges and 12b-1 fees between Class A and B shares and that Class A shares would be the more appropriate choice for their investments) that a branch manager may use to confirm a Class B share transaction of $100,000 or greater, there is no specific requirement that the letter be used. Moreover, in practice, it appears that FAs, instead of branch managers, are sometimes sending these letters to customers.

41. Since at least February 2002, the compliance department at Morgan Stanley DW also has been reviewing large purchases of Class B shares by contacting the branches and asking for explanations and confirmations that the customer did, in fact, decide to make the purchase after the necessary disclosures were made. The firm's procedures, however, do not require that the firm, through its compliance department or otherwise, review the branches' contacts with customers relating to Class B share purchases that are covered by the Class B share policy.

42. Based on the above-described conduct, Morgan Stanley DW willfully

violated Section 17(a)(2) of the Securities Act. Section 17(a)(2) does not require a showing of scienter.

## Undertakings

43. Morgan Stanley DW undertakes the following:

   a. Morgan Stanley DW shall place and maintain on its website within 15 days of the date of entry of the Order disclosures respecting the Partners Program to include, if applicable: (i) the existence of the program; (ii) the fund complexes participating in the program; (iii) the maximum amount of payment that Morgan Stanley DW receives, expressed in basis points, for participation in the program; (iv) the source of such payments (fund assets, distributor, underwriter, etc.); (v) the maximum amount that FAs receive, expressed in basis points, for retention of assets in program mutual funds; and (vi) that FAs and their branch managers receive greater compensation for the sale of Partners funds' than they do for non-participating funds. Morgan Stanley DW shall make this information available via a hyperlink on the home page of its website.

   b. Within 45 days of the date of entry of the Order, Morgan Stanley DW shall prepare a "Mutual Fund Bill of Rights" in plain English, not unacceptable to the Commission's Staff, that will include the disclosures in paragraph a. above as well as disclosures concerning the differences in fees and expenses connected with the purchase of different mutual fund share classes; why Class A shares are more appropriate for some investors; and the firm's policy of not accepting purchases in Class B shares of $100,000 or greater. Within 75 days of the date of the entry of the Order, Morgan Stanley DW shall place the Bill of Rights on its website; and send the Bill of Rights to all current retail customers, to all new retail customers upon the opening of an account, and to all retail customers on an annual basis thereafter.

   c. Morgan Stanley DW shall retain, within 45 days of the date of entry of the Order, the services of an Independent Consultant not unacceptable to the Commission's Staff. Morgan Stanley DW shall exclusively bear all costs, including compensation and expenses, associated with the retention of the Independent Consultant. Morgan Stanley DW shall retain the Independent Consultant to conduct a comprehensive review of: (i) Morgan Stanley DW's receipt of Partners Program revenue to determine compliance with NASD Rule 2830(k); (ii) the completeness of the disclosures respecting the Partners Program and the differences in mutual fund share classes; and (iii) the policies and procedures relating to FAs' recommendations to customers of Class B shares in amounts of $100,000 or greater and of Partners' funds. Morgan Stanley DW shall retain the Independent Consultant to recommend policies and procedures that address deficiencies, if any, in the areas reviewed as outlined in (i) to (iii).

   d. Morgan Stanley DW shall within 45 days of the date of entry of the Order provide to the Independent Consultant a list of customers who made single purchases of Morgan Stanley proprietary funds Class B shares in amounts of $100,000 or greater, between January 1, 2000 and the date of entry of the Order, including details of the date of the

purchase, the specific fund purchased, the amount invested and information identifying the customers. Additionally, within 45 days of the date of entry of the Order, Morgan Stanley DW shall submit to the Independent Consultant for review a plan pursuant to which Morgan Stanley DW shall offer the purchasers of $100,000 or greater in a single transaction of Morgan Stanley proprietary funds Class B shares between January 1, 2000 and the date of entry of the Order, who still hold all such shares, the option of electing for a certain period of time to convert such Class B shares into Class A shares in such a manner that each investor is placed in the same financial position that such investor would have been in with respect to that single transaction had the investor purchased Class A shares instead of Class B shares in that transaction (the "Plan"). The Plan shall also address methods to put such customers who sold some or all of their Class B shares during the above-referenced time period into the same financial position that such investor would have been in with respect to that single transaction had the investor purchased Class A shares instead of Class B shares in that transaction. Morgan Stanley DW shall also prepare letters to be sent to each category of such customers, those who still hold all such Class B shares and those who sold some or all of such Class B shares, either offering them the opportunity to convert or other actions in accordance with the Plan (the "Letters"). Morgan Stanley DW shall also submit the Letters to the Independent Consultant for review within 45 days of the date of entry of the Order. The Plan and the Letters shall not be unacceptable to the Independent Consultant. If the Independent Consultant finds that the Plan does not result in fairly providing an option to the purchasers described above so as to place them in the same financial position such investors would have been in with respect to that single transaction had the investors purchased Class A shares instead of Class B shares in that transaction, Morgan Stanley shall attempt in good faith to reach an agreement with the Independent Consultant on terms to achieve this objective within 70 days of the date of the entry of the Order. In the event that Morgan Stanley DW and the Independent Consultant are unable to agree on an alternative proposal, Morgan Stanley DW shall abide by the recommendation of the Independent Consultant.

