**EXHIBIT I**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 8557 / March 23, 2005

SECURITIES EXCHANGE ACT OF 1934
Release No. 51415 / March 23, 2005

ADMINISTRATIVE PROCEEDING
File No. 3-11869

| | |
|---|---|
| In the Matter of<br><br>Citigroup Global Markets, Inc.,<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Citigroup Global Markets, Inc. ("CGMI").

II.

In anticipation of the institution of these proceedings, CGMI has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, CGMI consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Order"), as set forth below.

### III.

On the basis of this Order and CGMI's Offer, the Commission finds that:

### Respondent

1. <u>Citigroup Global Markets, Inc.</u> is a broker-dealer, which, through its predecessors, has been registered with the Commission pursuant to Section 15 of the Exchange Act since 1960. It is also a member of the National Association of Securities Dealers ("NASD"). CGMI's principal offices are located in New York, New York. CGMI uses the Smith Barney trade name for its retail brokerage services. CGMI is a subsidiary of Citigroup Inc., which is a publicly held Delaware corporation headquartered in New York, New York.

### Overview

2. From at least January 1, 2002 through July 31, 2003, CGMI failed to disclose adequately certain material facts to its customers in the offer and sale of mutual fund shares. At issue in this case are two distinct disclosure failures. The first relates to CGMI's revenue sharing program. In addition to standard sales loads and 12b-1 trail payments, CGMI received revenue sharing payments from investment advisers and distributors associated with approximately 75 mutual fund complexes.[1] In exchange for these payments, CGMI provided "shelf space" to mutual funds by granting them access to, or increased visibility in, CGMI's extensive retail distribution network. The second disclosure failure relates to CGMI's sales of Class B shares of mutual funds in amounts aggregating $50,000 or greater. CGMI did not adequately disclose at the point of sale, in connection with its recommendations to customers to purchase Class B shares, that such shares were subject to higher annual fees and that those fees could have a negative impact on the customers' investment returns depending upon the investment amount and the intended holding period.

3. CGMI's revenue sharing program, known as the Tier Program, created an undisclosed conflict of interest because CGMI offered and sold to its customers only the shares of those mutual fund complexes that paid CGMI additional compensation. When CGMI recommended and sold mutual funds to its customers, CGMI relied upon the disclosures that fund companies made in their prospectuses and statements of additional information ("SAIs"), although

---

[1] Generally, broker-dealers who sell mutual fund shares are compensated with front-end or contingent deferred sales charges or sales loads, which are paid by the customer based on the dollar amount of the investment. The sales load known as a front-end load is collected from the customer at the time of sale of mutual fund shares, whereas the sales load known as a contingent deferred sales charge ("CDSC") is collected from the customer at redemption of the mutual fund shares. Some broker-dealers also receive annual payments, known as 12b-1 trails, based on the value of customer assets held with the mutual fund. The 12b-1 payments are made pursuant to each fund's 12b-1 plan, which sets forth the amount of the annual fee mutual funds pay for distribution costs, including payments to broker-dealers.

2

most of those disclosures did not provide sufficient facts that would enable CGMI's customers to understand the nature and scope of CGMI's revenue sharing program. As a result, CGMI violated Section 17(a)(2) of the Securities Act and Rule 10b-10 under the Exchange Act.

4.      As to the sale of Class B shares of mutual funds, at the point of sale, many of CGMI's registered representatives, known as financial consultants ("FCs"), recommended Class B shares to certain customers without adequately disclosing the differences in share classes, including information about commissions and annual expenses and that an equal investment in Class A shares at certain dollar levels could yield a higher return. As a result, CGMI violated Section 17(a)(2) of the Securities Act.

### CGMI's Revenue Sharing Program

5.      Mutual fund complexes that were approved for sale by CGMI were required to make revenue sharing payments to CGMI.

6.      During the time period at issue, CGMI divided all participating fund complexes into one of three tiers. There were approximately 45 fund complexes in Tiers 1 and 2, which accounted for over 95 percent of CGMI's mutual fund sales. There were approximately 30 Tier 3 fund complexes, which represented the remainder of CGMI's overall recommended sales.

