. Information on the investment performance (in the case of a renewal), the relevant peer group(s) of funds and appropriate indices;

. Sales and redemption data in respect of the Fund (in the case of a renewal);

. The economic outlook and the general investment outlook in the relevant investment markets;

. Eaton Vance, Lloyd George and OrbiMed's results and financial condition and the overall organization of the investment adviser;

. Arrangements regarding the distribution of Fund shares;

. The procedures used to determine the fair value of each Fund's assets;

. **The allocation of brokerage, including allocations to soft dollar brokerage and allocations to firms that sell Eaton Vance fund shares**; [emphasis added]

. Eaton Vance's management of the relationship with the custodian, sub-custodians and fund accountants;

. The resources devoted to Eaton Vance's compliance efforts undertaken on behalf of the funds it manages and the record of compliance with the investment policies and restrictions and with policies on personal securities transactions;

. The quality, nature, cost and character of the administrative and other non-investment management services provided by Eaton Vance and its affiliates;

. Investment managing staffing;

. Operating expenses (including transfer agency expenses) paid to third parties; and

. Information provided to investors, including the Fund's shareholders.

84.    In truth and in fact, the Eaton Vance Funds boards of trustees, *i.e.*, the Trustee

Defendants, were captive to and controlled by Eaton Vance and the Investment Adviser

Defendants, who induced the Trustee Defendants to breach their statutory and fiduciary duties to

30

manage and supervise the Eaton Vance Funds, approve all significant agreements and otherwise take reasonable steps to prevent the Investment Adviser Defendants from skimming Eaton Vance Funds assets. In many cases, key Eaton Vance Funds trustees and officers were employees or former employees of the Investment Adviser Defendants and were beholden for their positions, not to Eaton Vance Funds investors, but, rather, to the Investment Adviser Defendants they were supposed to oversee. The Trustee Defendants served for indefinite terms at the pleasure of the Investment Adviser Defendants and formed supposedly independent committees, charged with responsibility for billions of dollars of fund assets (much of which were comprised of investors' college and retirement savings).

85.    To ensure that the trustees were compliant, the Investment Adviser Defendants often recruited key fund trustees from the ranks of investment adviser companies and paid them excessive salaries for their service as trustees. For example, James B. Hawkes, the Chairman, President and Chief Executive Officer of BMR, EVM, Eaton Vance and EV, is also the trustee and/or officer of 195 registered investment companies in the Eaton Vance fund complex (both Master and Feeder funds in the Master-Feeder structure), including the Eaton Vance Growth Trust. Other trustees responsible for the management of the Eaton Vance Growth Trust oversaw between 192 and 195 portfolios in the Eaton Vance fund complex.

86.    In exchange for creating and managing the Eaton Vance Funds, the Investment Adviser Defendants charged the Eaton Vance Funds a variety of fees, each of which was calculated as a percentage of assets under management. Hence, the more money invested in the funds, the greater the fees paid to Eaton Vance and its related entities. In theory, the fees charged to fund investors are negotiated at arm's length between the fund board and the investment management company and must be approved by the independent members of the

board. However, as a result of the Trustee Defendants' dependence on the investment
management company, and its failure to properly manage the investment advisers, millions of
dollars in assets of Eaton Vance Fund investors were transferred through fees payable from
Eaton Vance Funds assets to the Investment Adviser Defendants that were of no benefit to fund
investors.

87.    These practices proved to be enormously profitable **for Eaton Vance** at the
expense of plaintiffs and other members of the Class who had invested in the Eaton Vance
Funds. In this regard, a *Forbes* article published on September 15, 2003, stated as follows:

> The average net profit margin at publicly held mutual fund firms was
> 18.8% last year, blowing away the 14.9% margin for the financial industry
> overall . . . . [f]or the most part, customers do not enjoy the benefits of the
> economies of scale created by having larger funds. **Indeed, once a fund
> reaches a certain critical mass, the directors know that there is no
> discernible benefit from having the fund become bigger by drawing in
> more investors; in fact, they know the opposite to be true - once a
> fund becomes too large it loses the ability to trade in and out of
> positions without hurting its investors.**
>
> **The [mutual fund] business grew 71-fold (20 fold in real terms) in the
> two decades through 1999, yet costs as a percentage of assets somehow
> managed to go up 29%. . . .** Fund vendors have a way of stacking their
> boards with rubber stamps. As famed investor Warren Buffett opines in
> Berkshire Hathaway's 2002 annual report: 'Tens of thousands of
> "independent" directors, over more than six decades, have failed
> miserably.' A genuinely independent board would occasionally fire an
> incompetent or overcharging fund advisor. That happens just about
> never." [Emphasis added.]

88.    Plaintiff and other members of the class never knew, nor could they have known,
from reading the fund prospectuses or otherwise, of the extent to which the Investment Adviser
Defendants were using directed brokerage, commissions, soft dollars and so-called 12b-1 fees to
improperly siphon assets to brokers pursuant to the shelf space agreements discussed above.

**The Investment Adviser Defendants Used**
**Rule 12b-1 Marketing Fees For Improper Purposes**

89.    Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met.  The Rule 12b-1 conditions, among others, are that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made."  Additionally, the directors "have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether the plan should be implemented or continued."  The directors may continue the plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) [15 U.S.C. 80a-35(a) and (b)] of the Act that **there is a reasonable likelihood that the plan will benefit the company and its shareholders.** "  [Emphasis added.]