e. Within 45 days of the date of entry of the Order, Morgan Stanley DW shall submit to the Independent Consultant for review (and simultaneously to the Commission Staff) a plan ("Distribution Plan") pursuant to which Morgan Stanley DW shall administer and distribute the monetary sums ordered to be paid pursuant to IV.C below. The Distribution Plan shall address how such monetary sums shall be distributed to benefit customers who purchased through Morgan Stanley DW mutual funds of the Asset Retention Program between January 1, 2000 and November 30, 2002 or of the Partners Program between December 1, 2002 and the date of entry of the Order. The Distribution Plan shall not be unacceptable to the Independent Consultant. If the Independent Consultant finds that the Distribution Plan is unacceptable, Morgan Stanley shall attempt in good faith to reach an agreement with the Independent Consultant within 70 days of the date of the entry of the Order. In the event that Morgan Stanley DW and the Independent Consultant are unable to agree on an alternative proposal, Morgan Stanley DW shall abide by the recommendation of the Independent Consultant. The final Distribution

Plan shall be submitted, and be acceptable, to the Commission Staff.

f. Morgan Stanley DW shall cooperate fully with the Independent Consultant and shall provide the Independent Consultant with access to Morgan Stanley DW's files, books, records and personnel as reasonably requested for the review described in c., d. and e. above.

g. Morgan Stanley DW shall further retain the Independent Consultant, at the conclusion of the review, which in no event shall be more than 75 days after the date of entry of the Order, to submit to Morgan Stanley DW and to the Commission's Staff an Initial Report. The Initial Report shall address, at a minimum: (i) whether the receipt of Partners Program revenue is in compliance with NASD Rule 2830(k); (ii) the adequacy of disclosures respecting the Partners Program and the differences in mutual fund share classes; (iii) the adequacy of the policies and procedures respecting FAs' recommendations to customers of Class B shares in amounts of $100,000 and greater and of Partners' funds; (iv) the adequacy of the Plan, with a goal toward placing the affected customers in the positions they would have been in with respect to the single purchase of Class B shares in the amount of $100,000 or greater had they been offered the opportunity, at the time of that single transaction, to purchase Class A shares with full disclosure; and (v) the adequacy of the Distribution Plan. The Initial Report must include a description of the review performed, the conclusions reached, and the Independent Consultant's recommendations for policies and procedures to address any deficiencies identified, an effective system for implementing the recommended policies and procedures and an effective system for establishing and maintaining written records that evidence compliance with the recommended policies and procedures.

h. Within 105 days after the date of entry of the Order, Morgan Stanley DW shall in writing advise the Independent Consultant and the Commission's Staff of the recommendations from the Initial Report that it has determined to accept and the recommendations that it considers to be unnecessary or inappropriate. With respect to any recommendation that Morgan Stanley DW considers unnecessary or inappropriate, Morgan Stanley DW shall explain why the objective or purpose of such recommendation is unnecessary or inappropriate and provide in writing an alternative policy, procedure or system designed to achieve the same objective or purpose.

i. With respect to any recommendation with which Morgan Stanley DW and the Independent Consultant do not agree, Morgan Stanley DW shall attempt in good faith to reach an agreement with the Independent Consultant within 120 days of the date of entry of the Order. In the event the Independent Consultant and Morgan Stanley DW are unable to agree on an alternative proposal not unacceptable to the Commission's Staff, Morgan Stanley DW shall abide by the recommendation of the Independent Consultant.

j. Within 130 days of the date of entry of the Order, Morgan Stanley DW shall in writing advise the Independent Consultant and the Commission's Staff of the recommendations and proposals that it is adopting.

k. Morgan Stanley DW shall further retain the Independent Consultant to complete the aforementioned review and submit a written Final Report thereon to Morgan Stanley DW and to the Commission's Staff within 145 days after the date of entry of the Order. The Final Report must recite the efforts the Independent Consultant undertook to review Morgan Stanley DW's receipt of revenue for the Partners Program, for compliance with NASD Rule 2830(k), the disclosures respecting the Partners Program and the differences in mutual fund share classes, the procedures used to convert the customers identified in d. above from Class B to Class A shares, the policies and procedures respecting FAs' recommendations to customers of Class B shares in amounts of $100,000 and greater and of Partners' funds, and the procedures to administer, and distribute the monetary sums identified in the Distribution Plan as set forth in section e. above, and shall set forth in detail the Independent Consultant's recommendations and a reasonable time period or time periods, not to exceed 205 days from the date of entry of the Order, for Morgan Stanley DW to implement each of those recommendations. The Final Report must also describe how Morgan Stanley DW proposes to implement those recommendations within the time periods set forth in the Final Report.