7.      CGMI typically charged fund complexes revenue sharing fees based on a combination of gross sales and assets under management. Tier 1 and Tier 2 fund complexes paid 15 basis points ("bps") on gross sales of mutual fund shares and 5 to 10 bps on aged assets,[2] and Tier 3 funds paid 10 bps on gross sales of mutual fund shares and 5 to 10 bps on aged assets.[3] Such revenue sharing payments were typically paid out of the investment adviser's or distributor's assets, not from the fund's assets, and were in addition to fees paid by the respective funds, such as sales charges, 12b-1 fees, shareholder servicing fees and account maintenance fees.

8.      CGMI did not provide any of the revenue sharing payments to its FCs or branch managers. Likewise, CGMI did not provide any increased payouts or cash bonuses to its FCs or branch managers in connection with its revenue sharing or based upon CGMI's tier designations.

---

[2] Aged assets are defined as participating fund shares held over one year. CGMI charged 10 bps for aged assets up to the amount of assets under management as of December 31, 2000 and charged 5 bps on aged assets exceeding that amount.

[3] In 2003, CGMI began charging Tier 2 fund complexes the same fees as Tier 1 fund complexes. Previously, Tier 2 fund complexes paid the same fees as Tier 3 fund complexes.

9.      CGMI used the above-referenced formulas to calculate the payments due and mailed invoices each quarter to the fund complexes, which then remitted payment in the form of checks or money transfers.

10.     CGMI provided certain benefits to the fund complexes in Tier 1 and Tier 2. Based principally on the number and variety of funds offered, length of track record, size of assets under management, ability to support FCs and customers through training and education, and level of FC and customer demand, CGMI allowed only Tier 1 and Tier 2 fund complexes to have direct access to its FCs, subject to branch manager approval. Only Tier 1 and Tier 2 fund complexes could contact CGMI's branch offices for meetings where the fund complexes could have direct contact with interested FCs. Tier 1 fund complexes also generally received greater agenda space at sales meetings and conferences, were permitted more frequent access to the branch offices and had access to CGMI's FCs through CGMI's in-house publications and broadcasts. By comparison, Tier 3 fund complexes did not receive such visibility within CGMI's retail network.

### CGMI Did Not Adequately Disclose its Revenue Sharing Program to its Customers

11.     From at least January 1, 2002 through July 31, 2003, CGMI did not adequately disclose to its customers, who purchased mutual fund shares, the existence of the revenue sharing program and CGMI's receipt of these additional payments pursuant to the program.

12.     CGMI disclosed information to customers concerning mutual fund purchases primarily through its FCs' direct contacts with customers and by supplying customers with prospectuses and, if requested, SAIs issued by the mutual funds. CGMI had no policies or procedures requiring FCs to disclose to their customers the existence of CGMI's revenue sharing program.

13.     Instead, CGMI relied on the participating funds' prospectuses and SAIs to satisfy its disclosure obligations with regard to its revenue sharing program. Although some of the prospectuses and SAIs contained various disclosures concerning payments to the broker-dealers distributing their funds, most of the disclosures were generally vague and lacked sufficient information to inform CGMI's customers of the nature and scope of CGMI's revenue sharing program. For example, the prospectuses and SAIs did not specifically disclose the magnitude of the revenue sharing payments that CGMI received from the fund complexes or that certain fund complexes had greater access to, or increased visibility in, CGMI's retail network. As a result, CGMI's customers were not provided with sufficient information to appreciate the dimension of the conflict of interest the revenue sharing program created.

14.     Beginning in July 2003, CGMI amended and began improving confirmation disclosures relating to its revenue sharing program. In addition, CGMI requested that participating mutual fund complexes enhance their disclosures in their prospectuses and SAIs regarding revenue sharing payments.

4

15. Based on the foregoing, CGMI willfully[4] violated:

    a.    Section 17(a)(2) of the Securities Act, which provides that it is "unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they made, not misleading;" and

    b.    Rule 10b-10 under the Exchange Act, which provides in pertinent part that "it shall be unlawful for any broker or dealer to effect for or with an account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security . . . unless such broker or dealer, at or before completion of such transaction, gives or sends to such customer written notification disclosing . . . the source and amount of any other remuneration received or to be received by the broker in connection with the transaction."