90.    The exceptions to the Section 12b-1 prohibition on mutual fund marketing were enacted in 1980 under the theory that the marketing of mutual funds, all things being equal, should be encouraged because increased investment in mutual funds would presumably result in economies of scale, the benefits of which would be shifted from fund managers to investors. During the Class Period, the Trustee Defendants authorized, and the Investment Adviser

33

Defendants collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees.

91.     However, the purported Rule 12b-1 fees charged to Eaton Vance Funds investors were highly improper because the conditions of Rule 12b-1 were not met. There was no "reasonable likelihood" that the plan would benefit the company and its shareholders. On the contrary, as the funds were marketed and the number of fund investors increased, the economies of scale thereby created, if any, were not passed on to Eaton Vance Funds investors. For example, despite the fact that net assets for the Eaton Vance World Wide Health Sciences Fund increased from $418 million to $985 million during the class period, the **net asset value per share of the fund decreased by more than 24%,** falling from $12.33 per share at the end of the fiscal year for 2000 to $9.36 per share at the end of the fiscal year for 2003. Yet, during the same period, expenses charged by defendants increased, with the ratio of expenses to net assets jumping from 1.79% in 2000 to 1.81% in 2003, which comes as little surprise given that the total management and other fees collected by Eaton Vance for all Funds ballooned during the Class Period by more than 37% jumping from $173 million at the beginning of the Class Period to more than $237 million by the end of the Class Period.

92.     Moreover, Defendants failed to impose any 12b-1 breakpoints - *i.e.* reductions in 12b-1 fees - as the assets of the funds increased. The concept behind breakpoints is that as fund assets increase, certain fixed costs remain the same, thereby reducing the overall costs per shareholder. Despite this fact, Defendants failed to impose 12b-1 breakpoints for payments that should not have increased as the size of the Fund assets increased as it did for the World Wide Health Sciences Fund.

93.    This increase in fees while the net asset value plummeted, and the failure to grant any breakpoints, were red flags that the Trustee Defendants knowingly or recklessly disregarded. If anything, the Eaton Vance Funds' marketing efforts were creating diminished marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance. The Trustee Defendants ignored or failed to review written reports of the amounts expended pursuant to the Eaton Vance Funds Rule 12b-1 Plan, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 Plan, on a quarterly basis as required and hence failed to terminate the plans and the payments made pursuant to the Rule 12b-1 Plan, even though such payments not only harmed existing Eaton Vance Funds shareholders, but also were improperly used to induce brokers to breach their duties of loyalty to their prospective Eaton Vance Funds investors.

94.    As discussed throughout this Complaint and below, in violation of Rule 12b-1, defendants made additional undisclosed payments to brokers, in the form of excess commissions, that were not disclosed or authorized by the Eaton Vance Funds Rule 12b-1 plan.

### The Improper Use of Excessive Commissions and Directed Brokerage Business

95.    The Investment Adviser Defendants paid excessive commissions and directed brokerage business to broker-dealers who steered their clients into Eaton Vance Funds as part of *quid pro quo* "shelf-space" program arrangements between Eaton Vance and brokerages. Such payments and directed-brokerage payments were used to fund sales contests and other undisclosed financial incentives to further push Eaton Vance Funds. These incentives created an undisclosed conflict of interest and caused brokers to steer clients into Eaton Vance Funds regardless of the funds' investment quality relative to other investment alternatives and to thereby breach their duties of loyalty.

35

96.    By paying the excessive commissions and directing brokerage business to participate in "shelf-space" programs, the Investment Adviser Defendants violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan.  Additionally, in several actions to date against brokerages and mutual funds, the SEC, the NASD and various other regulators have made it clear that the use of excessive commissions and directed brokerage to participate in "shelf-space" programs - as Eaton Vance has done here - is highly improper.

97.    The excessive commissions and directed brokerage business used by Eaton Vance did not fund any services that benefited the Eaton Vance Funds shareholders.  This practice materially harmed plaintiffs and other members of the Class from whom the illegitimate and improper fees were taken.

### Improper Use of "Soft Dollars"

98.    Investment advisers routinely pay brokers commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well.  Specifically, the Section 28(e) "safe harbor" provision of the Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades. Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary duties "solely by reason of [their] having caused the account to pay a . . . broker . . . in excess of the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined **in good faith** that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. §28(e) (emphasis added).  In other words, funds are allowed to include in "commissions" payment for not only purchase and sales execution, but also for specified services, which the

36

SEC has defined to include, "any service that provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities." The commission amounts charged by brokerages to investment advisers in excess of the purchase and sale charges are known within the industry as "Soft Dollars."

99.     The Investment Adviser Defendants went far beyond what is permitted by the Section 28(e) safe harbor by routinely using "Soft Dollars" as excessive commissions to pay brokers to push unwitting clients into Eaton Vance Funds. The Investment Adviser Defendants used Soft Dollars to pay for these excessive commissions as well as overhead costs (for items such as overpriced computer hardware and software) thus charging Eaton Vance Funds investors for costs not covered by the Section 28(e) safe harbor and that, consistent with the investment advisers' fiduciary duties.

### Demand on the Boards to Take Corrective Action Would Be Futile

100.    Plaintiffs have not made any demand on the Boards of Trustees (the "Boards") to institute this action. Such demand would be a futile and useless act because the Boards are incapable of making an independent and disinterested decision for the following reasons:

101.    As alleged in detail herein, each of the Trustee Defendants who sat on the Boards was appointed by, and serves at the pleasure of, the Investment Adviser Defendants. Each of the Trustee Defendants who sat on the Boards is controlled by and beholden to the Investment Adviser Defendants for his/her position and substantial compensation as a Trustee. Although as a technical matter, the shareholders have a right to vote out the Trustees, the Trustees know that this is extremely unlikely if the Investment Advisers support the Trustees, which they have done throughout the Class Period. Accordingly, each of the Trustee Defendants is incapable of evaluating a demand independently and disinterestedly.