l. Morgan Stanley DW shall take all necessary and appropriate steps to adopt and implement all recommendations and proposals contained in the Independent Consultant's Final Report.

m. Morgan Stanley DW shall further retain the Independent Consultant to conduct a follow-up review of Morgan Stanley DW's efforts to implement each of the recommendations contained in the Independent Consultant's Final Report. This follow-up review shall be completed no later than 310 days after the date of entry of the Order. As part of the follow-up review process, Morgan Stanley DW shall retain the Independent Counsel to submit a follow-up report to the Commission's Staff no later than 330 days after the date of entry of the Order. The follow-up report must set forth the details of Morgan Stanley DW's efforts to implement each of the recommendations contained in the Final Report, and must separately state whether Morgan Stanley DW has fully complied with each of the recommendations in the Final Report.

n. For good cause shown, and upon receipt of a timely application from the Independent Consultant or Morgan Stanley DW, the Commission's Staff may extend any of the procedural dates set forth above.

o. To ensure the independence of the Independent Consultant, Morgan Stanley DW: (i) shall not have the authority to terminate the Independent Consultant, without the prior written approval of the Commission's Staff; (ii) shall compensate the Independent Consultant, and persons engaged to assist the Independent Consultant, for services rendered pursuant to the Order at their reasonable and customary rates; (iii) shall not be in and shall not have an attorney-client relationship with the Independent Consultant and shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Consultant from transmitting any information, reports, or documents to the Commission or the Commission's Staff.

    p. To further ensure the independence of the Independent Consultant, for the period of the engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Morgan Stanley DW, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity. Any firm with which the Independent Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the Commission's Staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Morgan Stanley DW, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions specified in the Offer submitted by Morgan Stanley DW.

Accordingly, it is hereby ORDERED that:

    A. Morgan Stanley DW is censured.

    B. Morgan Stanley DW shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act and Rule 10b-10 under the Exchange Act.

    C. Morgan Stanley DW shall pay, in accordance with the provisions of the Distribution Plan, the amount of $50 million, consisting of disgorgement plus prejudgment interest in the amount of $25 million and a civil monetary penalty in the amount of $25 million (pursuant to Section 308 of the Sarbanes-Oxley Act of 2002).

    D. Morgan Stanley DW shall comply with the undertakings enumerated in Section III.43.

    By the Commission.

                                  Jonathan G. Katz
                                  Secretary

**Endnotes**

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2] Generally, broker-dealers who sell mutual fund shares are compensated with front-end or contingent deferred sales charges or sales loads, which

are paid by the customer based on the dollar amount of the investment. The sales load known as a front-end load is collected from the customer at the time of sale of mutual fund shares, whereas the sales load known as a contingent deferred sales charge ("CDSC") is collected from the customer at redemption of the mutual fund shares. Some broker-dealers also receive annual payments, known as 12b-1 trails, based on the value of customer assets held with the mutual fund. The 12b-1 payments are made pursuant to each fund's 12b-1 plan, which sets forth the amount of the annual fee mutual funds pay for distribution costs, including payments to broker-dealers.

[3] Morgan Stanley DW referred to these payments as "soft dollars."

[4] Prior to the Partners Program, the expense allocation for all external mutual funds, including those participating in the Asset Retention Program, was 40%.

[5] While fund distributors are required to provide customers with a prospectus, which is typically received after the point of sale, they are not required to provide an SAI unless a customer requests a copy.

[6] "Willfully" as used in this Order means intentionally committing the act which constitutes the violation, see *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000); *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965). There is no requirement that the actor also be aware that he is violating one of the Rules or Act. *Id.*

[7] Scienter refers to a "mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

[8] As described above, sales loads are sales commissions paid by the customer either at the time of purchase (Class A shares) or at the time of redemption, if redeemed within 6 years of purchase (Class B shares).

[9] Sales charges for fixed income funds are lower than for equity funds and similarly decline at the same breakpoint levels.

[10] Investors may also qualify for breakpoint discounts by aggregating purchases in a single transaction, known as a combined purchase privilege, or by aggregating a current purchase with prior purchases, known as "rights of accumulation." Morgan Stanley also offers breakpoints through "letters of intent"-- statements that investors sign indicating the intent to purchase qualifying amounts of shares over a stated period of time.

[11] The sales credit on fixed income funds similarly declines.

[12] An earlier version of the Multi-Class Manual also addressed the disclosures that FAs should make to customers concerning share class distinctions. It identified client profiles relating to the sales of various classes of shares and important factors for FAs to consider in selecting share classes. Moreover, it directed FAs to read the compliance department's notice on Multi-Class Mutual Funds Sales Practice Considerations, which stated that for Class B shares, FAs should "[a]dvise

investors who anticipate to hold their investment for less than six years that they should consider purchasing Class "A" category or Class "C" category, whichever provides the lowest cost to shareholders (lowest sales charge and ongoing expenses (12b-1 fee))."

*http://www.sec.gov/litigation/admin/33-8339.htm*