16. Certain broker-dealers affiliated with CGMI, namely Citicorp Investment Services, PFS Investments, Inc. and Tower Square Securities Inc. (collectively the "Affiliates"), voluntarily reported through CGMI to the Commission staff that, during the relevant time period, they also had revenue sharing programs similar to CGMI's program.[5] Like CGMI, the Affiliates did not provide their FCs and branch managers with any increased payouts or cash bonuses in connection with their revenue sharing programs. However, the programs varied, among other areas, in the number of tiers, the calculation of the payments and the access granted to the fund complexes participating in the programs. In addition, the Affiliates received some revenue sharing payments in the form of directed brokerage from certain fund complexes in connection with their respective revenue sharing arrangements.[6] The Affiliates, as did CGMI, relied on the participating fund complexes' prospectuses and SAIs to satisfy their obligations with regard to their revenue sharing programs and did not provide any additional disclosures to their customers. As noted above, these documents generally did not provide adequate disclosures to customers about the nature and scope of the revenue sharing programs.

---

[4] "Willfully" as used in the Order means intentionally committing the act which constitutes the violation, see Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000); Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965). There is no requirement that the actor also be aware that he is violating one of the Rules or Act. Id.

[5] Like CGMI, the Affiliates are also subsidiaries of Citigroup, Inc.

[6] The receipt of such payments was substantially discontinued in 2001.

5

## CGMI's Sale of Class B Shares

17. CGMI recommends mutual funds that issue different classes of shares, including Class A and Class B shares, which represent interests in the same portfolio of securities, but differ in the structure and amount of sales charges paid directly by shareholders and continuous, asset-based fees assessed on each shareholder's account.

18. Class A shares are subject to a front-end load, or initial sales charge, when originally purchased, and have modest annual fund expenses, including 12b-1 fees that are typically 0.25 percent. The majority of the front-end load is paid to the selling broker-dealer as a commission. The balance of the initial investment is paid for the fund's shares. Typically, the front-end load decreases as the size of the investment increases. This concept applies to both single purchases and to multiple purchases in the same family of funds that may be aggregated with the customer's other investments, as well as investments by that customer's household, as permitted by the funds' prospectuses. For most investments in which the total dollar amount invested in a fund family is $1 million or more, the front-end load is generally waived. These discounts are commonly referred to as "breakpoints" and the discounts typically increase at each of the $50,000, $100,000, $250,000, $500,000 and $1 million levels.

19. For example, for CGMI's affiliated proprietary funds, investments in Class A shares that, when aggregated, fall below $25,000 are subject to an initial sales charge that can range from 4.00 to 5.00 percent. However, for an investment: (i) between $25,000 and $49,999 the sales charge can range from 3.50 to 4.25 percent; (ii) between $50,000 and $99,999 the sales charge can range from 3.00 to 3.75 percent; (iii) between $100,000 and $249,999 the sales charge can range from 2.50 to 3.25 percent; (iv) between $250,000 and $499,999 the sales charge can range from 1.50 to 2.75 percent; (v) between $500,000 and $999,999 the sales charge can range from zero to 2.00 percent; and (vi) $1 million or more reduces the sales charge to zero. These breakpoints reduce the commissions paid to the selling broker-dealers by a corresponding amount. Investors can receive the benefits of breakpoint discounts by, among other ways, making a single investment, aggregating purchases, employing rights of accumulation or utilizing letters of intent.[7]

20. In contrast, Class B shares do not carry any front-end sales charge and do not have breakpoints regardless of the size of the investment. To compensate for the absence of a front-end sales charge, Class B shares have significantly higher annual 12b-1 fees (typically 1.00 percent) than Class A shares (typically 0.25 percent) and are subject to a contingent deferred sales charge ("CDSC") if redeemed prior to the expiration of a holding period specified

---

[7] A right of accumulation permits an investor or an eligible group of related investors (*e.g.*, the customer, the spouse and minor children) to "accumulate" or combine existing holdings of shares of a particular fund complex with additional purchases of shares of the same fund complex for the purpose of achieving breakpoints and associated discounts. Customers may also qualify for breakpoints by executing a letter of intent, which is an agreement to make multiple purchases of Class A shares issued by a fund family over a period of time, usually around 13 months, which, when aggregated, equal an amount that qualifies for a breakpoint discount.

in the prospectus. The amount of the CDSC, generally calculated as a percentage of the lesser of the purchase price or the account's value at the time of the sale, declines each year and eventually disappears entirely. Class B shares usually convert to Class A shares, at no cost to the investor, generally after eight years.

21. For investors, breakpoints and higher expenses generally have a direct and significant impact on a mutual fund investment's return. The significance of these differences is that, at certain dollar levels and holding periods, an equal investment in Class A shares, as opposed to Class B shares, may be in the best interest of the investor.