102.    Because of their lack of independence from the Investment Adviser Defendants, the Trustee Defendants wrongfully approved the advisor fees, 12b-1 fees, Soft Dollars and the materially misleading disclosures in the Eaton Vance Fund Prospectuses in each of the years they served as Directors.

103.    As alleged in detail herein, each of the Trustee Defendants knowingly participated in, approved, and/or recklessly disregarded the wrongs complained of herein. The conduct of the Trustee Defendants was in breach of their fiduciary duties and could not have been an exercise of good faith business judgment.

104.    The Trustee Defendants allowed a course of conduct that prejudiced the Eaton Vance Funds and investors as the Trustee Defendants allowed the excessive fees to be charged and shareholder investments to be used for improper purposes such as kickbacks to brokers. The payment of kickbacks to brokers which injured shareholders was conduct that should have been prevented by the Director Defendants, but was not.

105.    The Trustee Defendants also were self-interested in the improper kickbacks paid to brokers who steered their clients' assets into the Eaton Vance Funds in order to increase the assets in the Funds. Growth of a mutual fund is one of the keys to its survival, for if a mutual fund's assets stagnate or decrease, there is a great likelihood that the fund will be disbanded or merged with another fund. If the mutual fund is disbanded or merged, the board members for that fund necessarily lose their position on the fund's board as well as the compensation for sitting on that fund's board.

106.    Additionally, each of the Trustee Defendants received substantial payments and benefits by virtue of his/her membership on one or more Boards and his/her control of hundreds of Eaton Vance Funds, as follows:

a) Defendant Hawkes oversaw 195 Portfolios and received $3.1 million in 2003 alone for his services to the Eaton Vance Fund complexes. During his tenure as an Eaton Vance officer and/or trustee, Hawkes has received tens of millions of dollars in compensation and benefits;

b) Defendant Bibliowicz oversaw 193 Portfolios and received compensation of at least $160,000 in each of the last three years;

c) Defendant Hayes oversaw 195 Portfolios and received compensation of at least $170,000 in each of the last three years. During his tenure as a Trustee since 1986, he received millions of dollars in compensation and other benefits;

d) Defendant Reamer oversaw 195 Portfolios and received compensation of at least $160,000 in each of the last three years. During his tenure as a Trustee since 1985, he received millions of dollars in compensation and other benefits;

e) Defendant Stout oversaw 195 Portfolios and received compensation of at least $160,000 in each of the last three years;

f) Defendant Park oversaw 192 Portfolios and received compensation of $160,000 in 2003; and

g) Defendant Pearlman oversaw 192 Portfolios and received compensation of $160,000 in 2003.

107.    Each of the Trustee Defendants has thus benefited from the wrongdoing herein alleged and has engaged in such conduct to preserve his or her positions of control and the benefits thereof.

108.    Each of the Trustee Defendants continues to serve as a Trustee, and the Trustee Defendants comprise the Boards. As disclosed in the Prospectuses, Defendants Bibliowicz and Hawkes are admittedly non-independent due to their positions with Eaton Vance, the Investment Adviser Defendants and/or their affiliates. Defendants Hawkes, Reamer, and Hayes have served as Trustees of one or more Eaton Vance Funds since 1982, 1985, and 1986, respectively. Thus, in order to bring this action for breaching their fiduciary duties, the Trustee Defendants would be required to sue themselves and their fellow Trustees with whom they have had close business

39

and personal relationships for nearly 20 years. Accordingly, a majority of the Boards is incapable of evaluating a demand independently and disinterestedly.

### The Prospectuses Were Materially False And Misleading

109.    Defendants use a series of combined prospectuses ("Prospectuses"), whereby several Funds were covered by one Prospectus during the Class Period. For this reason, the Prospectuses state that "a Fund could be held liable for a misstatement or omission made about another Fund." Plaintiffs and other members of the Class were entitled to, and did, receive one or more of these Prospectuses, pursuant to which the Eaton Vance Funds shares were offered.

110.    Prospectuses are required to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund. The law requires that such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor.

111.    Each of the Eaton Vance Prospectuses issued during the Class Period failed to properly disclose to investors material information about the mutual funds and the fees and costs associated with them. As seen below, each of the Eaton Vance Prospectuses contained the same materially false and misleading statements and omissions regarding strategies for growth, revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars.

112.    Each of the Eaton Vance Prospectuses issued during the Class Period contained substantially the same materially false and misleading statements in that they omitted key information regarding the funds' strategy for growth of assets, revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars that were required to be disclosed in "easy to understand language" such that a reasonable investor could make an informed decision whether or not to invest in the Funds.

40

### Material Omissions Regarding Strategies for Growth

113.    The February 1, 2003 Prospectus for the Eaton Vance Large-Cap Growth Fund is

identical in substance to all Prospectuses issued during the Class Period in that it omits to state

that one of the principal methods for increasing assets of the Funds was through participation in

"shelf-space programs." For example, the February 1, 2003 Eaton Vance Large-Cap Growth

Fund Prospectus states:

   The Fund's investment objective is to seek long-term capital growth.

The Prospectus then describes the strategies in which the Fund seeks growth. However, this

statement is materially false and misleading because it failed to disclose that one of the strategies

of the Fund to increase assets was through shelf space programs whereby it paid brokers

kickbacks to steer clients into the Funds, thereby growing Fund assets.