22. With regard to Class B shares, the mutual fund distributor, which is generally an affiliate of the mutual fund, advances a commission to the selling broker-dealer. Because Class B shares do not offer breakpoint discounts, broker-dealers and their representatives receive greater commissions from the sale of Class B shares than from the sale of the same amount of Class A shares if the sale would qualify for breakpoint discounts. Mutual fund complexes, through their distributors, recoup the commissions they advance for Class B shares through the substantially higher Rule 12b-1 fees and/or the CDSC. The different fee structures, expenses and characteristics of Class A and Class B shares, including the availability of breakpoint discounts with regard to purchases of Class A shares, and the impact of CDSCs on investments in Class B shares, are described in the mutual fund prospectuses and SAIs.

23. From January 1, 2002 through July 31, 2003, CGMI recommended and sold Class B shares of mutual funds to customers who, depending on the amount of the investment and the holding period, generally would have benefited had they purchased Class A shares instead. Specifically, these customers made purchases of Class B shares in various mutual funds which, had they purchased Class A shares, could have qualified for breakpoints beginning at the $50,000 level, through single purchases, aggregating multiple purchases, employing rights of accumulation or utilizing letters of intent. As a result of the customers' purchases of Class B shares, CGMI received greater commissions from these transactions than it would have earned had it sold Class A shares of the same mutual funds.

### CGMI's Policies and Procedures Regarding Class B Shares

24. CGMI had certain policies requiring FCs to disclose to customers certain information regarding Class B shares. For example, the firm's Mutual Fund Sales Practices Compliance Manual required FCs to disclose, among other things: (i) types of sales charges and fees; (ii) multiple classes of securities; (iii) options for reduced or waived sales charges (including breakpoints); (iv) multiple fund purchases; and (v) expense ratios. More specifically, the manual required that FCs assist each customer in deciding which class of shares was likely to be most advantageous given the customer's individual circumstances.

25. Although CGMI had certain written policies requiring disclosures about the various classes of fund shares, CGMI's procedures were not sufficient to ensure that FCs made such disclosures to their customers, other than providing them with prospectuses. Among other things, FCs, when recommending and selling Class B shares of mutual fund shares to

customers, did not adequately disclose that: (i) such shares were subject to higher annual fees that could have a negative impact on the customers' investment return, or (ii) once breakpoints become available beginning at the $50,000 level, an equal investment in Class A shares could yield a higher return.

26.   In July 2003, CGMI began to change its procedures with regard to the sale of mutual funds, including through the implementation of blocks on the sale of Class B shares where the customer would be in a more advantageous financial position by purchasing Class A shares.

27.   As a result of the foregoing, CGMI willfully[8] violated Section 17(a)(2) of the Securities Act.

28.   In determining whether to accept CGMI's Offer, the Commission has considered a related disciplinary action by the NASD involving CGMI's sale of Class B shares during the same time period covered by the Order. In its Acceptance, Waiver and Consent submitted to the NASD to resolve that matter, CGMI has agreed to pay to the NASD a fine of $6.25 million and to undertake certain remedial and corrective actions for the benefit of investors.

29.   CGMI has obtained corporate resolutions of the Boards of Directors of Citigroup, Inc. or an appropriate corporate parent of the Affiliates directing each of the Affiliates to comply fully with the undertakings in paragraph 30 below to the extent that such undertakings specifically apply to the Affiliates. CGMI has also obtained a corporate resolution of the parent corporation directing that CGMI shall take all steps reasonable and necessary to obtain such compliance by the Affiliates. All resolutions shall remain in effect until such time as CGMI has completed, and has ensured that the Affiliates have complied with, all such undertakings.

### Undertakings

30.   CGMI undertakes the following:

a.   CGMI shall place and maintain on its website, within 30 days from the date of entry of the Order, disclosures regarding its revenue sharing program to include, if applicable: (i) the existence of the program; (ii) the fund complexes participating in the program; (iii) the maximum amount of payment that CGMI receives, expressed in basis points, in connection with the fund complexes' participation in the program; and (iv) the source of such payments. CGMI shall make this information available via a hyperlink on the home page of its website. CGMI shall also cause the Affiliates to take the same actions within 30 days from the date of entry of the Order.