### Material Omissions Regarding Revenue Sharing

114.    The February 1, 2003 Prospectus for the Eaton Vance Large-Cap Growth Fund is

identical in substance to all Prospectuses issued during the Class Period in that under the heading

SALES CHARGES it stated as follows with respect to its description of the distribution plan and

method it offered its shares to the public that Defendants euphemistically referred to as "revenue

sharing":

> The principal underwriter may, from time to time, at its own
> expense, provide additional incentives to investment dealers which
> employ registered representatives who sell Fund shares and/or
> shares of other funds distributed by the principal underwriter. In
> some instances, such additional incentives may be offered only to
> certain investment dealers whose representatives sell or are
> expected to sell significant amounts of shares. In addition, the
> principal underwriter may from time to time increase or decrease
> the sales commissions payable to investment dealers.

115.    The Prospectus is materially false and misleading in that it failed to disclose, *inter alia,* the following material and damaging adverse facts which damaged plaintiffs and other members of the Class:

(a)    that the Investment Adviser Defendants and/or Distributor Defendant used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf space" programs whereby the broker steered clients into Eaton Vance Funds;

(b)    that the Investment Advisor Defendants used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space" programs;

(c)    that the Investment Adviser Defendants directed brokerage payments to firms that favored Eaton Vance Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Eaton Vance Funds Rule 12b-1 Plan;

(d)    that the Investment Adviser Defendants and/or the Distributor Defendant compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements;

(e)    that such revenue sharing payment created undisclosed conflicts of interest;

(f)    that the Eaton Vance Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

42

(g)     that any economies of scale achieved by marketing of the Eaton Vance

Funds to investors were not passed on to Eaton Vance Funds investors; but rather, as the Eaton

Vance Funds grew, fees charged to Eaton Vance Funds investors continued to increase; and

(h)     that the Trustee Defendants had abdicated their duties under the

Investment Company Act and their common law fiduciary duties, failed to monitor and supervise

the Investment Adviser Defendant and, as a consequence, the Investment Adviser Defendants

were able to systematically skim millions of dollars from the Eaton Vance Fund investors.

**Material Omissions Regarding Directed Brokerage Business**

116.    The February 1, 2003 Eaton Vance Large-Cap Growth Fund Prospectus is

identical in substance to all Prospectuses issued during the Class Period in that under the heading

PORTFOLIO SECURITIES TRANSACTIONS it states as follows:

> Subject to the requirement that the investment adviser shall use its best
> efforts to seek and execute portfolio security transactions at advantageous
> prices and at reasonably competitive spreads or commission rates, the
> investment adviser is authorized to consider as a factor in the selection of
> any broker-dealer firm with whom portfolio orders may be placed the fact
> that such firm has sold or is selling Fund shares or shares of other
> investment companies sponsored by the investment adviser or its affiliates.
> This policy is not inconsistent with a rule of the NASD, which rule
> provides that no firm which is a member of the NASD shall favor or
> disfavor the distribution of shares of any particular investment companies
> on the basis of brokerage commissions received or expected by such firm
> from any source.

117.    The above statement is materially false and misleading in that it failed to disclose

that Defendants chose brokers to execute sales for the Funds' portfolios - and thereby directed

the commissions from the sales of the portfolios' securities to these brokers - to satisfy

negotiated arrangements with brokerages to give Eaton Vance "shelf space" visibility and to

push their clients into Eaton Vance Funds in exchange for directed brokerage.  Additionally, the

above statement is materially false and misleading for its failure to disclose, *inter alia*, the following:

      (a)    that the Investment Adviser Defendants and/or Distributor Defendant used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf space" programs whereby the broker steered clients into Eaton Vance Funds;

      (b)    that the Investment Advisor Defendants and/or Distributor Defendant used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf space" programs;

      (c)    that the Investment Adviser Defendants' and/or Distributor Defendant's use of brokerage commissions violated the rules of the NASD;

      (d)    that the Investment Adviser Defendants and/or Distributor Defendant directed brokerage payments to firms that favored Eaton Vance Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Eaton Vance Funds Rule 12b-1 Plan;

      (e)    that the Eaton Vance Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

      (f)    that the Investment Adviser Defendants and/or the Eaton Vance Distributor Defendant compensated themselves out of investor assets for any payments made pursuant to revenue sharing agreements;

44

(g)     that such revenue sharing payments created undisclosed conflicts of interest;

(h)     that any economies of scale achieved by marketing of the Eaton Vance Funds to investors were not passed on to Eaton Vance Funds investors; but rather, as the Eaton Vance Funds grew, fees charged to Eaton Vance Funds investors continued to increase; and

(i)     that the Trustee Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the Eaton Vance Fund investors.

**Material Omissions Regarding Soft Dollars**

118.     The February 1, 2003 Prospectus for the Eaton Vance Large-Cap Growth Fund is identical in substance to all Prospectuses issued during the Class Period in that under the heading PORTFOLIO SECURITIES TRANSACTIONS it states as follows:

> As authorized in Section 28(e) of the Securities Exchange Act of 1934, a broker or dealer who executes a portfolio transaction may receive a commission which is in excess of the amount of commission another broker or dealer would have charged for effecting that transaction if the investment adviser determines in good faith that such compensation was reasonable in relation to the value of the brokerage and research services provided. This determination may be made either on the basis of that particular transaction or on the basis of overall responsibilities which the investment adviser and its affiliates have for accounts over which they exercise investment discretion. In making any such determination, the investment adviser will not attempt to place a specific dollar value on the brokerage and research services provided or to determine what portion of the commission should be related to such services. Brokerage and research services may include advice as to the value of securities, the advisability of securities or purchasers or sellers of securities; furnishing analyses and reports concerning issuers, industries, securities, economic factors and trends, portfolio strategy and the performance of accounts; effecting securities transactions and performing functions incidental thereto (such as clearance and settlement); and the "Research Services" referred to in the next paragraph.