---

[8] "Willfully" as used in the Order means intentionally committing the act which constitutes the violation, see Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000); Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965). There is no requirement that the actor also be aware that he is violating one of the Rules or Act. Id.

b.  CGMI shall retain, within 60 days from the date of entry of the Order, the services of an Independent Consultant, who is not unacceptable to the Commission's staff. CGMI shall require the Independent Consultant to perform all of the services and tasks as described below. CGMI shall exclusively bear all costs, including compensation and expenses, associated with the retention and performance of the Independent Consultant.

c.  CGMI shall retain and shall require the Independent Consultant to conduct a comprehensive review of: (i) the completeness of the disclosures regarding CGMI's Tier Program and the differences in mutual fund share classes; and (ii) the policies and procedures relating to CGMI's recommendations to its customers of mutual funds in the Tier Program and of different class shares of mutual funds. CGMI shall retain the Independent Consultant to recommend policies and procedures to ensure compliance with applicable statutory and regulatory requirements in these areas.

d.  CGMI shall, within 90 days from the date of entry of the Order, provide to the Independent Consultant a list of customers who purchased Class B shares between January 1, 2002 and the date of entry of the Order (the "relevant time period"), of $50,000 or greater, including, without limitation, through single and multiple purchases by the customer(s) and through aggregation by household[9] and fund family of all purchases during the relevant time period. The list must include at least the customers' names and contact information, any firm-based household identification number, the date, fund name, fund symbol and number of shares purchased, and the gross principal amount invested for every purchase. Every purchase transaction on the list is a "Qualifying Purchase." However, Qualifying Purchases shall not include:

    (i)  purchases of Class B shares for which customers have previously settled and signed releases of claims against CGMI;

    (ii)  purchases of Class B shares which were later cancelled at no cost to the customer;

    (iii)  purchases of Class B shares, which, when aggregated with other Class B share purchases by the same household in the same fund family, total less than $100,000, and for which the customer would have been charged a Class A share initial sales charge exceeding 4.00 percent;

---

[9] "Household" includes all accounts that are related by at least two of the following three factors: (1) tax identification/social security numbers; (2) address; and (3) last or "key" name.

9

  (iv) purchases of Class B shares, which, when aggregated with other Class B share purchases by the same household in the same fund family, total less than $100,000, and where the customer (1) entered into a systematic withdrawal plan at the time of the Class B share purchase, and immediately began receiving systematic withdrawals from the Class B share purchase without incurring CDSCs, or (2) chose not to reinvest all capital gains and dividends from the Class B share purchase;

  (v) purchases of Class B shares, which, assuming a 5 percent annual rate of return and considering all expenses, are projected to have a higher redemption value, determined as of the end of each year following the purchase date, in comparison to Class A shares in any two years during the period beginning with the effective date of the Order and ending on the date the Class B shares are scheduled to automatically convert to Class A shares under the terms of the fund prospectuses in effect at the time of the purchase; and

  (vi) purchases of Class B shares, which, assuming a 5 percent annual rate of return and considering all expenses during the relevant time period, are projected, as of the date of conversion, to have a value within $100.00 of the projected value of Class A shares had the customers purchased Class A shares instead of Class B shares.[10]

 e. Additionally, within 150 days from the date of entry of the Order, CGMI shall offer any customer who made a Qualifying Purchase(s) and still holds all such shares, the option of converting such Class B shares into Class A shares in such a manner that each customer is placed in the same financial position, based on actual fund performance, in which such customer would have been, as of the date no more than 10 business days prior to the date on which the offered conversion to Class A shares is to be completed, with respect to the Qualifying Purchase(s) had the customer purchased Class A shares instead of Class B shares (the "Settlement Plan").

 f. The Independent Consultant, following consultation with CGMI, may further remove from the Settlement Plan additional Class B share purchases as long as the Independent Consultant provides CGMI and the Commission's staff with quantitative proof that the customer could not materially benefit[11] from

---

[10] In addition, the Qualifying Purchases shall not include purchases of Class B shares which would not have been eligible for breakpoints at or above specified thresholds in certain mutual funds as identified on a list to be provided to the Independent Consultant.