*     *     *

45

These Research Services include such matters as general economic, political, business and market information, industry and company reviews, evaluations of securities and portfolio strategies and transactions, proxy voting data and analysis services, technical analysis of various aspects of the securities markets, recommendations as to the purchase and sale of securities and other portfolio transactions, financial, industry and trade publications, news and information services, pricing and quotation equipment and services, and research oriented computer hardware, software, data bases and services.

119.    The Prospectuses failed to disclose, *inter alia,* the following material and damaging adverse facts regarding Soft Dollars which damaged plaintiffs and other members of the Class:

(a)    that the Investment Adviser Defendants and/or the Distributor Defendant used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf space" programs whereby the brokers steered clients into Eaton Vance Funds;

(b)    that the Investment Advisor Defendants and/or the Distributor Defendant used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf space" programs;

(c)    that the use of brokerage commissions to satisfy bilateral arrangements with brokers known as "shelf space" programs violated of Section 28(e) of the Exchange Act;

(d)    that the Investment Adviser Defendants and/or the Distributor Defendant directed brokerage payments to firms that favored Eaton Vance Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Eaton Vance Funds Rule 12b-1 Plan;

(e)    that the Investment Adviser Defendants and/or the Distributor Defendant compensated themselves out of investor assets for any payments made pursuant to revenue sharing agreements;

46

(f)    that such revenue sharing payments created undisclosed conflicts of interest;

(g)    that the Eaton Vance Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(h)    that any economies of scale achieved by marketing of the Eaton Vance Funds to investors were not passed on to Eaton Vance Funds investors; but rather, as the Eaton Vance Funds grew, fees charged to Eaton Vance Funds investors continued to increase; and

(i)    that the Trustee Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the assets of Eaton Vance Fund investors.

## CLASS ACTION ALLEGATIONS

120.    Plaintiffs bring certain of these claims as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who held shares, units or like interests in any of the Eaton Vance Funds between January 30, 1999 and November 17, 2003, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

47

121.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are many thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by EVD, the Eaton Vance Funds and the Investment Adviser Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

122.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

123.   Plaintiffs can bring claims regarding all the Funds listed in Exhibit A due to the juridical link between the Funds as well as the fact that the Funds are essentially alter-egos of one another acting as one unitary organization.

124.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

125.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Investment Company Act was violated by defendants' acts as alleged herein;

(b)     whether the Investment Advisers Act was violated by defendants' acts as alleged herein;

48

(c)    whether the Investment Adviser Defendants breached their common law fiduciary duties and/or knowingly aided and abetted common law breaches of fiduciary duties;

(d)    whether statements made by defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about the business, operations and financial statements of the Eaton Vance Funds; and

(e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

126.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## INVESTMENT COMPANY ACT CLAIMS

### COUNT I

### AGAINST THE INVESTMENT ADVISER DEFENDANTS AND TRUSTEE DEFENDANTS FOR VIOLATIONS OF SECTION 34(B) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

127.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

128.    This Count is asserted against the Investment Adviser Defendants in their role as investment advisers to the Eaton Vance Funds and against the Trustee Defendants for their role in the creation of the materially false and misleading Prospectuses.

129.    The Investment Adviser Defendants and Trustee Defendants made untrue statements of material fact in registration statements and reports filed and disseminated pursuant to the Investment Company Act and omitted to state facts necessary to prevent the statements made therein, in light of the circumstances under which they were made, from being materially false and misleading.  The Investment Adviser Defendants and Trustee Defendants failed to disclose the following:

(a)    that the Investment Adviser Defendants authorized the payment from investor assets of excessive commissions to broker dealers in exchange for preferential marketing services known as "shelf space" and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

(b)    that the Investment Adviser Defendants and/or the Distributor Defendant compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements;

50

(c)     that the Investment Adviser Defendants improperly directed brokerage payments to firms that favored Eaton Vance Funds, which constituted a form of marketing that was not disclosed in or authorized by the Eaton Vance Funds Rule 12b-1 Plan;

(d)     that the Eaton Vance Funds Rule 12b-1 Plan was not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12(b) of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(e)     that by paying brokers to aggressively steer their clients to Eaton Vance Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

(f)     that any economies of scale achieved by marketing of the Eaton Vance Funds to new investors were not passed on to Eaton Vance Funds investors; on the contrary, as the Eaton Vance Funds grew, fees charged to Eaton Vance Funds investors continued to increase;

(g)     that defendants improperly used Soft Dollars and excessive commissions, paid from Eaton Vance Funds assets, to pay for overhead expenses the cost of which should have been borne by Eaton Vance and not Eaton Vance Funds investors; and

(h)     that the Trustee Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, that the Trustee Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the Eaton Vance Funds investors.

130.    By reason of the conduct described above, the Investment Adviser Defendants and the Trustee Defendants violated Section 34(b) of the Investment Company Act.

131.    As a direct, proximate and foreseeable result of the Investment Adviser Defendants' and Trustee Defendants' violation of Section 34(b) of the Investment Company Act, Eaton Vance Funds investors have incurred damages.

132.    Plaintiffs and the other members of the Class have been specially injured by Defendants' violations of Section 34(b) of the Investment Company Act.  Such injuries were suffered directly by the shareholders, rather than by the Eaton Vance Funds themselves.