[11] The Settlement Plan shall provide that CGMI will not be required to offer a customer conversion if the customer would not materially benefit from an offer of conversion because

having the particular transaction converted to Class A shares and the removal of such Qualifying Purchase is not unacceptable to the Commission's staff.

g. The Settlement Plan shall also provide for the payment of cash, subject to each customer's choice not to receive payment, to put those customers who made a Qualifying Purchase(s) and sold, prior to receipt of notice from CGMI, some or all of their Class B shares comprising the Qualifying Purchase(s) into the same financial position, based on actual fund performance and redemption value, when aggregating Qualified Purchases, in which such customers would have been had the Class B shares that were sold been invested in Class A shares instead.

h. Under the Settlement Plan, each customer shall be entitled to breakpoints to the extent permitted by each relevant fund family based on all eligible holdings[12] and applicable rights of accumulation and assuming letters of intent were utilized in accordance with the applicable prospectuses.

i. In the event that any customer, who made a Qualifying Purchase(s), elects to convert those purchases to Class A shares from Class B, and CGMI is unable to effectuate such conversion for any reason, CGMI shall be required under the Settlement Plan to provide for the payment of cash, subject to each customer's choice not to receive payment, to such customer in an amount that will place the customer in the same financial position, based on actual performance and redemption value, that such customer would have been in as of the date of entry of the Order had the customer made his Qualifying Purchase(s) in Class A shares instead of Class B.

j. The Settlement Plan shall not be unacceptable to the Independent Consultant and the Commission's staff.

k. Additionally, as part of the Settlement Plan, within 120 days from the date of entry of the Order, CGMI shall submit to the Independent Consultant and the Commission's staff for review sample letters in plain English: (i) offering each customer, according to the particular characteristics of their account and purchases, the opportunity to convert in accordance with the Settlement Plan and/or cash payment, subject to each customer's choice not to receive payment,

---

either the annual expense differential between Class A shares and Class B shares, the CDSC schedule, and/or the conversion year quantitatively are such that Class B shares may be substantially equal, or more appropriate, compared to Class A shares of the same fund, at particular investment levels.

[12] Eligible holdings means the balance of all investments permitted by the relevant fund family to be aggregated for applicable breakpoints at the time of the Qualifying Purchase, including investments made before and held at the time of, the Qualifying Purchase.

11

for any portions of Qualifying Purchases that have been sold; (ii) explaining the economic advantages and disadvantages to the customer of the options; and (iii) stating that the customer should consult with a tax advisor to determine whether the conversion carries any federal, state, or local tax consequences. Such letters may include other factors that customers may reasonably rely upon when deciding whether to convert. The letter shall not be unacceptable to the Independent Consultant and the Commission's staff.

l.  CGMI shall fully complete execution of the Settlement Plan within 270 days from the date of entry of the Order.

m.  CGMI shall further retain and shall require the Independent Consultant to prepare and, within 150 days from the date of entry of the Order, submit to CGMI and the Commission's staff an Initial Report. The Initial Report shall address, at a minimum: (i) the adequacy of the disclosures regarding CGMI's revenue sharing program; (ii) the adequacy of CGMI's disclosures of the differences in mutual fund share classes; (iii) the adequacy of the policies and procedures regarding CGMI's recommendations and disclosures to its customers of mutual funds in its revenue sharing program; (iv) the adequacy of the policies and procedures regarding CGMI's recommendations and disclosures to its customers of mutual fund share classes; and the (v) the adequacy of the Settlement Plan, with a goal toward placing CGMI customers who made Qualifying Purchases in the same financial positions they would have been had they purchased Class A shares instead of Class B shares. The Initial Report must include a description of the review performed, the conclusions reached, and the Independent Consultant's recommendations for policies and procedures to ensure compliance with all applicable statutory and regulatory requirements in these areas, an effective system for implementing the recommended policies and procedures and an effective system for establishing and maintaining written records that evidence compliance with the recommended policies and procedures.

n.  Within 180 days from the date of entry of the Order, CGMI shall in writing advise the Independent Consultant and the Commission's staff of the recommendations from the Initial Report that it is adopting and the recommendations that it considers to be unnecessary or inappropriate. With respect to any recommendation that CGMI considers unnecessary or inappropriate, CGMI shall explain why the objective or purpose of such recommendation is unnecessary or inappropriate and provide in writing an alternative policy, procedure or system designed to achieve the same objective or purpose.

o.  With respect to any recommendation with which CGMI and the Independent Consultant do not agree, CGMI shall attempt in good faith to reach an agreement with the Independent Consultant within 210 days from the date of entry of the Order. In the event the Independent Consultant and CGMI are unable to

agree on an alternative proposal not unacceptable to the Commission's staff, CGMI shall abide by the recommendation of the Independent Consultant.