133.    The Investment Adviser Defendants and Trustee Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal such adverse material information.

## COUNT II

### AGAINST EVD, THE INVESTMENT ADVISER DEFENDANTS AND THE TRUSTEE DEFENDANTS PURSUANT TO SECTION 36(A) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

134.    Plaintiffs repeat and reallege each and every allegation contained above and otherwise incorporate the allegations contained above.

135.    This Count is brought by the Class against EVD, the Investment Adviser Defendants and the Trustee Defendants for breach of their fiduciary duties as defined by Section 36(a) of the Investment Company Act.

136.    EVD, the Investment Adviser Defendants and the Trustee Defendants had a fiduciary duty to the Class.

137.    EVD, the Investment Adviser Defendants and the Trustee Defendants violated Section 36(a) by improperly charging investors in the Eaton Vance Funds purported Rule 12b-1

marketing fees, and by drawing on the assets of Eaton Vance Fund investors to make undisclosed

payments of Soft Dollars and excessive commissions, as defined herein, in violation of Rule 12b-

1.

138.    By reason of the conduct described above, EVD, the Investment Adviser

Defendants and the Trustee Defendants violated Section 36(a) of the Investment Company Act.

139.    As a direct, proximate and foreseeable result of EVD's, the Investment Adviser

Defendants' and the Trustee Defendants' breaches of fiduciary duties in their roles as principal

underwriter, investment advisers, and trustees and officers, respectively, to Eaton Vance Funds

investors, Eaton Vance Funds and the Class have incurred millions of dollars in damages.

140.    Plaintiffs, in this count, seek to enjoin Defendants from engaging in such practices

in the future as well as recover improper Rule 12b-1 fees, Soft Dollars, excessive commissions

and the management fees charged the Eaton Vance Funds by EVD, the Investment Adviser

Defendants and the Trustee Defendants.

## COUNT III

### AGAINST EVD, THE INVESTMENT ADVISER DEFENDANTS AND THE TRUSTEE DEFENDANTS PURSUANT TO SECTION 36(B) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

141.    Plaintiffs repeat and reallege each and every allegation contained above and

otherwise incorporate the allegations contained above.

142.    This Count is brought by the Class against the Investment Adviser Defendants

and the Trustee Defendants for breach of their fiduciary duties as defined by Section 36(b) of the

Investment Company Act.

143.    EVD, the Investment Adviser Defendants and the Trustee Defendants had a

fiduciary duty to the Eaton Vance Funds and the Class with respect to the receipt of

53

compensation for services and of payments of a material nature made by and to EVD, the Investment Adviser Defendants and the Trustee Defendants.

144.    EVD, the Investment Adviser Defendants and the Trustee Defendants violated Section 36(b) by improperly charging investors in the Eaton Vance Funds purported Rule 12b-1 marketing fees, and by drawing on the assets of Eaton Vance Fund investors to make undisclosed payments of Soft Dollars and excessive commissions, as defined herein, in violation of Rule 12b-1.

145.    By reason of the conduct described above, EVD, the Investment Adviser Defendants and the Trustee Defendants violated Section 36(b) of the Investment Company Act.

146.    The Trustee Defendants received improper payments, in that they received their compensation despite the fact they violated their fiduciary duties.

147.    As a direct, proximate and foreseeable result of EVD's, the Investment Adviser Defendants' and the Trustee Defendants' breaches of fiduciary duties in their roles as principal underwriter, investment advisers, and trustees and officers, respectively, to Eaton Vance Funds investors, Eaton Vance Funds and the Class have incurred millions of dollars in damages.

148.    Plaintiffs, in this count, seek to recover improper Rule 12b-1 fees, Soft Dollars, excessive commissions and the management fees charged the Eaton Vance Funds by EVD, the Investment Adviser Defendants and the Trustee Defendants.

## COUNT IV

### AGAINST EATON VANCE, EV AND EVM (AS CONTROL PERSONS OF EVD), EATON VANCE AND EV (AS CONTROL PERSONS OF EVM AND BMR), AND LGML (AS A CONTROL PERSON OF LGM) FOR VIOLATION OF SECTION 48(A) OF THE INVESTMENT COMPANY ACT BY THE CLASS

149.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

150.    This Count is brought pursuant to Section 48(a) of the Investment Company Act against Eaton Vance, EV and EVM as control persons of EVD; and Eaton Vance and EV as control persons of EVM and BMR; LGML as a control person of LGM who caused EVD, EVM, BMR and LGML to commit the violations of the Investment Company Act alleged herein. It is appropriate to treat these defendants as a group for pleading purposes and to presume that the misconduct complained of herein are the collective actions of Eaton Vance, EV, EVM, BMR, and LGML.

151.    EVD is liable under Sections 36(a) and 36(b) of the Investment Company Act as set forth herein.

152.    EVM, BMR and LGML are liable under Section 34(b), 36(a) and 36(b) of the Investment Company Act as set forth herein.

153.    Each of Eaton Vance, EV, EVM, and LGML were "control persons" of EVD, EVM, BMR and LGML and caused the violations complained of herein. By virtue of their positions of operational control and/or authority over EVD, EVM, BMR and LGML, Eaton Vance, EV, EVM, and LGML directly and indirectly, had the power and authority, and exercised the same, to cause EVD, EVM, BMR and LGML to engage in the wrongful conduct complained of herein.

154.    Pursuant to Section 48(a) of the Investment Company Act, by reason of the foregoing, Eaton Vance, EV, EVM, and LGML are liable to plaintiffs to the same extent as are EVD, EVM, BMR and LGML for their primary violations of Sections 34(b), 36(a) and 36(b) of the Investment Company Act.