p.      CGMI shall further retain and shall require the Independent Consultant to complete the aforementioned review and submit a written Final Report to CGMI and to the Commission's staff within 270 days from the date of entry of the Order. The Final Report must recite the efforts the Independent Consultant undertook to review: (i) CGMI's disclosures regarding its revenue sharing program; (ii) CGMI's disclosures regarding the differences in mutual fund share classes; (iii) the policies and procedures regarding CGMI's recommendations of the mutual funds in its revenue sharing program; (iv) the policies and procedures regarding CGMI's recommendations and disclosures to customers of multi-class mutual funds; and (v) the procedures to administer the Settlement Plan and the completeness of the implementation of the Settlement Plan. The Final Report shall also set forth in detail the Independent Consultant's recommendations and a reasonable time period(s), not to exceed 300 days from the date of entry of the Order, for CGMI to implement its recommendations. The Final Report must also describe how CGMI proposes to implement those recommendations within the time period(s) set forth in the Final Report.

q.      CGMI shall take all necessary and appropriate steps to adopt and implement all recommendations and proposals contained in the Independent Consultant's Final Report. In addition, CGMI shall cause the Affiliates to implement all of the recommendations and proposals relating to revenue sharing contained in the Independent Consultant's Final Report, as applicable.

r.      CGMI shall further retain and shall require the Independent Consultant to conduct a follow-up review of CGMI's efforts to implement each of the recommendations contained in the Independent Consultant's Final Report, as applicable. This follow-up review shall be completed no later than 360 days from the date of entry of the Order. As part of the follow-up review process, CGMI shall retain and shall require the Independent Counsel to submit a follow-up report to the Commission's staff no later than 375 days from the date of entry of the Order. The follow-up report must set forth the details of CGMI's and the Affiliates' efforts to implement each of the recommendations contained in the Final Report, and must separately state whether CGMI and the Affiliates have fully complied with each of the recommendations in the Final Report, as applicable.

s.      To ensure the independence of the Independent Consultant, CGMI: (i) shall not have the authority to terminate the Independent Consultant, without the prior written approval of the Commission's staff; (ii) shall compensate the Independent Consultant, and persons engaged to assist the Independent Consultant, for services rendered pursuant to the Order at their reasonable and customary rates; and (iii) shall not be in and shall not have an attorney-client relationship with the Independent Consultant and shall not seek to invoke the attorney-client or any other

doctrine or privilege to prevent the Independent Consultant from transmitting any information, reports or documents to the Commission or the Commission's staff.

t.    To further ensure the independence of the Independent Consultant, for the period of the engagement and for a period of two years from completion of the engagement, CGMI, its present or former affiliates, directors, officers, employees, and agents acting in their capacity shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Independent Consultant. Further, CGMI, its present or former affiliates, directors, officers, employees, and agents acting in their capacity shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with any firm, with which the Independent Consultant is affiliated in performance of his or her duties under the Order, or agents acting in their capacity, for the period of the engagement and for a period of two years after the engagement without prior written consent of the Commission's staff.

u.    CGMI shall cooperate fully with the Independent Consultant and shall provide the Independent Consultant with prompt access to CGMI's and the Affiliates' files, books, records and personnel as the Independent Consultant reasonably deems necessary or appropriate in fulfilling any function or completing any task described in these undertakings.

v.    For good cause shown, and upon receipt of a timely application from the Independent Consultant or CGMI, the Commission's staff may extend any of the procedural dates set forth above.

## IV.

In view of the foregoing, the Commission deems it appropriate, in the public interest, and for the protection of investors, to impose the sanctions agreed to in CGMI's Offer.

Accordingly, pursuant to Section 8A of the Securities Act and Sections 15(b) and 21C of the Exchange Act, it is hereby ORDERED that:

1.    CGMI shall cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Rule 10b-10 under the Exchange Act;

2.    CGMI is censured;

3.    CGMI shall, within 30 days from the date of entry of the Order, pay a civil money penalty in the amount of $20 million to the United States Treasury. Such payment shall be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations

Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (D) submitted under cover letter that identifies CGMI as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Arthur S. Gabinet, Securities and Exchange Commission, Mellon Independence Center, 701 Market St., Suite 2000, Philadelphia, PA 19106; and

    4.    CGMI shall comply with the undertakings enumerated in Section III.30. above.

By the Commission.

    Jonathan G. Katz
    Secretary