155.    By virtue of the foregoing, The Eaton Vance Funds, plaintiffs and the other Class members are entitled to damages against Eaton Vance, EV, EVM, BMR, and LGML.

## INVESTMENT ADVISER ACT CLAIMS

### COUNT V

### AGAINST THE INVESTMENT ADVISER DEFENDANTS UNDER SECTION 215 OF THE INVESTMENT ADVISERS ACT FOR VIOLATIONS OF SECTION 206 OF THE INVESTMENT ADVISERS ACT DERIVATIVELY ON BEHALF OF THE EATON VANCE FUNDS

156.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

157.    This Count is based upon Section 215 of the Investment Advisers Act, 15 U.S.C. §80b-15.

158.    The Investment Adviser Defendants had advisory contracts with the Eaton Vance Portfolios and served as "investment advisers" to the Eaton Vance Portfolios and other members of the Class pursuant to the Investment Advisers Act. The Eaton Vance Funds, and their shareholders, were the intended beneficiaries of these advisory contracts and investment advisor services.

159.    As fiduciaries pursuant to the Investment Advisers Act, the Investment Adviser Defendants were required to serve the Eaton Vance Portfolios and Eaton Vance Funds in a manner in accordance with the federal fiduciary standards set forth in Section 206 of the Investment Advisers Act, 15 U.S.C. §80b-6, governing the conduct of investment advisers.

160.    During the Class Period, the Investment Adviser Defendants breached their fiduciary duties to the Eaton Vance Portfolios and Eaton Vance Funds by engaging in a deceptive contrivance, scheme, practice and course of conduct pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon the Eaton Vance Portfolios and Eaton Vance Funds. The Investment Adviser Defendants breached their fiduciary duties owed to the Eaton Vance Portfolios and Eaton Vance

Funds by engaging in the aforesaid transactions, practices and courses of business knowingly or recklessly so as to constitute a deceit and fraud upon the Eaton Vance Portfolios and Eaton Vance Funds. The Investment Adviser Defendants are liable as direct participants in the wrongs complained of herein. The Investment Adviser Defendants, because of their position of authority and control over the Eaton Vance Portfolios and Eaton Vance Funds were able to and did control the fees charged to and collected from the Eaton Vance Portfolios and Eaton Vance Funds and otherwise control the operations of the Eaton Vance Portfolios and Eaton Vance Funds.

161.    The Investment Adviser Defendants had a duty to (1) disseminate accurate and truthful information with respect to the Eaton Vance Portfolios and Eaton Vance Funds; and (2) truthfully and uniformly act in accordance with their stated policies and fiduciary responsibilities to the Eaton Vance Portfolios and Eaton Vance Funds. The Investment Adviser Defendants participated in the wrongdoing complained of herein in order to prevent the Eaton Vance Portfolios and Eaton Vance Funds from knowing of the Investment Adviser Defendants' breaches of fiduciary duties including: (1) the charging of the Eaton Vance Portfolios and Eaton Vance Funds and Eaton Vance Funds investors improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" as a marketing tool; and (4) charging the Eaton Vance Portfolios and Eaton Vance Funds for excessive and improper commission payments to brokers.

162.    As a result of the Investment Advisers' multiple breaches of their fiduciary duties owed to the Eaton Vance Portfolios and Eaton Vance Funds, the Eaton Vance Portfolios and Eaton Vance Funds were damaged.

163.    The Eaton Vance Portfolios and Eaton Vance Funds are entitled to rescind their investment advisory contracts with the Investment Adviser Defendants and recover all fees paid in connection with their enrollment pursuant to such agreements.

## NEW YORK GENERAL BUSINESS LAW §349 CLAIMS

## COUNT VI

## AGAINST ALL DEFENDANTS FOR VIOLATION OF
## NEW YORK GENERAL BUSINESS LAW §349

164.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

165.    This Count is brought pursuant to Section 349(h) of the New York General Business Law against all defendants who misrepresented and omitted to inform Plaintiffs and the Class through uniform materials, and/or participated in the deceptive acts and practices alleged of herein, that fees paid by Cass members would be used for purposes other than that which they were actually used. It is appropriate to treat these defendants as a group for pleading purposes and to presume that the misconduct complained of herein is the collective actions of all defendants.

166.    Plaintiffs and other members of the Class never knew, nor could they have known, from reading the Prospectuses or otherwise, of the extent to which the Investment Adviser Defendants were using so-called 12b-1 fees, directed brokerage, excessive commissions and revenue-sharing to improperly and illegally siphon assets from the Eaton Vance Fund investors.

167.    These omissions and practices alleged herein were unfair and deceptive when made and were made with the intent to, and did, (a) deceive Plaintiffs and the members of the

Class, and (b) induce plaintiffs and members of the Class to hold the Funds and pay excessive and undisclosed fees, in violation of Section 349.

168.    By virtue of the foregoing, plaintiffs and other Class members are entitled to damages against all Defendants.

## BREACH OF FIDUCIARY DUTY CLAIMS

## COUNT VII

### BREACH OF FIDUCIARY DUTY AGAINST THE INVESTMENT ADVISER DEFENDANTS ON BEHALF OF THE CLASS

169.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

170.    As advisers to the Eaton Vance Funds, the Investment Adviser Defendants were fiduciaries to the plaintiffs and other members of the Class and were required to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor.

171.    As set forth above, the Investment Adviser Defendants breached their fiduciary duties to plaintiffs and the Class.

172.    Plaintiffs and the Class have been specially injured as a direct, proximate and foreseeable result of such breach on the part of the Investment Adviser Defendants and have suffered substantial damages.

173.    Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of plaintiffs and other members of the Class, the Investment Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

## COUNT VIII

### BREACH OF FIDUCIARY DUTY AGAINST THE TRUSTEE
### DEFENDANTS ON BEHALF OF THE CLASS

174.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

175.    As Eaton Vance Funds trustees, the Trustee Defendants had a fiduciary duty to the Eaton Vance Funds and Eaton Vance Funds investors to supervise and monitor the Investment Adviser Defendants.

176.    The Trustee Defendants breached their fiduciary duties by reason of the acts alleged herein, including their knowing or reckless failure to prevent the Investment Adviser Defendants from (1) charging improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" as a marketing tool; and (4) charging for excessive and improper commission payments to brokers.

177.    Plaintiffs and the Class have been specially injured as a direct, proximate and foreseeable result of such breach on the part of the Trustee Defendants and have suffered substantial damages.

178.    Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of plaintiffs and other members of the Class, the Trustee Defendants are liable for punitive damages in an amount to be determined by the jury.

60

## COUNT IX

### AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS ON BEHALF OF THE CLASS

179.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

180.    At all relevant times herein, the brokerages that sold Eaton Vance Funds had fiduciary duties of loyalty to their clients, including plaintiffs and other members of the Class.

181.    The Defendants knew or should have known that the brokerages had these fiduciary duties.

182.    By accepting improper Rule 12b-1 fees, Soft Dollars and excessive commissions in exchange for aggressively pushing Eaton Vance Funds, and by failing to disclose the receipt of such fees, the brokerages breached their fiduciary duties to plaintiffs and the other members of the Class.

183.    The defendants possessed actual or constructive knowledge that the brokerages were breaching their fiduciary duties, but nonetheless perpetrated the scheme alleged herein.

184.    Defendants' actions, as described in this complaint, were a substantial factor in causing the losses suffered by plaintiffs and the other members of the Class. By participating in the brokerages' breaches of fiduciary duties, defendants are liable therefor.

185.    As a direct, proximate and foreseeable result of defendants' knowing participation in the brokerages' breaches of fiduciary duties, plaintiffs and the Class have suffered damages.

186.    Because defendants acted with reckless and willful disregard for the rights of plaintiffs and other members of the Class, defendants are liable for punitive damages in an amount to be determined by the jury.

## UNJUST ENRICHMENT CLAIMS

### COUNT X

### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT
### ON BEHALF OF THE CLASS

187.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

188.    Defendants have benefited from their unlawful acts through the excessive and improper fees they charged and received from plaintiffs and the other members of the Class.  It would be inequitable for defendants to be permitted to retain the benefit of these overpayments, which were conferred by plaintiffs and the other members of the Class and retained by defendants.

### PRAYER FOR RELIEF

**WHEREFORE,** plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiffs as the Class representatives and plaintiffs' counsel as Class Counsel as pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding punitive damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.      Awarding the Eaton Vance Funds/Portfolios rescission of their contracts with the Investment Adviser Defendants, including recovery of all fees which would otherwise apply, and recovery of all fees paid to the Investment Adviser Defendants;

E.      Ordering an accounting of all Eaton Vance Fund related fees, commissions, and Soft Dollar payments;

F.      Ordering restitution of all unlawfully or discriminatorily-obtained fees and charges;

G.      Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the defendants' assets to assure that plaintiffs and the Class have an effective remedy;

H.      Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

I.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:        August 26, 2004            **MILBERG WEISS BERSHAD**
                                         **& SCHULMAN LLP**

                                         By: _____
                                         Jerome M. Congress (JC - 2060)
                                         Janine L. Pollack (JP – 0178)
                                         Michael R. Reese (MR – 3183)
                                         One Pennsylvania Plaza
                                         New York, New York 10119
                                         (212) 594-5300

                                         *Plaintiffs' Lead Counsel*

**MURRAY, FRANK & SAILER LLP**
Brian P. Murray (BM-9954)
Eric J. Belfi (EB – 8895)
275 Madison Avenue - Suite 801
New York, New York 10016
(212) 682-1818

**WEISS & YOURMAN**
Joseph H. Weiss (JW – 4534)
Richard A. Acocelli (RA – 2029)
551 Fifth Avenue
New York, New York 10176
(212) 682-3025

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Robert B. Weiser
Three Bala Plaza East - Suite 400
Bala Cynwyd, Pennsylvania 19004
(610) 667-7706

**DAVID B. KAHN & ASSOCIATES, LTD.**
David B. Kahn
Mark King
One Northfield Plaza, Suite 100
Northfield, Illinois 60093
(847) 501-5083

***Plaintiffs' Executive Committee***

**FRUCHTER & TWERSKY**
Jack G. Fruchter (JF – 8435)
One Pennsylvania Plaza
Suite 1910
New York, New York 10119
(212) 279-5050

**STULL STULL & BRODY**
Jules Brody (JB – 9151)
Aaron Brody (AB – 5850)
Tzivia Brody (TB – 7268)
6 East 45th Street
New York, New York 10017
(212) 687-7230

64

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
The World Trade Center - Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland 21202
(410) 332-0030

**GLANCY BINKOW & GOLDBERG LLP**
Michael M. Goldberg
1801 Avenue of the Stars - Suite 311
Los Angeles, California 90067
(310) 201-9150

**WECHSLER HARWOOD LLP**
Robert Ira Harwood
Samuel K. Rosen
488 Madison Avenue, 8th Floor
New York, New York 10022
(212) 935-7400

*Additional Plaintiffs' Counsel*

65